No. 23-8043

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

IRON BAR HOLDINGS, LLC,
*Plaintiff-Appellant,*

v.

BRADLY CAPE, et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Wyoming, No. 22-CV-67
Hon. Scott W. Skavdahl, United States District Judge

## OPENING BRIEF OF APPELLANT

<table>
<tr>
<td>

M. Gregory Weisz
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386

</td>
<td>

Robert Reeves Anderson
Brian M. Williams
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
(303) 863-1000

Sean A. Mirski
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 942-5000

</td>
</tr>
</table>

**Oral Argument Requested**

November 6, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF RELATED CASES ................................................ ix

CITIZENSHIP STATEMENT .............................................................1

JURISDICTIONAL STATEMENT .......................................................1

INTRODUCTION ..............................................................................1

STATEMENT OF THE ISSUE .............................................................4

STATEMENT OF THE CASE ..............................................................5

    A.   History of Public Land Development in the West ....................5

        1.   Public Land Surveys.....................................................5

        2.   Creating the Checkerboard .........................................7

        3.   Range Wars ...............................................................10

        4.   *Leo Sheep* ..................................................................15

    B.   Case Background................................................................17

    C.   Proceedings Below .............................................................23

SUMMARY OF ARGUMENT ............................................................25

STANDARD OF REVIEW .................................................................27

ARGUMENT ...................................................................................27

I.   Corner Crossing Is Unlawful .............................................................27

    A.   Corner Crossing Is a Civil Trespass Under Wyoming Law ....................27

    B.   Federal Law Does Not Authorize Corner Crossing .................................31

        1.   Congress Did Not Reserve an Easement to Access Public Lands in the Checkerboard...........................................32

        2.   Congress Did Not Create Access Rights to Public Lands in the Unlawful Inclosures Act................................36

    C.   Authorities Have Long Recognized Corner Crossing to Be Illegal.........39

II.   The District Court Erred in Legalizing Corner Crossing...................................43

    A.   *Mackay* Is Not Binding, Persuasive, or Even Good Law.........................43

    B.   Neither of the District Court's "Additional Considerations" Supports Its Holding................................................................51

    C.   Questions About Public Access Warrant Political, Not Judicial, Solutions ............................................................................53

CONCLUSION .................................................................................62

ORAL ARGUMENT STATEMENT ....................................................63

CERTIFICATE OF COMPLIANCE .......................................................................64

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY
    REDACTIONS ................................................................................................65

CERTIFICATE OF SERVICE ...............................................................................66

ADDENDUM
    ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ........Add. 2
    FINAL JUDGMENT ...............................................................................Add. 34
    AMENDED FINAL JUDGMENT .........................................................Add. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Sybase, Inc.*,
    468 F.3d 642 (10th Cir. 2006) ............................................................27

*Bellis v. Kersey*,
    241 P.3d 818 (Wyo. 2010)..................................................................28

*United States ex rel. Bergen v. Lawrence*,
    848 F.2d 1502 (10th Cir. 1988) .....................................................13, 37

*Boynton v. Moffat Tunnel Improvement Dist.*,
    57 F.2d 772 (10th Cir. 1932) ..............................................................45

*Buchhalter v. Rude*,
    54 F.2d 834 (10th Cir. 1931) ..............................................................46

*Buford v. Houtz*,
    133 U.S. 320 (1890)...................................... 11, 12, 33, 36, 44, 46, 49

*Camfield v. United States*,
    167 U.S. 518 (1897)..............................................................13, 33, 38

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021)...................................................................27, 39

*Pueblo of Sandia ex rel. Chaves v. Smith*,
    497 F.2d 1043 (10th Cir. 1974) .....................................................51, 52

*Cox v. Vaught*,
    52 F.2d 562 (10th Cir. 1931) ..............................................................46

*Est. of McMorris v. Comm'r*,
    243 F.3d 1254 (10th Cir. 2001) ..........................................................45

*Goforth v. Fifield*,
    352 P.3d 242 (Wyo. 2015)..............................................................29, 52

*Harmony Ditch Co. v. Sweeney*,
    222 P. 577 (Wyo. 1924)......................................................................29

*Koenig v. Aldrich*,
    949 N.W.2d 882 (Wis. Ct. App. 2020) ........................................................... 30, 31

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ........................................................................................... 52

*Lazarus v. Phelps*,
    152 U.S. 81 (1894) ............................................................................................. 11

*Leo Sheep Co. v. United States*,
    570 F.2d 881 (10th Cir. 1977) ........................................................................... 33

*Leo Sheep Co. v. United States*,
    440 U.S. 668 (1979) ..................... 3, 10, 11, 15, 16, 25, 32, 33, 34, 35, 38, 48, 49

*Light v. United States*,
    220 U.S. 523 (1911) ........................................................................................... 11

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005) ........................................................................................... 27

*LKL Assocs., Inc. v. Union Pac. R.R.*,
    17 F.4th 1287 (10th Cir. 2021) .......................................................................... 27

*London v. Beaty*,
    612 F. App'x 910 (10th Cir. 2015) ...................................................................... 1

*Mackay v. Uinta Dev. Co.*,
    219 F. 116 (8th Cir. 1914) ...................................... 24, 26, 33, 43, 44, 45, 46, 48

*Miami Tribe of Okla. v. United States*,
    656 F.3d 1129 (10th Cir. 2011) .......................................................................... 1

*New York Life Ins. Co. v. Doerksen*,
    75 F.2d 96 (10th Cir. 1935) ............................................................................... 46

*Omaechevarria v. State of Idaho*,
    246 U.S. 343 (1918) ..................................................................................... 12, 38

*PruneYard Shopping Ctr. v. Robins*,
    447 U.S. 74 (1980) ............................................................................................. 28

*Pub. Lands Council v. Babbitt*,
    529 U.S. 728 (2000).......................................................................12, 13

*S. Sur. Co. v. MacMillan Co.*,
    58 F.2d 541 (10th Cir. 1932) ................................................46

*Sammons v. Am. Auto. Ass'n*,
    912 P.2d 1103 (Wyo. 1996)........................................................27, 28

*Shell Petroleum Corp. v. Corn*,
    54 F.2d 766 (10th Cir. 1932) ................................................46

*United States Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837 (2020).........................................................42

*United States v. Causby*,
    328 U.S. 256 (1946)...............................................................29, 52

**Constitutional Provisions and Statutes**

U.S. Const. amend. V..................................................................48

43 U.S.C.
    § 315..............................................................................................13
    § 1061...............................................................................12, 13, 37
    § 1063...............................................................................13, 37, 39
    § 1701..........................................................................................14
    § 1701(a)(1)................................................................................14
    § 1702(c) .....................................................................................14
    § 1715(a) .....................................................................................59
    § 2301(6) .....................................................................................59
    § 2304..........................................................................................59
    § 2305..........................................................................................59

54 U.S.C.
    § 200301.......................................................................................58

Act of July 2, 1864, 13 Stat. 356.......................................................9

Act of June 28, 1934, 48 Stat. 1269...............................................13

Great American Outdoors Act, Pub. L. No. 116-152, 134 Stat. 682
    (2020).........................................................................................58

8 Stat.
    80...........................................................................................................5
    81...........................................................................................................5
    82...........................................................................................................5

12 Stat.
    489 § 1..................................................................................................9
    492 § 3..................................................................................................9

Wyo. Stat. § 6-3-303 ..............................................................................41

Wyo. Stat. § 10-4-302 ......................................................................29, 31

Wyo. Stat. § 23-3-305(b) .......................................................................52

Wyo. Stat. § 34-19-201(a)(iii)................................................................28

Wyo. Admin. Code 040.0001.35 § 6 ......................................................50

## Other Authorities

1 Laws of the United States (1815)...........................................................5

2 Joseph Story, *Commentaries on the Constitution* (5th ed.
    1891) ....................................................................................................7

2 Pub. Nat. Res. L. § 15:4 (2d ed.)..........................................................36

Andro Linklater, *Measuring America* (2002) ..........................................5

BLM, *About Us* (2023), https://on.doi.gov/3tYhowO.............................16

BLM, *Utah land exchange improves public access to big game
    hunting* (July 2018), https://on.doi.gov/3QPoiO5 ..............................59

Bryan Garner et al., *The Law of Judicial Precedent* (2016)....................45

Bureau of Land Management, *Manual of Surveying Instructions for
    the Survey of the Public Lands of the United States* (2009) .............5, 6

Candy Moulton, *Conflict on the Range*, True West (Aug. 28, 2011).....................12

Carol Vincent, Cong. Rsch. Serv., RL33531, *Land and Water
    Conservation Fund* (2018)..................................................................58

Charles Kaiser & Charles Breer, *Legal Issues Presented by Checkerboard, Inholding, and Split Estate Lands*, 40A Rocky Mtn. Min. L. Inst. (1995) .......................................................................36, 59

Cong. Globe, 31st Cong., 1st Sess. (1850) ............................................9

*Cornered*, Outdoor Life (Aug. 10, 2015), https://bit.ly/49l7x4v............................41

*Fact Sheet: Habitat Loss & Fragmentation*, Wildlife Soc'y (Mar. 2017), https://bit.ly/3yhSTbD .....................................................57

*Federal Land Transaction Facilitation Act*, The Conservation Fund (Feb. 2022), https://bit.ly/3MqGRFp..................................................59

George Gould, Comment, *Access to Public Lands Across Intervening Private Lands*, 8 Land & Water L. Rev. 149 (1973) ....................................14, 58

*Hearing on H.B. 23-1066 Before the H. Agric., Water & Nat. Res. Comm.* (Colo. 2023), https://bit.ly/3QoYeI9 ......................................41

Hunting with Heroes Wyoming (2020), https://bit.ly/46UMmVl............................18

John Sheridan, *The Legal Landscape of America's Landlocked Property*, 37 UCLA J. Envtl. L. & Pol'y 229 (2019) ........................................60

Keeton et al., *Prosser and Keeton on the Law of Torts* § 13 (5th ed. 1984) ......................................................................................30

Mike Koshmrl, *Feds Walk Back BLM Boss' Corner Crossing Directive*, WyoFile (July 14, 2023), https://bit.ly/45ZXnTQ............................25

Montana Fish, Wildlife & Parks, *Frequently Asked Questions from Montana Hunters* (2023), https://bit.ly/47fZWSI...............................41

Montana Fish, Wildlife & Parks, *FWP Issues Statement on Wyoming Corner Crossing Case* (June 1, 2023), https://bit.ly/3FFjX9z .........................25

Montana Fish, Wildlife & Parks, *What Is Block Management*, https://bit.ly/3QPq7dT ......................................................................60

*Off Limits, But Within Reach: Unlocking the West's Inaccessible Public Lands*, Theodore Roosevelt Conservation Partnership (2018), https://bit.ly/3QcKU9m..........................................................58

Paul Gates, *History of Public Land Law Development* (1968)..............................8, 9

Restatement (Second) of Torts § 159 (1965)...............................................29, 30, 52

*Terms of Use*, onX (Aug. 4, 2023), https://bit.ly/49iDydj ......................................54

*Wyoming Civil Pattern Jury Instructions* (2022)................................................28, 29

Wyoming Game & Fish Dep't, *Elk Mountain Hunter Management Area* (2023), https://bit.ly/3u0MAeO ...................................................................17

## STATEMENT OF RELATED CASES

Pursuant to Tenth Circuit Rule R. 28.2(C)(3), Plaintiff-Appellant states that there are no prior or related appeals.

## CITIZENSHIP STATEMENT

Iron Bar Holdings, LLC is a limited liability company whose sole member is Fred Eshelman, a citizen of North Carolina.

## JURISDICTIONAL STATEMENT

Iron Bar brought suit for civil trespass under Wyoming law against four citizens of Missouri: Bradly Cape, Zachary Smith, Phillip Yeomans, and John Slowensky. App. V1:38. Defendants removed to federal court, App. V1:12, 63, which exercised jurisdiction under 28 U.S.C. § 1332. The court granted summary judgment to defendants. App. V5:884. Iron Bar subsequently withdrew its remaining claim with prejudice, App. V5:885-86, and the district court entered final judgment on June 1, 2023, App. V5:889; App. V5:897-98 (amended final judgment). Iron Bar timely filed a notice of appeal on June 29, 2023. App. V5:890.

This Court has jurisdiction under 28 U.S.C. § 1291. The amended final judgment "end[ed] the litigation on the merits and le[ft] nothing for the court to do but execute the judgment." *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1137 (10th Cir. 2011); *London v. Beaty*, 612 F. App'x 910, 914 (10th Cir. 2015) (court had jurisdiction after appellant obtained dismissal with prejudice).

## INTRODUCTION

Starting in the 1820s, Congress ceded vast swaths of public land in the West to private railroads, employing a peculiar checkerboard pattern that legislators mistakenly hoped would maximize the value of the alternating squares of public land

retained by the government. Congress, however, did not reserve any right-of-way to access the public parcels interspersed among the newly privatized land. Accordingly, today, moving from the corner of one public parcel in the checkerboard to a neighboring corner (known as "corner crossing") requires trespassing through the adjoining private property. While the incursion can be brief, there is no *de minimis* exception to trespass.

In 2021, four hunters corner-crossed Iron Bar's private property, intentionally disregarding two "no trespassing" signs, to hunt on adjacent public lands. When they refused to leave or refrain from future trespass, Iron Bar sought injunctive relief and a declaration that the hunters' actions were an unlawful trespass. Under Wyoming law, civil trespass consists of intentionally entering another's private property, which includes both the land and usable space above it, without permission. Defendants admit they did exactly that. They can escape liability, then, only if federal law excused their conduct.

The question before the Court is thus whether federal law tacitly grants the public a right to trespass over private property to recreate on adjacent public land. Defendants argue that Congress eliminated the most valuable stick in the bundle of property rights—the right to exclude—without ever saying so, for all current and future owners of the checkerboard railroad grants. Every relevant policymaker has concluded otherwise. The Bureau of Land Management, charged by Congress with

2

administering the nation's public lands, and the Wyoming Attorney General, the Wyoming Game & Fish Department, and local county prosecutors have all decided that federal law provides no exception, and that corner crossing is an actionable trespass.

This is not a question of first impression for the judiciary. In 1979, the Supreme Court unanimously held that the government did *not* possess any right-of-way across private land corners to access its "landlocked" parcels in the checkerboard. The Supreme Court squarely rejected the argument, which this Court had previously accepted in the same case, that Congress "implicitly reserved an easement to pass over the [privately owned] sections in order to reach the [public] sections that were held by the Government." *Leo Sheep Co. v. United States*, 440 U.S. 668, 678 (1979). The Supreme Court held "both as a matter of common-law doctrine and as a matter of construing congressional intent, we are unwilling to imply rights-of-way, with the substantial impact that such implication would have on property rights granted over 100 years ago." *Id.* at 681-82. The Court observed that federal officials shared the same understanding: "When the Secretary of the Interior has discussed access rights, his discussion has been colored by the assumption that those rights had to be purchased." *Id.* at 687. That holding resolves this case: Private citizens—as licensees of the government—do not have an access right superior to that of the government itself.

3

Sweeping aside this controlling precedent and the uniform views of the political branches, the district court held that defendants were not liable for trespassing through Iron Bar's property. The district court did not identify any positive source of law exempting corner crossing from Wyoming trespass law; instead, it relied primarily on a 100-year-old Eighth Circuit decision about grazing customs—a decision that is not binding, persuasive, or even valid today.

If upheld, the decision below would effectuate one of the broadest judicial takings of private property in American history. It also would short-circuit an ongoing political process. For decades, the political branches have been implementing nuanced access solutions that respect existing private property rights, including through the use of eminent domain. To be clear, Iron Bar *supports* access solutions, and its owner has offered to swap land with government authorities to consolidate the checkerboard and enhance public access to public lands. This Court should not undermine these and other political initiatives by unilaterally decreeing—contrary to Supreme Court precedent—that private property owners alone must bear the cost of public access.

## STATEMENT OF THE ISSUE

Whether defendants committed civil trespass under Wyoming law when they intentionally and repeatedly entered into and crossed Iron Bar's property without permission to access adjacent public land.

## STATEMENT OF THE CASE

**A.      History of Public Land Development in the West**

**1.      Public Land Surveys**

On May 20, 1785, the Confederation Congress passed the Land Ordinance of 1785 to establish a system for the survey, sale, and settling of the country's newly acquired territories. A few years earlier, the plucky colonials had prevailed in the Revolutionary War, forcing Great Britain to recognize not only American independence but also the new republic's rights to most territory east of the Mississippi River. 8 Stat. 80, 81-82. A new country was born, and property was a first order of business.

For Congress, that vast territory came as a godsend. The federal government emerged from the war with large debts and no meaningful taxing power under the Articles of Confederation. Andro Linklater, *Measuring America* 69-70 (2002). Congress sought to solve its debt dilemma by selling the country's new territories. Before that territory could be sold, however, it had to be surveyed. *Id.* at 67. Hence the Land Ordinance of 1785, which established the Public Land Survey System that surveyors would use to plat (*i.e.*, divide) the land west of the thirteen original colonies. 1 Laws of the United States 563-64 (1815).

Surveyors platted landscapes into six-mile-by-six-mile squares called "townships." Bureau of Land Management, *Manual of Surveying Instructions for the Survey of the Public Lands of the United States* 12 (2009) [*BLM Surveying*

5

*Manual*]. Each township was then subdivided into 36 one-mile-by-one-mile parcels of land called "sections." *Id.* Sections contained approximately 640 acres, and surveyors sequentially numbered each section from 1 to 36, starting with each township's northeastern-most section and snaking west and east until reaching Section 36, the southeastern-most section. *Id.*

| | | | | | |
|---|---|---|---|---|---|
| 6 | 5 | 4 | 3 | 2 | 1 |
| 7 | 8 | 9 | 10 | 11 | 12 |
| 18 | 17 | 16 | 15 | 14 | 13 |
| 19 | 20 | 21 | 22 | 23 | 24 |
| 30 | 29 | 28 | 27 | 26 | 25 |
| 31 | 32 | 33 | 34 | 35 | 36 |

Surveyors marked the section boundaries by placing monuments at each corner where four sections met. *BLM Surveying Manual* at 105. Early surveyors created monuments from whatever was at hand: rocks, sticks, mounds, tree carvings, and even dinosaur bones. App. V1:178. Since these early monuments had "a tendency to deteriorate over time," *id.*, surveyors began replacing them with standardized, die-cast "brass caps," each roughly the size of a soda can, *BLM Surveying Manual* at 106. That re-monumenting effort continues today. App. V1:182-83.

 

### 2.    Creating the Checkerboard

During the eighteenth and early nineteenth centuries, the federal government sold off surveyed land to repay its debts, even as it acquired new territory from France, Spain, and Mexico. Congress, however, soon devised more ambitious plans for unsold federal land.

Congress came to believe that the country's prosperity depended on enhancing transportation infrastructure. Questions lingered, however, over the constitutionality of the federal government directly subsidizing "internal improvements," 2 Joseph Story, *Commentaries on the Constitution* 166-71 (5th ed. 1891), and private companies often lacked the funds necessary to undertake these massive construction projects.

Congress found the solution in land: the federal government would finance the country's internal improvements through public land grants. States and private companies would construct roads, canals, and eventually railroads; in exchange, they would receive grants of nearby public land that they could sell to finance the work.

But Congress wanted more: giving away public land would still leave the federal government at a loss, arguably in violation of constitutional prohibitions. So starting in the 1820s, Congress began granting public land in an unusual pattern. Rather than conveying large blocks of contiguous land, Congress deliberately began granting only alternate sections of land (usually the odd-numbered parcels), interspersing squares of soon-to-be private land with squares of federally owned land. Paul Gates, *History of Public Land Law Development* 357-58 (1968). The result was a "checkerboard" pattern of land ownership, in which the federal government reserved control of every other section, while states and private actors owned the remainder.



| PUBLIC | PRIVATE | PUBLIC | PRIVATE |
| PRIVATE | PUBLIC | PRIVATE | PUBLIC |
| PUBLIC | PRIVATE | PUBLIC | PRIVATE |

The motivation for this land-grant scheme was nakedly economic: the federal government hoped that, once the squares of granted (*i.e.*, private) land had

appreciated in value, it could sell the interspersed public land at a premium. One leading proponent, Senator Stephen Douglas, enthused that the scheme would make the retained government lands "saleable at double the usual price." Cong. Globe, 31st Cong., 1st Sess., 845 (1850). He was not alone in his excitement. "[A]s the *Congressional Globe* shows *ad infinitum*," politicians hoped "that by giving half the land away and thereby making possible construction of the road, canal, or railroad, the government would recover from the reserved sections as much as it would have received from the whole." Gates, *supra*, at 346.

Congress implemented the checkerboard land-grant scheme at scale during construction of the transcontinental railroad. On July 1, 1862, Congress passed the Pacific Railroad Act, creating the Union Pacific Railroad Company and empowering it to construct a transcontinental railroad. 12 Stat. 489, 490, § 1. To incentivize construction, Congress granted Union Pacific "every alternate section of public land, designated by odd numbers, … within the limits of ten miles on each side of said road," *id.* at 492, § 3, later doubled to twenty miles on each side, Act of July 2, 1864, 13 Stat. 356, 358. By the early 1870s, Congress had given away 150 million acres of checkerboarded land, with 130 million acres going to the railroad companies alone. Gates, *supra*, at 379, 384-85.



### 3.   Range Wars

Congress's checkerboard scheme would lead to serious and recurring access problems over the next 150 years.

Congress did not reserve any rights to access the public lands it retained in the checkerboard; indeed, it had not seen any point in doing so, since legislators assumed that "when development came, it would occur in a parallel fashion on adjoining public and private lands and that the process of subdivision, organization of a polity, and the ordinary pressures of commercial and social intercourse would work itself into a pattern of access roads." *Leo Sheep Company v. United States*, 440 U.S. 668,

686, 681 (1979). Seemingly everyone assumed the government would have no trouble selling the reserved sections of public land.

Everyone was wrong. Far from selling its reserved sections at a premium, the government could not dispose of its holdings even at minimum prices. Settlers scooped up a few sections with significant sources of water but passed over what remained because it was not economically viable in the arid West. *Id.* at 683.

Conflicts over access did not surface immediately. Partly, that was because the West remained underpopulated. Partly, it was because of the custom of the "open range." Common-law property principles would ordinarily have obliged ranchers to "confine [their stock] to [their] own land"; if they did not, they would "be liable for trespasses committed by [that stock] upon the uninclosed lands of others." *Lazarus v. Phelps*, 152 U.S. 81, 84 (1894). "Such a principle," however, "was ill adapted to the nature and condition of the [West]," *Buford v. Houtz*, 133 U.S. 320, 328 (1890), which still possessed "vast tracts of uninclosed land, suitable for pasture," *Light v. United States*, 220 U.S. 523, 535 (1911).

So across the West, a different custom arose: "Everybody used the open, uninclosed country … as a public common on which their horses, cattle, hogs, and sheep could run and graze." *Buford*, 133 U.S. at 327-28. That custom applied not just to public lands—which individuals could use freely pursuant to an "implied license" from the government, *id.* at 323—but also, to some extent, to private lands.

The result was a "fence-out" property regime, under which "the owner of land was obliged to inclose it with a view to its cultivation; that without a lawful fence he could not, as a general thing, maintain an action for a trespass thereon by the cattle of his neighbor running at large; and that to leave uncultivated lands uninclosed was an implied license to cattle and other stock at large to traverse and graze them." *Id.* at 330.

As more settlers moved west, residents began fighting for control. Cattlemen fought against encroaching settlers, but their greatest animosity was reserved for sheep herders, whose ravenous flocks de-pastured the rangeland and made it unsuitable for cattle. *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 732 (2000); *Omaechevarria v. State of Idaho*, 246 U.S. 343, 344-45 (1918). Sometimes these rivalries turned deadly. Cattlemen mercilessly drove sheep off cliffs to their deaths, and antagonists on both sides were quick to shoot opposing stock—and their owners—on sight. Candy Moulton, *Conflict on the Range*, True West (Aug. 28, 2011). Estimates vary, but dozens of ranchers and rustlers were killed in these "range wars." *Id.*

Congress sought to tamp down these conflicts by outlawing some cattlemen's practice of erecting fences around hundreds of thousands of acres of land, enclosing not only their own lands but also those of the federal government. The Unlawful Inclosures Act of 1885, 43 U.S.C. § 1061, outlawed such fencing and also prohibited

any "unlawful" attempts to "prevent or obstruct … any person from peaceably entering upon … any tract of public land," *id.* § 1063. Shortly after its passage, the Supreme Court explained that the statute was grounded in the government's power to "protect[] the public lands from nuisances erected upon adjoining property." *Camfield v. United States*, 167 U.S. 518, 528 (1897).

Peace eventually came with the closing of the open range. For all its neighborly virtues, the open range had led to a tragedy of the commons. Stock growers not only fought over control but also let their herds overgraze the public rangelands, destroying its topsoil. *Pub. Lands Council*, 529 U.S. at 732-33. Overgrazing and drought combined to create the "devastating storms of the Dust Bowl." *Id.* Congress responded by passing the Taylor Grazing Act of 1934, 43 U.S.C. § 315. The Act allowed the president to withdraw the public's implied license to graze stock on public lands and replaced it with a system of exclusive grazing permits that largely endures to this day. 48 Stat. 1269, 1269-71; *United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1506 (10th Cir. 1988) ("[T]he Taylor Grazing Act put an end to the open public range."). That policy change consigned the open range to the history books, along with the West's free-for-all grazing custom.

Even as these developments signaled the end of the range wars, they opened a new conflict over access to public land. After the Taylor Grazing Act, the federal government ended its longstanding (if mostly futile) attempts to sell its

checkerboarded parcels. George Gould, Comment, *Access to Public Lands Across Intervening Private Lands*, 8 Land & Water L. Rev. 149, 150-51 (1973). Going forward, the government would become more custodian than seller, charged with managing public lands for public use. That shift was formalized in the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701, which declared that public lands should generally "be retained in Federal ownership," *id.* § 1701(a)(1), and "utilized in the combination that will best meet the present and future needs of the American people," *id.* § 1702(c).

Gradually, dormant questions about access began surfacing. For decades, the custom of the open range had provided cattlemen, sheep herders, and others with functional access to public rangeland, thereby mostly sparing courts from having to decide whether other methods of legal access existed. *See, e.g.*, Gould, *supra*, at 155-56. But now, the demise of that custom and the rise of the government's new custodial role threw into sharp relief the question that had long lurked in the background: Did the federal government—and the public as its licensee—reserve an easement to cross private property for access to public land in the checkerboard?

### 4.    *Leo Sheep*

The Supreme Court answered that question in *Leo Sheep Company v. United States*, 440 U.S. 668 (1979). Leo Sheep and Palm Livestock were successors-in-interest to several odd-numbered parcels of land originally granted to Union Pacific. *Id.* at 677-78. After receiving numerous requests for public access, the federal government built a road across the corners of the companies' checkerboarded land to create public access to a nearby reservoir.



Area Near Seminoe Dam, Carbon County, Wyoming

Odd-numbered sections granted to railroad in 1862 and now owned by plaintiff

Even-numbered sections of public domain

Pre-existing dirt road

Pre-existing dirt road improved by B.L.M. December 1973

Dirt road relocated by B.L.M. December 1973

Leo Sheep sued to quiet title. In response, the federal government claimed a right of access under an easement implicitly reserved in the initial railroad land grants and later confirmed by the Unlawful Inclosures Act. The Supreme Court rejected both arguments, holding that if the federal government wanted to access its land across Leo Sheep's parcels, it would need to use its power of eminent domain and pay just compensation. *Id*. at 687-88.

*Leo Sheep* ended the federal government's claim to a generalized right of access to checkerboarded public land. The government reoriented its policies toward securing public access in ways consistent with private-property rights. Over the next half century, state, local, and private actors worked cooperatively toward that end. *Infra* Part II.C.

Such efforts have borne fruit even as work remains. Congress granted approximately 150 million acres of checkerboarded land to private owners, reserving essentially the same amount. One estimate suggests that there remain at most 8.3 million acres of "corner-locked" public land—that is, public land that touches other public land at a corner but is otherwise surrounded by private land. App. V4:618. The BLM manages roughly 5.8 million acres of that amount, App. V4:627, representing approximately 2.4% of its 245-million-acre portfolio, BLM, *About Us* (2023), https://on.doi.gov/3tYhowO.

For some, however, government-led efforts to ensure public-land access have not produced results fast enough. Some recreationists have engaged in self-help through a practice called "corner crossing," which involves stepping from one corner of public land to another across private property. Since corners meet at an infinitesimally small point, corner crossing always involves a person intruding, however briefly, through private property. For that reason, BLM and state officials have consistently underscored that corner crossing is unlawful. *Infra* Part I.C.

## B.    Case Background

In 2005, Fred Eshelman purchased roughly 22,000 acres of private land on Elk Mountain in Carbon County, Wyoming, through Iron Bar Holdings. App. V1:80. Because Elk Mountain was part of the checkerboard granted to Union Pacific, Dr. Eshelman relied on "definitive[]" guidance from the BLM about corner crossing's illegality in the purchase process. App. V4:728.

Since then, Iron Bar has not sought to wall off Elk Mountain. Quite the opposite: Dr. Eshelman has opened his property to government officials and even strangers who have reached out and asked permission to cross or hunt. App. V3:386-87; App. V4:730. Dr. Eshelman also partners annually with the Wyoming Game & Fish Department to turn thousands of acres of his ranch into a "hunter management area" for the public to hunt for antlerless elk. Wyoming Game & Fish Dep't, *Elk Mountain Hunter Management Area* (2023), https://bit.ly/3u0MAeO. Finally, and

most important to him personally, Dr. Eshelman enrolled Elk Mountain Ranch in Hunting with Heroes, a program that "give[s] back to our nation's disabled veterans by honoring them with unique hunting, fishing and other outdoor experiences." Hunting with Heroes Wyoming (2020), https://bit.ly/46UMmVl.

Like other ranch owners, Dr. Eshelman has been forced to address trespassers, including corner crossers. In 2015, Iron Bar's property manager asked the Wyoming Game & Fish Department about the best way to prevent trespassing. App. V3:441-43. An officer advised him to post two "no trespassing" signs on either side of checkerboard corners where trespassing had been an issue. *Id*. The property manager complied, staking two signs on the corner closest to the county road that snakes through public and private parcels north of Elk Mountain. Each sign gave the phone number for Elk Mountain Ranch. *Id*. The manager installed a metal chain linking the signs across the corner. App. V3:444.



Signs were not enough; the ranch repeatedly encountered corner crossers. In 2018, Dr. Eshelman approached the State of Wyoming to propose a land swap: Dr. Eshelman would trade 2,240 acres of his property for 2,240 acres of the State's

landlocked property. App. V5:909-10, 939-40. From the perspective of public access, this deal should have been a no-brainer: not only would the State gain 2,240 acres of newly accessible land, but it would also open up public access to an additional 840 acres of otherwise inaccessible public land. App. V5:926. But in 2020, the State scuttled the proposed swap when it learned that Dr. Eshelman's property had a conservation easement that could prevent the State from maximizing revenue from the land. App. V5:939-40.

So Dr. Eshelman proposed a second land swap, this time to the BLM. On November 30, 2020, he wrote to BLM's Wyoming State Director to explain that "[i]n recent months," the ranch had "noticed hunters, often traveling from out-of-state, who have corner-jumped their way across the checkerboard" in ways that raised serious concerns about "the safety of [Iron Bar's] owners, guests, employees and other invitees as well as its cattle and property." App. V5:908. Since Dr. Eshelman "share[d] the growing sentiment that increased public access to BLM lands … would be a beneficial and a worthwhile goal," he wanted to explore "possible longer-term solutions" to the checkerboard problem that would respect his property rights *and* ensure public access. *Id.* Foremost was "the possibility of mutually beneficial land exchanges that would result in the transfer of some of the landlocked BLM parcels for more valuable tracts." *Id.* But, as before, the swap never materialized.

One corner-crossing incident that had spurred Iron Bar's land-swap proposal involved hunters from Missouri. In 2020, Defendant Bradly Cape planned a hunting trip on Elk Mountain with Phillip Yeomans and Zachary Smith. Add. 5-6. After arriving on site, the men approached the corner with the "no trespassing" signs. Add. 7-8. The hunters did not call the number for Elk Mountain Ranch or otherwise ask permission to enter Iron Bar's land. App. V3:481. Instead, they grabbed the posts and swung themselves around, across Iron Bar's property, landing on the adjoining public land. Add. 8. Over the next week, they crossed Iron Bar's property at multiple corners. Add. 8, 11. The hunters would later recall that they repeatedly crossed the corners designated by pin drops 1, 2, 5, and 8 on the map below. Add. 8.



Iron Bar staff learned of the three hunters' presence. *Id*. After confirming that the hunters had crossed Iron Bar's property and planned to do so again, Iron Bar's property manager warned that he would call the Carbon County Sheriff's Office. App. V3:512. Undeterred, the hunters responded, "you do what you got to do." App. V3:513. The Sheriff's Office assured Iron Bar that it would cite the hunters, and the incident seemed closed. App. V2:250.

It was not. One year later, the hunters returned to Elk Mountain Ranch with a fourth companion, John Slowensky. Add. 10. Mr. Cape again planned the hunt on land accessible only by crossing Iron Bar's property; this time, he constructed an



A-frame ladder to climb over the "no trespassing" signs. *Id*. After the hunters crossed that initial corner, they proceeded to repeatedly cross the same corners as the year before, along with several new corners designated by pin drops 3, 4, 6, and 7. *Id*.

Once again, Iron Bar learned of the hunters' presence, and once again its staff confronted them. Add. 12. When the hunters refused to stop trespassing, the property manager called the prosecutor's office, which directed the Sheriff's Office to write citations for criminal trespass. *Id*. Wyoming Game & Fish instructed the hunters to leave Iron Bar's property. *Id*.

Carbon County prosecuted the hunters for criminal trespass. "[C]orner crossing is illegal," the county attorney explained, noting that the County had "a consistent policy" of citing offenders under the State's criminal trespass law "at least since 2008." Resp. to Defs.' Mot. to Dismiss at 2, *State of Wyoming v. Cape*, No. CT-2021-5869 (Mar. 8, 2022). In April 2022, a jury acquitted the hunters. Add. 13.

### C.     Proceedings Below

In February 2022, Iron Bar filed this civil trespass action against the four hunters in Wyoming state court. Iron Bar sought a declaratory judgment that corner crossing was unlawful and an order restraining the defendants from future unauthorized entry. App. V1:52-56. Defendants, who are Missouri citizens, removed the case to federal court. App. V1:12.

On May 26, 2023, the district court ruled on the parties' cross-motions for summary judgment. The court began by accepting the property-law principles put forward by Iron Bar—that "subject to certain restrictions, a private landowner owns the airspace within a reasonable height of the land and enjoys a right to exclude others from that airspace." Add. 14. "Taken together," the district court noted, "this would appear dispositive of the matter." Add. 16.

But the court then held that landowners face "numerous restrictions on the full use of alienability of land," limits that can arise from "express legal restrictions," "background principles," and "preexisting federal-law limitations on what otherwise would be state-law property rights." *Id*. The court did not identify any state or federal law that expressly limits the right of private landowners to control the space above their land; nor did the court identify any law expressly granting the public an easement to pass through that space. Instead, citing "history, federal caselaw, federal statutory law, and recent Wyoming legislation," the court held that some unspecified

combination of those factors "demonstrate[d]" that the public has "the right to the benefit of the public domain, which necessarily requires some limitation on the adjoining private landowner's right of exclusion within the checkerboard pattern of land ownership." Add. 17.

Central to the district court's reasoning was a century-old decision, *Mackay v. Uinta Development Company*, 219 F. 116 (8th Cir. 1914). In *Mackay*, the Eighth Circuit held that a sheep herder had the right to drive his three-quarter-mile-wide flock across private parcels in the checkerboard, and that the herder also had no obligation to pay damages for his flock devouring 90% of the private grassland along the way. Add. 17-18 (citing *Mackay*, 219 F. at 117-18). Seeing "many parallels to the instant lawsuit," the district court held that it was bound (and persuaded) by *Mackay*, and that *Mackay* "entitled" every member of the public "to a reasonable way of passage" over private land to access checkerboarded public parcels. Add. 17, 19.

Contemplating the checkerboard problem, the district court concluded that "[i]t is only reasonable for the owner of the private sections and the public, as the owner of the alternating sections, to share in the solution." Add. 27. Accordingly, "the Court [found] that where a person corner crosses on foot within the checkerboard from public land to public land without touching the surface of private land and without damaging private property, there is no liability for trespass." *Id*.

Following the decision, several state agencies reaffirmed their longstanding view that corner crossing is unlawful. *See, e.g.*, Montana Fish, Wildlife & Parks, *FWP Issues Statement on Wyoming Corner Crossing Case* (June 1, 2023), https://bit.ly/3FFjX9z ("Corner crossing remains unlawful in Montana[.]"). The BLM, after some initial confusion, also confirmed it had not changed policies. Mike Koshmrl, *Feds Walk Back BLM Boss' Corner Crossing Directive*, WyoFile (July 14, 2023), https://bit.ly/45ZXnTQ. A BLM communications director emphasized that if the district court's decision "holds up under appeal and becomes the law of the land, there [would need] to be time so we can work with private landowners." *Id.* He underscored: "This will be a change." *Id.*

## SUMMARY OF ARGUMENT

**I.**    Corner crossing constitutes civil trespass under Wyoming law. Iron Bar possesses as much of a property interest in the area immediately above its land as in the surface itself. It also holds the right to exclude others from that property. Defendants concede they intentionally entered Iron Bar's property without permission. Those undisputed facts establish a trespass under Wyoming law, consistent with longstanding state and federal guidance.

Nothing in federal law creates a trespass exception for corner crossing. The Supreme Court clarified 45 years ago that Congress did not reserve a right of access to public lands in the checkerboard. *Leo Sheep Co. v. United States*, 440 U.S. 668

(1979). Since the federal government lacks a right of access to its land, so do its licensees, including defendants here. Likewise, the Unlawful Inclosures Act creates no affirmative right of access to public lands. While the Act precludes the *unlawful* fencing of public lands, nothing in the Act gives recreationists free rein to access public lands by encroaching on private property.

**II.**    The district court erred when it relied on amorphous "background principles" of property law to create a federal right to corner cross. The primary basis for the district court's holding—*Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914)—is not binding on this Court, is not persuasive, and is no longer good law. *Mackay* was rooted in now-obsolete grazing customs on the open range, and the decision has nothing to say about recreational corner crossing. Even if *Mackay* had purported to grant the public broad access rights within the checkerboard, those rights did not survive *Leo Sheep*.

The judiciary is ill-suited to settle policy debates surrounding corner crossing. However well-meaning, the district court's ruling will lead to trespassing and damage to private property across the West; impose significant costs on property owners; and harm the environment, all without guaranteeing greater access to public lands. Resolution of these issues is best left to politically accountable actors who can—and are—implementing initiatives that balance the public's right to access public lands with the rights of private property owners.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *LKL Assocs., Inc. v. Union Pac. R.R.*, 17 F.4th 1287, 1294 (10th Cir. 2021). On cross-motions for summary judgment, the court "must view the inferences to be drawn from affidavits, attached exhibits and depositions in the light most favorable to the party that did not prevail." *Allen v. Sybase, Inc.*, 468 F.3d 642, 649 (10th Cir. 2006).

## ARGUMENT

### I.     Corner Crossing Is Unlawful

The protection of private property rights "is indispensable to the promotion of individual freedom." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). "[P]erhaps the most fundamental" property right is the right to exclude, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005), the "*sine qua non*" of property itself, *Cedar Point*, 141 S. Ct. at 2073, because that right enables all others. Here, the right to exclude establishes that when defendants repeatedly and intentionally crossed the corners of Iron Bar's property, they committed a civil trespass under Wyoming law that was unauthorized by federal law. Federal and state authorities agree, having deemed the practice unlawful for decades.

### A.     Corner Crossing Is a Civil Trespass Under Wyoming Law

In Wyoming, "exclusive possession is a fundamental element of property ownership." *Sammons v. Am. Auto. Ass'n*, 912 P.2d 1103, 1105 (Wyo. 1996). "Ownership of property implies the right of possession and control and includes the

27

right to exclude others" and "to expel trespassers." *Id.* (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82 (1980)).

Civil trespasses are actionable under the common law in Wyoming, where they are defined in the context of real property as "invasions of the interest in the exclusive possession of land and in its physical condition." *Bellis v. Kersey*, 241 P.3d 818, 824-25 (Wyo. 2010). Civil trespass has two elements: first, the plaintiff must have been "in possession of the property when the entry occurred," and second, the defendant must have "intentionally entered upon that property." Trespass Elements, *Wyoming Civil Pattern Jury Instructions* § 21.09 (2022), https://bit.ly/3M5lXLQ; *cf.* Wyo. Stat. § 34-19-201(a)(iii) (defining "trespasser" as "a person or persons who enter or remain upon land in the possession of another without a privilege to do so created by the owner's consent or otherwise").

Each element is met here. First, Iron Bar indisputably possessed the property when the entry occurred. Second, defendants concede that they intentionally crossed over the corners of land possessed by Iron Bar. App. V4:792 ("Defendants did cross on foot or with an A-frame ladder through the airspace situated above the corners shared by Plaintiff's lands and public lands.").

Defendants stress they never "set foot" on the surface of those corners, but that is irrelevant. State law establishes that "[t]he ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the

28

surface beneath." Wyo. Stat. § 10-4-302. Iron Bar thus has the same possessory interest in the area immediately above its land as it does in the land's surface. Indeed, property law has never distinguished between the two. *United States v. Causby*, 328 U.S. 256, 265 (1946) ("invasions of [area above the surface of land] are in the same category as invasions of the surface"); Restatement (Second) of Torts § 159 (1965) (trespass may be committed "on, beneath, or above the surface of the earth"). That makes practical sense: "it is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere." *Causby*, 328 U.S. at 264.

Defendants also argue that even though they intentionally entered Iron Bar's property, they passed through it *temporarily* and caused no permanent *damage*. App. V3:360-61. That, too, is irrelevant. Civil trespass in Wyoming does not have a duration requirement, nor does it require any showing of actual damage. Instead, "Wyoming follows the general rule that at least nominal damages are available where an actionable trespass has occurred." *Goforth v. Fifield*, 352 P.3d 242, 250 (Wyo. 2015); *accord* Trespass Damages, *Wyoming Civil Pattern Jury Instructions* § 21.11 (2022), https://bit.ly/48XeIQc (collecting caselaw). "A trespass cannot be justified by proof that the damages were only nominal or even that the plaintiff benefited by it." *Harmony Ditch Co. v. Sweeney*, 222 P. 577, 579 (Wyo. 1924).

That principle reflects a fundamental tenet of property law: even *de minimis* intrusions qualify as trespasses. Keeton et al., *Prosser and Keeton on the Law of Torts* § 13, at 75, 78-79 (5th ed. 1984). The Restatement (Second) of Torts explains that plaintiffs need not show interference with (or injury to) the use of the land to establish an above-ground trespass; rather, "an unprivileged intrusion into the space above the surface of the earth, at whatever height above the surface, is a trespass." Restatement § 159 cmt. f. The Restatement illustrates the point with two examples of above-ground trespasses relevant here:

3.    A extends his arm over the boundary fence between A's land and B's land. A is a trespasser.

4.    A, while hunting birds on a public pond, fires shot across B's land close to the surface. The shot do not come to rest on B's land, but fall into another public body of water on the other side of it. A is a trespasser.

*Id.*, illus. 3 and 4. By emphasizing the transitory nature of their unauthorized entry, defendants are merely contesting the extent of damages, not their underlying liability for trespass.

Courts confronting materially identical property-law regimes have held that corner crossing constitutes a trespass. In *Koenig v. Aldrich*, 949 N.W.2d 882 (Wis. Ct. App. 2020) (unpub.), a landowner owned a parcel of land that "checkerboards with three other parcels," including a county-owned parcel diagonal to his parcel. *Id.* at *1. He sought to access the county land "by stepping directly from his property

onto the county-owned property," thereby "enter[ing] the airspace above" his neighbors' corners. *Id.*

On appeal, the Wisconsin Court of Appeals affirmed the lower court's finding of trespass, rejecting the landowner's argument for a "trespass exception" for corner crossing. *Id.* The Court of Appeals largely relied on Wisconsin's statute vesting ownership of the space above the lands in the owner of the surface beneath—a statute identical in all relevant respects to Wyoming law. *Compare id.* at *2 (quoting Wis. Stat. § 114.03), *with* Wyo. Stat. § 10-4-302. The court held that, as in Wyoming, "[o]ne is subject to liability to another for trespass, irrespective of whether he … thereby causes harm to any legally protected interest of the other." *Koenig*, 949 N.W.2d at *2. Relying in part on the Restatement, the court rejected the landowner's "'stepping over' contention and conclude[d] the circuit court properly determined that [the landowner's] intrusion into the airspace above [his neighbors'] property constituted a trespass." *Id.* at *2-3.

Wyoming law requires the same result here. Corner crossing is unlawful under state law, and Iron Bar properly brought a civil trespass claim to enforce its property rights.

**B.    Federal Law Does Not Authorize Corner Crossing**

Since defendants trespassed under state law, they can prevail only if corner crossing is authorized by federal law—either because Congress reserved an

easement for public access in its checkerboard land grants, or because Congress subsequently created a public right of access that preempts private property owners' right to exclude. Binding precedent forecloses either possibility. In *Leo Sheep*, the Supreme Court held that Congress reserved no right of access in the railroad land grants to checkerboarded public lands. The Supreme Court has also rejected the contention that Congress created a preemptive right of access in the only possibly relevant subsequent statute, the Unlawful Inclosures Act.

### 1.  Congress Did Not Reserve an Easement to Access Public Lands in the Checkerboard

When Congress conveyed land to Union Pacific in the 1860s, it granted the odd-numbered sections of land without reserving any right of access to the remaining even-numbered sections. As the Supreme Court held in *Leo Sheep*, that choice was deliberate (if short-sighted), and it means that, absent permission, neither the government nor the public may cross privately owned sections of the checkerboard in order to access land still owned by the government.

Like Iron Bar, Leo Sheep Company and Palm Livestock Company were successors-in-interest to odd-numbered sections of land in Carbon County, Wyoming. *Leo Sheep*, 440 U.S. at 677-78. Like Iron Bar, "the checkerboard configuration" of those companies' lands made it "physically impossible" for the public to access public parcels "without some minimum physical intrusion" to the companies' private parcels. *Id.* at 678. From the government's perspective, that was

untenable, because northwest of the companies' properties lay the Seminoe Reservoir, an area where the public liked to fish and hunt. *Id.* Following public requests for access, the government cleared a dirt road that crossed the companies' properties at two corners. *Id.*; *Leo Sheep Co. v. United States*, 570 F.2d 881, 884 (10th Cir. 1977). The companies sued to quiet title, and the district court granted their motion for summary judgment. *Leo Sheep*, 440 U.S. at 678.

On appeal, this Court reversed and held that Congress had "intended to reserve an easement to permit access to the even-numbered sections which were surrounded by lands granted the railroad." *Leo Sheep*, 570 F.2d at 885. Otherwise, this Court concluded, neither the government nor the public would be able to access "the interlocking even-numbered sections," *id.*, which would contravene what this Court saw as "the right of the Government and the public to have access to the public domain," *id.* at 888. To support this purported right of access, this Court stressed "the teaching" of three cases, *id.* at 892: *Camfield v. United States*, 167 U.S. 518 (1897), *Buford v. Houtz*, 133 U.S. 320 (1890), and *Mackay v. Uinta Dev. Co.*, 219 F. 116 (8th Cir. 1914).

Judge Barrett dissented, observing that "the United States [had] not believe[d] for the past 110 years that it was endowed with the gratuities found in the majority opinion." *Id.* at 889. Judge Barrett criticized the majority for engaging in "judicial legislation" to fix Congress's mistakes. *Id.* at 890.

Certiorari was granted to resolve "[w]hether the United States reserved a right of access to the retained even-numbered sections of land when it granted the Union Pacific Railroad title to the odd-numbered sections completely surrounding the even-numbered sections." Brief for the United States, *Leo Sheep Co. v. United States*, 440 U.S. 668 (No. 77-1686), 1978 WL 223187, at *1 ("U.S. Br."). Leo Sheep and Palm Livestock argued that Congress failed to expressly reserve a right of access, and the federal government could not rely on the common-law doctrine of easements by necessity because no necessity existed: the government could always access its property by exercising its eminent domain power. Brief of Leo Sheep, *Leo Sheep*, 440 U.S. 668 (No. 77-1686), 1978 WL 207269, at *9-14. In response, the government argued it was "virtually inconceivable" that Congress intended "to give up the government's right of access to the retained sections," and "no less inconceivable" for the United States to rely on eminent domain to ensure access. U.S. Br., *supra*, at *7. If the Supreme Court accepted petitioners' argument, the government warned, the result would be that "public hunting, fishing, and other recreational uses [of the public domain] would be curtailed." *Id.* at *34.

The Supreme Court unanimously sided with Leo Sheep and reversed the Tenth Circuit. The Court began by noting that the government was not claiming "any express reservation of an easement in the Union Pacific Act" because there quite obviously was none. *Leo Sheep*, 440 U.S. at 678-79. Nor was there any "implicit

reservation of the asserted easement … established by 'settled rules of property law.'" *Id.* at 679. The Supreme Court agreed that an "easement is not actually a matter of necessity in this case because the Government has the power of eminent domain." *Id.* at 679-80. The Court also found it significant that the federal government had for a century acted on the assumption that "access rights" to checkerboarded public land "had to be purchased," and had said so many times. *Id.* at 687; *id.* at 681 n.18, 687 n.25. "So both as a matter of common-law doctrine and as a matter of construing congressional intent," the Supreme Court refused to "imply rights-of-way" for the government. *Id.* at 681-82.

The Supreme Court recognized that its holding and reasoning might impair public access to public land. *Id.* at 685-88. But that did not matter legally because Congress never intended to reserve such a right in the first place. *Id.* at 681, 685-86. Instead, the Court found, Congress focused on "negotiation, reciprocity considerations, and the power of eminent domain as obvious devices for ameliorating disputes." *Id.* at 681. Each of those solutions remained available. If the federal government wanted public access to checkerboarded public land, it could always pay appropriate "compensation." *Id.* at 688.

While *Leo Sheep* involved the federal government, its holding applies equally to the government's licensees, including the public at large. After all, the public may enter and use public land only as the government's licensee and at its sufferance. *See*

*Buford*, 133 U.S. at 326; 2 Pub. Nat. Res. L. § 15:4 (2d ed.) ("Most persons who go upon the federal lands do so under a revocable license, meaning that they are entering by sufferance, not by right."). If the *government* lacks a generalized right of access to its land—as *Leo Sheep* held—then so does the *public*, for a licensee cannot exercise greater rights under a license than the licensor possesses. *See* Charles Kaiser & Charles Breer, *Legal Issues Presented by Checkerboard, Inholding, and Split Estate Lands*, 40A Rocky Mtn. Min. L. Inst. (1995) (Public "would have no greater right to cross private lands to reach public lands than the BLM did in *Leo Sheep* because they are acting as the government's licensee and presumably do not have any greater rights than their licensor."). Or, as the United States itself observed in *Leo Sheep*, "denial of the government's right of access to its lands would … restrict[] … public use … of a large segment of the public domain." U.S. Br. at *33-34.

*Leo Sheep* establishes definitively that Congress did not reserve any right of public access to the checkerboarded parcels that would have permitted defendants to lawfully cross Iron Bar's property. That decision is binding and forecloses any reserved right to corner cross.

### 2.     Congress Did Not Create Access Rights to Public Lands in the Unlawful Inclosures Act

Congress also did not create any right of access to public lands by preempting state-law trespass actions through the Unlawful Inclosures Act. As its title signifies, the Act was designed to outlaw "unlawful" enclosures—efforts to obstruct access to

public land that was *otherwise* legally accessible. The Act does not purport to give the public any new, affirmative right to access public land, much less to preempt state law. Section 1061 generally declares unlawful "inclosures of any public lands … to be hereafter made, erected, or constructed." Section 1063 prohibits "fencing or inclosing" as well as "force, threats, intimidation, … [and] any other unlawful means" to "prevent or obstruct[] any person from peaceably entering upon or establishing a settlement or residence on any tract of public land." Neither provision creates a right of access—certainly not expressly, and not implicitly either. In fact, by referring only to "unlawful" means of prohibiting access, the Act acknowledges that property owners can still use "lawful" means to "prevent or obstruct" members of the public "from peaceably entering upon … public land," *id.* § 1063—namely, by exercising their right to exclude others from entering their property. By permitting *lawful* impediments to access, the Act reinforces rather than undermines preexisting state property rights.

Caselaw and the federal government's own interpretation confirm as much. This Court held in *Bergen* that the Unlawful Inclosures Act "creates no easements or servitudes." *Bergen*, 848 F.2d at 1506. That holding mirrors the official position of the federal government in *Leo Sheep*: "By its terms, *the Act created no new rights or interests*." U.S. Br., *supra*, at *23 n.13 (emphasis added). Similarly, the Supreme Court in *Leo Sheep* held that the Act lacked "any significance" to whether the federal

government retained a right to access public land. 440 U.S. at 683. Citing *Camfield*, the Supreme Court explained that the Act permitted a landowner to "fence completely his own land," including each individual "odd-numbered lot[]," even though doing so would "[o]bviously" prevent "access to [the] even-numbered lots" owned by the government. *Leo Sheep*, 440 U.S. at 685.

*Camfield* itself recognized that a landowner would "doubtless" have the right to fence his separate sections—even if doing so obstructed access to public land—because "he is entitled to the complete and exclusive enjoyment of [his land], regardless of any detriment to his neighbor." 167 U.S. at 527-28. If the Act allows private parties to enclose their individual landholdings so as to seal off access to public lands, then the Act cannot logically be read to convey an affirmative right to access public lands. *See Omaechevarria*, 246 U.S. at 344-45.



*Unlawful fencing*            *Lawful fencing*

38

Here, Iron Bar did not "fence out" anyone from public lands that fall within the perimeter of its holdings. Iron Bar instead brought a trespass action, which is not by any characterization an unlawful enclosure. Nor is a trespass action an "unlawful means" of exclusion. Rather, it is a routine and lawful way for property owners to exercise "one of the most treasured rights of property ownership." *Cedar Point*, 141 S. Ct. at 2072. Put simply, defendants were "prevent[ed]" from "peaceably entering upon … public land," 43 U.S.C. § 1063, not because of anything Iron Bar did, but because they never had a right to cross Iron Bar's property in the first place.

For similar reasons, Iron Bar did not violate the Act by posting "no trespassing" signs on the relevant corners and hanging a chain between them. Signs and a foot-long chain are not an "enclosure." And they could not have "prevent[ed] or obstruct[ed]," *id.*, defendants from lawfully entering public land *unless* defendants had a lawful right to enter in the first place (which they did not). The district court was thus correct not to address the Unlawful Inclosures Act until *after* deciding the legality of corner crossing (albeit wrongly). Add. 28.

### C.    Authorities Have Long Recognized Corner Crossing to Be Illegal

Recognizing the illegality of corner crossing is neither novel nor controversial. Federal and state authorities have deemed the practice unlawful for decades.

In the 1980s, the BLM developed a "Wyoming Public Land Access Guide" that explained: "Corner crossings in the checkerboard land pattern area are not considered legal public access." App. V1:136. In 1997, the BLM's Assistant Regional Solicitor for the Rocky Mountain Region issued an opinion on "the public's right of access to public lands in the 'checkerboard' area of Wyoming." App. V2:233. Asked whether a person could "legally step over a checkerboard corner … without trespassing on the cornering private lands," the Solicitor was unequivocal: "The answer to the question is no." *Id.* Why? Because corner crossing necessarily means "trespass[ing] upon the property of the owner of the opposite, private, land." *Id.* The BLM today warns hunters that "[i]t is illegal to cross public land at corners." App. V2:237; *id.* ("[I]t may seem like a logical thing to step over the corner from one piece of public land to another…. [But] it is illegal to cross at boundary corners.").

Wyoming has been equally resolute. The BLM developed the "Wyoming Public Land Access Guide" in cooperation with Wyoming's Game & Fish Department. App. V1:144-45. A decade later, the Wyoming Attorney General issued an opinion analyzing whether corner crossing violated two of the state's criminal trespass laws. App. V5:1000-04. The Attorney General concluded that corner crossing did not violate Wyoming's "trespass to hunt" law because that law prohibits only those trespasses that actually involve *hunting* on private property. But the

40

Attorney General emphasized that its conclusion about the "trespass to hunt" law "*does not mean that 'corner-crossing' is lawful*." App. V5:1003 (emphasis added). Instead, "a person who 'corner-crosses' could be charged under Wyo. Stat. Ann. § 6-3-303," Wyoming's more broadly worded criminal trespass law. *Id*. Section 6-3-303 is violated whenever someone "enters or remains on or in the land or premises of another person, knowing he is not authorized to do so, or after being notified to depart or to not trespass." *Id*. The Attorney General noted that landowners own the space above the land, and that "the definition of 'enter' is expansive enough to include penetrating an invisible plane." App. V5:1003-04. "Accordingly, passing through the space above private property, knowing one does not have permission to be on that private property, may be a criminal trespass under Wyo. Stat. Ann. § 6-3-303." App. V5:1004.

Other states have likewise confirmed that corner crossing without permission is unlawful. *See, e.g.*, Montana Fish, Wildlife & Parks, *Frequently Asked Questions from Montana Hunters* 18 (2023), https://bit.ly/47fZWSI ("Corner crossing … is illegal without permission from the adjacent landowner(s)."); *Hearing on H.B. 23-1066 Before the H. Agric., Water & Nat. Res. Comm.*, 2023 Leg., 1st Sess. (Colo. 2023), at 2:39:14-2:39:28 (Ty Petersburg, Chief of Law Enforcement for Colorado Parks and Wildlife, explaining that Colorado charges 12 to 15 corner-crossing violations annually), https://bit.ly/3QoYeI9; Matthew Copeland, *Cornered*, Outdoor

Life (Aug. 10, 2015), https://bit.ly/49l7x4v ("Corner crossing … remains a prosecutable offense" in "Utah, Idaho, New Mexico, and Colorado.").

*     *     *

*Leo Sheep*, *Camfield*, and other authorities cited above establish that even though the public has a revocable license to *use* public land, the public does not have an unlimited right to *access* that land by trespassing through private property. As the BLM summarized after *Leo Sheep*: the "public does not have an implied right-of-way to cross privately owned sections of 'checkerboard' lands to get to the Government-owned sections of those lands." App. V2:233.[1] The BLM accordingly warns the public that "[y]ou are not guaranteed access, even though you are trying to reach public lands." App. V2:237; *accord* App. V1:136.

Federal law does not authorize corner crossing, and because corner crossing violates Wyoming property law, the district court should have found defendants liable for trespassing.

---

[1] "A right-of-way is a type of easement [that] grants the limited right to pass … through the estate of another." *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1844 (2020).

## II.     The District Court Erred in Legalizing Corner Crossing

The district court did not dispute much of the analysis above. It agreed that Iron Bar "possesses a property interest in the airspace above its land … and generally holds the right to exclude others from its property." Add. 26. It acknowledged *Leo Sheep*'s holding that the federal government did not reserve any right of access to public parcels in the checkerboard. Add. 21. Finally, the district court did not rely on the Unlawful Inclosures Act to establish the legality of corner crossing. Add. 28.

The district court nevertheless held that the public has an implied right to "a reasonable way of passage" over private land to access public land that lies beyond. Add. 24. The court described this right as a "background principle" of law, but did not say whether it was federal or state law, nor from whence it sprang. Add. 27. Instead, the court relied on three factors: (1) a century-old Eighth Circuit decision, *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914); (2) some "additional considerations," Add. 24; and (3) its sense that corner crossing was "only reasonable" in light of access problems posed by the checkerboard, Add. 27. None of those factors supports the district court's conclusion.

### A.     *Mackay* Is Not Binding, Persuasive, or Even Good Law

The district court found a right to corner cross "primarily" based on *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914). Add. 31. That was error.

*Mackay* involved a dispute between John Mackay and the Uinta Development Company, which owned private property in the Wyoming checkerboard. 219 F. at 117. Mackay, a sheep herder, drove his flock of 3,500 sheep south to graze on public land for the winter. *Id.* at 117-18. En route, Mackay's herd crossed over the company's private land, which was entirely "open and unfenced." *Id.* Mackay's herd did not cross only at corners; rather, Mackay drove his flock "upon and along a strip of land three-fourths of a mile wide upon and across the entire length or width of some of the [company's] sections of land," with his sheep grazing on the land the entire way, and ultimately "consum[ing] nine-tenths of the grass thereon." *Id.* at 120-21 (Sanborn, J., dissenting). Uinta sued Mackay for trespass, and the district court ruled in the company's favor. *Id.* at 117.

A divided Eighth Circuit reversed. Centering its analysis on the idea that Mackay's right to access public land could not be merely "theoretical," the Eighth Circuit concluded that Mackay's passage had been reasonable, and that he was thus not liable for trespass. *Id.* at 119-20. The Eighth Circuit did not identify the source of law that apparently entitled Mackay "to a reasonable way of passage over the uninclosed tract of land," but in support of its reasoning, the majority cited the custom of the open range identified in *Buford v. Houtz* and the Unlawful Inclosures Act. *Id.* at 120.

Applying *Mackay*, the district court here acknowledged that "questions remain concerning whether *Mackay* is still valid law" but found "no reasonable basis to believe it is not bound by *Mackay*," and, regardless, found the case "particularly persuasive due to the many factual parallels." Add. 19-20. The court thus adopted "the core principle of *Mackay*, that private individuals possess 'a reasonable way of passage over the unenclosed tract of land without being guilty of trespass' within the checkerboard." Add. 24 (quoting *Mackay*, 219 F. at 120). That was error three times over: *Mackay* is not binding on this Court; it is not persuasive; and it is no longer good law.

*First*, *Mackay* is not binding. *Mackay* was decided by the Eighth Circuit, not the Tenth. Although Congress created the Tenth Circuit by splitting the Eighth Circuit in 1929, this Court has "never held that the decisions of our predecessor circuit are controlling." *Est. of McMorris v. Comm'r*, 243 F.3d 1254, 1258 (10th Cir. 2001); Bryan Garner et al., *The Law of Judicial Precedent* 514 (2016) (same).

The district court concluded otherwise based on dicta from a 1932 decision, *Boynton v. Moffat Tunnel Improvement Dist.*, 57 F.2d 772 (10th Cir. 1932), in which a Tenth Circuit panel stated that "the decisions cited from the Supreme Court of the United States, from the Eighth Circuit Court of Appeals, and from this court, are binding upon us." *Id.* at 781. But as this Court later clarified, that passing reference to Eighth Circuit decisions was dicta, *McMorris*, 243 F.3d at 1258 n.7, and the Tenth

Circuit has never suggested elsewhere that the Eighth Circuit's decisions might be binding upon it. It would be shocking if the Tenth Circuit had secretly adopted the Eighth Circuit's pre-1929 caselaw *in toto* but—in the century since—never once relied on *any* of that caselaw as binding authority.[2]

*Second*, even if *Mackay* were binding, it would have little relevance to this case. *Mackay* was decided at the apex of the open-range era, and its holding must be understood in light of the distinctive property-law regime of the time. The Eighth Circuit repeatedly stressed that the private land crossed by Mackay's flock was "unenclosed." *Mackay*, 219 F. at 120; *id.* at 117 ("open and unfenced"), 119 ("appearance is that of a common"), 120 ("a great grazing pasture"). Open, unfenced land was central to the majority's holding because "to leave uncultivated lands unenclosed was an implied license to cattle and other stock at large to traverse and graze them." *Buford*, 133 U.S. at 330. *Mackay* was thus an application of the custom of the open range, and the decision's language about rights "to a reasonable way of passage" are limited by the scope and vitality of the custom upon which it rested.

---

[2] This Court has treated the Eighth Circuit's pre-1929 caselaw as a buffet, not a set menu. *See S. Sur. Co. v. MacMillan Co.*, 58 F.2d 541, 545-46 (10th Cir. 1932) (panel was "disposed to follow" Eighth Circuit precedent); *Buchhalter v. Rude*, 54 F.2d 834, 839 (10th Cir. 1931) (Eighth Circuit precedent would be "strong support" for a party's position); *New York Life Ins. Co. v. Doerksen*, 75 F.2d 96, 100-01 (10th Cir. 1935) (canvassing other circuits to adopt unique rule); *Cox v. Vaught*, 52 F.2d 562, 564 (10th Cir. 1931) (treating Eighth Circuit precedent as persuasive); *Shell Petroleum Corp. v. Corn*, 54 F.2d 766, 770 (10th Cir. 1932) (same).

Given that context, *Mackay* has no relevance to the legality of corner crossing today. Congress closed the open range shortly after *Mackay* was decided, and private landowners are no longer understood to extend implied licenses that permit others to graze across their land.

*Third*, even if *Mackay* were binding, and even if *Mackay* sought to declare a timeless (albeit unidentified) right to "a reasonable way of passage" to public land, *Leo Sheep* would have put any such claim out to pasture. *Leo Sheep* held that the federal government lacks any reserved right of access to public land in the checkerboard, and that the government lacks any affirmative right of access under the Unlawful Inclosures Act. Indeed, the Supreme Court reversed this Court's opinion in *Leo Sheep*, which had invoked *Mackay* to excuse the government's encroachment. The Supreme Court made clear that neither the government—nor the public as its licensee—has a generalized right of access to landlocked public property by trespassing through private property.

Below, the district court resisted this conclusion principally on the grounds that *Leo Sheep* was so "factually and legally different" from *Mackay* "as to offer practically no persuasive value." Add. 21, 24. The district court distinguished *Leo Sheep* on two grounds: first, because it concerned the rights of the government rather than the public, Add. 21-23; and second, because it involved the construction of a dirt road rather than travel by foot (or hoof), Add. 23-24. Neither distinction matters.

First, it makes no difference that *Leo Sheep* addressed the government's right of access rather than an individual's. As explained above, members of the public are the government's licensees and thus have no greater access right than the government itself.

Indeed, that is exactly how *Mackay* framed the issue. Mackay had claimed that "*as a licensee of the government* he was entitled to select a reasonable way over [private land]," *Mackay*, 219 F. at 118 (emphasis added), and the Eighth Circuit observed that "[a]s long as the present policy of the government continues, all persons *as its licensees* have an equal right of use of the public domain," *id.* (emphasis added). The court declared that the landowner could not "cast upon the government *and its licensees* all the disadvantages of the interlocking arrangement of the odd and even numbered sections." *Id.* at 119 (emphasis added). *Mackay* thus reflects that private-party access was, at most, co-extensive with whatever rights the government held as licensor. Once *Leo Sheep* established the government had no such rights, that holding curtailed the rights of the public under *Mackay* as well.

It is similarly irrelevant that eminent domain is a sovereign power. The government may constitutionally take private property only "for public use." U.S. Const. amend. V. Just look at *Leo Sheep*, where the government built a road over corners of private property to ensure access for the recreating public. 440 U.S. at 678. Nothing precludes defendants from petitioning the government to use eminent

48

domain to create access to parts of Elk Mountain. Far from supporting the holding below, the fact that "the power of eminent domain (condemnation) is not an alternative available to Defendants," Add. 24, underscores how much defendants' right of access is bound up with the government's.

The district court relied on a footnote in *Leo Sheep* that distinguished *Buford* as based on "a century old grazing custom," and further noted that the *Buford* Court "also was influenced by the sheep ranchers' lack of any alternative." Add. 23; 440 U.S. at 687 n.24. But like *Mackay*, *Buford* acknowledged that ranchers could use public land only under "an implied license" from the government. 133 U.S. at 326. Ranchers likewise had an implied license under Utah law to graze on private lands unless fenced out. *Leo Sheep*'s passing reference to the ranchers' "lack of any alternative" simply acknowledged that sheep herders could not have grazed anywhere, contrary to the open-range grazing custom, if enjoined in that case. That custom has long since passed.

Second, the district court stressed that "*Leo Sheep* concerned the construction of a public thoroughfare," whereas this case involves "no damage or alteration to [Iron Bar's] private property." Add. 23-24. But whatever the *facts* of *Leo Sheep*, its controlling *holding* was that the government had no right to cross private property to create public access to public lands. *Leo Sheep*, 440 U.S. at 681-82. The Supreme Court repeatedly made clear it was rejecting the "right asserted by the Government

in this case," *id*. at 681—namely, "a right of access to the retained even-numbered sections of land," U.S. Br. at 2. Property law does not distinguish between rights of access for roadbuilding and other rights of access, and neither did the Supreme Court in *Leo Sheep*.

The district court's embrace of *Mackay* undercuts the purported limits of its own holding. While its opinion declares "there is no liability for trespass" when someone crosses corners "without touching the surface of private land and without otherwise damaging private property," Add. 31, *Mackay* held that there was no liability for trespass even when someone *does* "touch[] the surface of private land," and even when he *does* "damage private property." *Mackay* thus proves too much. As interpreted by the district court, *Mackay* is not cabined to sheep passage; the same "access-public-land-at-all-costs" logic extends to trespasses far more invasive than corner crossing.

Seeking to avoid that tension, the district court waved away the "significantly more intrusive" "'way of passage' taken in *Mackay*" as not being "at issue in this case." Add. 24. Courts, however, are not free to cherry-pick portions of precedent they would like to follow, and the knock-on effects of the district court's reading of *Mackay* would be vast. Other actors will undoubtedly apply its interpretation to justify more intrusive trespasses through private property, including ranchers leading their herds, all-terrain enthusiasts driving their ATVs, and hunters entitled

to vehicle accommodations. *See* Wyo. Admin. Code 040.0001.35 § 6 (holders of a disabled hunter permit may lawfully "shoot from a stationary vehicle to take wildlife"). Under the logic of the decision below, each of these actors, like the sheep herder in *Mackay*, would be "entitled to a reasonable way of passage" over private land, and each cannot feasibly cross at a corner without setting foot on private land. If *Mackay* remains the law, in other words, there is no principle that will limit *Mackay* to corner crossing.

### B.    Neither of the District Court's "Additional Considerations" Supports Its Holding

Besides *Mackay*, the district court relied on "two additional considerations"— a decision about airplane flight paths in New Mexico and a prospective amendment to Wyoming law—to "buttress[]" its holding that corner crossing is lawful. Add. 24. Neither of those "considerations" supports the district court's holding.

First, the district court cited *Pueblo of Sandia ex rel. Chaves v. Smith*, 497 F.2d 1043 (10th Cir. 1974). Add. 25. In *Pueblo*, a Native American tribe sued a New Mexico airport for trespass, alleging that aircraft were invading the tribe's property when they took off and landed at a nearby airport. 497 F.2d at 1044. This Court held that, in light of "th[e] context" of "low level flights," the tribe was required to prove "interfer[ence] with the actual use of [the tribe's] land" to establish a trespass. *Id.* at 1045.

*Pueblo* has no relevance here. Most obviously, the court there did not apply Wyoming law. The district court below read *Pueblo* as requiring "some accompanying damage to or interference with the actual use of the landowner's property," Add. 25, but that has never been an element of a trespass claim in Wyoming, *see Goforth*, 352 P.3d at 250. *Pueblo* was also about trespasses involving aircraft, a *sui generis* branch of trespass law. *Cf. Causby*, 328 U.S. at 264. *Pueblo* drew its legal standard from the Restatement (Second) of Torts, 497 F.2d at 1045 n.3, which explains that aircraft flights are trespasses *only* when they "interfere[] with [an]other's use and enjoyment of his land," whereas other types of above-ground intrusions qualify as trespasses even when they do not interfere with use and enjoyment. *Compare* Restatement § 159(1)-(2), *with id.*, illustrations 3 and 4. Unsurprisingly, then, the district court below conceded elsewhere that "[t]he right of aircraft flight is immaterial to this case." Add. 15 n.1.

Second, the district court "buttressed" its holding with prospective changes to Wyoming's criminal "trespass to hunt" law, Wyo. Stat. § 23-3-305(b), which the court interpreted as clarifying the legality of corner crossing.

Start with the obvious problem: the amended version of the statute would not take effect until July 1, 2023—nearly two months *after* the district court's ruling and almost two years *after* defendants corner crossed. Add. 25. A law that takes effect

after the district court entered judgment does not bear on the legality of conduct that occurred years earlier. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

The district court also misunderstood the prospective law's substance. Since 2004, the Wyoming Attorney General has affirmed that corner crossing does not automatically violate the State's "trespass to hunt" law—but not because corner crossing isn't a trespass. Instead, it's because corner crossing does not necessarily (or even usually) involve hunting directly *on* private land. *Supra* pp. 40-41. The prospective amendment simply codified the Attorney General's decades-old guidance. Critically, however, the Wyoming legislature chose *not* to amend Section 6-3-303, the State's more broadly worded criminal trespass law, and it is *that* law that Wyoming authorities have used to prosecute corner crossing. If anything, the Wyoming legislature's decision to leave corner crossing within the scope of the State's criminal trespass law—to say nothing of its civil trespass law—confirms that it was not trying to legalize corner crossing.

### C.    Questions About Public Access Warrant Political, Not Judicial, Solutions

Ultimately, the district court believed corner crossing was the "only reasonable" "solution" to the access problem created by Congress. Add. 27. But courts are institutionally ill-equipped to "fix" policy problems or pick "reasonable" "solutions" in this manner. In legalizing corner crossing, the court short-circuited ongoing efforts by politically accountable actors to address the access problem.

Corner crossing implicates complicated policy considerations. Public land belongs to the public, and members of the public—including defendants here—*should* generally be able to access it. Yet not all access is the same, and corner crossing is a particularly unworkable practice that imposes costs on landowners, the environment, and ultimately the public itself. The district court failed to account for these costs while overstating the policy benefits of its preferred solution.

*First*, its decision will inevitably lead to trespassing and damage to private property. While the opinion tries to cabin corner crossing to passage without "touching the surface of private land" or "otherwise damaging private property," Add. 31, those limitations are neither realistic nor feasible.

One cannot cross a corner without first finding it, and that is where the trouble begins. GPS devices and applications like onX can help identify only the rough vicinity of a corner. onX, for instance, has an *average* error range of 5-10 feet, and users regularly report errors of 50 feet or more. Being off by even 5 feet near a corner likely means standing several feet *inside* private property. onX accordingly warns users not to use the app to identify and respect property lines. *See Terms of Use*, onX (Aug. 4, 2023), https://bit.ly/49iDydj.

Corners can be identified with precision only if there happens to be a monument—like a brass cap—marking the exact spot, but that is an uncertain prospect at best. Brass caps are often hidden under brush, rocks, snow, or fallen

timber. Elsewhere, no brass cap exists: the BLM has not re-monumented every corner, and many original monuments (rocks, sticks, dinosaur bones) have vanished. Still other corners are impossible to cross because they are found underneath trees or bodies of water, or atop cliffs, in thickets, or halfway down ravines. Even if a corner crosser manages to find a brass cap, it will often be too late—in the process of searching around, he will already have trespassed on private property multiple times. The decision below thus guarantees trespasses of the kind it purports to guard against while simultaneously setting a trap for the unwary recreationist.

*Second*, corner crossing will impose significant costs on property owners. A substantial expense of rural landowners is fencing and regular patrols to keep out unwanted trespassers. App. V1:172. Private landowners in the checkerboard have traditionally not needed such measures for their *internal* property lines—that is, boundaries bordering corner-locked public parcels—because internal lines are distant from potential trespassers. But under the decision below, landowners will need to patrol and fence not only the outer boundaries of their estates, but also all the inner ones, at exponentially higher cost, as depicted below.[3]

---

[3] The tan (mostly odd-numbered) areas are Iron Bar's property; the green shaded squares are government-owned parcels. App. V3:372. The red lines represent hypothetical fencing throughout Iron Bar's property.



Consider, too, the risks. Owners of checkerboarded land understood that, because corner crossing has long been illegal, their property would be private and secluded. *Id.* With corner crossing, however, members of the public, including hunters with high-powered rifles, will roam freely within the perimeter without notifying anyone of their presence. Most members of the public will act responsibly, but some will not. The potential for accidents (and worse) is obvious.

Costs like these will diminish property values. Iron Bar projects a 10-25% diminution in value of its property from corner crossing, though some estimates

56

approach 30%. App. V1:173.[4] If those losses are multiplied across the millions of acres of private land in the checkerboard, that would erase billions of dollars of private-property value.

*Third*, corner crossing would have deleterious domino effects on the environment. Some landowners will respond by erecting fences along interior property lines, which will interrupt previously intact wildlife corridors and habitats, leading to biodiversity loss and ecosystem degradation. *Fact Sheet: Habitat Loss & Fragmentation*, Wildlife Soc'y (Mar. 2017), https://bit.ly/3yhSTbD. More generally, widespread public use of landlocked public parcels will fragment currently contiguous habitats in ways that have historically disrupted native populations. *Id*.

*Fourth*, it's debatable whether corner crossing will actually increase access to public land. *Camfield* and *Leo Sheep* recognized that landowners may lawfully fence their individual parcels of checkerboarded land, even if doing so blocks access to adjacent public land. *Supra* p. 38. Some, maybe most, landowners may decide that parcel-by-parcel fencing is the only economically viable solution to the problems imposed by corner crossing, in which case both property owners and the public will be worse off than before.

---

[4] Commentators have mischaracterized this figure as damages Iron Bar seeks from defendants. Iron Bar dropped its claim for actual damages. App. V4:666.

The takeaway is not that corner crossing should be unlawful because of these costs. Rather, the point is simply that courts are not institutionally suited to weigh these factors or address the long-term consequences of different access policies. Gould, *supra*, at 172-73. The job of crafting a "reasonable" "solution" rests with politically accountable actors or private parties, not the judiciary.

Fortunately, the relevant actors are stepping up. Federal, state, and local entities are enhancing public access across the country, employing a variety of solutions that respect private property interests.

One early legislative fix was the Land and Water Conservation Fund, 54 U.S.C. § 200301, which "help[s] preserve, develop, and ensure access to outdoor recreation resources." Carol Vincent, Cong. Rsch. Serv., RL33531, *Land and Water Conservation Fund* 1 (2018). From 1964 to 2018, the Fund "opened more than 5 million acres of public land [and] invested more than $16 billion in conservation and outdoor recreation." *Off Limits, But Within Reach: Unlocking the West's Inaccessible Public Lands*, Theodore Roosevelt Conservation Partnership (2018), https://bit.ly/3QcKU9m. In 2020, Congress passed the Great American Outdoors Act, Pub. L. No. 116-152, 134 Stat. 682, permanently funding the program and mandating appropriation of the Fund's annual $900 million budget.

The Federal Land Policy Management Act further expanded the government's ability "to secure access to public lands" by "purchase, exchange, donation, or

eminent domain." 43 U.S.C. § 1715(a). Land exchanges "offer creative, permanent solutions to a variety of use, access, and other problems created by private and state inholdings, split estates, and checkerboard lands." Kaiser and Breer, *supra*, at 15. In 2018, the BLM used this statutory authority to exchange 12,603 acres of non-contiguous federal land for 11,586 acres of private land in Skull Valley, Utah, providing the public with its "first-time right to access certain recreation areas." BLM, *Utah land exchange improves public access to big game hunting* (July 2018), https://on.doi.gov/3QPoiO5.

The Federal Land Transaction Facilitation Act of 2000 created "a more expeditious process for disposal and acquisition of land" to "facilitate a more effective configuration of land ownership patterns." 43 U.S.C. § 2301(6). The Act authorizes federal agencies to sell public lands and use the revenue to purchase private land or easements with high conservation or recreation value. 43 U.S.C. §§ 2304-05. In 2018, Congress permanently reauthorized the Act with the support of 165 sportsmen's, conservation, and government groups. *Federal Land Transaction Facilitation Act*, The Conservation Fund (Feb. 2022), https://bit.ly/3MqGRFp. The amendment specifically authorized the BLM to target inaccessible lands that will "help[] consolidate the public-private land checkerboard in the West." *Id.*

Complimentary initiatives are ongoing at the state level. The Block Management program in Montana, Open Gates in New Mexico, and the "Access Yes" programs in Wyoming and Idaho expand access for recreation on public land by incentivizing private landowners to "open their borders" for access. App. V4:637. These programs have expanded recreational access to public lands; about 1,200 landowners enrolled over 7 million acres of land in Montana's Block Management program alone for the 2022 hunting season. Montana Fish, Wildlife & Parks, *What Is Block Management*, https://bit.ly/3QPq7dT.

Finally, non-profit organizations are partnering with landowners and governments to enhance public access to corner-locked land. Examples include the Theodore Roosevelt Conservation Partnership, the Wilderness Land Trust, and the Trust for Public Lands. John Sheridan, *The Legal Landscape of America's Landlocked Property*, 37 UCLA J. Envtl. L. & Pol'y 229, 251 (2019). In 2017, for example, the Trust for Public Lands purchased a 600-acre ranch and then sold it to the BLM for $480,000, thereby opening up 32,000 acres of previously inaccessible land in Arizona's Coronado National Forest. *Id*. at 250.

*    *    *

Given the scale of Congress's initial folly—an astounding 300 million acres of checkerboarded land—one might wonder whether these efforts are meaningfully resolving the public access problem. The answer is unequivocally yes. Fewer than

nine million acres of public land remain corner-locked. App. V4:618. The Land and Water Conservation Fund alone has opened up 5 million acres of public land. Along with complementary initiatives described above, it will continue creating public access while respecting rights of private landowners.

The decision below threatens to short-circuit these efforts. By crafting its own solution—legalizing corner crossing—the district court mandated a zero-sum outcome that pits hunters against landowners. This Court should reverse and allow politically accountable actors to focus on mutually beneficial solutions that increase access while honoring basic property rights.

## CONCLUSION

Iron Bar respectfully asks the Court to reverse the decision below.

Respectfully submitted,

*/s/ R. Reeves Anderson*

Robert Reeves Anderson
Brian M. Williams
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, #3100
Denver, CO 80202
(303) 863-1000
reeves.anderson@arnoldporter.com
brian.williams@arnoldporter.com

Sean A. Mirski
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 942-5000
sean.mirski@arnoldporter.com

M. Gregory Weisz
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386
gweisz@penceandmac.com

November 6, 2023

## ORAL ARGUMENT STATEMENT

Pursuant to 10th Cir. L. R. 28.2(C)(2), Iron Bar requests oral argument in this case in light of the public significance of the issues raised.

## CERTIFICATE OF COMPLIANCE

1.     The foregoing brief complies with the type-volume limitations of Fed.

R. App. P. 32(a)(7)(B)(i) because the brief contains 12,985 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(f).

2.     The brief also complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

365 in Times New Roman 14-point font.


 Dated: November 6, 2023                    */s/ R. Reeves Anderson*
                                          Robert Reeves Anderson

**CERTIFICATE OF DIGITAL SUBMISSION**
**AND PRIVACY REDACTIONS**

I certify that all required privacy redactions have been made in this brief pursuant to 10th Cir. R. 25.5. I further certify that the hard copies of this brief to be submitted to the Court will be exact copies of the version submitted electronically and that the electronic submission of this brief was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Dated: November 6, 2023                    */s/ R. Reeves Anderson*
                                            Robert Reeves Anderson

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, I electronically filed the foregoing brief with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users.


 Dated: November 6, 2023          */s/ R. Reeves Anderson*
                                   Robert Reeves Anderson

**ADDENDUM**



# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

IRON BAR HOLDINGS, LLC, a North
Carolina limited liability company
registered to do business in Wyoming,

       Plaintiff,

   v.

BRADLEY H. CAPE, ZACHARY M.
SMITH, PHILLIP G. YEOMANS, and
JOHN W. SLOWENSKY,

       Defendants.

Case No. 22-CV-67-SWS

---

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

---

This matter comes before the Court on the following cross motions for summary judgment:

(1)    Plaintiff's Motion for Partial Summary Judgment and supporting memorandum (ECF 63, 64), to which Defendants responded (ECF 68); and

(2)    Defendants' Motion for Summary Judgment and supporting memorandum (ECF 65, 66), to which Plaintiff responded (ECF 67), and Defendants provided a limited reply (ECF 75) with the Court's leave.

The Court heard oral argument on the motions on May 10, 2023. (ECF 76.) Having considered the parties' submissions, the arguments of counsel, the record, the amici briefs (ECF 42, 45), and being otherwise fully advised, the Court finds, concludes, and orders as set forth here.

## INTRODUCTION

Plaintiff privately owns a significant amount of real property on Elk Mountain in Carbon County, Wyoming. (Am. Compl. ¶¶ 1, 11; ECF 37-1.) Much of Plaintiff's private property borders and surrounds federal public lands managed by the U.S. Department of Interior Bureau of Land Management (BLM), state public lands managed by the State of Wyoming, and township lands managed by the Town of Hanna. (ECF 64-9; *see also* ECF 66-2.) Many of the private and public lands meet at their corners, forming a checkerboard pattern, as roughly demonstrated here:



The points of contact at each corner meet at an infinitely small point and, "like a point in mathematics, are without length or width." *Mackay v. Uinta Development Co.*, 219 F. 116, 118 (8th Cir. 1914.) In brief, the tortured path resulting in this generally 40-mile wide checkerboard pattern of land ownership (20 miles on each side of the railroad track) has been summarized thusly:

History and politics have complicated the pattern of land ownership in the

West.  To promote western expansion in the nineteenth century, the federal
government encouraged the construction of rail lines through the West by
granting every other 640-acre parcel along rail corridors to a railroad company.
The hope was that the lands remaining with the government would increase in
value as the companies built rail lines, which the government would later sell at
high prices.  The plan was successful further east, but the government struggled
to sell the lands in the arid West.  The result of this failed venture is the
checkerboard pattern of public and private land that now plagues much of the
West.

Hannah Solomon, *Wyoming's Data Trespass Laws Trample First Amendment Rights*, 18 Vt. J. Envtl.

L. 346, 353–54 (2016) (footnotes omitted); *see also Leo Sheep Co. v. United States*, 440 U.S. 668,

670-77 (1979) (discussing the circumstances and events resulting in the creation of the

checkerboard pattern of land ownership that persists today in parts of the West).

"It is at once apparent that this checkerboard ownership pattern necessarily impedes

the ability of government employees and the general public to travel to and from federal land,

as frequently the only access routes travers private property." *United States v. 82.46 Acres of*

*Land, More or Less, Situate in Carbon Cnty, Wyo.*, 691 F.2d 474, 475 (10th Cir. 1982).  This lawsuit

involves the decades-long dispute of whether an individual is subject to civil liability for

trespassing if they travel by foot through the checkerboard from public land to public land at

the corners, while never touching private land and not damaging private property, without the

permission of the owner(s) of the adjoining private land(s).  The Court finds the century-old

case of *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914), which also originated in the

District of Wyoming, provides the answer and allows such corner crossing by foot without

trespass liability.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact

could resolve the issue either way," and it is material "if under the substantive law it is essential

to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)

(internal quotation marks omitted). Testimony or other evidence "grounded on speculation

does not suffice to create a genuine issue of material fact to withstand summary judgment."

*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).

The Court views the record and all reasonable inferences that might be drawn from it

in the light most favorable to the party opposing summary judgment. *Dahl v. Charles F. Dahl,*

*M.D., P.C. Defined Ben. Pension Trust*, 744 F.3d 623, 628 (10th Cir. 2014). "Cross-motions for

summary judgment are to be treated separately; the denial of one does not require the grant

of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)

Generally, the moving party has "both the initial burden of production on a motion

for summary judgment and the burden of establishing that summary judgment is appropriate

as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting

*Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)). If the moving party

carries this initial burden, the nonmoving party may not rest on its pleadings but must bring

forward specific facts showing a genuine dispute for trial. *Id.* (citing *Jenkins v. Wood*, 81 F.3d

988, 990 (10th Cir. 1996)).

## FACTS

1.   **2020 Hunt and Corner Crossings**

In the fall of 2020, Defendants Cape, Smith, and Yeomans traveled from their homes

in Missouri to Carbon County to hunt big game on Elk Mountain. (Am. Compl. ¶¶ 2-4, 18; Answer to Am. Compl. ¶¶ 3-5; 19.) They each had a valid hunting license and/or tag to hunt in the area. (ECF 66 p. 10.) They drove on a public road, Rattlesnake Pass Road, to Section 14, which is public land managed by the BLM, where they parked and set up their camp. (Cape Depo. 42:13-15.) Over the next several days, they hunted on several sections of public land in a south-southeastern direction from their camp, specifically on Sections 24, 30, 36, and 26 (*id.* 31:4-12), which are shown on the following map.



This map is an excerpt from Plaintiff's Exhibit 8 (ECF 64-9), but the Court notes Plaintiff also owns Sections 13 and 23, though not denoted on the map. (ECF 64 p. 3; ECF 68 p. 2; ECF

66 p. 4.)  Each numbered Section is one square mile (640 acres) of land.  (ECF 66-15 p. 7.)

Upon approaching the northwest corner of public Section 24 from public Section 14 (denoted at Pin Drop 8 on the map above), the three hunters were met with two steel posts, each with a "No Trespassing" sign, that were connected together with a chain, a padlock, and some wire.  One post was installed in Section 13 (private) and the other in Section 23 (private), and the chain and wire ran through the air over the corner of Sections 13, 24, 23, and 14, as shown here from Defendants' Exhibit E (ECF 66-5).



The survey marker ("brass cap") shown in the photo between the two signs protruding about a foot out of the ground designates the "corner" where Sections 13, 24, 23, and 14 meet.  (ECF

66 pp. 3-4.)  Other than these chained-together signs, there were no posts, fencing, or buildings

within one-quarter of a mile of the corner.  (Grende Depo. 43:4-8.)

       With their backpacks and hunting gear, Defendants Cape, Smith, and Yeomans could

not fit between the signs and under the chain to move from Section 14 to Section 24.  (ECF

66 p. 6; *see* Grende Depo. 42:19-23 (agreeing the chain and lock "present a physical obstacle

to anyone who is walking from Section 14 to Section 24 across the corner").)  So, one by one,

each grabbed one of the steel posts and swung around it, planting their feet only on Sections

14 (BLM) and Section 24 (BLM) but passing through the airspace above Section 23 (Plaintiff)

and/or Section 13 (Plaintiff).  (ECF 64 p. 4; ECF 68 pp. 3-4.)  In holding onto the steel posts

and swinging around them to cross from Section 14 to Section 24, there is no evidence the

Defendants caused any damage to Plaintiff's property.  (Grende Depo. 27:3-25.)

       They then proceeded with their hunt on the public land.  At the other corners they

crossed (denoted as Pin Drops 1, 2, and 5 on the above map), there were no further physical

barriers such as steel posts and chain, so the hunters simply stepped or jumped over the survey

marker/brass cap from public land to public land, again passing momentarily through airspace

above Plaintiff's privately-owned land.  (*See, e.g.*, ECF 64 p. 8; ECF 68 p. 2; Cape Depo. 58:11-

24 (describing stepping over the survey marker from Section 36 (BLM) to Section 26 (BLM));

Yeomans Depo. 39:10-18.)  The hunters spent about a week hunting in the area and crossed

the corners multiple times using the methods described.  (ECF 64 p. 4; ECF 68 p. 2.)

       Plaintiff observed Defendants Cape, Smith, and Yeomans during their 2020 hunt and

did not approve of Defendants' presence.  Plaintiff never consented to Defendants entering

its property or airspace in any manner.  (ECF 64 p. 8; *see* ECF 68 pp. 3-5.)  Prior to 2020,

**Add. 8**            **Add. 8**            **Add. 8**

Plaintiff instituted an ongoing practice of having its employees confront or interact with a "suspected trespasser" found on or near Plaintiff's property, even if the person was found while on public land.  (Eshelman Depo. 32:12-34:8, 66:17-25.)  The suspected trespasser is instructed to leave, but if they resist, Plaintiff will contact local law enforcement, including the Wyoming Game & Fish Department, to seek a criminal trespass citation or other prosecution. (ECF 66 p. 9.)  And if in Plaintiff's view law enforcement takes insufficient action on the matter, Plaintiff will continue to contact law enforcement to push the matter and will also contact the local prosecutor's office to request criminal prosecution.  (*Id.* p. 9.)  Finally, as here, Plaintiff may also institute a civil action against the suspected trespasser.  (*Id.* p. 10.) Probably obvious at this point, Plaintiff considers corner crossing to be an invasion of the airspace above its land that constitutes unlawful trespassing.  (Eshelman Depo. 60:20-25, 63:13-23, 78:9-14, 83:25-84:8.)

In 2020, Plaintiff's property manager, Steven Grende, confronted the Defendants when he found them on public land because he determined they could only reach such public land by trespassing, whether by corner crossing through Plaintiff's airspace or otherwise. (ECF 66 p. 10; Grende Depo. 68:9-20; Smith Depo. 25:17-26:17.)  When he requested they leave the area, the hunters refused.  (Yeomans Depo. 81:18-82:6.)  Mr. Grende then contacted law enforcement to complain about the alleged trespassing.  (Smith Depo. 56:4-11.)  The hunters explained to the responding sheriff's deputy that they had corner crossed from public land to public land without touching private land, and law enforcement did not issue any warning or citation to the hunters in 2020.  (Cape Depo. 105:3-23; Smith Depo. 56:1-57:23; Yeomans Depo. 80:14-81:14.)  The three hunters successfully completed their hunting trip as

planned that year and then returned home.

There is no evidence the three hunters physically touched the surface of Plaintiff's land when corner crossing or caused any damage to Plaintiff's private property in 2020. (Grende Depo. 22:12-24:20.)

2. **2021 Hunt and Corner Crossings**

The three hunters plus Defendant Slowensky returned to the same area in the fall of 2021 to hunt. This time, in an effort to not touch Plaintiff's steel posts when crossing from public Section 14 to public Section 24, they brought a steel A-frame ladder that Defendant Cape had constructed. (ECF 64-10; Cape Depo. 77:2-22; Smith Depo. 34:1-5; Yeomans Depo. 43:20-44:12.) As shown here in a cropped portion of Plaintiff's Ex. 9 (ECF 64-10), the ladder straddled over the lower "No Trespassing" sign, with two feet resting on Section 14 and the other two feet on Section 24. (ECF 66-15 p. 8.)



Page 9 of 32

The now-four hunters crossed the same corners as the previous year plus a few more to access additional sections of public lands. Specifically, Defendants hunted on Sections 14, 24, 26, 30, 36, 32, 6, and 8, while crossing the corners denoted by Pin Drops 1-8 on the following map. (*See* ECF 64 pp. 6-7; ECF 68 p. 2.)



This map was adapted from Plaintiff's Exhibit 8 (ECF 64-9) to show the additional Sections

of land that were hunted in 2021, and the Court again notes Plaintiff also owns Sections 13 and 23 though such is not denoted on the map. The hunters only used their ladder to cross from Section 14 to Section 24 because the other corners were unobstructed and they could simply step or jump over the survey marker/brass cap from public land to public land. (ECF 64 p. 8; ECF 68 p. 2.)

Defendants' 2021 hunting expedition did not go as smoothly as the prior year's. Plaintiff proved much more aggressive about expelling the hunters from the area and seeking their criminal prosecution for alleged trespassing in 2021. Mr. Grende and another Plaintiff employee confronted the hunters in person multiple times in attempts to get them to leave the public lands bordering Plaintiff's private lands. (Yeomans Depo. 82:7-83:1, 83:18-84:1.) Plaintiff's employees also interfered with Defendants' hunt by constantly watching them from nearby and by driving motorized vehicles on public parcels near Defendants while they hunted in an effort to scare away the game. (ECF 66 p. 12.) When the hunters refused to stop corner crossing and hunting on the public lands, Mr. Grende contacted the Wyoming Game and Fish Department, which said it would not take action against the hunters. (Grende Depo. 68:21-69:5.) Undeterred, he then contacted the local sheriff's office, which initially also refused to take action against the hunters. (*Id.* at 69:6-15.) He then contacted the local prosecuting attorney's office, which said it was willing to prosecute the corner crossings as criminal trespassing. (*Id.* at 69:21-70:5.) The prosecuting attorney's office directed the sheriff's office to write citations for criminal trespass to each Defendant, which were issued. (ECF 66 p. 14; ECF 66-21 p. 8.) In connection, the Wyoming Game and Fish Department also instructed Defendants to leave the area and not enter the subject public lands again. (ECF 66 p. 14.)

Consequently, the hunters' 2021 hunting trip was cut short.  Following a jury trial several

months later, each Defendant was acquitted by the jury of the state criminal trespass charge.

(ECF 66-24.)

There is no evidence the hunters made physical contact with Plaintiff's private land or

caused any damage to Plaintiff's private property in 2021.  (Grende Depo. 21:2-23:2, 28:1-13.)

3.    **"Waypoint 6" from Defendant Smith**

During Defendants' 2020 hunting trip, Defendant Smith used a GPS mapping tool on

his cellphone called "onX Hunt," which helps hunters find property lines and determine land

ownership.  (*See* Decl. Zachary Smith at ¶¶ 3-8, ECF 72-1 p. 3; Spitzer Depo. 10:19-12:18.)

Plaintiff subpoenaed the raw metadata created by Defendant Smith's use of the onX Hunt

application and found that Defendant Smith had designated a waypoint, "Waypoint 6," that

was located on Plaintiff's private land and not near a corner.  (ECF 67-3, 67-4.)  Plaintiff

contends Waypoint 6 establishes Defendant Smith, and maybe other Defendants, trespassed

upon the surface of Plaintiff's private land in 2020.  (ECF 67 p. 24.)

The onX Hunt metadata for Waypoint 6 shows it was created on September 30, 2020

(while Defendant Smith was hunting in Wyoming) and was deleted from the application on

October 19, 2020.  (ECF 67-3 p. 2.)  Defendant Smith believes his onX Hunt raw data is

accurate but says he does not recall creating Waypoint 6 and, in any event, it does not solely

prove his physical presence at the location of the waypoint. (Decl. Zachary Smith at ¶¶ 7-12.)

An onX Hunt user can "drop" (create) a waypoint to designate their current location, but they

can also drop a waypoint that is nowhere near their current location, including from a different

state. (Spitzer Depo. 25:2-12.)

<u>ANALYSIS</u>

The Court will focus its initial discussion on the issue of corner crossing and whether

it, as it was performed by Defendants in this case, constitutes an actionable trespass.

1.   <u>Subject to Certain Restrictions, a Private Landowner Owns the Airspace Within
     a Reasonable Height of the Land and Enjoys a Right to Exclude Others from
     that Airspace</u>

No person can reasonably doubt the fundamental importance of private property rights

to the development and continuing validity of the United States.  "The Founders recognized

that the protection of private property is indispensable to the promotion of individual

freedom.  As John Adams tersely put it, '[p]roperty must be secured, or liberty cannot exist.'"

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (quoting Discourses on Davila, in 6

Works of John Adams 280 (C. Adams ed. 1851)).  Indeed, the Fifth Amendment protects an

individual's property against encroachment by the federal government and the Fourteenth

Amendment protects that same property against encroachment by a state.

While the U.S. Constitution protects a person's property interests, *Jordan-Arapahoe, LLP

v. Board of Cnty. Comm'rs of County of Arapahoe, Colo.*, 633 F.3d 1022, 1025 (10th Cir. 2011), the

actual property interests themselves "are not created by the Constitution.  Rather they are

created and their dimensions are defined by existing rules or understandings that stem from

an independent source such as state law—rules or understandings that secure certain benefits

and that support claims of entitlement to those benefits," *Board of Regents v. Roth*, 408 U.S. 564,

577 (1972).

> We thus must turn to state law in understanding the scope of property rights in
> land ownership.  This is not always a simple task.  The modern understanding
> of the bundle of sticks of land ownership is overlain with myriad competing
> land use, zoning, and environmental regulations.  A landowner faces numerous

restrictions on the full use and alienability of land depending on the interplay of local, state, and federal law.

*Jordan-Arapahoe*, 633 F.3d at 1026; *see Garnett v. Brock*, 2 P.3d 558, 563 (Wyo. 2000) ("In order to be afforded constitutional status, property rights must have been initially recognized and protected by state law."), *overruled on other grounds by Brown v. City of Casper*, 248 P.3d 1136 (Wyo. 2011).

The property rights at issue in this case are two-pronged and intertwined: (1) Plaintiff's ownership of the airspace above its land, and (2) Plaintiff's right to exclude others from that airspace. Looking at the first prong, the Wyoming Statutes have stated since 1931:

> The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of [aircraft] flight[1] ….

Wyo. Stat. § 10-4-302; *see Cheyenne Airport Board v. Rogers*, 707 P.2d 717, 722 (Wyo. 1985). The U.S. Supreme Court similarly stated:

> [I]t is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere. Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run. The principle is recognized when the law gives a remedy in case overhanging structures are erected on adjoining land. The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. The fact that he does not occupy it in a physical sense—by the erection of buildings and the like—is not material.

*United States v. Causby*, 328 U.S. 256, 264 (1946) (internal citation and footnote omitted); *see Griggs v. Allegheny County, Pa.*, 369 U.S. 84, 89 (1962) ("the use of land presupposes the use of

---

[1] The right of aircraft flight is immaterial to this case, which involves incursions into airspace only a few feet off the ground, but the Supreme Court case of *United States v. Causby*, 328 U.S. 256 (1946), effectively "divided the airspace into two strata. The landowner owned the airspace within the 'immediate reaches' of the surface of his land, but the upper air was navigable airspace, in the public domain." *Pueblo of Sandia ex rel. Chaves v. Smith*, 497 F.2d 1043, 1045–46 (10th Cir. 1974).

some of the airspace above it").

Turning now to the latter prong, of course an owner of real property has a right to exclude others from their property. The Wyoming Supreme Court has explained, "Ownership of property implies the right of possession and control and includes the right to exclude others; that is, a true owner of land exercises full dominion and control over it and possesses the right to expel trespassers." *Sammons v. Am. Auto. Ass'n*, 912 P.2d 1103, 1105 (Wyo. 1996). The U.S. Supreme Court similarly said, "It is true that one of the essential sticks in the bundle of property rights is the right to exclude others." *Pruneyard Shopping Center v. Robbins*, 447 U.S. 74, 82 (1980).

Applying these ownership principles here, the law makes clear that Plaintiff is the lawful owner of "as much of the space above the ground" of its property as it could reasonably occupy or use in connection with the land. Additionally, Plaintiff has the right to exclude others from that airspace.

Taken together, this would appear dispositive of the matter. This is not the end of the analysis, though. As the Court noted, "A landowner faces numerous restrictions on the full use and alienability of land depending on the interplay of local, state, and federal law." *Jordan-Arapahoe*, 633 F.3d at 1026. The U.S. Supreme Court has recognized landowners take their land subject to certain express legal restrictions, such as zoning ordinances, as well as "'background principles of nuisance and property law' [that] independently restrict the owner's intended use of the property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1026-32 (1992)). "And valid preexisting federal-law limitations on what otherwise would be state-law property rights are among the

limitations that may inhere in title so as to limit compensable property rights." *McCutchen v. United States*, 14 F.4th 1355, 1365 (Fed. Cir. 2021), *cert. denied*, 143 S. Ct. 422 (2022); *see also Interstate Consol. St. Ry. Co. v. Commonwealth of Massachusetts*, 207 U.S. 79, 87 (1907) ("the great constitutional provisions for the protection of property are not to be pushed to a logical extreme, but must be taken to permit the infliction of some fractional and relatively small losses without compensation, for some, at least, of the purposes of wholesome legislation").

## 2.   Relevant Restrictions on the Ownership of Airspace and Right to Exclude Within the Checkerboard Pattern of Land Ownership

Thus, the next step of the examination is determining whether there are any relevant restrictions on the Plaintiff's ownership of the subject airspace or its right to exclude others from that airspace. The Court's examination reveals history, federal caselaw, federal statutory law, and recent Wyoming legislation demonstrate corner crossing in the manner done by Defendants in this case is just such a restriction on Plaintiff's property rights because Defendants, "in common with other persons [have] the right to the benefit of the public domain," *Mumford v. Rock Springs Grazing Ass'n*, 261 F. 842, 849 (8th Cir. 1919), which necessarily requires some limitation on the adjoining private landowner's right of exclusion within the checkerboard pattern of land ownership.

First, and most pertinent to the issues here, is the case of *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914), which has many parallels to the instant lawsuit. In *Mackay*, the "Uinta Development Company sued Mackay for damages for trespass by trailing his sheep across and depasturing its lands in Wyoming." *Id.* at 117. Mackay was moving his sheep south across the Wyoming checkerboard to graze on federal lands for the winter. *Id.* at 117-18. Uinta Development Company warned Mackay not to cross its privately-owned lands on the

way. *Id.* at 118.   Mackay nevertheless started his sheep south, crossing portions of the

company's private land as well as parcels of public land as he went, while his sheep grazed

upon the land the entire way. *Id.* Mackay "drove his sheep, over the protest and prohibition

of the [company], upon and along a strip of land three-fourths of a mile wide upon and across

the entire length or width of some of the [company's] sections of land, and caused his sheep

to consume nine-tenths of the grass thereon." *Id.* at 120-21 (Sanborn, J., dissenting).   At the

company's insistence, Mackay was arrested along the way, and the company also sued him for

civil trespass.   *Id.*   After a bench trial, the district court rendered judgment for the company,

holding Mackay liable for civil trespass damages. *Id.* at 117.

On appeal, the Eighth Circuit reversed the District of Wyoming's decision. *Id.* at 120.

The Eighth Circuit held: "The question here, which we think should be answered in the

affirmative, is whether Mackay was entitled to a reasonable way of passage over the unenclosed

tract of land without being guilty of trespass." *Id.* at 120.   In determining that Mackay should

have a reasonable way of passage over the company's private lands to access the public lands,

the appellate court said:

> The company admitted [Mackay's] right as to the public domain, but warned
> him not to go over any of its lands on penalty of prosecution for trespass.... If
> the position of the company were sustained, a barrier embracing many thousand
> acres of public lands would be raised, unsurmountable except upon terms
> prescribed by it.   Not even a solitary horseman could pick his way across
> without trespassing.   In such a situation the law fixes the relative rights and
> responsibilities of the parties.   It does not leave them to the determination of
> either party.   As long as the present policy of the government [concerning public
> lands] continues, all persons as its licensees have an equal right of use to the
> public domain, which cannot be denied by interlocking lands held in private
> ownership.
>
> ...

This case illustrates the conflict between the rights of private property and the public welfare under exceptional conditions…. This large body of land, with the odd-numbered sections of the company and the even-numbered sections of the public domain located alternately like the squares of a checker-board, remains open as nature left it. Its appearance is that of a common, and the company is so using the contained public portions. In such use it makes no distinction between them and its own holdings. It has not attempted physically to separate the latter for exclusive private use. It admits that Mackay had the right in common with the public to pass over the public lands. But the right admitted is a theoretical one, without utility, because practically it is denied except on terms it prescribes. Contrary to the prevailing rule of construction, it seeks to cast upon the government and its licensees all the disadvantages of the interlocking arrangement of the odd and even numbered sections because the grant in aid of the railroad took that peculiar form. It could have lawfully fenced its own without obstructing access to the public lands. That would have lessened the value of the entire tract as a great grazing pasture, but it cannot secure for itself that value, which includes as an element the exclusive use of the public lands, by warnings and actions in trespass.

*Id.* at 118-20.[2]

The many parallels between the circumstances in *Mackay* and those here are obvious. And significant to *Mackay's* decision that a member of the public was "entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass" were the "exceptional conditions" created by the unique checkerboard of land ownership that is at the center of this controversy. However, questions remain concerning whether *Mackay* is still valid law all these years later, and the Court turns to those questions now.

*Mackay* has never been expressly overruled, but whether it is binding on this Court appears unsettled. *Mackay* was decided by the Eighth Circuit Court of Appeals. In 1929, Congress divided the Eighth Circuit into two circuits. The Eighth Circuit retained Minnesota,

---

[2] Judge Sanborn dissented in *Mackay*, but not concerning whether Mackay had the right to cross the company's private land to gain access to the public lands. Instead, Judge Sanborn opined, "The owner of land is not deprived of his right to recover the damages he sustains by the taking by another of his grass, growing grain, or timber from his land, or the mineral out of it, even if the taker has the right to cross his land[.]" *Mackay*, 219 F. at 121.

Iowa, North Dakota, South Dakota, Nebraska, Missouri, and Arkansas. The new Tenth

Circuit took Wyoming, Colorado, Utah, New Mexico, Kansas, and Oklahoma. Thus, at the

time of *Mackay*, Wyoming was part of the Eighth Circuit. In the years since its formation, the

Tenth Circuit has issued conflicting guidance on the binding nature of prior Eighth Circuit

decisions. *Compare Boynton v. Moffat Tunnel Improvement Dist.*, 57 F.2d 772, 781 (10th Cir. 1932)

("decisions cited from the Supreme Court of the United States, from the Eighth Circuit Court

of Appeals, and from this court, are binding upon us"), *with Estate of McMorris v. Comm'r*, 243

F.3d 1254, 1258 (10th Cir. 2001) ("we have never held that the decisions of our predecessor

circuit are controlling in this court").

Because *Mackay* originated from the District of Wyoming and was decided by the

appellate court then sitting over this Court, this Court can find no reasonable basis to believe

it is not bound by *Mackay's* decision. Nonetheless, even if *Mackay* is somehow only persuasive

authority, the Court finds it particularly persuasive due to the many factual parallels between

*Mackay* and the instant case.

Additionally, Plaintiff in this case has argued *Mackay* was implicitly overruled by *Leo

Sheep Co. v. United States*, 440 U.S. 668 (1979). The material differences between *Leo Sheep* and

*Mackay* suggest such a claim to be exaggerated. In *Leo Sheep*, two companies (Leo Sheep Co.

and Palm Livestock Co.) owned the odd-numbered sections in an area of the checkerboard

lands in Wyoming that sat east and south of the Seminoe Reservoir. *Id.* at 677-78. "Because

of the checkerboard configuration, it is physically impossible to enter the Seminoe Reservoir

sector from this direction without some minimum physical intrusion upon private land." *Id.*

at 678. The federal government intervened after receiving several complaints that the private

landowners were denying the public access to the reservoir over the private lands or were demanding access fees. *Id.* Upon the theory that Congress reserved to the federal government an implied easement over the privately-owned checkerboard lands when they were originally conveyed, the federal government built a dirt road extending from a local county road to the reservoir that crossed both public and private lands and invited the public to access the reservoir using the new road. *Id.* The companies moved to quiet title in the private lands against the federal government. *Id.* The District of Wyoming granted the petition and quieted title in the companies, but the Tenth Circuit reversed on direct appeal, concluding Congress implicitly reserved an easement to pass over the private odd-numbered sections of the checkerboard in order to reach the even-numbered public sections. *Id.* On permissive review, the U.S. Supreme Court reversed the Tenth Circuit. *Id.* at 688. The Supreme Court found insufficient evidence existed to suggest Congress impliedly reserved an easement by necessity in favor of the government across the private lands. *Id.* at 681-82.

The Court does not agree that *Leo Sheep* implicitly overruled *Mackay* for two reasons. First, several years after *Leo Sheep* was decided, the Tenth Circuit relied on *Mackay* in part in *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1509 (10th Cir. 1988), and never noted or suggested *Mackay* was overruled or invalid in any manner.

Second, and more significantly, *Leo Sheep* and *Mackay* are too factually and legally different for the Court to conclude *Mackay* cannot coexist in a world with *Leo Sheep*. The primary intruder in *Leo Sheep* was the federal government, whereas in *Mackay* (as in the instant case) it was a private individual. This is a fundamental difference because the federal government holds the power of eminent domain (condemnation), but private individuals do

not. Then Justice Rehnquist noted in *Leo Sheep*, "This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power **to construct public thoroughfares without compensation**." *Id.* at 687-88 (emphasis added). As this quote demonstrates, significant to the Supreme Court's consideration of the matter in *Leo Sheep* was the federal government's power of eminent domain (condemnation) under the Fifth Amendment, which allows the government to take private property without the owner's consent and convert it to public use (such as a public thoroughfare) in exchange for just and fair compensation.[3] The *Leo Sheep* opinion added: "Generations of land patents have issued without any express reservation of the right now claimed by the Government. Nor has a similar right been asserted before. When the Secretary of the Interior has discussed access rights, his discussion has been colored by the assumption **those rights had to be purchased**." *Id.* at 687 (emphasis added). Essentially, the Supreme Court determined the federal government's argument for an implied easement was an attempt to condemn a portion of private property to build a public thoroughfare without having to pay for it. That simply isn't the case or the issue in *Mackay* (or in the instant case).

The eminent domain distinction is substantial because *Leo Sheep* distinguished itself from a prior case that did not involve the federal government based in part on the availability of eminent domain. In *Buford v. Houtz*, 133 U.S. 320 (1890), a group of cattle ranchers owned some odd-numbered lots in the checkerboard pattern within the then-territory of Utah. *Id.* at

---

[3] *See PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2251-52, 2254-57 (2021), for a recent discussion of eminent domain.

321-22.  They sought an injunction against a group of sheep ranchers to prevent the sheep

ranchers from moving their sheep across the odd-numbered parcels to reach even-numbered

public lands for grazing.  *Id.* at 322-24.  The trial court dismissed the case, determining the

cattle ranchers had failed to state a viable claim for equity to support its injunction request,

and the supreme court of Utah affirmed the dismissal.  *Id.* at 321.  The U.S. Supreme Court

agreed and also affirmed the dismissal, stating:

> The appellants [cattle ranchers] being stock-raisers, like the defendants [sheep
> ranchers], whose stock are raised and fattened on the unoccupied lands of the
> United States mainly, seek by the purchase and ownership of parts of these
> lands, detached through a large body of the public domain, to exclude the
> defendants from the use of this public domain as a grazing ground, while they
> themselves appropriate all of it to their own exclusive use.... If we look at the
> condition of the ownership of these lands on which the plaintiffs rely for relief,
> we are still more impressed with the injustice of this attempt.... Of this 921,000
> acres of land, the plaintiffs only assert title to 350,000 acres; that is to say, being
> the owners of one-third of this entire body of land, which ownership attaches
> to different sections and quarter sections scattered through the whole body of
> it, they propose by excluding the defendants to obtain a monopoly of the whole
> tract, while two-thirds of it is public land belonging to the United States, in
> which the right of all parties to use it for grazing purposes, if any such right
> exists, is equal.  The equity of this proceeding is something which we are not
> able to perceive.

*Id.* at 325-26.  The Supreme Court distinguished the *Leo Sheep* decision from *Buford* by stating,

"The Court [in *Buford*] also was influenced by the sheep ranchers' lack of any alternative." *Leo*

*Sheep*, 440 U.S. at 687 n.24.  The federal government's power of condemnation, to take private

land for public use in exchange for fair payment, is the important alternative that was available

in *Leo Sheep* but not available in *Buford* or in *Mackay* (or in this case).  In sum, the Court does

not find *Leo Sheep* implicitly overruled *Mackay*.

The Court further finds *Leo Sheep* of limited applicability when examining the instant

case.  First, as already noted, *Leo Sheep* concerned the construction of a public thoroughfare (a

dirt road) across portions of private property, whereas the undisputed evidence in this case shows no damage or alteration to Plaintiff's private property. In this case, the primary intrusion of Plaintiff's property takes the form of an incursion into a small portion of the airspace above the land that lasted a matter of seconds, not a permanent construction that altered Plaintiff's land. Second, like in *Mackay*, the power of eminent domain (condemnation) is not an alternative available to Defendants in this case. Thus, *Leo Sheep* is so materially different from the case at bar as to offer practically no persuasive value on the matter. The Court concludes *Mackay* remains valid and finds it is the authority most directly on point to the questions in this case.

In sum, *Mackay* is still valid authority that is at least very persuasive, if not outright binding, on the instant matter. The many similarities cause the Court to conclude the core principle of *Mackay*, that private individuals possess "a reasonable way of passage over the unenclosed tract of land without being guilty of trespass" within the checkerboard applies to the circumstances of this lawsuit. Admittedly, though, the "way of passage" taken in *Mackay* was significantly more intrusive than the "way of passage" taken in this case, and the scope of the path taken in *Mackay* is not at issue in this case. Instead, the scope of the path taken by Defendants in 2020 and 2021 is at issue in this case, which is where the Court now turns.

3. **Determining the Scope of the Relevant Restriction on the Ownership of Airspace and Right to Exclude Within the Checkerboard Pattern of Land Ownership**

The Court's conclusion that the main principle of *Mackay* applies here to give Defendants "a reasonable way of passage over the unenclosed tract of land without being guilty of trespass" is both buttressed and limited in scope by two additional considerations.

First, the Court finds the Tenth Circuit case of *Pueblo of Sandia ex rel. Chaves v. Smith*, 497 F.2d

1043 (10th Cir. 1974), offers persuasive guidance on the matter. That case concerned aircraft

travel rather than pedestrian travel, but the discussion there runs parallel to the issues

concerning Defendants' corner crossings in this case. Specifically, the Tenth Circuit there

stated an incursion into only airspace requires some accompanying damage to or interference

with the actual use of the landowner's property to constitute an actionable trespass. *Id.* at

1045.

> Appellant contends the allegation and proof of actual damages is unnecessary
> because violation of a landowner's possessory right constitutes a trespass for
> which at least nominal damages are presumed. This is ordinarily true when
> trespass to realty is concerned. But traversing the airspace above a plaintiff's
> land is not, of itself, a trespass. It is lawful unless done under circumstances
> which cause injury.

*Id.* Applying a similar principle to the present case, Defendants' temporary incursions into the

airspace at the corners of Plaintiff's land does not constitute trespassing unless actual damages

result therefrom, and there is no evidence that Defendants' airspace intrusions caused actual

damage to or interfered with Plaintiff's use of its property. Neither does this Court believe

Plaintiff can premise damages upon the loss of the right to exclude individuals from public

lands, absent the use of an aircraft or human cannon shot, which Plaintiff never held.

Second, recalling that the scope of property rights is largely defined by state law, the

Court considers the recently amended version of Wyoming Statute § 23-3-305(b), Senate File

No. SF0056, which was passed overwhelmingly by the Wyoming Legislature earlier this year,

signed into law by the Governor, and set to take effect July 1, 2023. The new version of that

statute, with the recent amendments in bold, provides:

(b)      No person shall enter upon, **travel through or return across** the private

property of any person to **take wildlife,** hunt, fish, collect antlers or horns, or trap without the permission of the owner or person in charge of the property. Violation of this subsection constitutes a low misdemeanor punishable as provided in W.S. 23-6-202(a)(v) [up to $1,000 fine and six months of imprisonment]. **For purposes of this subsection "travel through or return across" requires physically touching or driving on the surface of the private property.**

Wyo. Stat. § 23-3-305(b) (bold added) (to become effective July 1, 2023). The plain language of the recent amendments to this statute applies to corner crossings as they occurred in this case, where Defendants did not touch the surface of Plaintiff's land. Moreover, the statutory changes plainly demonstrate the Wyoming Legislature's intent to ensure such corner crossing does not constitute a criminal act.

### 4.   <u>Corner Crossing on Foot in the Checkerboard Pattern of Land Ownership Without Physically Contacting Private Land and Without Causing Damage to Private Property Does Not Constitute an Unlawful Trespass</u>

In sum, Plaintiff indeed possesses a property interest in the airspace above its land (up to a certain height that is not at issue in this case) and generally holds the right to exclude others from its property, but that right is not boundless. Defendants

> in common with other persons [have] the right to the benefit of the public domain, and the courts will not enforce any rule of property in the [Plaintiff] that will deny to the [Defendants] and those similarly situated a reasonable way of passage over the unenclosed tracts of land of the [Plaintiff].

*Mumford*, 261 F. at 849; *see Mackay*, 219 F. at 118 ("As long as the present policy of the government continues, all persons as its licensees have an equal right of use of the public domain, which cannot be denied by interlocking lands held in private ownership."). Plaintiff asserts, "Federal courts have recognized that Congress purposely created the checkerboard, and [Plaintiff] is not to blame for the problems arising from the pattern." (ECF 67 p. 25.) Plaintiff is correct that it is not to blame for the problems caused by the checkerboard pattern

of land ownership, but "[i]n such a situation the law fixes the relative rights and responsibilities of the parties. It does not leave them to the determination of either party." *Mackay*, 219 F. at 118. Plaintiff may not "cast upon the government and its licensees all the disadvantages of the interlocking arrangement of the odd and even numbered sections because the grant in aid of the railroad took that peculiar form." *Id.* at 119-20.

It is only reasonable for the owner of the private sections and the public, as the owner of the alternating sections, to share in the solution. Synthesizing the law surveyed above, the Court finds that where a person corner crosses on foot within the checkerboard from public land to public land without touching the surface of private land and without damaging private property, there is no liability for trespass. In this way, the private landowner is entitled to protect privately-owned land from intrusion to the surface and privately-owned property from damage while the public is entitled its reasonable way of passage to access public land. The private landowner must suffer the temporary incursion into a minimal portion of its airspace while the corner crosser must take pains to avoid touching private land or otherwise disturbing private property. Similar restrictions imposed upon a landowner within the "exceptional conditions" created by the checkerboard, *Mackay*, 219 F. at 120, date back well over a century and are some of those "background principles of nuisance and property law [that] independently restrict the owner's intended use of the property," *Lingle*, 544 U.S. at 538 (internal quotations omitted).

5.    <u>**Defendants' Corner Crossings in this Case are Not Unlawful Trespasses**</u>

In applying this principle to the undisputed facts of this case, the Court considers first the corner crossings where Defendants did not make physical contact with Plaintiff's land or

private property, including those where Defendants needed to only step over a survey marker/brass cap and where they used the A-frame ladder in 2021 to climb over Plaintiff's signs, lock, and chain without touching them. This covers every corner crossing in 2021 as well as all 2020 corner crossings except for the crossings between Section 14 and Section 24. The undisputed evidence here is that Defendants performed these corner crossings without physically touching Plaintiff's private land and without otherwise damaging Plaintiff's private property. (Grende Depo. 11:14-12:12, 16:16-17:11, 21:2-22:11.) Consequently, a cause of action for civil trespass does not lie against Defendants as it concerns these corner crossings, and they are entitled to summary judgment in their favor as to these corner crossings.

The Court now considers the 2020 corner crossings between Sections 14 and 24, where Defendants Cape, Smith, and Yeomans admitted to holding onto Plaintiff's steel post to swing around the locked chain that connected the two steel posts. The Court again finds guidance in *Mackay*. The Unlawful Inclosures Act of 1885 (UIA), 43 U.S.C. §§ 1061-1066, was a consideration in *Mackay* but was not singularly controlling. *See Mackay*, 219 F. at 120. The Court similarly finds the UIA applicable but not singularly controlling regarding Defendants' 2020 corner crossings between Sections 14 and 24. The UIA states in relevant part:

> No person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct … any person from peaceably entering upon … any tract of public land subject to … entry under the public land laws of the United States, or shall prevent or obstruct free passage or transit over or through the public lands[.]

43 U.S.C. § 1063.

It is undisputed that the locked chain that was installed between the steel posts by Plaintiff hung through the airspace over the adjoining public land of Sections 14 and 24.

(Grende Depo. 39:5-14.)   And the locked chain further presented a physical obstacle and obstruction to anyone attempting to step across the corner from Section 14 to Section 24. (Grende Depo. 42:19-23.)   Thus, Plaintiff's lock and chain constituted an improper attempt to "prevent or obstruct … any person from peaceably entering upon … any tract of public land" in violation of the UIA.[4]  The Eighth Circuit in *Mackay* said about the UIA, "We think, however, that a private litigant cannot recover from another for an invasion of an alleged right founded upon his own violation of the statute." *Mackay*, 219 F. at 120.  Plaintiff's violation of the UIA forced Defendants to grab the steel posts, which were anchored on private property, to maneuver around the physical obstacle.  Consistent with *Mackay*, Plaintiff may not recover for a trespass, if any, occurring due to Plaintiff's violation of the UIA.

Moreover, and apart from the UIA, the undisputed evidence again shows Defendants did not touch the surface of Plaintiff's land or damage its private property in connection with these corner crossings.  (Grende Depo. 22:12-24:20, 27:3-28:13)  Consequently, a cause of action for civil trespass does not lie against Defendants as it concerns these 2020 corner crossings, and they are entitled to summary judgment in their favor as to these 2020 corner crossings.

As it relates to the various corner crossings performed by Defendants in moving from public land to public land by foot in 2020 and 2021 within the checkerboard pattern of land ownership, they cannot be subject to liability for civil trespass.  Defendants are therefore entitled to summary judgment in their favor concerning Plaintiff's cause of action for civil

---

[4] In addition to precluding the use of physical barriers, § 1063 of the UIA also makes it unlawful to threaten or intimidate any person from peaceably entering upon any tract of land subject to entry under the public land laws of the United States, or preventing or obstructing free passage or transit over or through the public lands.

trespass related to all of Defendants' corner crossings.

**6.   A Genuine Dispute of Material Fact Exists Concerning Whether "Waypoint 6" Constitutes Unlawful Trespassing**

Recall that Waypoint 6 does not appear to involve an act of corner crossing but rather an alleged trespass upon the surface of Plaintiff's private land, Section 19, in an area away from a corner. (*See* ECF 67-4.)  Waypoint 6 was created on September 30, 2020, on the onX Hunt application being used by Defendant Smith, and it was deleted (from the app but not from onX Hunt's metadata) about three weeks later. (*See* ECF 67-3 p. 2.)  And a waypoint can be created without the user ever being at the designated location.

Many or most of the waypoints created by Defendant Smith indicated his current location or an area where he had been or intended to go. (*See* ECF 67-5.)  On the other hand, all Defendants were adamant in their depositions that they never stepped foot on Plaintiff's private land.  Defendant Smith also expressly asserted under penalty of perjury that his onX Hunt metadata is accurate, that he must have created Waypoint 6 without realizing it, but he never made physical contact with or traveled to Waypoint 6. (ECF 72-1.)  Thus, evidence exists to support Plaintiff's claim of trespass as to Waypoint 6, specifically the conceded accuracy of the onX Hunt data and the other waypoints that depicted many of Defendants Smith, Cape, and Yeomans physical locations.  Contrary evidence in the form of Defendants' depositions and declarations exists to counter Plaintiff's claim as to Waypoint 6.  Therefore, the Court finds a genuine dispute of material fact exists regarding whether a Defendant trespassed upon Plaintiff's Section 19 in connection with Waypoint 6, and the question should be submitted to a jury for determination.  Summary judgment is not appropriate on this issue.

On this claim, though, the undisputed evidence is that Plaintiff does not know of any

**Add. 30**          **Add. 30**          **Add. 30**

damage and has not repaired any damage caused by Defendants to its property in 2020. (Grende Depo. 24:11-20, 27:8-12.)   Accordingly, only nominal damages in the maximum amount of $100.00 are at issue for Defendants' alleged trespass in 2020 concerning Waypoint 6.[5]   *See Goforth v. Fifield*, 352 P.3d 242, 250 (Wyo. 2015) (noting that when no actual damages are shown, Wyoming allows the recovery of nominal damages for an actionable trespass, and the Wyoming Supreme Court interprets nominal damages to max out at $100.00 based on Wyo. Stat. § 1-14-125).

## CONCLUSION

The conflict inherent in the checkerboard pattern of landownership, which pits a landowner's right to exclude others from private property against the public's right to access public lands, has been around for well over a century and has visited this Court multiple times over the years.   In determining the present lawsuit, the Court primarily relies on the opinion from *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914), which originated in this Court and was issued by the appellate court for this Court.   *Mackay* explained that for "exceptional conditions," including the conflict borne of the checkerboard, "the law fixes the relative rights and responsibilities of the parties.   It does not leave them to the determination of either party." *Id.* at 118.   And the Court's survey of the law revealed that where a person corner crosses on foot in the checkerboard from public land to public land without touching the surface of private land and without otherwise damaging private property, there is no liability for trespass. *See id.* at 120 ("The question here, which we think should be answered in the affirmative, is

---

[5]  Defendant Slowensky was not present for the 2020 hunting trip and therefore cannot be liable for any such trespass.

whether Mackay was entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass."). This determination, though, is necessarily unique to and limited in application to the "peculiar" "interlocking arrangement of odd and even numbered sections," *id.* at 119-20, making up the checkerboard pattern of land ownership created by Congress in the mid-1800s.

When this law is applied to the undisputed evidence in this case, no reasonable jury could find Defendants liable for civil trespass for their corner crossing activities. However, the facts and circumstances surrounding Waypoint 6 are in genuine dispute, and this claim of trespass must be submitted to a jury for a decision, albeit limited to nominal damages.

The Court addresses one final matter. While this lawsuit has been pending, and with greater frequency in recent weeks, the Court has received various attempts, whether by email or phone call, from members of the public to offer their opinions as to how this Court should resolve this controversy. These submissions have come from people who are not parties to this case and who, unlike the amici parties, have not been given permission by the Court to tender a submission that can be viewed and responded to by all parties. The Court's staff has screened these improper submissions, and the Court has not reviewed or considered these submissions as part of examining the issues in this case, nor will the Court review or consider them or any other improper ex parte submissions in the future. Attempts by a person or entity not a party to a lawsuit to influence or persuade a court of law's decision are improper. "Whereas the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion, the judiciary does not decide cases by reference to popular opinion." *Hodge v. Talkin*, 799 F.3d 1145, 1159 (D.C. Cir. 2015) (quotations omitted)

(alteration in original). The founders of the United States sought to insulate the Judicial branch of government from public opinion so judges could apply and be influenced only by the law, not by popular opinion or public polling. This Court's sworn obligation is to uphold and apply the law. The Court has done its utmost to decipher the applicable law and apply it to the facts of this and every case. To the extent this Court's determination of the law is believed to be erroneous, the remedy is for a party to take an appeal.

ORDER

In conformity with the findings of fact and conclusions of law determined herein,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF 65) is **GRANTED IN PART AND DENIED IN PART**. Defendants are entitled to judgment as a matter of law as to all claims of trespassing involving Defendants' corner crossings in 2020 and 2021. Defendants' request for summary judgment is denied as to the claim of trespassing involving Waypoint 6 (which does not involve corner crossing) due to the existence of a genuine dispute of material fact, but any recovery by Plaintiff on such claim shall be limited to nominal damages.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (ECF 63) is **DENIED**. Plaintiff is not entitled to judgment as a matter of law concerning Defendants' corner crossings in 2020 and 2021, and a genuine dispute of material fact exists to preclude summary judgment concerning the alleged Waypoint 6 trespassing (which does not involve corner crossing).

**ORDERED**: May _26th_, 2023.

Scott W. Skavdahl
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

IRON BAR HOLDINGS, LLC, a North
Carolina limited liability company
registered to do business in Wyoming,

      Plaintiff,

    v.

    Case No. 22-CV-67-SWS

BRADLEY H. CAPE, ZACHARY M.
SMITH, PHILLIP G. YEOMANS, and
JOHN W. SLOWENSKY,

      Defendants.

## FINAL JUDGMENT

This matter comes before the Court on its Order on Cross Motions for Summary Judgment (ECF 83), which is fully incorporated herein by this reference, and Plaintiff's Withdrawal of Remaining Claim (ECF 86), which withdrew Plaintiff's claim of physical surface trespass. Together, these documents dispose of all causes of action.

**FINAL JUDGMENT** is hereby entered in favor of Defendants and against Plaintiff on all claims of airspace trespass and declaratory judgment. Plaintiff's claim of physical surface trespass is voluntarily withdrawn. Neither party is entitled to an award of attorney fees in this action, and any award of costs will be governed by Fed. R. Civ. P. 54(d)(1) and Local Civil Rule 54.2.

DATED: ~~May~~ *June 1st*, 2023.

F.R.C.P. 58(b)(2) approval as to form:

_____
Scott. W. Skavdahl
United States District Judge

Entered:    Margaret Botkins
        Clerk of Court

By _____
    Kim Blonigen
    Deputy Clerk of Court

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

IRON BAR HOLDINGS, LLC, a North
Carolina limited liability company
registered to do business in Wyoming,

       Plaintiff,

    v.

BRADLEY H. CAPE, ZACHARY M.
SMITH, PHILLIP G. YEOMANS, and
JOHN W. SLOWENSKY,

       Defendants.

Case No. 22-CV-67-SWS

---

## AMENDED FINAL JUDGMENT

This matter comes before the Court on Plaintiff's Motion for Issuance of Amended Judgment Pursuant to Fed. R. Civ. P. 60(a) (ECF 106). Having considered the unopposed motion and reviewed the record herein, the Court **grants** the motion and orders as follows:

Together, the Order on Cross Motions for Summary Judgment (ECF 83), which is fully incorporated herein by this reference, and Plaintiff's Withdrawal of Remaining Claim (ECF 86), which withdrew Plaintiff's claim of physical surface trespass with prejudice, disposed of all causes of action in this lawsuit.

**FINAL JUDGMENT** is hereby entered in favor of Defendants and against Plaintiff on all claims of airspace trespass and declaratory judgment. Plaintiff's claim of physical surface trespass has been voluntarily withdrawn with prejudice and is therefore dismissed with prejudice. Neither party is entitled to an award of attorney fees in this action, and any award of costs will be governed by Fed. R. Civ. P. 54(d)(1) and Local Civil Rule 54.2. This Amended Final Judgment is effective *nunc pro tunc* to June 1, 2023, the date of the original final judgment.

**DATED**: July __18th__, 2023.

F.R.C.P. 58(b)(2) approval as to form:

Scott. W. Skavdahl
United States District Judge

Entered:        Margaret Botkins
                Clerk of Court

By:                        
                Kim Blonigen
                Deputy Clerk of Court

**Add. 36**          **Add. 36**          **Add. 36**