No. 23-8043

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

IRON BAR HOLDINGS, LLC,
*Plaintiff-Appellant*,

v.

BRADLY CAPE, et al.,
*Defendants-Appellees*.

On Appeal from the United States District Court for
the District of Wyoming, No. 22-CV-67
Hon. Scott W. Skavdahl, United States District Judge

## APPELLANT'S APPENDIX VOLUME 1
## (AA1–AA190)

M. Gregory Weisz
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386

Robert Reeves Anderson
Brian M. Williams
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
(303) 863-1000

Sean A. Mirski
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 942-5000

**Oral Argument Requested**

November 6, 2023

## INDEX

District Court Docket Sheet ....................................................................................AA3

Defendants' Petition for Removal,
    Dkt. 1 (Mar. 22, 2022)....................................................................AA12

    Ex. A: All process, pleadings, and orders served on Petitioners in
    State Court Action (Dkt. 1-1) ......................................................AA47

Order Denying Remand to State Court,
    Dkt. 22 (May 19, 2022) ................................................................AA63

First Amended Complaint,
    Dkt. 37 (Nov. 1, 2022) .................................................................AA70

    Ex. A: Warranty Deed (Dkt. 37-1) ..............................................AA80

Defendants' Answer to First Amended Complaint,
    Dkt. 39 (Nov. 15, 2022) ...............................................................AA85

Brief *Amicus Curiae* of Backcountry Hunters & Anglers,
    Dkt. 42 (Dec. 5, 2022)..................................................................AA98

Brief *Amici Curiae* of Wyoming Stock Growers Association and
    Wyoming Wool Growers Association,
    Dkt. 45 (Dec. 6, 2022)..................................................................AA111

Plaintiff's Expert Witness Designation,
    Dkt. 48 (Dec. 15, 2022)................................................................AA147

Expert Report of William Fehringer,
    Dkt. 56-1 (Feb. 15, 2023).............................................................AA177

Curriculum Vitae of William Fehringer,
    Dkt. 56-5 (Feb. 15, 2023).............................................................AA182

Plaintiff's Motion for Partial Summary Judgment,
    Dkt. 63 (Apr. 12, 2023)................................................................AA186

APPEAL,CASP,TERMED

# U.S. District Court
## District of Wyoming (Cheyenne)
### CIVIL DOCKET FOR CASE #: 2:22-cv-00067-SWS

Iron Bar Holdings LLC v. Cape et al
Assigned to: Honorable Scott W Skavdahl
Referred to: Honorable Kelly H Rankin
Case in other court:  USCA, 23-08043
                   Second Judicial District - Carbon County, Wyoming, Civil
                   Act. No. 22-00034
Cause: 28:1441 Petition for Removal

Date Filed: 03/22/2022
Date Terminated: 06/01/2023
Jury Demand: Both
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Iron Bar Holdings LLC**
*a North Carolina limited liability company registered
to do business in Wyoming*

represented by **M Gregory Weisz**
PENCE & MACMILLAN LLC
1720 Carey Avenue, Suite 600
PO Box 765
Cheyenne, WY 82003
307/638-0386
Fax: 307/634-0336
Email: gweisz@penceandmac.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin Arthur**
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, CO 80202
303-892-7280
Fax: 303-893-1379
Email: kristin.arthur@dgslaw.com
*TERMINATED: 08/07/2023*
*PRO HAC VICE*

**Theresa Wardon Benz**
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, CO 80202
303-892-9400
Fax: 303-893-1379
Email: theresa.benz@dgslaw.com
*TERMINATED: 08/07/2023*
*PRO HAC VICE*

V.

**Defendant**

**Bradly H Cape**
*also known as*
Bradley H Cape

represented by **Ryan A Semerad**
THE FULLER LAW FIRM
242 South Grant Street
Casper, WY 82609
307-265-3455
Fax: 307-265-2859
Email: semerad@thefullerlawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**AA3**                        **AA3**                        **AA3**

**Alexandria LaVonne Layton**
EVANS FEARS & SCHUTTERT LLP
6720 Via Austi Parkway
Ste 300
Las Vegas, NV 89119
702-805-0290
Fax: 702-805-0291
Email: alayton@efstriallaw.com
*ATTORNEY TO BE NOTICED*

**Lee A Mickus**
Evans Fears & Schuttert LLP
3900 E Mexico Avenue
Ste 1300
Denver, CO 80210
303-656-2199
Email: lmickus@efstriallaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**Zachary M Smith**      represented by **Ryan A Semerad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandria LaVonne Layton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee A Mickus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**
**Phillip G Yeomans**      represented by **Ryan A Semerad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandria LaVonne Layton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee A Mickus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**
**John W Slowensky**      represented by **Ryan A Semerad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandria LaVonne Layton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee A Mickus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**
**Backcountry Hunters & Anglers**      represented by **Eric B Hanson**
KEKER, VAN NEST & PETERS

**AA4**       **AA4**       **AA4**

633 Battery St.
San Francisco, CA 94111
415-676-2349
Email: ehanson@keker.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Lewallen**
CHAPMAN VALDEZ & LANSING
125 West 2nd Street
PO Box 2710
Casper, WY 82601
307/237-1983
Email: plewallen@bslo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trevor James Schenk**
Chapman Valdez & Lansing Law Office
PO Box 2710
Casper, WY 82602
307-237-1983
Email: tschenk@bslo.com
*LEAD ATTORNEY*

**Amicus**

**Wyoming Stockgrowers Association**    represented by    **Karen J Budd-Falen**
BUDD-FALEN LAW OFFICES
300 East 18th Street
P O Box 346
Cheyenne, WY 82003
307/632-5105
Fax: 307/637-3891
Email: karen@buddfalen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Wyoming Wool Growers Association**    represented by    **Karen J Budd-Falen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/22/2022 | 1 | NOTICE OF REMOVAL from Second Judicial District - Carbon County, Wyoming, Civil Act. No. 22-34. (Filing fee $ 402 receipt number AWYDC-2078664), filed by Phillip G Yeomans, Bradley H Cape, Zachary M Smith, John W Slowensky. (Attachments: # 1 Exhibit Exhibit A to Notice of Removal, # 2 Exhibit Exhibit B to Notice of Removal, # 3 Exhibit Exhibit C to Notice of Removal, # 4 State Court Complaint, # 5 Civil Cover Sheet) (Semerad, Ryan) (Attachment 5 replaced with flattened document 3/22/2022) (Court Staff, stbd). (Additional attachment(s) added on 3/22/2022: # 6 Order on Removal) (Court Staff, stbd). (Entered: 03/22/2022) |
| 03/22/2022 | 2 | STATE COURT COMPLAINT filed 2/15/2022 filed by Iron Bar Holdings LLC. (Court Staff, stbd) (Entered: 03/22/2022) |
| 03/22/2022 | 3 | Notice of Judge Assignment and Consent to Proceed before a Magistrate Judge. The case has been assigned to the Honorable Kelly H. Rankin (Presiding Judge). (Court Staff, stbd) (Entered: 03/22/2022) |
| 03/28/2022 | 4 | MOTION to Dismiss filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 03/28/2022) |
| 03/28/2022 | 5 | MEMORANDUM in Support of 4 Motion to Dismiss filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 03/28/2022) |
| 03/30/2022 | 6 | ORDER REASSIGNING CASE. Case reassigned to the Honorable Scott W Skavdahl as Presiding Judge and the Honorable Kelly H Rankin as Referral Judge for all further proceedings by the Honorable Scott W Skavdahl. |

| | | |
|---|---|---|
| | | (Court Staff, sjfg) (Entered: 03/30/2022) |
| 03/31/2022 | 7 | ORDER ON REMOVAL by the Honorable Scott W Skavdahl. See Order for details. (Copy of Order sent to Clerk of Second Judicial District Court, Carbon County via U.S. mail). (Court Staff, skb) (Entered: 03/31/2022) |
| 04/04/2022 | 8 | TRANSMITTAL of State Court Record. (Attachments: # 1 Docket Sheet Docket Sheet and all filings) (Semerad, Ryan) (Entered: 04/04/2022) |
| 04/05/2022 | 9 | STATE COURT DOCKET SHEET. (Court Staff, stbd) (Entered: 04/05/2022) |
| 04/05/2022 | 10 | ACCEPTANCE OF SERVICE filed in Second Judicial District Court on 3/2/2022 by All Defendants. (Court Staff, stbd) Modified text to correct date of filing on 4/5/2022 (Court Staff, stbd). (Entered: 04/05/2022) |
| 04/06/2022 | 11 | SUPPLEMENT re 1 Notice of Removal (Attorney),, filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Semerad, Ryan) (Entered: 04/06/2022) |
| 04/11/2022 | 12 | MEMORANDUM in Opposition to 4 MOTION to Dismiss filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 04/11/2022) |
| 04/14/2022 | 13 | MOTION to Remand filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 04/14/2022) |
| 04/14/2022 | 14 | MEMORANDUM in Support of 13 Motion to Remand filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 04/14/2022) |
| 04/18/2022 | 15 | REPLY BRIEF re 4 Motion to Dismiss filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 04/18/2022) |
| 04/28/2022 | 16 | RESPONSE in Opposition re 13 Motion to Remand filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 04/28/2022) |
| 05/02/2022 | 17 | REPLY to 16 Response in Opposition to Motion filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 05/02/2022) |
| 05/06/2022 | 18 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Eric Hanson to appear pro hac vice; Check not tendered; filed by Movant Backcountry Hunters & Anglers. (Attachments: # 1 Exhibit Affidavit of Eric Hanson, # 2 Proposed Order)(Schenk, Trevor) Modified text to correct movant on 5/6/2022 (Court Staff, stbd). (Entered: 05/06/2022) |
| 05/06/2022 | 19 | ORDER by the Honorable Kelly H Rankin granting 18 MOTION for Eric Hanson to appear pro hac vice; filed by Backcountry Hunters & Anglers. (cc: Counsel via email)(Court Staff, stbd) Modified text to correct movant on 5/6/2022 (Court Staff, stbd). (Entered: 05/06/2022) |
| 05/06/2022 | 20 | Notice of Pro Hac Vice Attorney Appearance by Eric B Hanson on behalf of Backcountry Hunters & Anglers Filing fee $ 100, receipt number AWYDC-2099019. (Hanson, Eric) Modified text to correct movant on 5/6/2022 (Court Staff, stbd). (Main Document 20 replaced on 5/10/2022 to flatten document) (Court Staff, skb). (Entered: 05/06/2022) |
| 05/06/2022 | 21 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Leave to File Reply/Brief/Supplement (Non-Dispositive) *amicus curiae brief* filed by Movant Backcountry Hunters & Anglers. (Attachments: # 1 Proposed Order, # 2 Exhibit Proposed amicus curiae brief)(Hanson, Eric) (Entered: 05/06/2022) |
| 05/19/2022 | 22 | ORDER by the Honorable Scott W Skavdahl denying 13 Motion to Remand (Court Staff, scat) (Entered: 05/19/2022) |
| 07/20/2022 | 23 | ORDER by the Honorable Scott W Skavdahl denying 4 Motion to Dismiss. This matter shall be referred to the magistrate judge for an initial pretrial conference under Fed. R. Civ. P. 16. (Court Staff, skb) (Entered: 07/20/2022) |
| 07/27/2022 | 24 | (TEXT-ONLY) NOTICE of Initial Pretrial Conference: BY TELEPHONE - All parties shall appear by telephone through the Courts conference call system. Guests call: Toll Free 1-888-398-2342| Access code 3107456#. | Join as guest Press # |Security code 1001#. Parties should have their calendars on hand for scheduling. Under Local Rule 16.1(a)(2) the parties are reminded to file a written Joint Case Management Plan three business days prior to the Initial Pretrial Scheduling Conference. The Plan form may be located at www.wyd.uscourts.gov/judges-info under Judge Rankin. **Initial Pretrial Conference set for 9/1/2022 at 09:00 AM before Honorable Kelly H Rankin.** (Court Staff, smxb) (Entered: 07/27/2022) |
| 07/29/2022 | 25 | ANSWER to 2 Complaint with Affirmative Defenses, with Jury Demand by Phillip G Yeomans, Bradley H Cape, Zachary M Smith, John W Slowensky. (Semerad, Ryan) (Entered: 07/29/2022) |
| 08/15/2022 | 26 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Order Granting Leave to File Amicus Brief filed by Movants Wyoming Stockgrowers Association, Wyoming Wool Growers Association. (Attachments: # 1 Proposed Amici Brief, # 2 Exhibit, # 3 Exhibit, # 4 Proposed Order)(Budd-Falen, Karen) (Attachment 1 replaced |

| | | |
|---|---|---|
| | | with correct version per counsel on 8/16/2022)(Court Staff, stmo). Modified text on 8/16/2022 (Court Staff, stmo). Modified text on 8/17/2022 (Court Staff, skb). (Entered: 08/15/2022) |
| 08/22/2022 | 27 | (TEXT-ONLY) NOTICE Resetting Initial Pretrial Conference: BY TELEPHONE - All parties shall appear by telephone through the Courts conference call system. Guests call: Toll Free 1-888-398-2342| Access code 3107456#. | Join as guest Press # |Security code 1001#. Parties should have their calendars on hand for scheduling. Under Local Rule 16.1(a)(2) the parties are reminded to file a written Joint Case Management Plan three business days prior to the Initial Pretrial Scheduling Conference. The Plan form may be located at www.wyd.uscourts.gov/judges-info under Judge Rankin. **Initial Pretrial Conference reset for 9/1/2022 at 11:00 AM before Honorable Kelly H Rankin.** (Court Staff, smxb) (Entered: 08/22/2022) |
| 08/26/2022 | 28 | Proposed JOINT CASE MANAGEMENT PLAN by Iron Bar Holdings LLC. (Weisz, M) (Entered: 08/26/2022) |
| 08/31/2022 | 29 | ORDER by the Honorable Kelly H Rankin denying as moot 21 Motion to File Reply/Brief/Supplement.(Court Staff, sag) (Entered: 08/31/2022) |
| 08/31/2022 | 30 | ORDER by the Honorable Kelly H Rankin granting 26 Motion for Leave to File Amicus Brief. It is ordered the Associations shall file their Amicus Curiae Brief within three (3) business days of the entry of this Order. (Court Staff, sag) Modified text on 9/1/2022 (Court Staff, sjlg). (Entered: 08/31/2022) |
| 09/01/2022 | 31 | INITIAL PRETRIAL ORDER by the Honorable Kelly H Rankin.Motions to Amend deadline 11/1/2022. Dispositive Motions filing deadline 4/12/2023. Dispositive Motion response deadline 4/26/2023. **Dispositive Motions Hearing set for 5/10/2023 01:00 PM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl.** Other Fact Witness Deadline 3/1/2023 Expert Witness Designation-Plaintiff deadline 12/15/2022. Expert Witness Designation-Defendant deadline 2/15/2023. Discovery due by 4/12/2023. Stipulation Deadline 5/17/2023. Motion in Limine deadline 5/17/2023. Motions in Limine Response Deadline 5/24/2023. **Final Pretrial Conference set for 6/6/2023 01:00 PM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl. Jury Trial (4 days/stacked #1) set for 6/26/2023 09:00 AM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl.** (Court Staff, sag) (Entered: 09/01/2022) |
| 09/02/2022 | 32 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Amend Caption filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Proposed Order)(Semerad, Ryan) Modified text on 9/2/2022 (Court Staff, skb). (Entered: 09/02/2022) |
| 09/06/2022 | 33 | ORDER by the Honorable Kelly H Rankin granting 32 MOTION to Amend Caption. IT IS ORDERED that the caption in this matter going forward shall be amended to reflect the correct spelling of Defendant Bradly H. Cape's first name. (Court Staff, smxb) (Entered: 09/06/2022) |
| 09/28/2022 | 34 | NOTICE of Attorney Appearance by Lee A Mickus on behalf of Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans (Mickus, Lee) (Entered: 09/28/2022) |
| 11/01/2022 | 35 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Amend/Correct 2 Complaint filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Proposed Order)(Weisz, M) (Entered: 11/01/2022) |
| 11/01/2022 | 36 | ORDER by the Honorable Kelly H Rankin granting 35 MOTION to Amend/Correct 2 Complaint. Plaintiff shall file its First Amended Complaint within three business days. (Court Staff, sjdl) (Entered: 11/01/2022) |
| 11/01/2022 | 37 | AMENDED COMPLAINT against Defendant Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans, filed by Iron Bar Holdings LLC. (Attachments: # 1 Exhibit) (Weisz, M) (Entered: 11/01/2022) |
| 11/15/2022 | 38 | NOTICE by Plaintiff Iron Bar Holdings LLC *Notice to Other Party of Subpoena to Produce Documents, Information, or Objects in a Civil Action to James Hasskamp* (Stewart, Crystal) (Entered: 11/15/2022) |
| 11/15/2022 | 39 | ANSWER to 37 Amended Complaint with Affirmative Defenses, with Jury Demand, by Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 11/15/2022) |
| 11/29/2022 | 40 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Leave to File an Amicus Curiae Brief filed by Movant Backcountry Hunters & Anglers. (Attachments: # 1 Exhibit [Proposed] Brief of Amicus Curiae Backcountry Hunters & Anglers, # 2 Affidavit [Proposed] Declaration of Eric B. Hanson in Support of Brief of Amicus Curiae Backcountry Hunters & Anglers (with exhibits 1-4), # 3 Proposed Order Granting Backcountry Hunters & Anglers Motion for Leave to File an Amicus Curiae Brief)(Hanson, Eric) Modified text on 12/1/2022 (Court Staff, skb). (Entered: 11/29/2022) |
| 11/30/2022 | 41 | ORDER by the Honorable Kelly H Rankin granting 40 Motion to File Amicus Brief. Movant may file its amicus brief within three business days. (Court Staff, sjdl) (Entered: 11/30/2022) |
| 12/05/2022 | 42 | BRIEF OF AMICUS CURIAE, filed by Amicus Backcountry Hunters & Anglers. (Attachments: # 1 Affidavit of Eric B. Hanson In Support of Brief of Amicus Curiae Backcountry Hunters & Anglers (with exhibits 1-4)) (Hanson, Eric) Modified text on 12/7/2022 (Court Staff, skb). (Entered: 12/05/2022) |

| 12/06/2022 | 43 | NOTICE of *Return of Non-Service of Subpoena to James Hasskamp* by Plaintiff Iron Bar Holdings LLC re 38 Notice to Other Party of Subpoena to Produce Documents, Information, or Objects in a Civil Action to James Hasskamp (Weisz, M) Modified text on 12/7/2022 (Court Staff, skb). (Entered: 12/06/2022) |
|---|---|---|
| 12/06/2022 | 44 | NOTICE OF FILING BRIEF OF AMICUS CURIAE by Amicus Parties Wyoming Stockgrowers Association, Wyoming Wool Growers Association. (Court Staff, stbd) (Entered: 12/06/2022) |
| 12/06/2022 | 45 | BRIEF OF AMICUS CURIAE filed by Amicus Parties Wyoming Stockgrowers Association, Wyoming Wool Growers Association. (Court Staff, stbd) (Entered: 12/06/2022) |
| 12/07/2022 | 46 | DISREGARD - DOCKETING ERROR. Counsel to refile. ~~Amended NOTICE by Plaintiff Iron Bar Holdings LLC~~ *~~Amended Notice To Other Party Of Subpoena To Produce Documents, Information, Or Objects In A Civil Action To James Hasskamp~~* ~~(Weisz, M)~~ Modified on 12/7/2022 (Court Staff, skb). (Entered: 12/07/2022) |
| 12/07/2022 | 47 | Amended NOTICE to Other Party of Subpoena to Produce Documents, Information, or Objects in a Civil Action to James Hasskamp (Stewart, Crystal) Modified text and filer on 12/7/2022 (Court Staff, skb). (Entered: 12/07/2022) |
| 12/15/2022 | 48 | Designation of Expert Witnesses by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 12/15/2022) |
| 12/20/2022 | 49 | NOTICE of Change of Address by Lee A Mickus, attorney on behalf of Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans (Mickus, Lee) (Entered: 12/20/2022) |
| 12/21/2022 | 50 | RETURN of Subpoena by Plaintiff Iron Bar Holdings LLC upon James A. Hasskamp on December 9, 2022. (Weisz, M) (Entered: 12/21/2022) |
| 01/10/2023 | 51 | MOTION in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit, # 2 Proposed Order)(Semerad, Ryan) (Entered: 01/10/2023) |
| 01/24/2023 | 52 | RESPONSE in Opposition re 51 MOTION in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 01/24/2023) |
| 01/24/2023 | 53 | MOTION for hearing re 51 MOTION in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order) (Weisz, M) Modified event and text on 1/27/2023 (Court Staff, skb). (Entered: 01/24/2023) |
| 01/27/2023 | 54 | ORDER by the Honorable Scott W Skavdahl denying 53 Motion for hearing re 51 Motion in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart. Defendants may submit a reply to Plaintiff's response on or before February 3, 2023. (Court Staff, skb) (Entered: 01/27/2023) |
| 01/30/2023 | 55 | REPLY BRIEF in Support of 51 MOTION in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith. (Mickus, Lee) Modified text and add link on 2/6/2023 (Court Staff, skb). (Entered: 01/30/2023) |
| 02/15/2023 | 56 | Designation of Expert Witnesses by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Semerad, Ryan) (Entered: 02/15/2023) |
| 02/17/2023 | 57 | ORDER by the Honorable Scott W Skavdahl denying 51 Motion in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart. With the limited applicability noted herein, James Rinehart's proposed expert testimony will not be precluded under Rule 702/Daubert. (Court Staff, skb) (Entered: 02/17/2023) |
| 03/01/2023 | 58 | Witness List by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) Modified text on 3/2/2023 (Court Staff, skb). (Entered: 03/01/2023) |
| 03/01/2023 | 59 | Witness List by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 03/01/2023) |
| 03/28/2023 | 60 | NOTICE of Attorney Appearance by Alexandria LaVonne Layton on behalf of Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans (Layton, Alexandria) Modified text on 3/30/2023 (Court Staff, skb). (Entered: 03/28/2023) |
| 04/10/2023 | 61 | MOTION for Leave to File Excess Pages regarding Brief in Support of Motion for Summary Judgment filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Proposed Order)(Semerad, Ryan) (Entered: 04/10/2023) |
| 04/11/2023 | 62 | ORDER GRANTING DEFENDANTS' MOTION FOR LEAVE TO EXCEED PAGE LIMIT FOR BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT by the Honorable Scott W Skavdahl re 61 Motion to File Excess Pages. The Defendants may file a brief in support of their motion for summary judgment that does not exceed thirty-five (35) pages.(Court Staff, stbd) (Entered: 04/11/2023) |

| 04/12/2023 | 63 | MOTION for Partial Summary Judgment, filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 04/12/2023) |
|---|---|---|
| 04/12/2023 | 64 | MEMORANDUM in Support of 63 Motion for Partial Summary Judgment filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5a, # 6 Exhibit 5b, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit Deposition of Steven Grende, # 15 Exhibit Deposition of Bradly H. Cape, # 16 Exhibit Deposition of Phillip G. Yeomans, # 17 Exhibit Deposition of Zachary M. Smith, # 18 Exhibit Deposition of John W. Slowensky) (Weisz, M) (Entered: 04/12/2023) |
| 04/12/2023 | 65 | MOTION for Summary Judgment, filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 04/12/2023) |
| 04/12/2023 | 66 | MEMORANDUM in Support of 65 Motion for Summary Judgment filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y) (Semerad, Ryan) (Entered: 04/12/2023) |
| 04/26/2023 | 67 | MEMORANDUM in Opposition to 65 MOTION for Summary Judgment, filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Exhibit 13, # 2 Exhibit 14, # 3 Exhibit 15a, # 4 Exhibit 15b, # 5 Exhibit 15c, # 6 Exhibit 15d, # 7 Exhibit Depo, # 8 Exhibit Depo, # 9 Exhibit Depo, # 10 Exhibit Depo, # 11 Exhibit Depo, # 12 Exhibit Depo, # 13 Exhibit Depo) (Weisz, M) (Entered: 04/26/2023) |
| 04/26/2023 | 68 | MEMORANDUM in Opposition to 63 MOTION for Partial Summary Judgment, filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Semerad, Ryan) (Entered: 04/26/2023) |
| 04/26/2023 | 69 | ~~MOTION REFERRED TO Judge Kelly H Rankin.~~ MOTION for Order Granting Leave to Attend Hearing Virtually filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Proposed Order)(Semerad, Ryan) Modified to unrefer motion on 4/27/2023 (Court Staff, skb). (Entered: 04/26/2023) |
| 04/27/2023 | | Motions No Longer Referred: 69 MOTION for Order Granting Leave to Attend Hearing Virtually. (Court Staff, skb) (Entered: 04/27/2023) |
| 04/27/2023 | 70 | MOTION for Leave to File Reply/Brief/Supplement (Dispositive) filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Proposed Order)(Semerad, Ryan) (Entered: 04/27/2023) |
| 04/27/2023 | 71 | MEMORANDUM in Opposition to 70 MOTION for Leave to File Reply/Brief/Supplement (Dispositive) filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Weisz, M) (Entered: 04/27/2023) |
| 04/27/2023 | 72 | REPLY to 71 Memorandum in Opposition to Motion, filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Semerad, Ryan) (Entered: 04/27/2023) |
| 04/28/2023 | 73 | ORDER by the Honorable Scott W Skavdahl granting 70 Motion to File Reply/Brief/Supplement (Dispositive). On or before May 3, 2023, Defendants may file a reply brief of no more than 5 pages addressing only Section V of Plaintiff's opposition brief (located at ECF 67 p. 24) (Court Staff, skb) (Entered: 04/28/2023) |
| 04/28/2023 | 74 | ORDER by the Honorable Scott W Skavdahl denying 69 Motion for Order Granting Leave to Attend Hearing Virtually. (Court Staff, skb) (Entered: 04/28/2023) |
| 05/03/2023 | 75 | REPLY BRIEF re 67 Memorandum in Opposition to Motion, filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Semerad, Ryan) (Entered: 05/03/2023) |
| 05/10/2023 | 76 | MINUTES for proceedings held before Honorable Scott W Skavdahl: Motions Hearing held on 5/10/2023. (Court Reporter Megan Strawn.) (Court Staff, skb) (Entered: 05/10/2023) |
| 05/17/2023 | 77 | MOTION in Limine regarding Exclude Testimony filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 05/17/2023) |
| 05/17/2023 | 78 | DISREGARD. Counsel to refile. ~~STIPULATION OF FACTS filed by Iron Bar Holdings LLC. (Weisz, M)~~ Modified on 5/18/2023 (Court Staff, skb). (Entered: 05/17/2023) |
| 05/17/2023 | 79 | PROPOSED STIPULATION OF FACTS filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) Modified text on 5/18/2023 (Court Staff, skb). (Entered: 05/17/2023) |

| 05/17/2023 | 80 | STIPULATION OF FACTS filed by Iron Bar Holdings LLC. (Weisz, M) (Entered: 05/17/2023) |
|---|---|---|
| 05/17/2023 | 81 | PROPOSED STIPULATION OF FACTS filed by Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) Modified text on 5/18/2023 (Court Staff, skb). (Entered: 05/17/2023) |
| 05/24/2023 | 82 | RESPONSE in Opposition re 77 MOTION in Limine regarding Exclude Testimony filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 05/24/2023) |
| 05/26/2023 | 83 | ORDER by the Honorable Scott W Skavdahl denying 63 Motion for Partial Summary Judgment; granting in part and denying in part 65 Motion for Summary Judgment. See Order for details. (Court Staff, skb) (Entered: 05/26/2023) |
| 05/30/2023 | 84 | MOTION REFERRED TO Judge Kelly H Rankin. Stipulated MOTION for Extension of Time (Non-Dispositive) requesting extension of Final Pretrial Order filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 05/30/2023) |
| 05/30/2023 | 85 | ORDER by the Honorable Kelly H Rankin granting 84 Motion for Extension of Time. The parties shall have up to and including June 1, 2023, to submit their joint proposed Final Pretrial Order. (Court Staff, sjdl) (Entered: 05/30/2023) |
| 06/01/2023 | 86 | NOTICE of Withdrawal of Remaining Claim by Plaintiff Iron Bar Holdings LLC re 83 Order on Motion for Partial Summary Judgment, Order on Motion for Summary Judgment. (Weisz, M) Modified text on 6/1/2023 (Court Staff, skb). (Entered: 06/01/2023) |
| 06/01/2023 | 87 | JUDGMENT in favor of Defendants against Plaintiff by the Honorable Scott W Skavdahl.(Court Staff, skb)The AO133 Bill of Cost form is available at https://www.wyd.uscourts.gov/forms/bill-costs. (Entered: 06/01/2023) |
| 06/15/2023 | 88 | BILL OF COSTS filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A) (Semerad, Ryan) (Entered: 06/15/2023) |
| 06/23/2023 | 89 | NOTICE by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans *of Firm Name Change* (Mickus, Lee) (Entered: 06/23/2023) |
| 06/23/2023 | 90 | NOTICE by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans *of Firm Name Change* (Layton, Alexandria) (Entered: 06/23/2023) |
| 06/29/2023 | 91 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Theresa Wardon Benz to appear pro hac vice; Check not tendered; filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 06/29/2023) |
| 06/29/2023 | 92 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Kristin Arthur to appear pro hac vice; Check not tendered; filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 06/29/2023) |
| 06/29/2023 | 93 | NOTICE OF APPEAL as to 87 Judgment filed by Plaintiff Iron Bar Holdings LLC. Filing fee $ 505, receipt number AWYDC-2277551. (Weisz, M) (Entered: 06/29/2023) |
| 06/29/2023 | 94 | ORDER by the Honorable Kelly H Rankin granting 91 MOTION for Theresa Wardon Benz to appear pro hac vice & 92 MOTION for Kristin Arthur to appear pro hac vice filed by Iron Bar Holdings LLC.(cc: Counsel via email) (Court Staff, stbd) (Entered: 06/29/2023) |
| 06/29/2023 | 95 | Preliminary Record of appeal sent to USCA and counsel re 93 Notice of Appeal (Attorney) **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 06/29/2023) |
| 06/29/2023 | | FINANCIAL ENTRY: $100 PRO HAC VICE FEE PAID ON BEHALF OF THERESA WARDON BENZ AND KRISTIN ARTHUR ($200 Received - Receipt #2-1733) (Court Staff, stmo) (Entered: 06/29/2023) |
| 06/30/2023 | 96 | Appeal Number 23-8043 received from USCA for 93 Notice of Appeal (Attorney) filed by Iron Bar Holdings LLC. Docketing statement due 07/14/2023 for Iron Bar Holdings, LLC. Transcript order form due 07/14/2023 for Iron Bar Holdings, LLC. Notice of appearance due on 07/14/2023 for Bradley H. Cape, Iron Bar Holdings, LLC, John W. Slowensky, Zachary M. Smith and Phillip G. Yeomans. Disclosure statement due on 07/14/2023 for Iron Bar Holdings, LLC. (Court Staff, stbd) (Entered: 06/30/2023) |
| 06/30/2023 | 97 | TRANSCRIPT ORDER FORM by court reporter Megan Strawn. Transcripts due 07/30/2023. (Strawn, Megan) (Entered: 06/30/2023) |
| 07/05/2023 | 98 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion for Summary Judgment held on 05/10/2023 before Judge Scott W. Skavdahl re 93 Notice of Appeal (Attorney). To purchase a copy of this transcript, please contact Court Reporter Megan Strawn, phone (307) 232-2626 or email strawnreporting@yahoo.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of |

| | | |
|---|---|---|
| | | Intent to Redact due 7/12/2023. Notice of Redaction Request due 7/26/2023. Redacted Transcript Deadline set for 8/5/2023. Release of Transcript Restriction set for 10/3/2023. (Strawn, Megan) (Entered: 07/05/2023) |
| 07/05/2023 | 99 | Transcript Letter transmitted to USCA re 93 Notice of Appeal (Attorney). All transcripts that have been ordered from this reporter for this appeal are now filed with the United States District Court, District of Wyoming. (Strawn, Megan) (Entered: 07/05/2023) |
| 07/05/2023 | 100 | Appeal Remark - Notice that the transcript was filed by Ms. Megan Strawn in district court on 07/05/2023 re 93 Notice of Appeal (Attorney). **Record on appeal/Notice due 7/12/2023** (Court Staff, stbd) (Entered: 07/05/2023) |
| 07/05/2023 | 101 | CLERK'S Bill of Costs regarding 88 Bill of Costs filed by Defendant Phillip G Yeomans, Defendant Zachary M Smith, Defendant John W Slowensky, Defendant Bradly H Cape Defendants awarded costs in the amount of $5,192.60. (Court Staff, skb) (Entered: 07/05/2023) |
| 07/07/2023 | 102 | Notice of Pro Hac Vice Attorney Appearance by Kristin Arthur on behalf of Iron Bar Holdings LLC (Arthur, Kristin) (Entered: 07/07/2023) |
| 07/07/2023 | 103 | Notice of Pro Hac Vice Attorney Appearance by Theresa Wardon Benz on behalf of Iron Bar Holdings LLC (Benz, Theresa) (Entered: 07/07/2023) |
| 07/07/2023 | 104 | MOTION to stay case filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Affidavit of Rebecca Englert, # 2 Exhibit 1 - Postcard, # 3 Exhibit 2 - April 23, 2023 Email, # 4 Exhibit 3 - April 25, 2023 Email, # 5 Exhibit 4- March 9, 2023 Email, # 6 Exhibit 5- Facebook Message, # 7 Exhibit 6- B. Cape Deposition & Z. Smith Deposition)(Benz, Theresa) Modified text on 7/7/2023 (Court Staff, skb). (Entered: 07/07/2023) |
| 07/17/2023 | 105 | APPEAL ORDER from USCA - Briefing on the merits is suspended pending further order. Appellant's memorandum brief due 07/28/2023 for Iron Bar Holdings, LLC (please see order for further details) as to 93 Notice of Appeal (Attorney) filed by Iron Bar Holdings LLC. (Court Staff, stbd) (Entered: 07/17/2023) |
| 07/18/2023 | 106 | Transcript Letter transmitted to USCA re 93 Notice of Appeal (Attorney). All transcripts ordered for this appeal are now filed with the United States District Court, District of Wyoming. For purposes of appeal, the record is now ready. (Court Staff, stbd) (Entered: 07/18/2023) |
| 07/18/2023 | 107 | MOTION to Alter/Amend Judgment filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order) (Weisz, M) (Entered: 07/18/2023) |
| 07/19/2023 | 108 | AMENDED JUDGMENT in favor of Defendants against Plaintiff by the Honorable Scott W Skavdahl. (Court Staff, skb) (Entered: 07/19/2023) |
| 07/21/2023 | 109 | RESPONSE in Opposition re 104 MOTION to stay case filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Semerad, Ryan) (Entered: 07/21/2023) |
| 07/27/2023 | 110 | REPLY to 109 Response in Opposition to Motion filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 07/27/2023) |
| 07/31/2023 | 111 | ORDER by the Honorable Scott W Skavdahl denying 104 Motion to Stay Pending Appeal. (Court Staff, skb) (Entered: 07/31/2023) |
| 08/07/2023 | 112 | NOTICE by Plaintiff Iron Bar Holdings LLC *of Withdrawal of Kristin L. Arthur* (Arthur, Kristin) (Entered: 08/07/2023) |
| 08/07/2023 | 113 | NOTICE by Plaintiff Iron Bar Holdings LLC *of Withdrawal of Theresa Wardon Benz* (Benz, Theresa) (Entered: 08/07/2023) |

Ryan A. Semerad, Esq.
Wyoming Bar No. 7-6270
**THE FULLER LAW FIRM**
242 South Grant Street
Casper, Wyoming 82601
Telephone: 307-265-3455
Facsimile: 307-265-2859
Email: semerad@thefullerlawyers.com

*Attorney for Defendants Bradley H.
Cape, Zachary M. Smith, Phillip G.
Yeomans, and John W. Slowensky*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF WYOMING**

| | |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming, <br><br> Plaintiff, <br><br> BRADLEY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual, <br><br> Defendants. | CASE NO. |

**DEFENDANTS' PETITION FOR REMOVAL**

**TO THE HONORABLE JUDGES OF THE ABOVE-ENTITLED COURT:**

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1331, 1332, 1441(a)-(b), and 1446(a), Petitioners Bradley H. Cape, Zachary M. Smith, Phillip G. Yeomans, and John W. Slowensky (collectively, "Petitioners") hereby jointly petition the Court for removal of the action described below from the District Court for the Second Judicial District, County of Carbon, State of Wyoming, to this Court, and in support thereof, respectfully show:

1

1.      Petitioners are named defendants in the above-entitled action.

2.      On February 15, 2022, Plaintiff Iron Bar Holdings, LLC ("Plaintiff") filed a Complaint for Declaratory Judgment & Civil Trespass (the "Complaint") against Petitioners in the District Court for the Second Judicial District, County of Carbon, State of Wyoming, Civil Action No. 22-34.  Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the Complaint, Acceptance of Service of Plaintiff's Complaint for Declaratory Judgment & Civil Trespass, and all process, pleadings, and orders served upon Petitioners in the state court action are attached as **Exhibit A**.

3.      On February 16, 2022, counsel for Plaintiff, Mr. M. Gregory Weisz, Esq., of Pence and MacMillan, LLC, emailed a courtesy copy of the file-stamped Complaint to several attorneys representing Petitioners in a related criminal case, including undersigned counsel for Petitioners in this civil matter.

4.      On March 2, 2022, Petitioners, through their undersigned counsel, filed an acceptance of service.  The thirty-day period for removal does not begin to run until the named defendant or defendants have been properly served.  *See Murphy Brothers Inc. v. Michetti Pipe Strining, Inc.*, 526 U.S. 344, 347–48 (1999).  Thirty (30) days have not elapsed since Petitioners accepted service of the Complaint.

5.      Plaintiff's Complaint alleges causes of action against Petitioners for declaratory judgment and civil trespass relating to Petitioners' hunting trip in Carbon County, Wyoming, on or between September 26 and September 30, 2021.  Plaintiff claims that Petitioners willfully entered upon and/or across Plaintiff's private property when they traveled from a section of public land managed by the Bureau of Land Management (the "BLM") to another section of public land managed by the BLM at the common corner shared by the two sections of public land and two sections of land owned by Plaintiff privately.  *See generally* Complaint at 1-5 (¶¶ 10-22).  Plaintiff

2

alleges that Petitioners "corner crossed" over the surface of Plaintiff's property and never physically contacted the surface of Plaintiff's property by using a ladder device to step from one section of public land, over the common corner and over two "no trespassing" signs posted by Plaintiff and connected together by a chain, and onto an adjacent section of public land abutted by Plaintiff's private property.  *See id.*

6.     Assignment to this Court and venue in this Court are proper because the action is pending in the District Court, State of Wyoming, in and for Carbon County, and the real property at issue is situated and the events giving rise to Plaintiff's claims occurred within the territorial limits of the State of Wyoming.  *See* 28 U.S.C. § 1391(b)(2).

<u>**JURISDICTION**</u>

7.     Under 28 U.S.C. § 1441, Congress has granted defendants the statutory right to remove a case from state court to a United States District Court where the case could have been originally filed.  Article III, Sections 1 and 2 of the United States Constitution authorize this grant of right and permit Congress to confer jurisdiction upon the federal courts, other than the Supreme Court, as Congress may seem proper for the public good.  *See Lockerty v. Phillips*, 319 U.S. 182, 187–88 (1943).

8.     Pursuant to 28 U.S.C. § 1331, the federal district courts have original jurisdiction of all civil actions arising under the United States Constitution, federal laws, or treaties of the United States.  This grant of jurisdiction is commonly referred to as "federal question jurisdiction."

9.     Pursuant to 28 U.S.C. § 1332(a), the federal district courts have original jurisdiction of all civil actions "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between," *inter alia*, citizens of different states.  This grant of jurisdiction is commonly referred to as "federal diversity jurisdiction."

## I.     FEDERAL QUESTION JURISDICTION

10.     First and foremost, Petitioners aver that this case is removable pursuant to 28 U.S.C. § 1331 because this case arises under federal law.

11.     A defendant can remove an action filed in state court to federal court provided at least one claim falls within original federal jurisdiction.  *See* 28 U.S.C. § 1367(a); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005).

12.     Article III of the United States Constitution gives federal courts power to hear cases "arising under" federal statutes.  *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 807 (1986).  The Constitution's grant of "arising under" jurisdiction to federal courts may permit this Court to hear "all cases in which a federal question is 'an ingredient' of the action."  *See id.* (quoting *Osborn v. Bank of the United States*, 22 U.S. 738, 823 (1824)).  However, because the constitutional grant of judicial power is not self-executing, *see id.*, this Court may only hear a case where there is both constitutional and statutory authority for federal jurisdiction.  *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 315 F. Supp. 2d 164, 172 (D. R.I. 2004).

13.     "In exploring the outer reaches of § 1331," the United States Supreme Court has emphasized that "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system."  *Merrell Dow*, 478 U.S. at 810.  Thus, this jurisdictional inquiry necessitates "prudence and restraint."  *Id.*

14.     Under 28 U.S.C. § 1331, the well-pleaded complaint rule is the default jurisdictional prescription.  This rule provides that "the federal question must appear on the face of a well-pleaded complaint and may not enter in anticipation of a defense."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494 (1983).  The rule is based on the notion that the plaintiff

is the "master of the claim" and may "avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). Under this general rule, "federal jurisdiction attaches when federal law creates the cause of action asserted." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, 578 U.S. 374, 383 (2016).

15. There are two narrow exceptions to the well-pleaded complaint rule. *See Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1203–04 (10th Cir. 2012).

16. First, a federal court may have jurisdiction over state law claims where the federal court concludes a plaintiff has "artfully pleaded" its claims to exclude necessary federal questions. *See Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998). "The artful pleading doctrine allows removal where federal law completely preempts an asserted state-law claim." *Id.*

17. Second, a federal court may have jurisdiction over a state law claim that necessarily raises a substantial, disputed federal question that a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities. *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005); *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

18. Pursuant to each of these two exceptions, this case falls within the "special and small category" of cases that, while cloaked by the plaintiff in state law claims, still lies within this Court's "arising under" jurisdiction. *Empire HealthChoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006).

   *a.* ***Artful Pleading/Complete Preemption***

19. Plaintiff's claims are artfully pleaded to avoid or conceal the federal nature of the issues contained therein such that this case is removeable.

20.     Two grounds exist for this Court to exercise jurisdiction under the "arising under" clause of Article III of the United States Constitution and 28 U.S.C. § 1331 despite the fact that Plaintiff did not explicitly allege a claim under federal law.  First, federal common law governs Plaintiff's claims in this matter such that "a federal rule of decision is 'necessary to protect uniquely federal interests.'"  *See Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964)).  Second, Congress provided an exclusive federal remedy for the claims at issue in this matter and intended for claims of this nature to be addressed solely in federal court such that Plaintiff's state law claims are completely preempted by federal law.  *See Metro Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987); *Dutcher v. Matheson*, 733 F.3d 980, 985 (10th Cir. 2013).

21.     Under either ground, in the removal context, "only complete preemption can support removal."  *Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, ___ F.4th ___, 2022 U.S. App. LEXIS 3458, at *41 (10th Cir. 2022).  To determine whether a state-law claim is completely preempted by federal law, courts in the Tenth Circuit apply a two-step analysis: "first, we ask whether the federal question at issue preempts the state law relied on by the plaintiff; and second, whether Congress intended to allow removal in such a case, as manifested by the provision of a federal cause of action."  *See id.* at ___, *27 (quoting *Dutcher*, 733 F.3d at 985–86).  The removal analysis begins with the second prong because the first prong examines the merits of ordinary federal preemption and ordinary preemption alone is insufficient to support removal.  *See id.*

22.     The congressional intent analysis turns, critically, on whether there is "a potential federal cause of action" because "complete preemption is not the same as preemption."  *Dutcher*, 733 F.3d at 986.  "That is, a state cause of action may not be viable because it is preempted by a

federal law—but only if federal law provides its own cause of action does the case raise a federal

question that can be heard in federal court." *Id.*

23.     To completely preempt, "the federal cause of action need not provide the same

remedy as the state cause of action." *Schmeling v. NORDAM*, 97 F.3d 1336, 1343 (10th Cir. 1996).

However, "the federal remedy at issue must vindicate the same basic right or interest that would

otherwise be vindicated under state law." *Devon Energy*, 693 F.3d at 1207.

> i.   Plaintiff's Claims Should Be Governed By Federal Common Law

24.     Plaintiff's claims demand a federal rule of decision because they directly concern

public access to federally owned public lands, a "uniquely federal" interest. *See Tex. Indus., Inc.*,

451 U.S. at 640.

25.     Cases arising under federal common law may be heard in federal court pursuant to

28 U.S.C. § 1331. *See Illinois v. City of Milwaukee (Milwaukee I)*, 406 U.S. 91, 100 (1972).

26.     "There is no federal general common law," *Erie R.R. Co. v. Tompkins*, 304 U.S. 64,

78 (1938), "but there remain limited areas of specialized federal common law." *See Suncor

Energy*, ___ F.4th at ___, 2022 U.S. App. LEXIS 3458, at *31 (cleaned up).

27.     "The cases in which federal courts may engage in common lawmaking are few and

far between." *Rodriguez v. FDIC*, 140 S. Ct. 713, 716 (2020).  Among them is when "a federal

rule of decision is necessary to protect uniquely federal interests." *See Tex. Indus., Inc.*, 451 U.S.

at 640.

28.     "[W]hen there exists a significant conflict between some federal policy or interest

and the use of state law, the Court has found it necessary, in a few and restricted instances, to

develop federal common law." *City of Milwaukee v. Illinois (Milwaukee II)*, 451 U.S. 304, 313

(1981) (cleaned up).

AA18                              AA18                              AA18

29.     Here, Plaintiff has alleged claims predicated on state law that concern a uniquely federal interest: whether private landowners may obstruct free passage or transit for any and all lawful purposes over, through, or between public lands owned by the federal government at common corners shared by two sections of such public land.

30.     "Generally speaking, state law defines property interests . . . ." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010) (opinion for the Court by Scalia, J.) (citing *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998)); *see also N. N.M. Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 494 F. Supp. 3d 850, 956 (D. N.M. 2020); *Vandevere v. Lloyd*, 644 F.3d 957, 963 (9th Cir. 2011) ("[W]e look to state law to determine what property rights exist . . . .").

31.     Under Wyoming state law, a person may not claim a property right or title to "unappropriated public lands lying withing the boundaries" of the State of Wyoming. *See* WYO. CONST. art. 21, § 26, cl. 1.

32.     Nevertheless, Plaintiff alleges, among other things, that it retains a private property right to exclude people from accessing public lands owned by the federal government by obstructing the ability of people to travel freely and peaceably from one section of public land to another, adjacent section of public land at corners shared by both sections of public land. *See* Complaint at 4 (¶ 19).

33.     In particular, Plaintiff alleges that it retains a property right to prohibit people from engaging in so-called "corner crossing." *See id.* Plaintiff alleges that "corner crossing" occurs when "two pieces of public land diagonally share a corner with two pieces of private land, and a person crosses from one piece of public land, diagonally across two parcels of private property, and onto an adjacent piece of public land." *Id.* at 4 (¶ 16).

34.     Plaintiff alleges that Petitioners corner crossed from one section of public land to another section of adjacent public land at a corner these public lands share with Plaintiff's private property.  *Id.*  Plaintiff alleges that it has fenced and/or posted the common corner with several "no trespassing" signs.  *See id.* at 3 (¶¶ 13-14).

35.     Plaintiff's claims and position in this matter flow from the basic property claim made by private landowners across the United States that impedes both the federal government and the general public from accessing, using, and enjoying an enormous public asset: public lands abutted by privately owned lands.

36.     The federal government owns more than one third of all land in this country—some nearly 761 million acres of land—yet, due the actions and efforts of private abutting landowners, federal regulators and the general public have inadequate access to large percentages of federally owned public land.  *See, e.g.,* Shelby D. Green, *No Entry to the Public Lands: Towards a Theory of Public Trust Servitude for a Way Over Abutting Private Land*, 14 WYO. L. REV. 19, 20–21 & n. 6 (2014) [*hereinafter* Green, *No Entry*].

37.     A federal rule of decision is necessary to protect and preserve the limitation on private landowners' ability to control or restrict access to federally owned public lands.  At present, an unresolved, significant conflict exists between federal land management policies, federal property interests, and the rights and interests of the general public to access and use federally owned public lands, on the one hand, ***and*** the personal preferences and particularities of private landowners under the guise of state property rights, on the other hand.

38.     Recognizing the legality of corner crossing from federally owned public land to adjacent sections of federally owned public land for the purpose of accessing the public domain for lawful purposes would ensure public access to millions of acres of public land.  *See* J.W.

9

Sheridan, Comment, *The Legal Landscape of America's Landlocked Public Lands*, 37(2) U. Cal. L.A. J. of Envtl. L. & Pol'y 229, 245–46 (2019) [*hereinafter* Sheridan, *Landlocked Public Lands*].

39.     Petitioners aver that this Court should step into the fray as a "necessary expedient" until Congress can formally address and resolve this conflict.  *See Milwaukee II*, 451 U.S. at 313.

40.     For these reasons, Petitioners aver that this Court, as a federal court with jurisdiction conferred by both Article III of the United States Constitution and 28 U.S.C. § 1331, has jurisdiction over this matter as federal common law governs this dispute and Plaintiff's claims.

ii.     <u>Plaintiff's Claims Are Artfully Pleaded/Completely Preempted by Federal Law</u>

41.     Plaintiff's claims are completely preempted by federal law such that this Court has jurisdiction over this matter pursuant to both Article III of the United States Constitution and 28 U.S.C. § 1331.

42.     To determine whether a state-law claim is completely preempted by federal law, this Court begins its analysis by inquiring "whether Congress intended to allow removal in such a case, as manifested by the provision of a federal cause of action." *See Suncor Energy*, ___ F.4th at ___, 2022 U.S. App. LEXIS 3458, at *27 (quoting *Dutcher*, 733 F.3d at 985–86).

43.     Here, Congress has expressly provided a federal cause of action to combat private obstructions impairing access to public lands.  *See* 43 U.S.C. §§ 1061 *et seq.*  Because Plaintiff's claims rely exclusively on its belief that it may obstruct public access to public lands and Congress has granted private individuals a federal cause of action to challenge such obstruction, Petitioners can satisfy the congressional intent requirement for complete preemption.

10

44.     Plaintiff's claims stem from allegations that Petitioners intended to and did physically cross diagonally from one section of public land to another, adjacent section of public land for the purpose of accessing the adjacent section of public land.  *See generally* Complaint at 3-5 (¶¶ 10-22).

45.     Plaintiff alleges that, through its ownership of certain real property, it has the right to exclude others from accessing public land by corner crossing.  *Id.* at 4 (¶ 19).

46.     Plaintiff's property at-issue in this case refers to "certain real property in Carbon County, Wyoming."  Complaint at 3 (¶ 11).  Plaintiff attached and incorporated certain documents to its Complaint to specify this real property.  *See* Exhibit 1 to Complaint.  Hereinafter, Plaintiff's real property at-issue in this case shall be referred to as the "Property."

47.     Plaintiff's Property is located in the "Checkerboard" area in Carbon County, Wyoming.  *See* Complaint at 1-2.

48.     The Tenth Circuit has described the Checkerboard about as succinctly as possible as follows:

> The Checkerboard, which comprises over one million acres of generally high desert land, derives its name from the pattern of alternating sections of private and public land which it comprises.  The checkerboard scheme of land ownership is a result of the Union Pacific Act passed in 1862.  Under the [Union Pacific] Act, the Union Pacific Railroad Company was awarded the odd-numbered lots of public land along the railbed right-of-way, extending back approximately twenty miles on each side of the railbed, as the company completed each mile of the transcontinental railroad.  By granting to the railroad the odd-numbered sections, and retaining the even-numbered sections, a checkerboard effect resulted.  With some exceptions, odd-numbered sections were surrounded on all four sides by even-numbered sections which were part of the public domain.  Similarly, even-numbered sections owned by the Government as public land were also generally surrounded on all four sides by odd-numbered sections granted to the railroad.  Today, more than half of the Checkerboard remains under federal ownership, while the remainder is held privately.

*See Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1179 (10th Cir. 2016) (cleaned up).

49.    The Tenth Circuit has recognized that "Congress has long prohibited private land owners within the Checkerboard from constructing fences that effectively fence in public rangeland," *see id.* (citing 43 U.S.C. §§ 1061-65), as well as from enclosing public lands by other means, *see United States ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414, 1419 (D. Wyo. 1985), *aff'd* 848 F.2d 1502 (10th Cir. 1988) ("[I]t is not the fence itself, but its effect which constitutes the UIA violation.").

50.    Plaintiff alleges that Petitioners violated Plaintiff's state law property right to exclude others from accessing public land by corner crossing.  *See* Complaint at 4 (¶¶ 18-19).

51.    Plaintiff alleges that its state law property rights extend to excluding people, like Petitioners, from accessing public lands by corner crossing even when, in doing so, corner crossers do not "step onto the surface" of Plaintiff's Property.  *Id.* at 4 (¶ 20).

52.    Plaintiff's claims, therefore, directly concern whether private property owners may exclude others from public lands that share a corner with both sections of public land and sections of private land.  Put another way, Plaintiff avers that it may enclose public lands accessible to others only by a common corner shared by other public lands and private lands owned by Plaintiff.

53.    Congress enacted The Unlawful Inclosures of Public Lands Act of 1885 (*hereinafter*, the "UIA"), codified as 43 U.S.C. §§ 1061-1065, to prohibit private landowners from restricting, limiting, or obstructing public access to public lands.  *See Leo Sheep Co. v United States*, 440 U.S. 668, 688–89 (1979).

54.    Section 1 of the UIA, 43 U.S.C. § 1061, provides:

"All inclosures of any public lands in any State or Territory of the United States, heretofore or to be hereafter made, erected, or constructed by any person, party, association, or corporation, to any of which land included within the inclosure the person, party, association, or corporation making or controlling the inclosure had no claim or color of title made or acquired in good faith, . . . are hereby declared to be unlawful, and the maintenance, erection, construction, or control of any such

12

inclosure is hereby forbidden and prohibited; and the assertion of a right to the exclusive use and occupancy of any part of the public lands of the United States in any State or any of the Territories of the United States, without claim, color of title, or asserted right as above specified as to inclosure, is likewise declared unlawful, and hereby prohibited."

55.     Section 3 of the UIA, 43 U.S.C. § 1063, provides:

"No person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct, or shall combine and confederate with others to prevent or obstruct, any person from peaceably entering upon or establishing a settlement or residence on any tract of public land subject to settlement or entry under the public land laws of the United States, or shall prevent or obstruct free passage or transit over or through the public lands: Provided, This section shall not be held to affect the right or title of persons, who have gone upon, improved, or occupied said lands under the land laws of the United States, claiming title thereto, in good faith."

56.     Plaintiff does not allege or contend that it may assert fee title ownership as a defense to obstructing access to the public lands Petitioners allegedly traveled on, over, or through. *See generally* Complaint; *see Bergen*, 848 F.2d at 1510 (describing the UIA's one statutory defense as color of title to enclosed property).   On the contrary, Plaintiff concedes that the public lands Petitioners alleged accessed were "real property managed by the United States Department of Interior Bureau of Land Management . . . ." *See* Complaint at 1-2.

57.     Section 2 of the UIA, 43 U.S.C. § 1062, confers jurisdiction on "any United States district court . . . having jurisdiction over the locality where the land inclosed, or any part thereof, shall be situated, to hear and determine proceedings in equity, by writ of injunction, to restrain violations of the provisions of this act [43 USCS §§ 1061 et seq.]; and it shall be sufficient to give the court jurisdiction if service of original process be had in any civil proceeding on any agent or employee having charge or control of the inclosure."

58.     Section 2 of the UIA, thus, directly confers jurisdiction on this Court to hear and determine equitable proceedings concerning the provisions of the UIA, including both Sections 1 and 3.

59.     While Section 2 directs that, for violations of Section 1 of the UIA only, under 43 U.S.C. § 1061, the role of a private party is limited to supplying an affidavit to the United States Attorney for the district wherein the potential violations of Section 1 exist suggesting that private parties lack standing to assert violations of Section 1 of the UIA on their own, *see Crow Tribe of Indians v. Repsis*, 73 F.3d 982, 993–94 (10th Cir. 1995), *overruled in part on other grounds by Herrera v. Wyoming*, 139 S. Ct. 1686, 1698 (2019), Section 2 does not limit the role of private parties, like Petitioners here, to bring, raise, or prosecute claims or defenses for violations of Section 3 of the UIA.  *See* 43 U.S.C. § 1062 ("It shall be the duty of the district attorney of the United States [United States Attorney] for the proper district, on affidavit filed with him by any citizen of the United States *that section one of this act [43 USCS § 1061]* . . . ." (Emphasis added)).

60.     Since 1897, the United States Supreme Court has held that, under the UIA, a private landowner may not make any enclosures on his own private land or on land within the public domain "under the guise of enclosing his own land . . . which is useless for that purpose, and can only have been intended to enclose the lands of the government . . . ."  *Camfield v. United States*, 167 U.S. 518, 528 (1897).

61.     The United States Supreme Court emphatically concluded that the entire purpose and meaning of the UIA was to prohibit "all 'enclosures' of public lands, by whatever means."  *Id.* at 525.  To these ends, the UIA "has long prohibited" private landowners within the Checkboard area of Carbon County, Wyoming, from directly or effectively restricting public access to public land for lawful purposes.  *See Am. Wild Horse Pres. Campaign*, 847 F.3d at 1179; *see Bergen*, 620 F. Supp. at 1419.

62.     As to Section 3 of the UIA, the Tenth Circuit has interpreted the clause "[n]o person . . . shall prevent or obstruct free passage or transit over or through the public lands" as prohibiting

enclosures of public lands that prevent others from freely passing over or through the public lands. *United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1508–09 (10th Cir. 1988), *cert. denied sub nom Lawrence v. United States*, 488 U.S. 980.

63.     Following the United States Supreme Court's holding in *Camfield*, the Tenth Circuit recognized that an order requiring a landowner to remove a fence in order to permit free and unrestricted access to public lands did not involve taking anything from the landowner or otherwise impairing his private property rights. *Id.* at 1507. "All that [the landowner] has lost is the right to exclude others . . . from the public domain—a right he never had." *Id.* at 1508.

64.     In that same decision, the Tenth Circuit rejected the defense anticipated by Plaintiff in its Complaint—that the United States Supreme Court held in *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979), that private landowners may exclude the public in general or individual members of the public from accessing public lands adjacent to or abutted by private property. *See* Complaint at 6 (¶ 31). The Tenth Circuit reasoned that *Leo Sheep* merely held that the UIA did not grant the federal government an easement by necessity or implication to build a public road over private property without compensation and a private landowner's refusal to acquiesce in the construction of a road over its private property without compensation is not a violation of the UIA. *See Bergen*, 848 F.2d at 1505–06. It later concluded that it would not and could not follow *Leo Sheep* to repeal the UIA and the plain public access protections of its express terms by implication. *See id.* at 1506.

65.     Plaintiff's claims amount to a request for a state court to endorse Plaintiff's past and ongoing violations of Section 3 of the UIA by prohibiting or obstructing the public from freely accessing public lands. Here, Plaintiff has expressly alleged that it has fenced or otherwise marked the common corner in a manner intended to prevent others from accessing the public land, as

Petitioners allegedly did in this case. *See* Complaint at 3-4 (¶¶ 13-16). Plaintiff's fencing, posting, or signage at the common corner obstructing free access to public lands is unequivocal violation of the UIA. *See Am. Wild Horse Pres. Campaign*, 847 F.3d at 1179; *see Bergen*, 620 F. Supp. at 1419.

66.    Because Congress provided individuals with a federal cause of action to combat such public access obstruction by private landowners while also expressly conferring jurisdiction over such claims on federal courts, *see* 43 U.S.C. § 1062, Petitioners can satisfy the congressional intent inquiry as to complete preemption here.

67.    Having satisfied the congressional intent prong of the complete preemption analysis, *see Dutcher*, 733 F.3d at 985–86, Petitioners now turn to the ordinary preemption defense prong.

68.    "Because most federal public land legislation calls for 'cooperative federalism,' express preemption of state laws and regulations is rare in public land law." *See Utah Native Plant Soc'y v. United States Forest Serv.*, 923 F.3d 860, 867 n.4 (10th Cir. 2019).

69.    Absent express preemption, state laws and regulations still may be preempted in either of two ways. First, if Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987). Second, "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (cleaned up).

16

70.     To this end, a state law cannot escape preemption if the general purposes behind the state and federal law are different; rather, "[t]he test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963).

71.     As to conflicts between state and federal law concerning or as applied to federally owned public lands found within a state, federal preemption is both more nuanced and more biting. *See Kleppe v. New Mexico*, 426 U.S. 529, 542–43 (1976); *Wyoming v. United States*, 279 F.3d 1214, 1226 (10th Cir. 2002).

72.     The Property Clause found in Article IV of the United States Constitution, U.S. CONST. art. IV, § 3, cl. 2,[1] "gives the federal government plenary power, including legislative and police power, over federal property." *United States v. Bd. of Cnty. Comm'rs of Otero*, 843 F.3d 1208, 1212 (10th Cir. 2016) (following *Kleppe*); *Granite Rock Co.*, 480 U.S. at 580 ("This Court has 'repeatedly observed' that '[t]he power over the public land thus entrusted to Congress is without limitations.'" (quoting *Kleppe*, 426 U.S. at 539)).

73.     State jurisdiction over federal land, thus, "does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use and to prescribe in what manner others may acquire rights in them." *Wyoming*, 279 F.3d at 1227 (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 404 (1917)).

---

[1] The Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST., art. IV, § 3, cl. 2.

74.    "If Congress so chooses, federal legislation, together with the policies and objectives encompassed therein, necessarily override and preempt conflicting state laws, policies, and objectives under the Constitution's Supremacy Clause, U.S. CONST. art. VI, cl. 2." *Id.* Consequently, "[a]lthough state and local governments can ordinarily exercise their police powers over federal land within their boundaries, those powers must yield under the Supremacy Clause when they conflict with federal law under the Property Clause." *Bd. of Cnty. Comm'rs of Otero*, 843 F.3d at 1212.  "A different rule would place the public domain of the United States completely at the mercy of [the State]." *Kleppe*, 426 U.S. at 543 (quoting *Camfield*, 167 U.S. at 526).

75.    Congress's powers under the Property Clause are broad enough "to reach beyond territorial limits" and regulate "conduct on private land that affects the public lands." *Id.* at 538 (analyzing *Camfield*).

76.    Pursuant to its Property Clause powers, Congress enacted the UIA to bring an end to exclusionary techniques employed by private landowners whereby, through various means, these private landowners leveraged "ownership over a relatively small area" to extract "exclusive control of thousands of acres" of public lands.  *See Leo Sheep Co.*, 440 U.S. at 688–89.

77.    For over a century, the well-established principle governing UIA violations has remained, "when, under the guise of enclosing his own land, [an individual landowner] builds a fence which is useless [for enclosing his own land], and can only have been intended to enclose the lands of the Government, he is plainly within the statute, and is guilty of an unwarrantable appropriation of that which belongs to the public at large." *Camfield*, 167 U.S. at 528; *Leo Sheep Co.*, 440 U.S. at 689–90; *Bergen*, 848 F.2d at 1508.

78.    Plaintiff claims that its ownership of the Property located in Carbon County, Wyoming, permits it to enclose several sections of public land amounting to an as yet

undetermined amount of the public domain and, accordingly, to exclude the public from these same public lands. *See* Complaint at 3-5 (¶¶ 10-22).

79.    Plaintiff expressly alleges that it has, in fact, enclosed federally owned public lands with fencing and/or signage. *See id.* at 3 (¶¶ 13-14).

80.    Plaintiff expressly alleges that it has the right to exclude others from corner crossing to access public lands. *See id.* at 4 (¶ 19).

81.    Plaintiff grounds its claims of right in property laws governed by state law. *See Stop the Beach*, 560 U.S. at 707.

82.    Plaintiff's claims are manifestly incompatible with the protections afforded by the UIA.

83.    Accordingly, it is impossible to comply with both Plaintiff's state law-based property claims and the UIA's statutory prohibitions against enclosures of public lands and obstruction of free access to the public domain. If nothing else, Plaintiff's state law claims stand as a substantial obstacle to the accomplishment of the full purposes and objectives of Congress. *See* Green, *No Entry* at 20–21.

84.    Therefore, Petitioners have satisfied the ordinary preemption prong of the complete preemption analysis.

85.    For all the reasons described here, Petitioners have satisfied both the congressional intent and ordinary preemption prongs necessary for Plaintiff's state-law claims to be completely preempted by federal law such that this Court may exercise "arising under" jurisdiction over this matter as conferred by both Article III of the United States Constitution and 28 U.S.C. § 1331.

/ / /

/ / /

### b.  Grable *Jurisdiction*

86.     Plaintiff's claims necessarily depend on a favorable resolution of a substantial, deeply disputed question of both federal constitutional and statutory law.

87.     In particular, constitutionally, Plaintiff's assertion, through its claims, that private landowners may prohibit or exclude the general public from accessing public lands by traveling from one section of public land to another, adjacent section of public land across a corner shared by two sections of private land contradicts Congress's Property Clause powers to control the use of federally owned lands.  *See Wyoming*, 279 F.3d at 1227 (quoting *Utah Power*, 243 U.S. at 404).

88.     Further, Plaintiff's claims run against the express terms of the UIA, which prohibit private landowners from excluding others from the public domain, as well as federal caselaw interpreting and applying the UIA in various contexts.  *See* 43 U.S.C. §§ 1061 *et seq.*; *see also Camfield*, 167 U.S. at 526–28; *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1179; *Bergen*, 620 F. Supp. at 1419.

89.     To this end, Plaintiff's claims concern public access to millions of acres of presumably "landlocked"—inaccessible due only to claims of abutting private landowners— federally owned public lands.  *Compare* Complaint at 3-5 (¶¶10-22) (claiming right to exclude others from engaging in *de minimis* contact with privately owned airspace to access public lands across common corners), *with* Sheridan, *Landlocked Public Lands*, at 245–46.

90.     Accordingly, Petitioners assert that this Court may exercise substantial federal question jurisdiction, also known as *Grable* jurisdiction, over this matter.

91.     "The elements for substantial federal question—or *Grable*—jurisdiction are that the 'federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.'"

AA31                    AA31                    AA31

*Suncor Energy*, ___ F.4th at ___, 2022 U.S. App. LEXIS 3458, at *48 (quoting *Gunn*, 568 U.S. at 258).

92.    First, questions of federal law are the only legal or factual issues contested in this case.

93.    "To determine whether an issue is 'necessarily' raised, the Supreme Court has focused on whether the issue is an 'essential element' of a plaintiff's claim." *Gilmore v. Weatherford*, 694 F.3d 1160, 1173 (10th Cir. 2012) (quoting *Grable*, 545 U.S. at 315).

94.    In *Grable*, the Supreme Court concluded that because "the meaning of a federal statute 'appeared' to be the only legal or factual issue contested," the federal issue was necessarily raised. *See Suncor Energy*, ___ F.4th at ___, 2022 U.S. App. LEXIS 3458, at *49 (quoting *Grable*, 545 U.S. at 315).

95.    Likewise, here, the only issue contested is whether federal laws, including the UIA and Congress's powers under the Property Clause, permit Plaintiff to obstruct or prohibit the public from crossing from one section of federally owned public land, over the common corner shared by two sections of public land and two sections of private land, to access another, adjacent section of federally owned public land. *See* Complaint at 1-2, 5 (¶ 26).

96.    Plaintiff's position is that the legality of public access to public lands via corner crossing has already been resolved by the United States Supreme Court in *Leo Sheep*, a case that discussed the UIA in dicta about the federal government's efforts to construct a road over private property in the Checkerboard area of Carbon County, Wyoming. *See* Complaint at 6 (¶ 31).

97.    Plaintiff's claims depend entirely on the accuracy of its position regarding the meaning and effects of *Leo Sheep* as applied to the UIA and public access to public lands over common corners shared by federally owned public lands and private lands in the Checkerboard.

98.     The only legal questions at issue in this case concern whether private landowners may prohibit or exclude the public from corner crossing from public land to public land without violating the UIA and the Property Clause found in Article IV of the United States Constitution, U.S. CONST. art. IV, § 3, cl. 2.  Put another way, this case only asks if a private landowner's property rights include the right to exclude others from the federally owned public domain adjacent to and abutting both publicly owned and privately owned lands in light of the federal law prohibiting private enclosures of public lands and rendering as void and unlawful private efforts to obstruct free access to the public domain.

99.     Accordingly, Plaintiff's claims do not merely "implicate federal issues" or raise a collateral attack on federal policies.  *Cf. Suncor Energy*, ___ F.4th at ___, 2022 U.S. App. LEXIS 3458, at *49.  Rather, Plaintiff's claims hinge entirely on a favorable interpretation of federal laws concerning public lands.

100.     Thus, the issues of federal law in this case are necessarily raised by Plaintiff's claims.

101.     Second, the questions of federal law in this case are substantial under the *Grable*/*Gunn* standard or the *Merrell Dow* standard.

102.     "The Supreme Court has applied two tests to determine whether a federal issue is sufficiently substantial." *Suncor Energy*, ___ F.4th at ___, 2022 U.S. App. LEXIS 3458, at *53–*54.

103.     Courts should look to the importance of the issue to the federal system to determine whether it is substantial.  *Gunn*, 568 U.S. at 260; *Grable*, 545 U.S. at 310.  Alternatively, courts should consider whether the relevant federal law provides a private right of action or preempts state causes of action.  *See Merrell Dow*, 478 U.S. at 812.

22

104.    To satisfy the *Grable*/*Gunn* substantiality prong, "it is not enough that the federal

issue be significant to the particular parties in the immediate suit." *Gunn*, 568 U.S. at 260. "The

substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal

system as a whole." *Id.*; *see Grable*, 545 U.S. at 310 (holding "that the **national interest** in

providing a federal forum for federal tax litigation is sufficiently substantial to support the exercise

of federal-question jurisdiction." (emphasis added)).

105.    "Such importance to the system can be evaluated by assessing whether the federal

issue 'would be controlling in numerous other cases.'" *Suncor Energy*, ___ F.4th at ___, 2022

U.S. App. LEXIS 3458, at *54 (quoting *McVeigh*, 547 U.S. at 700). "In contrast, resolution of

claims that are 'fact-bound and situation-specific' would not have this precedential effect and

would be insufficiently substantial." *Id.* (quoting *McVeigh*, 547 U.S. at 701).

106.    "A prerequisite to establish a case as having importance 'to the federal system as a

whole' is to identify a concrete federal law or regulation that the case definitively implicates . . .

." *Id.* at *55 (quoting *Gunn*, 568 U.S. at 260).

107.    This case definitively implicates both the UIA and Congress's powers pursuant to

the Property Clause.

108.    Resolution of this case's implications on the UIA and the Property Clause—for

Plaintiff or for Petitioners—will be controlling in any other case concerning access to millions of

acres of federally owned public land that is adjacent to or abutting both publicly and privately

owned land.

109.    In fact, Plaintiff specifically alleges that this case is aimed at not just Petitioners

supposed prior unlawful efforts to access public land abutting Plaintiff's privately owned lands,

but also at stymying future efforts or attempts to access public lands abutting Plaintiff's privately

owned lands by others.  *See* Complaint at 9 (¶ 51) (alleging that Petitioners "may intend to encourage other persons to carry out unlawful 'corner crossings' upon Plaintiff's Property").

110.     The millions of acres of federally owned public land at issue in this case are spread across several states, including, at least, Wyoming, Montana, Idaho, Colorado, Utah, Nevada, and New Mexico.  Sheridan, *Landlocked Public Lands* at 234.

111.     The national interest in resolving the legal contours of public access to public lands so that the public may understand, appreciate, and enjoy the public domain within the bounds of the law and Congress's authority to control the use of federally owned public lands emphatically and unequivocally supports the exercise of federal-question jurisdiction here.   Sheridan, *Landlocked Public Lands* at 235 ("Because public lands are used by locals and visitors alike, preserving access is a national interest.").

112.     Further, this case is not fact-bound or fact-specific.

113.     Plaintiff's claims, as alleged in the Complaint, assert that it retains the right to exclude the public from federally owned public lands in any circumstance where the public makes even *de minimis* contact with the air above Plaintiff's Property, let alone actual physical contact with Plaintiff's Property, when attempting to access public lands from adjacent public lands.  *See* Complaint at 4 (¶¶ 16-20).

114.     Plaintiff's claims, if true and viable, would render millions of acres of public land legally enclosed and completely inaccessible by any means in every case.

115.     Accordingly, the claims in this case and their inherent questions of federal law satisfy the *Grable*/*Gunn* standard for substantiality such that this Court should exercise federal-question jurisdiction here.

**AA35**                                      **AA35**                                      **AA35**

116.   Under the *Merrell Dow* standard, "[a] federal issue may also be substantial when the relevant federal law provides a private right of action or preempts state remedies." *Suncor Energy*, ___ F.4th at ___, 2022 U.S. App. LEXIS 3458, at *56–*57.

117.   The relevant federal laws in this case include the UIA and the Property Clause as well as related caselaw.

118.   The UIA, as an exercise of Congress's powers pursuant to the Property Clause, and Congress's Property Clause powers themselves must supersede and preempt the state law property rights and state law tort claims asserted by Plaintiff here. *See Kleppe*, 426 U.S. at 543 ("A different rule would place the public domain of the United States completely at the mercy of [the State]." (quoting *Camfield*, 167 U.S. at 526)).

119.   If the UIA ensures that private landowners or private actors *may not* exclude others from the public domain by literal fencing or obstacles or by other machinations or actions that effectively enclose public lands and Congress had the constitutional authority to protect public access to public lands in this way, then federal law necessarily preempts the state remedies Plaintiff attempts to avail itself of in this matter.

120.   What's more, the UIA specifically provides a private right of action in federal court for and specifically confers jurisdiction to federal courts over instances where private parties attempt to enclose public lands and interfere with the free passage over or through public lands. *See* 43 U.S.C. § 1062; *see supra* ¶ 59 (private parties are not prohibited from raising claims under 43 U.S.C. § 1063).

121.   For all these reasons, the federal issues in this case also satisfy *Merrell Dow* substantiality.

122.   Plaintiff concedes that the parties actually dispute the federal issues in this case. *See* Complaint at 1-2 (alleging that Petitioners believe they may access public lands adjacent to other public lands at a common corner while Plaintiff believes otherwise).  Indeed, as was the case in *Gunn*, the federal issue in this case "is the central point of dispute."  *Gunn*, 568 U.S. at 259.

123.   Finally, the federal issues presented in this case are capable of resolution in federal court without disrupting the federal-state balance approved by Congress.  *See id.* at 258.

124.   The federal government enjoys "plenary power, including legislative and police power, over federal property."  *Bd. of Cnty. Comm'rs of Otero*, 843 F.3d at 1212.

125.   Pursuant to this plenary power, Congress enacted a federal statute to prohibit private parties, including private landowners, from restricting or obstructing access to federally owned public lands.  *See* 43 U.S.C. §§ 1061 *et seq.*

126.   The United States Supreme Court has already resolved the balance of federal and state power on federally owned public lands in favor of federal law and federal powers.  *See Kleppe*, 426 U.S. at 543 ("[W]here those state laws conflict with . . . legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede."); *Bd. of Cnty. Comm'rs of Otero*, 843 F.3d at 1213.

127.   Accordingly, state legislatures, state executives, and state judiciaries may not grant rights, privileges, or powers to private parties regarding the use of or access to federally owned public lands located within a state that would conflict with federal legislation enacted by Congress pursuant to the Property Clause.

128.   For this reason, in addition to the others, this Court should exercise federal question jurisdiction over the matters presented in this case.

/ / /

AA37                              AA37                              AA37

### c.   *Conclusion*

129.   For all the reasons identified here, Petitioners respectfully aver that this Court may properly exercise federal question jurisdiction over the matters presented in this case pursuant to both Article III of the United States Constitution and 28 U.S.C. § 1331.

## II.   FEDERAL DIVERSITY JURISDICTION

130.   In the alternative, Petitioners aver that this case is removeable pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

131.   To establish federal diversity jurisdiction under 28 U.S.C. § 1332(a), adverse parties must not be citizens of the same state such that a complete diversity of parties exists and the amount in controversy in this matter, exclusive of interest and costs, must exceed $75,000.00. Petitioner can make both of these showings.

### a.   *Complete Diversity of Parties*

132.   First, the civil action must be between, among other viable options, citizens of different states.  *See* 28 U.S.C. § 1332(a)(1).

133.   Plaintiff Iron Bar Holdings, LLC, is a North Carolina limited liability company registered to do business in Wyoming.  *See* Complaint at 2 (¶ 1).  Plaintiff is incorporated under the laws of the State of North Carolina and has its principal place of business in Wilmington, North Carolina.  *See* **Exhibit B** (2020 Limited Liability Annual Report for Iron Bar Holdings, LLC).

134.   Petitioner Bradley H. Cape is an individual who resides in Missouri.

135.   Petitioner Zachary M. Smith is an individual who resides in Missouri.

136.   Petitioner Phillip G. Yeomans is an individual who resides in Missouri.

137.   Petitioner John W. Slowensky is an individual who resides in Missouri.

138.    Plaintiff does not dispute that Petitioners are residents of the state of Missouri.  *See*
Complaint at 2 (¶¶ 2-5).

139.    Petitioners are not residents or citizens of the forum state, the State of Wyoming.

140.    Plaintiff and Petitioners are not residents or citizens of the same state.

141.    Thus, this action satisfies the diversity of citizenship requirement for jurisdiction
pursuant to 28 U.S.C. § 1332(a).

> ### b.  *Amount in Controversy*

142.    Second, the amount in controversy must exceed the sum of $75,000.00.

143.    "The amount in controversy . . . is not 'the amount the plaintiff will recover,' but
rather an 'estimate of the amount that will be put at issue in the course of the litigation.'" *Frederick
v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1245 (10th Cir. 2012) (quoting *McPhail v.
Deere & Co.*, 529 F.3d 947, 956 (10th Cir. 2008)).

144.    In removed cases, the amount in controversy must be evident from the allegations
of either the complaint or the notice of removal.  *Baker v. Sears Holding Corp.*, 557 F. Supp. 2d
1208, 1212 (Colo. D. Ct. 2007).  Where the complaint itself does not specify the amount of
damages requested, a removing defendant must establish the jurisdictional amount in controversy
by an preponderance of the evidence.  *See* 28 U.S.C. § 1446(c)(2)(A); *Martin v. Franklin Capital
Corp.*, 251 F.3d 1284, 1290 (10th Cir. 2001) (collecting cases).

145.    To make this jurisdictional showing, Petitioners must "affirmatively establish
jurisdiction by proving jurisdictional facts that make it possible an excess of $75,000 is in play."
*Phelps Oil & Gas, LLC v. Noble Energy, Inc.*, 5 F.4th 1122, 1126 (10th Cir. 2021) (quoting
*McPhail*, 529 F.3d at 955).  "In an action seeking declaratory and injunctive relief, 'the amount in

controversy is measured by the value of the object of the litigation.'" *Id.* (quoting *Lovell v. State Farm Mut. Auto Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006)).

146.    In assessing whether the amount in controversy has been met in an action seeking declaratory and injunctive relief, federal courts in the Tenth Circuit apply the "either viewpoint" rule, which requires the reviewing court to consider "either the value of a judgment from the viewpoint of the plaintiff or the cost from the viewpoint of the defendant of injunctive and declaratory relief." *Id.* "In other words, we look to 'the pecuniary effect an adverse declaration will have on either party to the lawsuit.'" *Id.* (quoting *City of Moore v. Atchison, Topeka & Santa Fe Ry. Co.*, 699 F.2d 507, 509 (10th Cir. 1983)).

147.    In this action, Plaintiff seeks declaratory relief, injunctive relief, and unspecified monetary damages resulting from Petitioners' alleged "unauthorized entry and trespass" onto Plaintiff's private property.

148.    As to the extent of its claimed monetary damages, Plaintiff generally alleges that it has suffered damages "in an amount exceeding the minimal jurisdictional limit of" the District Court for the Second Judicial District, County of Carbon, State of Wyoming. *See* Complaint at 5 (¶ 22).

149.    Under Wyoming law, the lower trial court—the circuit court—"has exclusive original civil jurisdiction within the boundaries of the state for: (i) An action where the prayer for recovery is an amount not exceeding fifty thousand dollars ($50,000.00), exclusive of court costs . . . ." *See* Wyo. Stat. Ann. § 5-9-128(a)(i).

150.    By contrast, the Wyoming Constitution grants district courts with original civil jurisdiction "in all cases and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court." *See* WYO. CONST. art. 5, § 10.  In other words, the district

courts have original jurisdiction over all cases and proceedings "except those placed within the exclusive jurisdiction of another court." *See MH v. First Judicial Dist. Ct. of Laramie Cty.*, 2020 WY 72, ¶ 8, 465 P.3d 405, 408 (Wyo. 2020). Accordingly, the district court's minimal jurisdictional limit for damages in civil matters is $50,000.01.

151.    Therefore, in its Complaint filed in a Wyoming state district court, Plaintiff necessarily alleges that its claimed damages exceed $50,000.01. *Compare supra* ¶¶ 25-27, *with* Complaint at 5 (¶ 22) ("As a result of Defendants' trespass upon Plaintiff's Property, Plaintiff has suffered damages in an amount to be proven at trial, ***in an amount exceeding the minimal jurisdictional limit of this Court***, plus costs, expenses, and fees.").

152.    Plaintiff's own allegations alone may prove that the amount in controversy satisfies this Court's jurisdiction.

153.    Still, out of an abundance of caution, Petitioners allege that sufficient jurisdictional facts exist to prove by a preponderance of the evidence the possibility that "an excess of $75,000 is in play" in this litigation. *Phelps Oil & Gas, LLC*, 5 F.4th at 1126.

154.    Beyond Plaintiff's bare bones allegation that it suffered damages exceeding $50,000.01, Plaintiff makes several allegations that Petitioners' acts have encumbered Plaintiff's title to a real property asset worth tens of millions of dollars.

155.    First, Plaintiff alleges that Petitioners' "unauthorized entry and trespass clouds the title to Plaintiff's Property . . . ." Complaint at 8 (¶ 48).

156.    "Generally, title is '[t]he coincidence of all the elements that constitute the fullest legal right to control and dispose of property or a claim.'" *Granite Springs Retreat Ass'n v. Manning*, 2006 WY 60, ¶ 11, 133 P.3d 1005, 1012 (Wyo. 2006) (quoting THE AMERICAN HERITAGE COLLEGE DICTIONARY 1444 (4th ed. 2004)).

157.     "A cloud on title is defined as '[a]n outstanding claim or encumbrance which, if valid, would affect or impair the title of the owner . . . .'" *Id.* (quoting BLACK'S LAW DICTIONARY 255 (6th ed. 1990)).

158.     Upon information and belief, Plaintiff's Property includes several sections of privately-owned real property adjacent to several sections of publicly-owned real property.

159.     Upon information and belief, portions of the Property include the Elk Mountain Ranch. *See* Complaint at 2 (¶ 1) ("Plaintiff Iron Bar Holdings, LLC sometimes does business as Elk Mountain Ranch."); *see also* Exhibit 1 to Complaint at page 1 of 5 (appending a warranty deed from grantor Elk Mountain Ranch Company, LLC to Iron Bar Holdings, LLC).

160.     The Chickering Company, Inc., a ranch and recreational property broker, listed and sold Elk Mountain Ranch, located in Saratoga, Wyoming, for $19,500,000.00. *See* The Chickering Company, Inc. Property Listing for Elk Mountain Ranch, *available at* https://chickeringco.com/portfolio-item/elk-mountain/ (last accessed Mar. 22, 2022) [hereinafter, Chickering Listing].

161.     Further, on May 11, 2017, Plaintiff executed a mortgage on the Property, effective May 15, 2017, for $30,000,000.00 with Bank of America, N.A. as the mortgagee/secured party. *See* **Exhibit C** (Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, recorded May 15, 2017).

162.     Plaintiff has alleged that Petitioners' acts have clouded Plaintiff's title to the Property.

163.     A cloud on title encumbers the ability of an owner to control and dispose of property. *See Granite Springs Retreat Ass'n*, ¶ 11, 133 P.3d at 1012.

31

164.    Based on the Chickering Company, Inc.'s real property listing for Elk Mountain

Ranch, *see* Chickering Listing, as well as the mortgage loan secured by Plaintiff's Property, *see*

**Exhibit C**, the Property has a value in the tens of millions of dollars—up to and, perhaps,

exceeding $30,000,000.00.

165.    Upon information and belief, the value of Plaintiff's Property is due, in part, to

Plaintiff's belief that its title to the Property includes the right to prohibit the public from accessing

public land by traveling on foot from a section of public land to another, adjacent section of public

land at the corner where the two sections of public land meet two adjacent sections of privately-

owned land.

166.    Thus, Petitioners aver that, based on the value of the object of this litigation as well

as Plaintiff's allegation that Petitioners' conduct clouds title to that object, it is possible that an

excess of $75,000 is in play.

167.    Plaintiff also alleges that it suffered damages "for interference with the exclusive

use, possession, and control of such Property, in an amount to be proven at trial" and that it will

"continue to suffer damage for the loss of the use, custody, possession, and control of the Property

as long as Defendants continue or threaten to continue unauthorized entry and trespass upon and

across Plaintiff's Property." *See* Complaint at 8 (¶¶ 48-49).

168.    Once more, a preponderance of the evidence shows that the value of the Property

far exceeds the jurisdictional threshold. *See supra* ¶ 164.

169.    Thus, allegations of interference with exclusive use, possession, and custody of this

high-value Property makes it possible that more than $75,000 is in play in this matter.

170.    Further, given that Plaintiff also seeks certain equitable relief, including a declaratory judgment and an injunction, "the amount in controversy is measured by the value of the object of the litigation." *Lovell*, 466 F.3d at 897.

171.    Under the "either viewpoint" test, this Court may look to "the pecuniary effect an adverse declaration will have on either party to the lawsuit." *City of Moore*, 699 F.2d at 509.

172.    The object of this litigation is two-fold.  On the one hand, Plaintiff is seeking to protect what it believes to be its private property rights and title to a real property asset valued between $19.5 and $30 million.  On the other hand, Petitioners seek to vindicate their access rights to the public domain as members of the public.  The value of public access to the public domain, which contains millions of acres of public land, is immeasurable, invaluable, and must exceed $75,000.

173.    An adverse outcome to either party in this case could possibly involve well in excess of this Court's jurisdictional minimum.

174.    Thus, the amount in controversy is satisfied here.

**c.   *Conclusion***

175.    For all the reasons identified here, Petitioners respectfully aver that this Court may exercise federal diversity jurisdiction over the matters presented in this case pursuant to both Article III of the United States Constitution and 28 U.S.C. § 1332(a).

## **REMOVAL IS PROPER**

176.    This Notice of Removal is timely filed because it has been filed within thirty (30) days after Petitioners, through their counsel, accepted service of the Complaint and has been filed within one (1) year of the filing of the Complaint.  *See* 28 U.S.C. § 1446(b).

177.    Petitioners will also promptly file a Notice of Removed Action in the District Court for the Second Judicial District, County of Carbon, State of Wyoming, after filing this notice.  *See* 28 U.S.C. § 1446(d).

178.    Petitioners are also providing written notice of this Notice of Removal to Plaintiff, through its counsel.  *See* 28 U.S.C. § 1446(d); *see Doe v. Roman Catholic Diocese of Erie*, 2021 U.S. Dist. LEXIS 38454, at *4 n.4 (E.D.N.Y. Mar. 2, 2021) (citing *Kelley's Adm'r v. Abram*, 20 F. Supp. 229, 230 (D. Ky. 1937)); *cf. Spriggs v. Assoc. Press*, 55 F. Supp. 385, 387 (D. Wyo. 1944).

## RESERVATION OF RIGHT TO AMEND OR SUPPLEMENT

179.    Petitioners reserve the right to amend or supplement this Notice of Removal

## JURY DEMAND

Petitioners demand a trial by jury on all issues appropriate for jury determination.

**WHEREFORE**, Petitioners request that this action now pending against them in the District Court for the Second Judicial District, County of Carbon, State of Wyoming, be removed to this Court.

Dated: March 22, 2022.                          THE FULLER LAW FIRM

                                                By: */s/Ryan A. Semerad*
                                                   Ryan A. Semerad, Esq.
                                                   Wyoming State Bar No. 7-6270
                                                   242 South Grant Street
                                                   Casper, Wyoming 82601
                                                   Telephone: 307-265-3455
                                                   Facsimile: 307-265-2859
                                                   Email: semerad@thefullerlawyers.com

                                                   *Attorney for Petitioners Bradley H. Cape, Zachary M. Smith, Phillip G. Yeomans, and John W. Slowensky*

34

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **DEFENDANTS' PETITION FOR REMOVAL** was served this 22nd day of March, 2022, using the Court's Next Generation (NextGen) CM/ECF filing system, on counsel of record for Plaintiff Iron Bar Holdings, LLC:

M. Gregory Weisz
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386
(307) 634-0336 fax
gweisz@penceandmac.com

*Attorney for Plaintiff Iron Bar Holdings, LLC*

*/s/Ryan A. Semerad*
An Employee of the Fuller Law Firm

# EXHIBIT A

## All Process, Pleadings, and
## Orders Served on Petitioners in
## the State Court Action

## EXHIBIT A

**AA47**                    **AA47**                    **AA47**

| | | |
|---|---|---|
| STATE OF WYOMING | ) | IN THE DISTRICT COURT |
| | ) ss. | SECOND JUDICIAL DISTRICT |
| COUNTY OF CARBON | ) | Civil Action No. 22-34 |

IRON BAR HOLDINGS, LLC, a )
North Carolina limited liability )
company registered to do business )
in Wyoming, )
)
     Plaintiff, )
)
    v. )
)
BRADLEY H. CAPE, ZACHARY M. SMITH, )
PHILLIP G. YEOMANS, and )
JOHN W. SLOWENSKY, )
)
    Defendants. )

STATE OF WYOMING)
COUNTY OF CARBON) ss.
FILED

FEB 1 5 2022

MARA M. SANGER
CLERK OF DISTRICT COURT
BY
       DEPUTY

## COMPLAINT FOR DECLARATORY JUDGMENT & CIVIL TRESPASS

COMES NOW Plaintiff, Iron Bar Holdings, LLC, by and through its undersigned attorneys, Pence and MacMillan LLC, and for its complaint against Defendants Bradley H. Cape, Zachary M. Smith, Phillip G. Yeomans, and John W. Slowensky hereby states and alleges as follows:

### INTRODUCTORY STATEMENT

This case is a declaratory judgment and civil trespass action in which Plaintiff seeks a declaration from the Court that Defendants committed a civil trespass on real property owned by Plaintiff. Defendants carried out a so-called "corner crossing" by which they intentionally and knowingly traveled from real property managed by the United States Department of Interior

Bureau of Land Management ("BLM"), across Plaintiff's real property and then onto BLM-managed land in an area of Carbon County, Wyoming commonly known as the "checkerboard." In the checkerboard area, two sections of privately-owned real property lie diagonally adjacent to two sections of federal public land managed by the BLM. Defendants used a custom-built device to cross from one section of BLM-managed land, across Plaintiff's two sections of private land, and then onto an adjacent BLM-managed section of land. Upon information and belief, Defendants contend that they have a right to carry out the "corner crossing," which Plaintiff denies.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Iron Bar Holdings, LLC, is a North Carolina limited liability company registered to do business in Wyoming. Said Plaintiff owns certain real property located in Carbon County, Wyoming. Plaintiff Iron Bar Holdings, LLC sometimes does business as Elk Mountain Ranch.

2.      Upon information and belief, Defendant Bradley H. Cape, date of birth 1991, is of-age, is an individual natural person, and is a resident of the state of Missouri.

3.      Upon information and belief, Defendant Zachary M. Smith, date of birth 1998, is of-age, is an individual natural person, and is a resident of the state of Missouri.

4.      Upon information and belief, Defendant Phillip G. Yeomans, date of birth 1971, is of-age, is an individual natural person and is a resident of the state of Missouri.

5.      Upon information and belief, Defendant John W. Slowensky, date of birth 1974, is of-age, is an individual natural person, and is a resident of the state of Missouri.

6.      A dispute, case, and controversy exist between Plaintiff and Defendants.

7.      This Court has jurisdiction over this action pursuant to Article 5, Section 10 of the Wyoming Constitution and Wyo. Stat. Ann. § 1–37–102.

8.      The real property and property rights that are the subject of this action are located in Carbon County, Wyoming.

9.      Venue is appropriate in Carbon County, Wyoming by virtue of Wyo. Stat. Ann. §§ 1-5-101, 1-5-104, and 1-5-107.

## GENERAL ALLEGATIONS

10.     Plaintiff restates each and every allegation contained in Paragraphs 1 through 9 above as if fully set forth herein.

11.     Plaintiff owns certain real property located in Carbon County, Wyoming (hereinafter the "Property"), as set forth in Exhibit 1, attached hereto and incorporated herein by this reference.

12.     At all times relevant hereto, Plaintiff owned, controlled, and possessed the Property where Defendants committed a criminal trespass and a civil trespass.

13.     Plaintiff's Property in question is fenced and/or posted.

14.     Several No Trespassing signs are located on Plaintiff's Property, clearly visible to others, to attempt to keep unauthorized persons from entering the Property.

15.     Defendants have no right, title, or interest of any type or nature in Plaintiff's Property, whether as owners, equitable owners, easement owners, guests of the BLM, invitees of the BLM, tenants, users, corner-crossers, possessors, members of the public, or otherwise. Defendants have no right or privilege, whether express or implied, to use and/or access the BLM-managed lands by crossing Plaintiff's Property.

16.     On or about September 26-30, 2021, Defendants entered upon and across Plaintiff's Property by way of a "corner crossing" in order to hunt big game animals. Upon information and belief, Defendants may have entered upon and across Plaintiff's Property on other dates, to be determined during the course of discovery in this matter. "Corner crossing" occurs when two pieces of public land diagonally share a corner with two pieces of private land, and a person crosses from one piece of public land, diagonally across the two parcels of private property, and onto an adjacent piece of public land. In order to carry out a "corner crossing," the person must physically travel across the privately-owned real property.

17.     Specifically, Defendants built a ladder-like device and used said device to cross two sections of Plaintiff's Property in order to hunt on an adjacent BLM-managed section of real property.

18.     Plaintiff has a right to exclusive control, use, and enjoyment of its Property, which includes the airspace at the corner, above the Property. For purposes of this Complaint and under controlling law, the Property includes the airspace above the surface of the land, the surface of the land, and the subsurface below.

19.     Plaintiff owns and controls the airspace above its real property, and is entitled to exclude others from the use of that airspace by a "corner crossing."

20.     Defendants knowingly, intentionally, and purposely interfered with Plaintiff's right to use, control, and enjoy its Property by "corner crossing" through the Property and trespassing across the Property, even if Defendants did not step onto the surface of the Property.

21.     Defendants' intentional entry upon the Property was committed without Plaintiff's permission or acquiescence and was a trespass upon the Property.

22.     As a result of Defendants' trespass upon Plaintiff's Property, Plaintiff has suffered damages in an amount to be proven at trial, in an amount exceeding the minimal jurisdictional limit of this Court, plus costs, expenses, and fees.

### FIRST CLAIM FOR RELIEF--DECLARATORY JUDGMENT

23.     Plaintiff restates each and every allegation contained in Paragraphs 1 through 22 above as if fully set forth herein.

24.     This Court has jurisdiction over this action under the provisions of the Wyoming Uniform Declaratory Judgments Act, Wyo. Stat. Ann. § 1-37-101 et seq., in that Plaintiff is a person interested in determining its rights pertaining to real property upon which Defendants have trespassed, and desires to obtain a declaration of its rights with respect to Defendants' conduct at issue herein.

25.     Plaintiff was and is, and at all times relevant to this Complaint, the owner of the real property described in Exhibit 1 hereto, including but not limited to the airspace above the surface of such real property.

26.     A justiciable dispute, case, and controversy exists between Plaintiff and Defendants concerning the rights to and possession, use, and control of the Property, including the airspace. By Exhibit 1 hereto, Plaintiff has provided sufficient evidence of its ownership, control, and possessory interest in the Property, and Defendants' actions in carrying out a "corner crossing" is a trespass upon the Property.

27.     Entry of a declaratory judgment by this Court will serve to remove uncertainty and terminate the controversy between the parties, and will resolve those issues relevant to title, possession, and rights concerning the Property at issue.

28.     Adjudication by the Court of the dispute, case, and controversy will resolve any legal questions as to the ownership, possession, and control of the airspace above Plaintiff's Property and will confirm that Defendants had no right to cross the Property and to carry out a "corner crossing."

29.     The Court should enter a declaratory judgment as to the parties' respective rights and obligations in the subject matter of this litigation.

30.     Defendants have no right to own, possess, control, use, interfere with, or cross (even temporarily) Plaintiff's Property.  The Court should declare as such.

31.     Defendants have no express or implied right of access or easement upon or across Plaintiff's Property to get to adjoining public lands.  The United States Supreme Court rejected such an argument when made by the United States government, regarding lands in the checkerboard in Wyoming; if the United States has no such right, then certainly no private citizen has such a right.

32.     Defendants have no right, title, or interest of any type of nature in the Property owned by Plaintiff, whether as owners, equitable owners, easement owners, guests of the BLM, invitees of the BLM, tenants, users, corner-crossers, possessors, members of the public, or otherwise.  The Court should declare as such.

33.     The Court should declare that none of the Defendants have a right or privilege to cross or otherwise demand entry upon or across Plaintiff's Property.

34.     The Court should require Defendants to account for and describe in detail any act or omission that any one of them has taken at any time with respect to Plaintiff and/or its real property.

35.     The Court should declare that any act or omission taken by any of the Defendants with respect to ownership, authority to enter, cross, use, and/or control of the Property was done without legal authority and was void *ab initio*.

36.     The Court should declare that Defendants trespassed upon Plaintiff's Property and caused damage to Plaintiff thereby.

37.     The Court should enter an order requiring Defendants to pay damages to Plaintiff in an amount to be proven at trial, plus costs, expenses, and fees as may be allowed by law.

## SECOND CLAIM FOR RELIEF--CIVIL TRESPASS, INJUNCTION

38.     Plaintiff restates each and every allegation contained in Paragraphs 1 through 37 above as if fully set forth herein.

39.     Plaintiff was and is, and at all times relevant to this Complaint, the owner of the Property described in Exhibit 1 hereto.

40.     Plaintiff was and is, and at all times relevant to this Complaint, the exclusive owner, occupier, possessor, and controller of the Property, with a right to exclude others therefrom.

41.     At all times relevant herein, Plaintiff was in lawful and exclusive possession and control of the Property.

42.     At all times relevant hereto, none of the Defendants possessed any right, privilege, title, or interest of any type of nature in the Property owned by Plaintiff, whether as owners, easement owners, equitable owners, guests of the BLM, invitees of the BLM, tenants, possessors, users, corner-crossers, possessors, members of the public, or otherwise.

43.     On or about September 26-30, 2021, while Plaintiff was in lawful possession, custody, and control of the Property, Defendants made an unauthorized, willful, and intentional

entry upon the Property by way of a "corner crossing," knowing they were crossing Plaintiff's Property.

44.     The ability of Defendants to be upon and use public lands does not carry or include any right or privilege whatsoever, whether express or implied, to cross private property to get to adjoining public lands.

45.     Defendants' unauthorized entry upon and across the Property was made without Plaintiff's permission, consent, or acquiescence.

46.     Defendants' unauthorized entry upon and across the Property was willful, purposeful, knowing, and intentionally done, as the Property was fenced or posted, and "No Trespassing" signs were posted in a plain and visible manner in the area in question.

47.     In violating Plaintiff's property rights, Defendants acted maliciously and oppressively toward Plaintiff in that at all times prior to, during, and after Defendants committed such "corner crossing" trespass, the Defendants had knowledge of the location of the public and private property boundary lines.

48.     Defendants' unauthorized entry and trespass clouds the title to Plaintiff's Property and Plaintiff has suffered damages for interference with the exclusive use, possession, and control of such Property, in an amount to be proven at trial.

49.     As a direct and proximate result of Defendants' actions, Plaintiff suffered and will continue to suffer damage for the loss of the use, custody, possession, and control of the Property as long as Defendants continue or threaten to continue unauthorized entry and trespass upon and across Plaintiff's Property.

50.     Unless Defendants are compelled to cease from trespassing on Plaintiff's Property and violating Plaintiff's property rights, Plaintiff will suffer irreparable injury.

51.     The Defendants are actively carrying out a campaign to solicit funds to defend their improper and unlawful actions, and upon information and belief may intend to encourage other persons to carry out unlawful "corner crossings" upon Plaintiff's Property.

52.     The Court should enter an order requiring Defendants to pay damages to Plaintiff in an amount to be proven at trial.

53.     The Court should enter an order restraining Defendants from carrying out any "corner crossings" across Plaintiff's Property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor as follows:

A.     The Court should declare that Defendants have no ownership interest, privilege, or right to control, use, possess, or cross the real property owned by Plaintiff.

B.     The Court should enter a declaratory judgment as described in the First Claim for Relief set forth above, in favor of Plaintiff.

C.     The Court should enter an order requiring Defendants to account for any act or omission taken with respect to the Property.

D.     The Court should enter an order requiring Defendants to pay damages to Plaintiff, in an amount to be proven at trial, for trespassing upon and interfering with Plaintiff's use, control, possession, and enjoyment of the Property.

E.     To the fullest extent, the Court should require Defendants to pay the attorneys' fees, costs, and expenses incurred by Plaintiff in this litigation, as may be allowed by law.

F.     The Court should provide other just and appropriate relief to Plaintiff, the premises considered.

DATED this 11th day of February, 2022.


_____

M. Gregory Weisz, Wyo. Bar No. 6-2934
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386
(307) 634-0336 fax
gweisz@penceandmac.com
Plaintiff's Attorneys

# WARRANTY DEED

**Elk Mountain Ranch Company, a Limited Liability Company**, a/k/a Elk Mountain Ranch, LLC, ("Grantor") for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration in hand paid, receipt whereof is hereby acknowledged, conveys and warrants to **Iron Bar Holdings, LLC**, a North Carolina limited liability company, whose address is 16 N. Fifth Avenue, Wilmington, NC 28401, ("Grantee") the Real Property, situated in Carbon County and State of Wyoming, described on Exhibit "A" attached hereto and made a part hereof by this reference.

TOGETHER WITH all buildings and improvements thereon situate and appurtenances thereunto belonging.

TOGETHER WITH all of Grantor's rights, title and interest in and to all minerals and mineral rights, if any, including but not limited to oil, gas, coal, rocks, sand, gravel, and other minerals, located in, on, or under the Real Property.

TOGETHER WITH all of Grantor's rights, title and interest, if any, in and to all easements, rights-of-way, and rights to same belonging and inuring to the benefit of the Real Property, and in and to all strips and gores of land lying between the Real Property and adjoining property or streets, roads, or highways, open or proposed.

TOGETHER WITH all of Grantor's rights, title and interest, but without warranty, in and to all water and water rights, wells and well rights, ditches and ditch rights, reservoirs and reservoir rights, reservoir permits belonging or in any way appertaining to the Real Property.

SUBJECT, HOWEVER, to all easements, use agreements, reservations, restrictions and rights-of-way of record or apparent upon the ground.

WITNESS their hands this 18th day of November, 2005.

Grantor:

**Elk Mountain Ranch Company, a Limited Liability Company**, a/k/a Elk Mountain Ranch, LLC, by Elk Mountain Holdings Company, a Limited Liability Company, its manager

By: _____
    Peter E. Theriot, Manager

0917180   B-1092   P-0191   11/18/2005   03:17 PM   PG   1 of 4   Fee $ 68.00
Linda A. Smith, CARBON COUNTY CLERK

Exhibit 1
Page 1 of 5
See page 4 for legal desc.

STATE OF WYOMING )
                                                   : ss
COUNTY OF CARBON )

On this _18_ day of _November_, 2005, before me personally appeared Peter E. Thieriot, to me personally known, who, being by me duly sworn, did say that he is the Manager of Elk Mountain Holdings Company, a Limited Liability Company, the manager of Elk Mountain Ranch Company, a Limited Liability Company, a/k/a Elk Mountain Ranch, LLC, and that said instrument was signed and sealed on behalf of said limited liability company by authority of its members and said Peter E. Thieriot acknowledged said instrument to be the free act and deed of said limited liability company.

Given under my hand and notarial seal this _18_ day of _November_, 2005.

_____
Notary Public

My commission expires: _May 2, 2008_.

0917180   B-1092 P-0191   11/18/2005   03:17 PM   PG  2 of 4      Fee $ 68.00
Linda A. Smith, CARBON COUNTY CLERK

Exhibit 1
Page 2 of 5

AA59                               AA59                               AA59

ALTA COMMITMENT - 1982 - WY

Commitment No.: C45319

EXHIBIT "A"

The land referred to in this commitment is situated in the State of Wyoming, County of Carbon, and is described as follows:

PARCEL I:
TOWNSHIP 19 NORTH, RANGE 81 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section  5: All
Section  7: All

TOWNSHIP 20 NORTH, RANGE 81 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section  3: All that portion lying South of that certain parcel of land conveyed to The State Highway Commission of Wyoming and more particularly described in Warranty Deed recorded May 9, 1967, in Book 489, Page 306, Records of Carbon County, Wyoming,

EXCEPTING THEREFROM that parcel of land as conveyed to The Nature Conservancy by Warranty Deed recorded December 15, 1998, in Book 964, Page 294, Records of Carbon County, Wyoming.
Section  4: N½S½, Lots 1, 2, 3, and 4
Section  6: SE¼
Section  7: All
Section  8: NE¼, SW¼, S½NW¼, NE¼NW¼
Section  9: All
Section 10: All
Section 11: All that portion lying South of that certain parcel of land conveyed to The State Highway Commission of Wyoming and more particularly described in Warranty Deed recorded May 9, 1967, in Book 489, Page 306, Records of Carbon County, Wyoming,EXCEPTING THEREFROM that parcel of land as conveyed to Road 400 Properties, LLC, by Quitclaim Deed recorded December 1, 1998, in Book 964, Page 102, Records of Carbon County, Wyoming.
Section 14: NW¼
Section 15: All
Section 17: All
Section 18: SE¼
Section 19: All
Section 20: N½, N½S½, S½SE¼, SE¼SW¼
Section 21: All
Section 27: All
Section 29: All
Section 31: All
Section 33: All

TOWNSHIP 21 NORTH, RANGE 81 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section 31: All that portion lying South of that certain parcel of land conveyed to The State Highway Commission of Wyoming and more particularly described in Warranty Deed recorded May 9, 1967, in Book 489, Page 306, Records of Carbon County, Wyoming.
Section 33: All that portion lying South of that certain parcel of land conveyed to The State Highway Commission of Wyoming and more particularly described in Warranty Deed recorded May 9, 1967, in Book 489, page 306, Records of Carbon County, Wyoming.
Section 34: SW¼
Section 35: All that portion lying South of that certain parcel of land conveyed to The State Highway Commission of Wyoming and more particularly described in Warranty Deed recorded May 9, 1967, in Book 489, page 306, Records of Carbon County, Wyoming, EXCEPTING AND EXCLUDING THEREFROM those portions of Sections 31, 33 and 35, Township 21 North, Range 81 West, 6th P.M., shown as reserved to the Union Pacific Railway Company in Warranty Deed recorded October 28, 1895, in Book 33, page 447, Records of Carbon County, Wyoming.

(Exhibit A  - CONTINUED ON NEXT PAGE)

11/03
0917180  B-1092 P-0191   11/18/2005  03:17 PM  PG  3 of 4     Fee $ 68.00
Linda A. Smith, CARBON COUNTY CLERK

Exhibit 1
Page 3 of 5

AA60                    AA60                    AA60

ALTA COMMITMENT - 1982 - WY

Exhibit A , Continued

Commitment No. C45319

TOWNSHIP 19 NORTH, RANGE 82 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section  1: All
Section  2: W½, W½E½
Section  3: All
Section 10: That portion East of the existing fence line more particularly described as
follows:

> Beginning at a point on the South line of said Section 10 that bears
> N89°38'40"E, 3185.18 ft. East of the Southwest corner of said Section 10;
> Thence N79°53'46"W, 746.18 ft. to a point; Thence N83°56'48"W, 1046.14 ft.
> to a point; Thence N11°58'10"W, 554.66 ft. to a point; Thence N02°23'05"E,
> 606.01 ft. to a point; Thence N16°57'07"W, 196.18 ft. to a point; Thence
> N07°22'51"E, 54.34 ft. to a point; Thence N15°45'30"W, 260.20 ft. to a
> point; Thence N03°40'34"W, 406.01 ft. to a point; Thence N03°44'55"E,
> 431.91 ft. to a point; Thence N22°02'11"W, 138.28 ft. to a point; Thence
> N09°46'29"E, 149.34 ft. to a point; Thence N12°04'49"W, 494.65 ft. to a
> point; Thence N63°54'18"W, 178.29 ft. to a point; Thence N29°39'50"W,
> 707.24 ft. to a point; Thence N46°49'33"W, 362.76 ft. to a point; Thence
> N19°17'25"W, 299.18 ft. to a point; Thence N13°26'19"W, 299.82 ft. to a
> point; Thence N02°24'03"W, 268.23 ft. to a point on the North line of said
> Section 10 which bears N1°15'50"E, 5281.30 ft. from the Southwest corner
> of said Section 10.

Section 11: All
Section 13: All
Section 14: N½N½, S½N½N½, SW¼NE¼, NW¼SE¼, N½SW¼, SW¼SW¼
Section 15: All, EXCEPTING THEREFROM that portion conveyed by Warranty Deed to Kimbell, Inc.,
a Nevada corporation, recorded November 26, 1996, in Book 936, Page 327, Records
of Carbon County, Wyoming.

TOWNSHIP 20 NORTH, RANGE 82 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section 13: All
Section 15: All
Section 21: All
Section 22: All
Section 23: All
Section 25: All
Section 27: All
Section 28: N½, SE¼
Section 33: All
Section 35: All

Two private sections
at issue owned by Iron Bar

PARCEL II:
A tract of land in the NE¼ of Sec. 11, Township 20 North, Range 81 West, Carbon County,
Wyoming, more completely described as follows:

> Beginning at a point monumented with a 5/8 rebar and Al. cap in a SE/NW fenceline along
> the South of the Rattlesnake Pass County Road which bears S73°18'24"E, 3359.12 ft. from
> the Northwest corner of said Sec. 11; Thence S63°52'02"E, 1039.59 ft. along said
> fenceline to a point monumented with a 5/8 rebar and Al. cap; Thence S52°53'47"E, 42.79
> ft. to a point monumented with a 5/8 rebar and Al. cap; Thence S27°42'04"W, 239.08 ft.
> to a point monumented with a 5/8 rebar and Al. cap; Thence N52°48'05"W, 149.90 ft. to
> a point monumented with a 5/8 rebar and Al. cap; Thence N65°25'32"W, 961.70 ft. to a
> point monumented with a 5/8 rebar and Al. cap; Thence N33°54'40"E, 246.79 ft. to the
> point of beginning.

0917180   B-1092 P-0191   11/18/2005   03:17 PM  PG  4 of 4     Fee $ 68.00
Linda A. Smith, CARBON COUNTY CLERK

11/91                                          14

Exhibit 1
Page 4 of 5

Print Layout

Tools    Jump To    Search..

Case 3:22-cv-00067-SWS   Document 11   Filed 03/29/22   Page 16 of 16
Appellate Case: 24-8043   Document: 010111074676   Date Filed: 11/06/2023   Page 62

BLM

Iron Bar Holdings, LLC

COUNTY ROAD 400

←Area in question

Iron Bar Holdings, LLC

BLM

400

Rattlesnake Creek

Exhibit 1
Page 5 of 5

AA62        AA62        AA62

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2022 MAY 19  PM 1:32

MARGARET B W TIE, CLERK
CASPER

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

IRON BAR HOLDINGS, LLC, a North
Carolina limited liability company
registered to do business in Wyoming,

        Plaintiff,

    v.

BRADLEY H. CAPE, ZACHARY M.
SMITH, PHILLIP G. YEOMANS, and
JOHN W. SLOWENSKY,

        Defendants.

Case No. 22-CV-67-SWS

---

## ORDER DENYING REMAND TO STATE COURT

This matter comes before the Court on Plaintiff's Motion for Remand and supporting memorandum (Docs. 13, 14), Defendants' opposition (Doc. 16), and Plaintiff's reply (Doc. 17). Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court finds and concludes remand is not warranted because this Court has subject-matter jurisdiction over Plaintiff's claims.

### INTRODUCTION

Plaintiff owns certain real property in Carbon County, Wyoming. (Compl. ¶ 1.) Much of Plaintiff's private property borders public lands managed by the U.S. Department of Interior Bureau of Land Management (BLM) in a checkerboard pattern. (*Id.* p. 15.) This checkerboard pattern of land ownership causes public lands to meet diagonally at corners, and likewise for private lands, as roughly demonstrated here:

| PUBLIC | PRIVATE | PUBLIC | PRIVATE |
|--------|---------|--------|---------|
| PRIVATE | PUBLIC | PRIVATE | PUBLIC |

(*See* Compl. p. 2 ("In the checkerboard area, two sections of privately-owned real property lie diagonally adjacent to two sections of federal public land managed by the BLM.").)

Plaintiff owns two diagonally-adjacent parcels of private land and alleges that in September 2021, Defendants crossed from public land to public land at the corner in order to hunt big game animals by using a "ladder-like device." (*Id.* ¶¶ 16-17.) Plaintiff contends Defendants' acts of "corner crossing" resulted in trespassing and infringing upon Plaintiff's airspace above the corners of its private land, even though Defendants are not alleged to have physically touched Plaintiff's private land. (*Id.* ¶¶ 16-21.)

## STANDARD OF ANALYSIS FOR REMAND

Defendants obtained removal of this lawsuit from state court on allegations this Court had both federal-question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332. (Doc. 1.) Plaintiff seeks to remand the action back to state court based on a lack of subject-matter jurisdiction. (Doc. 13.)

Under 28 U.S.C. § 1447(c), a district court must remand a removed lawsuit if it appears there is a lack of subject-matter jurisdiction at any time before final judgment. "Subject matter jurisdiction defines the court's authority to hear a given type of case." *City of Albuquerque v. Soto Enterprises, Inc.*, 864 F.3d 1089, 1092–93 (10th Cir. 2017) (quoting *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)). "[I]t represents 'the

extent to which a court can rule on the conduct of persons or the status of things.'" *Id.* (quoting *Carlsbad Tech., Inc.*, 556 U.S. at 639).

Federal courts are courts of limited jurisdiction and there is a presumption against removal jurisdiction, "which the defendant seeking removal must overcome." *De La Rosa v. Reliable, Inc.*, 113 F. Supp. 3d 1135, 1155 (D.N.M. 2015); *see Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) ("the presumption is that [federal courts] lack jurisdiction unless and until a [proponent] pleads sufficient facts to establish it").  "The defendant seeking removal must establish that federal court jurisdiction is proper by a preponderance of the evidence." *De La Rosa*, 113 F. Supp. 3d at 1155.

## DISCUSSION

The Court concludes it has subject-matter jurisdiction over this action based on diversity jurisdiction

Federal district courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States." 28 U.S.C. § 1332(a)(1).  For purposes of this case, there is no dispute that Plaintiff and Defendants are citizens of different states (Compl. ¶¶ 1-5), thus satisfying the "complete diversity" requirement of § 1332(a)(1).  The dispute here concerns whether the amount in controversy exceeds $75,000.  (*See* Doc. 14 pp. 19-21.)  The amount in controversy is "an estimate of the amount that will be put at issue in the course of the litigation." *McPhail v. Deere & Co.*, 529 F.3d 947, 953 (10th Cir. 2008).

Defendants' notice of removal plausibly alleged the amount in controversy exceeded $75,000.  (Doc. 1 pp. 28-33.)  Because Plaintiff contests that allegation in the

motion to remand, Defendants must prove their assertion by a preponderance of the

evidence. *Dart Cherokee Basin Operating, Co., LLC v. Owens*, 574 U.S. 81, 89 (2014);

28 U.S.C. § 1446(c)(2)(B).  A non-exhaustive list of ways for Defendants to meet this

requirement includes

> contentions, interrogatories or admissions in state court; by calculation from
> the complaint's allegations[;] by reference to the plaintiff's informal
> estimates or settlement demands[;] or by introducing evidence, in the form
> of affidavits from the defendant's employees or experts, about how much it
> would cost to satisfy the plaintiff's demands.

*McPhail*, 529 F.3d at 954 (quoting *Meridian Security Ins. Co. v. Sadowski*, 441 F.3d 536,

541-42 (7th Cir. 2006)).

Starting with the complaint filed in state court, Plaintiff asserted Defendants' corner

crossing caused it damages "in an amount exceeding the minimal jurisdictional limit of"

Wyoming state district court.  (Compl. ¶ 22.)  Wyoming district courts possess jurisdiction

over civil lawsuits where more than $50,000 is at issue.  *See* Wyo. Const. art. 5, § 10

(providing state district courts with original jurisdiction over "all proceedings in which

jurisdiction shall not have been by law vested exclusively in some other court"); Wyo. Stat.

§ 5-9-128(a)(i) (granting state circuit courts with exclusive jurisdiction over civil actions

where the amount in controversy does not exceed $50,000).  Thus, Plaintiff's complaint

effectively claimed damages "for trespassing upon and interfering with Plaintiff's use,

control, possession, and enjoyment of the Property" (Compl. p. 9) of more than $50,000.

(*See* Doc. 8-1 p. 3 (Plaintiff's state court civil cover sheet indicating the amount in

controversy to be "$50,000+").)

In addition to trespass damages, Plaintiff also requested Defendants pay Plaintiff's

attorneys' fees, "as may be allowed by law." (Compl. p. 10.)  Though Plaintiff's complaint does not state its basis for requesting attorney fees, the amount in controversy may include "a 'reasonable estimate' of attorney's fees" where such recovery is permitted by statute. *Hinsley v. CreditBox.com, LLC*, 550 F. Supp. 3d 993, 995 (D.N.M. 2021) (quoting *Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1340 (10th Cir. 1998)).

Moreover, Plaintiff's complaint demands both declaratory judgment and injunctive relief. (Compl. ¶¶ 23-37, 50-53.)  "In cases seeking declaratory and injunctive relief, 'the amount in controversy is measured by the value of the object of the litigation.'" *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006) (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)).  "The Tenth Circuit has followed what has commonly been referred to as the 'either viewpoint rule' which considers either the value to the plaintiff or the cost to defendant of injunctive and declaratory relief as the measure of the amount in controversy for purposes of meeting the jurisdictional minimum." *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006) (citing *Justice v. Atchison, Topeka and Santa Fe Ry. Co.*, 927 F.2d 503, 505 (10th Cir. 1991)).  The following examples from the complaint demonstrate the requested declaratory and injunctive relief in this matter is highly valued by Plaintiff and extends beyond the allegations against the named Defendants:

- "Plaintiff was and is, and at all times relevant to this Complaint, the owner of the real property described in Exhibit 1 hereto, including but not limited to the airspace above the surface of such real property." (Compl. ¶ 25.)  "Defendants' unauthorized entry and trespass clouds the title to Plaintiff's Property[.]" (Compl. ¶ 48.)

- "Unless Defendants are compelled to cease from trespassing on Plaintiff's Property and violating Plaintiff's property rights, Plaintiff will suffer irreparable injury." (Compl. ¶ 50.)

- "The Defendants are actively carrying out a campaign to solicit funds to defend their improper and unlawful actions, and upon information and belief may intend to encourage other persons to carry out unlawful "corner crossings" upon Plaintiff's Property." (Compl. ¶ 51.)

Plaintiff's allegations readily demonstrate the value of its requested declaratory and injunctive relief exceeds the $75,000.01 jurisdictional minimum of this Court.

Additionally, the cost to Defendants if the requested injunctive and declaratory relief were granted must also be considered. *See Lovell*, 466 F.3d at 897 ("the cost to defendant of injunctive and declaratory relief as the measure of the amount in controversy for purposes of meeting the jurisdictional minimum"). If Plaintiff prevails, Defendants would be effectively barred from accessing the landlocked public land on which they enjoy hunting. (*See* Compl. ¶ 16.) Such access to public lands has value to Defendants, who traveled from Missouri to Wyoming to engage in recreation on public lands, and that value must be included when determining the amount in controversy for this case.

## CONCLUSION AND ORDER

Based on (1) Plaintiff's claim that it has suffered more than $50,000 in damages, (2) Plaintiff's claim that Defendants' corner crossing has clouded title to its lands, and (3) the cost to Defendants if the requested declaratory and injunctive relief is granted, the Court has little difficulty finding by a preponderance of the evidence that the monetary amount

that will be put at issue in the course of this litigation exceeds $75,000.  Consequently, the

Court concludes it possesses federal subject-matter jurisdiction over this lawsuit under 28

U.S.C. § 1332(a)(1).  The Court need not consider the question of whether federal-question

jurisdiction also exists.

      **IT IS THEREFORE ORDERED** that Plaintiff's Motion for Remand (Doc. 13) is

hereby **DENIED**.

      **ORDERED**: May ___19th___, 2022.

                         Scott W. Skavdahl
                         United States District Judge

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 22-CV-00067-SWS |
| BRADLY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual, | ) ) ) ) ) | |
| Defendants. | ) ) | |

---

### FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT & CIVIL TRESPASS

---

COMES NOW Plaintiff, Iron Bar Holdings, LLC, by and through its undersigned attorneys, Pence and MacMillan LLC, and for its complaint against Defendants Bradly H. Cape, Zachary M. Smith, Phillip G. Yeomans, and John W. Slowensky hereby states and alleges as follows:

### INTRODUCTORY STATEMENT

This case is a declaratory judgment and civil trespass action in which Plaintiff seeks a declaration from the Court that Defendants committed a civil trespass on real property owned by Plaintiff. Defendants carried out a so-called "corner crossing" by which they intentionally and

knowingly traveled from real property managed by the United States Department of Interior Bureau of Land Management ("BLM"), across Plaintiff's real property and then onto BLM-managed land in an area of Carbon County, Wyoming commonly known as the "checkerboard." In the checkerboard area, two sections of privately-owned real property lie diagonally adjacent to two sections of federal public land managed by the BLM. Defendants used a custom-built device to cross from one section of BLM-managed land, across Plaintiff's two sections of private land, and then onto an adjacent BLM-managed section of land. Upon information and belief, Defendants contend that they have a right to carry out the "corner crossing," which Plaintiff denies.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Iron Bar Holdings, LLC, is a North Carolina limited liability company registered to do business in Wyoming. Said Plaintiff owns certain real property located in Carbon County, Wyoming. Plaintiff Iron Bar Holdings, LLC sometimes does business as Elk Mountain Ranch.

2.      Upon information and belief, Defendant Bradly H. Cape, date of birth 1991, is of-age, is an individual natural person, and is a resident of the state of Missouri.

3.      Upon information and belief, Defendant Zachary M. Smith, date of birth 1998, is of-age, is an individual natural person, and is a resident of the state of Missouri.

4.      Upon information and belief, Defendant Phillip G. Yeomans, date of birth 1971, is of-age, is an individual natural person and is a resident of the state of Missouri.

5.      Upon information and belief, Defendant John W. Slowensky, date of birth 1974, is of-age, is an individual natural person, and is a resident of the state of Missouri.

6.      A dispute, case, and controversy exist between Plaintiff and Defendants.

7.      This Court has jurisdiction over this action pursuant to Article 5, Section 10 of the Wyoming Constitution and Wyo. Stat. Ann. § 1–37–102.

8.      The real property and property rights that are the subject of this action are located in Carbon County, Wyoming.

9.      Venue is appropriate in Carbon County, Wyoming by virtue of Wyo. Stat. Ann. §§ 1-5-101, 1-5-104, and 1-5-107.

## GENERAL ALLEGATIONS

10.     Plaintiff restates each and every allegation contained in Paragraphs 1 through 9 above as if fully set forth herein.

11.     Plaintiff owns certain real property located in Carbon County, Wyoming (hereinafter the "Property"), as set forth in Exhibit 1, attached hereto and incorporated herein by this reference.

12.     At all times relevant hereto, Plaintiff owned, controlled, and possessed the Property where Defendants committed a criminal trespass and a civil trespass.

13.     Plaintiff's Property in question is fenced and/or posted.

14.     Several No Trespassing signs are located on Plaintiff's Property, clearly visible to others, to attempt to keep unauthorized persons from entering the Property.

15.     Defendants have no right, title, or interest of any type or nature in Plaintiff's Property, whether as owners, equitable owners, easement owners, guests of the BLM, invitees of the BLM, tenants, users, corner-crossers, possessors, members of the public, or otherwise. Defendants have no right or privilege, whether express or implied, to use and/or access the BLM-managed lands by crossing Plaintiff's Property.

16.     On or about September 26-30, 2021, Defendants entered upon and across Plaintiff's Property by way of a "corner crossing" in order to hunt big game animals.  Upon information and belief, Defendants may have entered upon and across Plaintiff's Property on other dates, to be determined during the course of discovery in this matter.  "Corner crossing" occurs when two pieces of public land diagonally share a corner with two pieces of private land, and a person crosses from one piece of public land, diagonally across the two parcels of private property, and onto an adjacent piece of public land.  In order to carry out a "corner crossing," the person must physically travel across the privately-owned real property.

17.     Specifically, Defendants built a ladder-like device and used said device to cross two sections of Plaintiff's Property in order to hunt on an adjacent BLM-managed section of real property.

18.     Similar to the actions described in ¶ 16 above, upon information and belief Plaintiff alleges that one or more of the Defendants entered upon and across Plaintiff's Property in the fall 2020 big game hunting period in September and/or October in order to hunt big game animals.

19.     Plaintiff has a right to exclusive control, use, and enjoyment of its Property, which includes the airspace at the corner, above the Property.  For purposes of this Complaint and under controlling law, the Property includes the airspace above the surface of the land, the surface of the land, and the subsurface below.

20.     Plaintiff owns and controls the airspace above its real property, and is entitled to exclude others from the use of that airspace by a "corner crossing."

21.     Defendants knowingly, intentionally, and purposely interfered with Plaintiff's right to use, control, and enjoy its Property by "corner crossing" through the Property and trespassing across the Property, even if Defendants did not step onto the surface of the Property.

22.     Defendants' intentional entry upon the Property was committed without Plaintiff's permission or acquiescence and was a trespass upon the Property.

23.     As a result of Defendants' trespass upon Plaintiff's Property, Plaintiff has suffered damages in an amount to be proven at trial, in an amount exceeding the minimal jurisdictional limit of this Court, plus costs, expenses, and fees.

**FIRST CLAIM FOR RELIEF--DECLARATORY JUDGMENT**

24.     Plaintiff restates each and every allegation contained in Paragraphs 1 through 23 above as if fully set forth herein.

25.     This Court has jurisdiction over this action under the provisions of the Wyoming Uniform Declaratory Judgments Act, Wyo. Stat. Ann. § 1-37-101 et seq., in that Plaintiff is a person interested in determining its rights pertaining to real property upon which Defendants have trespassed, and desires to obtain a declaration of its rights with respect to Defendants' conduct at issue herein.

26.     Plaintiff was and is, and at all times relevant to this Complaint, the owner of the real property described in Exhibit 1 hereto, including but not limited to the airspace above the surface of such real property.

27.     A justiciable dispute, case, and controversy exists between Plaintiff and Defendants concerning the rights to and possession, use, and control of the Property, including the airspace. By Exhibit 1 hereto, Plaintiff has provided sufficient evidence of its ownership, control, and

possessory interest in the Property, and Defendants' actions in carrying out a "corner crossing" is a trespass upon the Property.

28.     Entry of a declaratory judgment by this Court will serve to remove uncertainty and terminate the controversy between the parties, and will resolve those issues relevant to title, possession, and rights concerning the Property at issue.

29.     Adjudication by the Court of the dispute, case, and controversy will resolve any legal questions as to the ownership, possession, and control of the airspace above Plaintiff's Property and will confirm that Defendants had no right to cross the Property and to carry out a "corner crossing."

30.     The Court should enter a declaratory judgment as to the parties' respective rights and obligations in the subject matter of this litigation.

31     Defendants have no right to own, possess, control, use, interfere with, or cross (even temporarily) Plaintiff's Property.  The Court should declare as such.

32.     Defendants have no express or implied right of access or easement upon or across Plaintiff's Property to get to adjoining public lands.  The United States Supreme Court rejected such an argument when made by the United States government, regarding lands in the checkerboard in Wyoming; if the United States has no such right, then certainly no private citizen has such a right.

33.     Defendants have no right, title, or interest of any type of nature in the Property owned by Plaintiff, whether as owners, equitable owners, easement owners, guests of the BLM, invitees of the BLM, tenants, users, corner-crossers, possessors, members of the public, or otherwise.  The Court should declare as such.

34.     The Court should declare that none of the Defendants have a right or privilege to cross or otherwise demand entry upon or across Plaintiff's Property.

35.     The Court should require Defendants to account for and describe in detail any act or omission that any one of them has taken at any time with respect to Plaintiff and/or its real property.

36.     The Court should declare that any act or omission taken by any of the Defendants with respect to ownership, authority to enter, cross, use, and/or control of the Property was done without legal authority and was void *ab initio*.

37.     The Court should declare that Defendants trespassed upon Plaintiff's Property and caused damage to Plaintiff thereby, both in 2020 and 2021.

38.     The Court should enter an order requiring Defendants to pay damages to Plaintiff in an amount to be proven at trial, plus costs, expenses, and fees as may be allowed by law.

**SECOND CLAIM FOR RELIEF--CIVIL TRESPASS, INJUNCTION**

39.     Plaintiff restates each and every allegation contained in Paragraphs 1 through 38 above as if fully set forth herein.

40.     Plaintiff was and is, and at all times relevant to this Complaint, the owner of the Property described in Exhibit 1 hereto.

41.     Plaintiff was and is, and at all times relevant to this Complaint, the exclusive owner, occupier, possessor, and controller of the Property, with a right to exclude others therefrom.

42.     At all times relevant herein, Plaintiff was in lawful and exclusive possession and control of the Property.

43.     At all times relevant hereto, none of the Defendants possessed any right, privilege, title, or interest of any type of nature in the Property owned by Plaintiff, whether as owners, easement owners, equitable owners, guests of the BLM, invitees of the BLM, tenants, possessors, users, corner-crossers, possessors, members of the public, or otherwise.

44.     On or about September 26-30, 2021, and also in September – October 2020, while Plaintiff was in lawful possession, custody, and control of the Property, Defendants made an unauthorized, willful, and intentional entry upon the Property by way of a "corner crossing," knowing they were crossing Plaintiff's Property.

45.     The ability of Defendants to be upon and use public lands does not carry or include any right or privilege whatsoever, whether express or implied, to cross private property to get to adjoining public lands.

46.     Defendants' unauthorized entry upon and across the Property was made without Plaintiff's permission, consent, or acquiescence.

47.     Defendants' unauthorized entry upon and across the Property was willful, purposeful, knowing, and intentionally done, as the Property was fenced or posted, and "No Trespassing" signs were posted in a plain and visible manner in the area in question.

48.     In violating Plaintiff's property rights, Defendants acted maliciously and oppressively toward Plaintiff in that at all times prior to, during, and after Defendants committed such "corner crossing" trespass, the Defendants had knowledge of the location of the public and private property boundary lines.

49.     Defendants' unauthorized entry and trespass clouds the title to Plaintiff's Property and Plaintiff has suffered damages for interference with the exclusive use, possession, and control of such Property, in an amount to be proven at trial.

50.     As a direct and proximate result of Defendants' actions, Plaintiff suffered and will continue to suffer damage for the loss of the use, custody, possession, and control of the Property as long as Defendants continue or threaten to continue unauthorized entry and trespass upon and across Plaintiff's Property.

51.     Unless Defendants are compelled to cease from trespassing on Plaintiff's Property and violating Plaintiff's property rights, Plaintiff will suffer irreparable injury.

52.     The Defendants are actively carrying out a campaign to solicit funds to defend their improper and unlawful actions, and upon information and belief may intend to encourage other persons to carry out unlawful "corner crossings" upon Plaintiff's Property.

53.     The Court should enter an order requiring Defendants to pay damages to Plaintiff in an amount to be proven at trial.

54.     The Court should enter an order restraining Defendants from carrying out any "corner crossings" across Plaintiff's Property.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor as follows:

A.     The Court should declare that Defendants have no ownership interest, privilege, or right to control, use, possess, or cross the real property owned by Plaintiff.

B.      The Court should enter a declaratory judgment as described in the First Claim for Relief set forth above, in favor of Plaintiff.

C.      The Court should enter an order requiring Defendants to account for any act or omission taken with respect to the Property.

D.      The Court should enter an order requiring Defendants to pay damages to Plaintiff, in an amount to be proven at trial, for trespassing upon and interfering with Plaintiff's use, control, possession, and enjoyment of the Property.

E.      To the fullest extent, the Court should require Defendants to pay the attorneys' fees, costs, and expenses incurred by Plaintiff in this litigation, as may be allowed by law.

F.      The Court should provide other just and appropriate relief to Plaintiff, the premises considered.

DATED this 1st day of November, 2022.


          /s M. Gregory Weisz
          M. Gregory Weisz, Wyo. Bar No. 6-2934
          PENCE AND MACMILLAN LLC
          P.O. Box 765
          Cheyenne, WY 82003
          (307) 638-0386
          (307) 634-0336 fax
          gweisz@penceandmac.com
          Plaintiff's Attorneys

# WARRANTY DEED

Elk Mountain Ranch Company, a Limited Liability Company, a/k/a Elk Mountain Ranch, LLC, ("Grantor") for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration in hand paid, receipt whereof is hereby acknowledged, conveys and warrants to Iron Bar Holdings, LLC, a North Carolina limited liability company, whose address is 16 N. Fifth Avenue, Wilmington, NC 28401, ("Grantee") the Real Property, situated in Carbon County and State of Wyoming, described on Exhibit "A" attached hereto and made a part hereof by this reference.

TOGETHER WITH all buildings and improvements thereon situate and appurtenances thereunto belonging.

TOGETHER WITH all of Grantor's rights, title and interest in and to all minerals and mineral rights, if any, including but not limited to oil, gas, coal, rocks, sand, gravel, and other minerals, located in, on, or under the Real Property.

TOGETHER WITH all of Grantor's rights, title and interest, if any, in and to all easements, rights-of-way, and rights to same belonging and inuring to the benefit of the Real Property, and in and to all strips and gores of land lying between the Real Property and adjoining property or streets, roads, or highways, open or proposed.

TOGETHER WITH all of Grantor's rights, title and interest, but without warranty, in and to all water and water rights, wells and well rights, ditches and ditch rights, reservoirs and reservoir rights, reservoir permits belonging or in any way appertaining to the Real Property.

SUBJECT, HOWEVER, to all easements, use agreements, reservations, restrictions and rights-of-way of record or apparent upon the ground.

WITNESS their hands this 18th day of November, 2005.

Grantor:
Elk Mountain Ranch Company, a Limited Liability Company a/k/a Elk Mountain Ranch, LLC, by Elk Mountain Holdings Company, a Limited Liability Company, its manager

By: _____
Peter E. Theriot, Manager

0917180   B-1092 P-0191   11/18/2005   03:17 PM   PG   1 of 4      Fee $ 68.00
Linda A. Smith, CARBON COUNTY CLERK

# Exhibit 1
# Page 1 of 5
# See page 4 for legal desc.

STATE OF WYOMING    )
                      : ss

COUNTY OF CARBON    )

On this _18_ day of _November_ , 2005, before me personally appeared Peter E. Thieriot, to me personally known, who, being by me duly sworn, did say that he is the Manager of Elk Mountain Holdings Company, a Limited Liability Company, the manager of Elk Mountain Ranch Company, a Limited Liability Company, a/k/a Elk Mountain Ranch, LLC, and that said instrument was signed and sealed on behalf of said limited liability company by authority of its members and said Peter E. Thieriot acknowledged said instrument to be the free act and deed of said limited liability company.

Given under my hand and notarial seal this _18_ day of _November_ , 2005.

_Jodie Shultz_
Notary Public

My commission expires: _May 2, 2008_ .

# Exhibit 1
# Page 2 of 5

**AA81**           **AA81**           **AA81**

ALTA COMMITMENT - 1982 - WY

Commitment No.: C45319

EXHIBIT "A"

The land referred to in this commitment is situated in the State of Wyoming, County of Carbon, and is described as follows:

PARCEL I:
TOWNSHIP 19 NORTH, RANGE 81 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section  5: All
Section  7: All

TOWNSHIP 20 NORTH, RANGE 81 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section  3: All that portion lying South of that certain parcel of land conveyed to The State
            Highway Commission of Wyoming and more particularly described in Warranty Deed
            recorded May 9, 1967, in Book 489, Page 306, Records of Carbon County, Wyoming.

            EXCEPTING THEREFROM that parcel of land as conveyed to The Nature
            Conservancy by Warranty Deed recorded December 15, 1998, in Book 964, Page
            294, Records of Carbon County, Wyoming.
Section  4: N½S½, Lots 1, 2, 3, and 4
Section  6: SE¼
Section  7: All
Section  8: NE¼, SW¼, S½NW¼, NE¼NW¼
Section  9: All
Section 10: All
Section 11: All that portion lying South of that certain parcel of land conveyed to The State
            Highway Commission of Wyoming and more particularly described in Warranty Deed
            recorded May 9, 1967, in Book 489, Page 306, Records of Carbon County,
            Wyoming, EXCEPTING THEREFROM that parcel of land as conveyed to Road 400
            Properties, LLC, by Quitclaim Deed recorded December 1, 1998, in Book 964, Page
            102, Records of Carbon County, Wyoming.
Section 14: NW¼
Section 15: All
Section 17: All
Section 18: SE¼
Section 19: All
Section 20: N½, N½S½, S½SE¼, SE¼SW¼
Section 21: All
Section 27: All
Section 29: All
Section 31: All
Section 33: All

TOWNSHIP 21 NORTH, RANGE 81 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section 31: All that portion lying South of that certain parcel of land conveyed to The State
            Highway Commission of Wyoming and more particularly described in Warranty Deed
            recorded May 9, 1967, in Book 489, Page 306, Records of Carbon County, Wyoming.
Section 33: All that portion lying South of that certain parcel of land conveyed to The State
            Highway Commission of Wyoming and more particularly described in Warranty Deed
            recorded May 9, 1967, in Book 489, page 306, Records of Carbon County, Wyoming.
Section 34: SW¼
Section 35: All that portion lying South of that certain parcel of land conveyed to The State
            Highway Commission of Wyoming and more particularly described in Warranty Deed
            recorded May 9, 1967, in Book 489, page 306, Records of Carbon County, Wyoming,
            EXCEPTING AND EXCLUDING THEREFROM those portions of Sections 31, 33 and 35,
            Township 21 North, Range 81 West, 6th P.M., shown as reserved to the Union
            Pacific Railway Company in Warranty Deed recorded October 28, 1895, in Book 33,
            page 447, Records of Carbon County, Wyoming.

(Exhibit A - CONTINUED ON NEXT PAGE)

11/01

Exhibit 1
Page 3 of 5

ALTA COMMITMENT - 1982 - WY

Exhibit A , Continued

Commitment No. C45319

TOWNSHIP 19 NORTH, RANGE 82 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section 1: All
Section 2: W½, W½E½
Section 3: All
Section 10: That portion East of the existing fence line more particularly described as follows:

> Beginning at a point on the South line of said Section 10 that bears N89°38'40"E, 3185.18 ft. East of the Southwest corner of said Section 10; Thence N79°53'46"W, 746.18 ft. to a point; Thence N83°56'48"W, 1046.14 ft. to a point; Thence N11°58'10"W, 554.66 ft. to a point; Thence N02°23'05"E, 606.01 ft. to a point; Thence N16°57'07"W, 196.18 ft. to a point; Thence N07°22'51"E, 54.34 ft. to a point; Thence N15°45'30"W, 260.20 ft. to a point; Thence N03°40'34"W, 406.01 ft. to a point; Thence N03°44'55"E, 431.91 ft. to a point; Thence N22°22'11"W, 138.28 ft. to a point; Thence N09°46'29"E, 149.34 ft. to a point; Thence N12°04'49"W, 494.65 ft. to a point; Thence N63°54'18"W, 178.29 ft. to a point; Thence N29°39'50"W, 707.24 ft. to a point; Thence N46°49'33"W, 362.76 ft. to a point; Thence N19°17'25"W, 299.18 ft. to a point; Thence N13°26'19"W, 299.82 ft. to a point; Thence N02°24'03"W, 268.23 ft. to a point on the North line of said Section 10 which bears N1°15'50"E, 5281.30 ft. from the Southwest corner of said Section 10.

Section 11: All
Section 13: All
Section 14: N½N½, S½NW¼, SW¼NE¼, NW¼SE¼, N½SW¼, SW¼SW¼
Section 15: All, EXCEPTING THEREFROM that portion conveyed by Warranty Deed to Kimbell, Inc., a Nevada corporation, recorded November 26, 1996, in Book 936, Page 327, Records of Carbon County, Wyoming.

TOWNSHIP 20 NORTH, RANGE 82 WEST, 6TH P.M., CARBON COUNTY, WYOMING
Section 13: All
Section 15: All
Section 21: All
Section 22: All
Section 23: All           Two private sections
Section 25: All
Section 27: All           at issue owned by Iron Bar
Section 28: N½, SE¼
Section 33: All
Section 35: All

PARCEL II:
A tract of land in the NE¼ of Sec. 11, Township 20 North, Range 81 West, Carbon County, Wyoming, more completely described as follows:

> Beginning at a point monumented with a 5/8 rebar and Al. cap in a SE/NW fenceline along the South of the Rattlesnake Pass County Road which bears S73°18'24"E, 3359.12 ft. from the Northwest corner of said Sec. 11; Thence S63°52'02"E, 1039.59 ft. along said fenceline to a point monumented with a 5/8 rebar and Al. cap; Thence S52°53'47"E, 42.79 ft. to a point monumented with a 5/8 rebar and Al. cap; Thence S27°42'04"W, 239.08 ft. to a point monumented with a 5/8 rebar and Al. cap; Thence N52°48'05"W, 149.90 ft. to a point monumented with a 5/8 rebar and Al. cap; Thence N65°25'32"W, 961.70 ft. to a point monumented with a 5/8 rebar and Al. cap; Thence N33°54'40"E, 246.79 ft. to the point of beginning.

0917180  B-1092 P-0191   11/18/2005  03:17 PM  PG  4 of 4     Fee $ 68.00
Linda A. Smith, CARBON COUNTY CLERK

11/91                              14

Exhibit 1
Page 4 of 5



https://maps.greenwoodmap.com/carbon/map#zcr=13.718663660410396/-11864534.778036298/5115163.659684621/0&lyrs=a19,publand,water,townlim,ownership,roads&filter=(pidn%20in('2082

Print Layout

Search..

BLM

Iron Bar Holdings, LLC

Area in question

Iron Bar Holdings, LLC

BLM

400

Exhibit 1
Page 5 of 5

AA84          AA84          AA84

Ryan A. Semerad, Esq.
Wyoming Bar No. 7-6270
**THE FULLER & SEMERAD LAW FIRM**
242 South Grant Street
Casper, Wyoming 82601
Telephone: 307-265-3455
Facsimile: 307-265-2859
Email: semerad@thefullerlawyers.com

Lee Mickus, Esq.
Wyoming Bar No. 7-5698
**EVANS FEARS & SCHUTTERT LLP**
3200 Cherry Creek Drive South, Suite 380
Denver, Colorado 80209
Telephone: 303-656-2199
Facsimile: 702-805-0291
Email: lmickus@efstriallaw.com

*Attorneys for Defendants Bradly H.
Cape, Zachary M. Smith, Phillip G.
Yeomans, and John W. Slowensky*

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming, | ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) |
| vs. | ) ) |
| | ) |
| BRADLY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual, | ) ) ) ) |
| | ) |
| Defendants. | ) |

CASE NO. 22-cv-00067-SWS

---

**DEFENDANTS' ANSWER TO PLAINTIFF'S *FIRST AMENDED COMPLAINT* (ECF NO. 37)**

---

1

Defendants Bradly H. Cape, Zachary M. Smith, Phillip G. Yeomans, and John W. Slowensky (collectively, "Defendants"), by and through their undersigned counsel, submit the following *Answer* to Plaintiff's *First Amended Complaint* (ECF No. 37). Specifically, Defendants answer each allegation in Plaintiff's *First Amended Complaint* as follows:

Defendants deny all allegations in Plaintiff's *First Amended Complaint* not expressly admitted, denied, or otherwise responded to herein.

## INTRODUCTION

1.     Defendants state that Plaintiff's "Introductory Statement" section does not contain any allegation to which a responsive pleading is required and so deny the same.

## PARTIES, JURISDICTION, AND VENUE

2.     As to the allegations made in Paragraph 1, Defendants state that the allegations are not directed toward Defendants, and therefore no response is necessary.

3.     As to the allegations made in Paragraph 2, Defendants deny that Mr. Cape's year of birth is 1991 but admit the remaining allegations.

4.     As to the allegations made in Paragraph 3, Defendants admit.

5.     As to the allegations made in Paragraph 4, Defendants admit.

6.     As to the allegations made in Paragraph 5, Defendants admit.

7.     As to the allegations made in Paragraph 6, Defendants state that Paragraph 6 contains legal conclusions to which no responsive pleading is required and so deny the same.

8.     As to the allegations made in Paragraph 7, Defendants state that Paragraph 7 contains legal conclusions to which no responsive pleading is required and so deny the same.

AA86                                    AA86                                    AA86

9.      As to the allegations made in Paragraph 8, Defendants admit that at least some of the real property and property rights that are the subject of this action are located in Carbon County, Wyoming.

10.      As to the allegations made in Paragraph 9, Defendants state that Paragraph 9 contains legal conclusions to which no responsive pleading is required and so deny the same.

## GENERAL ALLEGATIONS

11.      In response to Paragraph 10, Defendants repeat and incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

12.      As to the allegations made in Paragraph 11, Defendants admit that Plaintiff owns certain real property located in Carbon County, Wyoming (hereinafter, the "Property"), and that Exhibit 1 (ECF No. 37-1) attached to Plaintiff's *First Amended Complaint* describes the Property.

13.      As to the allegations in Paragraph 12, Defendants admit that Plaintiff owned the Property during the times specified elsewhere in the *First Amended Complaint* but deny that Defendants committed a criminal trespass or a civil trespass.

14.      As to the allegations in Paragraph 13, Defendants admit that Plaintiff had placed two posts on either side of a common corner shared by federally owned public land and chained the posts together with a padlock.  Defendants admit the posts were chained together in such a manner as to block or obstruct passage from one section of public land to the other, adjacent section of public land.

15.      As to the allegations in Paragraph 14, Defendants admit that Plaintiff has placed signs on the posts described in ¶ 15 *supra* that state "No Trespassing" and that these signs face a section of public land.  Defendants deny that that these "No Trespassing" signs were intended to keep people from entering Plaintiff's Property as opposed to the public lands.

3

16.     As to the allegations in Paragraph 15, Defendants state that Paragraph 15 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

17.     As to the allegations in Paragraph 16, Defendants admit that they were lawfully hunting certain game in Carbon County, Wyoming, between September 26 and September 30, 2021.  Defendants deny that they entered upon and/or across Plaintiff's Property.  Defendants otherwise aver that they accessed federally owned and managed public lands in Carbon County, Wyoming, from other federally owned and managed public lands in Carbon County, Wyoming, without entering upon Plaintiff's Property.  Defendants deny all other allegations in Paragraph 16.

18.     As to the allegations in Paragraph 17, Defendants admit they constructed a ladder and used that ladder to pass or travel over, through, or from one section of federally owned and managed public land in Carbon County, Wyoming, to another section of federally owned and managed public land in Carbon County, Wyoming, where the two sections of public land meet. Defendants deny that they built or used this ladder to enter upon, intrude in, or otherwise use or affect Plaintiff's Property.  Defendants admit that they built and used this ladder to assist them as they hunted on federally owned and managed public land and that some of the public lands they hunted were adjacent to some sections of land owned by Plaintiff.

19.     As to the allegations in Paragraph 18, Defendants deny that they entered upon and across Plaintiff's Property in the fall of 2020, but admit that Bradly H. Cape, Phillip G. Yeomans, and Zachary M. Smith did travel to and through public lands in Carbon County, Wyoming, to hunt game between September and October 2020.  Defendants specifically deny that John Slowensky was in Wyoming "in the fall 2020 big game hunting period in September and/or October in order to hunt big game animals."

20.    As to the allegations in Paragraph 19, Defendants state that Paragraph 19 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

21.    As to the allegations in Paragraph 20, Defendants state that Paragraph 20 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

22.    As to the allegations in Paragraph 21, Defendants deny.

23.    As to the allegations in Paragraph 22, Defendants deny.

24.    As to the allegations in Paragraph 23, Defendants deny.

**FIRST CLAIM FOR RELIEF—DECLARATORY JUDGMENT**

25.    In response to Paragraph 24, Defendants repeat and incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

26.    As to the allegations in Paragraph 25, Defendants state that Paragraph 25 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

27.    As to the allegations in Paragraph 26, Defendants admit that Plaintiff is the owner of the real property described in Exhibit 1 attached to Plaintiff's *First Amended Complaint* (ECF No. 37-1), but Defendants otherwise state that Plaintiff's allegations about the ownership of the airspace above the surface of such real property contain legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

28.     As to the allegations in Paragraph 27, Defendants state that Paragraph 27 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

29.     As to the allegations in Paragraph 28, Defendants state that Paragraph 28 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

30.     As to the allegations in Paragraph 29, Defendants state that Paragraph 29 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

31.     As to the allegations in Paragraph 30, Defendants state that Paragraph 30 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

32.     As to the allegations in Paragraph 31, Defendants state that Paragraph 31 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

33.     As to the allegations in Paragraph 32, Defendants state that Paragraph 32 contains legal conclusions and arguments to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

34.     As to the allegations in Paragraph 33, Defendants state that Paragraph 33 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

**AA90**                          **AA90**                          **AA90**

35.     As to the allegations in Paragraph 34, Defendants state that Paragraph 34 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

36.     As to the allegations in Paragraph 35, Defendants state that Paragraph 35 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

37.     As to the allegations in Paragraph 36, Defendants state that Paragraph 36 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

38.     As to the allegations in Paragraph 37, Defendants state that Paragraph 37 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

39.     As to the allegations in Paragraph 38, Defendants state that Paragraph 38 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

**SECOND CLAIM FOR RELIEF—CIVIL TRESPASS, INJUNCTION**

40.     In response to Paragraph 39, Defendants repeat and incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

41.     As to the allegations in Paragraph 40, Defendants admit.

42.     As to the allegations in Paragraph 41, Defendants state that they lack knowledge or information sufficient to form a belief about the truth of these allegations and so deny the same.

43.     As to the allegations in Paragraph 42, Defendants state that they lack knowledge or information sufficient to form a belief about the truth of these allegations and so deny the same.

**AA91**                    **AA91**                    **AA91**

44.   As to the allegations in Paragraph 43, Defendants state that Paragraph 43 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

45.   As the allegations in Paragraph 44, Defendants state that they lack knowledge or information sufficient to form a belief about the truth of whether Plaintiff was in lawful possession, custody, and control of the Property during any specific period of time and so deny the same. Defendants otherwise deny that they entered upon the Property by passing or traveling over or through one section of federally owned and managed public land to another section of federally owned and managed public land where these sections are adjacent to Plaintiff's Property. Defendants further deny that they knew or believed they were entering or crossing Plaintiff's Property at any time. Defendants further specifically deny that John Slowensky was in Wyoming in September–October 2020.

46.   As to the allegations in Paragraph 45, Defendants state that Paragraph 45 contains legal conclusions to which no responsive pleading is required and, to the extent any responsive pleading is required, Defendants deny the same.

47.   As to the allegations in Paragraph 46, Defendants deny that they entered upon or across Plaintiff's Property.  Defendants admit that they did not have Plaintiff's permission, consent, or acquiescence to enter Plaintiff's Property.  Permission to enter upon or across Plaintiff's Property is not required to enter, be upon, or travel through immediately adjacent sections of public land that are contiguous on the surface—even where they are next to sections of Plaintiff's Property.

48.   As to the allegations in Paragraph 47, Defendants deny that they entered upon or across Plaintiff's Property and they further deny that they willfully, purposefully, knowingly, or

8

intentionally entered upon or across Plaintiff's Property.  Defendants admit that two posts were installed on Plaintiff's Property displaying the words "No Trespassing," that these posts faced the section of federally owned and managed public land, and that these posts were chained together with a padlock obstructing free transit or passage from one section of public land to the other adjacent section of public land.  Defendants deny any and all other allegations as well as any implications that may drawn from any of the allegations present in Paragraph 47.

49.     As to the allegations in Paragraph 48, Defendants deny that they violated Plaintiff's property rights or that they acted "maliciously and oppressively" toward Plaintiff at any time. Defendants further deny that they committed any kind or form of trespass, including a so-called "'corner crossing' trespass."  Defendants admit that they had knowledge of the location of public and private property boundary lines.

50.     As to the allegations in Paragraph 49, Defendants deny.

51.     As to the allegations in Paragraph 50, Defendants deny.

52.     As to the allegations in Paragraph 51, Defendants deny.

53.     As to the allegations in Paragraph 52, Defendants deny.

54.     As to the allegations in Paragraph 53, Defendants deny.

55.     As to the allegations in Paragraph 54, Defendants deny.

### AFFIRMATIVE DEFENSES

Defendants hereby state the following affirmative defenses to Plaintiff's *Complaint*:

1.     Plaintiff has failed to state a claim upon which relief can be granted.

2.     Plaintiff's claims, causes of action, and requested relief are preempted by federal law.

3.      Plaintiff is now violating and has, at all times relevant to its claims in the *Complaint*, violated existing federal law, 43 U.S.C. §§ 1061 *et seq.*, by unlawfully enclosing public lands and/or by using force, threats, intimidation, and other unlawful means to prevent or obstruct Defendants, as members of the public, from peaceably entering upon, freely passing over or through, or freely traveling over or through the public lands.

4.      Plaintiff's claims are barred by the doctrine of laches.

5.      Plaintiff's claims are barred by the doctrine of unclean hands.

6.      Plaintiff's claims depend upon a right to exclusive use of or control over access to public lands that is being advanced without appropriate claim, color of title, or legitimate assertion of right.

7.      Defendants' conduct is and was justified.

8.      Defendants, as members of the public, possess a privilege or implied right to travel from one section of public land to another section of public land where the two sections of public land are immediately adjacent and contiguous at the surface.

9.      Defendants, as citizens of the United States, have a right of access to lands owned by the United States Government on behalf of the citizens of the United States.

10.     Plaintiff has suffered no damages.

11.     There is no basis for Plaintiff to recover costs or attorneys' fees from Defendants.

12.     Defendants have been required to retain the legal services of Ryan A. Semerad, Esq., and Lee Mickus, Esq., and may be required to retain other legal counsel in the future to defend against these claims and Defendants are entitled to an award of its reasonable attorneys' fees and costs.

13.     Some of the foregoing affirmative defenses have been pleaded for purposes of non-waiver.  Defendants reserve the right to add additional affirmative defenses as the bases for the same are revealed during discovery.

## DEMAND FOR TRIAL BY JURY

Defendants demand a jury trial on any and all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, having fully answered Plaintiff's *First Amended Complaint* and asserted affirmative defenses, Defendants respectfully request that this Court:

A.     Dismiss Plaintiff's *First Amended Complaint* with prejudice, and order that Plaintiff shall take nothing thereby;

B.     Order that Plaintiff's claims are forever barred;

C.     Order that Plaintiff's Prayer for Relief be denied with prejudice;

D.     Permanently enjoin Plaintiff from any future enclosure of public lands or other obstruction that prevents access to public lands from other, adjacent sections of public lands;

E.     Declare that Defendants, as members of the public engaged in lawful activities, were and are permitted under federal law, 43 U.S.C. §§ 1061 *et seq.*, to peaceably and freely travel or pass over or through one section of public land to another, immediately adjacent section of public land where the two sections of public land physically meet;

F.     Declare that Defendants, as citizens of the United States, possess a right of access to public lands owned by the United States Government on behalf of citizens of the United States.

G.     Declare that Plaintiff, as a private entity without claim, color of title, legal ownership, or other exclusive claim to the public lands, is prohibited from engaging in any conduct

that amounts to an enclosure of public lands or other unlawful obstruction to free transit or passage over or through the public lands for lawful purposes;

H.     Declare that Plaintiff has no property or other right or interest upon which it may bring or raise any claim for trespass or other legal infringement against another person for seeking access to or for accessing a section of public land from another, immediately adjacent section of public land where the two sections of public land meet; and

I.     Award Defendants their attorneys' fees and costs as permitted by law.

Dated: November 15, 2022.                    THE FULLER & SEMERAD LAW FIRM

By: */s/Ryan A. Semerad*_____
    Ryan A. Semerad, Esq.
    Wyoming State Bar No. 7-6270
    242 South Grant Street
    Casper, Wyoming 82601
    Telephone: 307-265-3455
    Facsimile: 307-265-2859
    Email: semerad@thefullerlawyers.com

    Lee Mickus, Esq.
    Wyoming Bar No. 7-5698
    EVANS FEARS & SCHUTTERT LLP
    3200 Cherry Creek Drive South, Ste 380
    Denver, Colorado 80209
    Telephone: 303-656-2199
    Facsimile: 702-805-0291
    Email: lmickus@efstriallaw.com

    *Attorneys for Defendants Bradly H. Cape, Zachary M. Smith, Phillip G. Yeomans, and John W. Slowensky*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 15th day of November, 2022, I electronically filed the foregoing instrument with the Clerk of the Court for the United States District Court for the District of Wyoming by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/Ryan A. Semerad*
The Fuller & Semerad Law Firm

AA97          AA97          AA97

Eric B. Hanson – pro hac vice
ehanson@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Counsel for *Amicus Curiae* Backcountry
Hunters & Anglers

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming,<br><br>Plaintiff,<br><br>v.<br><br>BRADLY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual,<br><br>Defendants. | Case No. 22-CV-00067-SW |

---

## BRIEF OF AMICUS CURIAE
## BACKCOUNTRY HUNTERS & ANGLERS

---

1926557

## STATEMENT OF IDENTITY AND INTEREST

Backcountry Hunters & Anglers ("BHA") is the voice for our wild public lands, waters, and wildlife. BHA is a non-profit that seeks to ensure North America's outdoor heritage of hunting and fishing in a natural setting through education and work on behalf of fish, wildlife, and wild places. With more than 350,000 members and supporters, and chapters in 48 states, Washington, D.C., two Canadian provinces and one Canadian territory, BHA draws support from sportsmen and -women from across the continent who share our commitment to fair and equal public access to our public lands and waters, the principles of fair chase, and the ethical pursuit of wild fish and game. BHA is also invested in the conservation and stewardship of fish and wildlife habitat, through collaboration with a diverse array of partners who share an interest in the future of these landscapes.

Unfortunately, millions of acres of public land are locked in a dispute that is a function of the checkerboard pattern of land ownership in the West. Preserving the right of every American to access public land is critically important to BHA and its members and supporters. Indeed, one of BHA's best-known slogans is "Keep Public Land in Public Hands." No individual monied interest should have the right to restrict the public from stepping across the corner of one adjoining parcel of federal public land to another, commonly known as "corner crossing."

BHA offers the Court the perspective of everyday Americans – the many millions of responsible public landowners across the country who deeply respect private property but also are devoted to the recreation and solace provided by our shared public lands. These individuals are being discouraged from exercising their rights to recreate on public land – and in some cases are harassed or worse – by landowners seeking to claim for themselves land that belongs to all Americans.

1926557

1

I.      **Uncertainty Over Corner Crossing Is Preventing Access to Millions of Acres of Public Land and Creates Uncertainty Over Access Rights.**

Corners where federal public land intersects private land are the keys to unlocking access to millions of acres of land owned by every American.

One recent analysis from a mapping and geographic information systems company shows that more than 8.3 million acres of public land across the West are "corner locked", *e.g.* only accessible by crossing a corner, like a chess bishop or a checkers piece might do. *See* Declaration of Eric B. Hanson ("Hanson Decl."), Ex. 1 (*The Corner-Locked Report*, OnX Maps (April 2022) ("OnX Report")).[1] Of that land, 72 percent (5.98 million acres) is specifically locked in a "checkerboard" pattern (e.g. land all arranged in square mile grids), according to the report. Notably, the report found that 49 percent of those corner-locked acres are just one corner away from being accessible. *Id.* Further, more than 2.44 million acres of public land are corner locked in the state of Wyoming alone. *Id.* According to the report, more than half of all landlocked public land in the West would be unlocked if corner crossing were legal. *Id.*

Conflict over corner crossing is neither rare nor unique. For example, in 2003, a hunter in Wyoming was charged with criminal trespass for corner crossing between public land adjacent to private land, and was found not guilty. *See* OnX Report. More recently, a hunter and shed antler collector in Montana was similarly charged in 2019. *See Testing Boundaries of Public Access, Private Property Rights*, Yellowstone Public Radio, Feb. 28, 2020.[2] He was also found not guilty, though was later convicted of a second offense where he was found not have crossed at a corner, but to have cut across an 80-foot stretch of private land. *Id. See also* Angus M. Thuermer Jr., *Corner Crossing: Hunters challenge public land access issue in court*, The Sheridan Press, Dec. 31, 2021.[3] The Defendants in this case were also prosecuted for criminal trespass as part of

---

[1] https://www.onxmaps.com/onx-access-initiatives/corner-crossing-report

[2] https://www.ypradio.org/environment-science/2020-02-28/park-county-court-cases-testing-boundaries-of-public-access-private-property-rights

[3] https://www.thesheridanpress.com/news/regional-news/hunters-challenge-public-land-access-issue-in-court/article_c51d46a4-68e0-11ec-b8f1-8f4a638db509.html

1926557

**AA100**                    **AA100**                    **AA100**

the same incident at issue here and were found not guilty. *See, e.g.*, Angus M. Thuermer Jr., *Jury finds four corner-crossing hunters not guilty of trespass*, Wyofile.com, Apr. 29, 2022.[4]

Individuals should not have to roll the dice and potentially subject themselves to the mercy of litigious landowners or local prosecutors just to recreate on public land that they legally are allowed to use. Yet media reports indicate a chilling effect emanating from the legal uncertainty around crossing corners to access public land, including the threat of being prosecuted for trespass. *See, e.g.*, Keegen Sentner, *The Wyoming Corner-Crossing Lawsuit Is Headed to Federal Court, Where a Ruling Could Affect Public Access Across the West*, Outdoor Life, Apr. 5, 2022 ("In the American West, roughly 1.6 million of acres of public land are inaccessible to the public because of this pattern and the public's inability to cross corners without fear of harassment from private landowners. The legality of corner crossing is a gray area that has never been fully resolved in the court system.");[5] Thuermer Jr., *Corner Crossing*, *supra* at n. 3 ("Meantime access to 404,000 Wyoming acres 20 miles north and south of the Union Pacific line — and 1,583,000 million landlocked federal public checkerboard acres across the West — remains largely controlled by private landowners and local and state law enforcement and judicial institutions."); Matthew Copeland, *Cornered: Western Sportsmen Trapped by Arcane Regulation Prohibiting Public Access at Corner Crossings*, Outdoor life, Aug. 10, 2015 ("The de facto ban on stepping from public land, to public land, over an intersection with private, hits sportsmen and –women hardest in Montana and Wyoming. . . . Large landowners, it turns out, still hold immense political sway in the Rocky Mountain states.").[6]

Private landowners in the West who own land checkerboarded with public land often appear to assume that their ownership of land intermixed with public land gives them domain over that public land. For example, advertisements for the sale of land in Wyoming, Montana, and other states in the West commonly include checkerboarded public land as part of the

---

[4] https://wyofile.com/jury-finds-four-corner-crossing-hunters-not-guilty-of-trespass/

[5] https://www.outdoorlife.com/hunting/corner-crossing-case-headed-to-federal-court/

[6] https://www.outdoorlife.com/blogs/open-country/cornered-western-sportsmen-trapped-arcane-regulation-prohibiting-public-access/

1926557

landowner's exclusive inholdings.[7] *See, e.g.*, Hanson Decl., Ex. 2 ("Located in Albany County, Wyoming, approximately 45 miles north of Laramie, or 55 miles west of Wheatland, Wyoming, the Laramie Plains Ranch features 54,209 total contiguous acres and consists of 25,764 deeded acres, 5,338 State of Wyoming lease acres, 8,251 BLM lease acres and 14,856 private lease acres fenced into the ranch."); Ex. 3 ("The Historic Kite Ranch, located in southeastern Wyoming, consists of 8,561 deeded acres, 3,738 State of Wyoming and 23,702 BLM and private lease acres for a total of 36,001 acres."); Ex. 4 ("Imagine gazing out from the deck of your 10,000 sq. ft. Log Lodge onto this safe, secure, pristine property that reaches from skyline to skyline. This huge offering encompasses 45,400 deeded acres, 12,800 acres leased, all contiguous.").

The Plaintiff in this case, a private ranch owned by an individual whose property is interspersed with BLM-managed public lands in a checkerboard pattern, has accused Defendants of civil trespass for momentarily crossing private airspace at a corner where public and private land intersect. *See* Dkt. 2 (State Court Complaint) at pp. 1-2, ¶¶ 39-53. Plaintiff also asks for a declaratory judgment confirming that "Defendants had no right to cross the Property and to carry out a 'corner crossing,'" among other requests. *Id.*, ¶¶ 24-37.

An example of the current checkerboard ownership of land in the general area at issue in this case is shown below:[8]



---

[7] While landowners may lease access to BLM land for grazing, that does not give them ownership rights or dominion over that land. *See* 43 CFR § 4130.2(c) ("Grazing permits or leases convey no right, title, or interest held by the United States in any lands or resources.").

[8] The yellow areas identify federal public BLM land, the blue represents Wyoming state land, and the unshaded areas represent private land. Elk Mountain, the area at issue in this case, is shown in the lower right portion of this image, with parcels of Plaintiff's land intermixed with public BLM land visible.

1926557

Plaintiff purportedly placed stakes on his land with a chain across the corner at issue, along with "No Trespassing" signs, in an attempt to prevent access across the corner from public land to public land. Angus M. Thuermer Jr., *Corner crossing: Hunters challenge public-land access issue in court*, WyoFile, Dec. 27, 2021.[9]



Defendants allegedly used a ladder to cross the corner, never actually touching Plaintiff's land. *Id. See also* Dkt. 2, ¶ 17.

Plaintiff contends it has a "right to exclusive control, use, and enjoyment of its Property, which includes the airspace at the corner, above the Property" and that it "owns and controls the airspace above its real property, and is entitled to exclude others from the use of that airspace by a 'corner crossing.'" *Id.*, ¶¶ 18-19.

Plaintiff's claim goes to the heart of whether private landowners can prohibit public access to the millions of corner-locked acres in Wyoming and across the West. Federal law is clear that Plaintiff cannot.

II.   **Laws Encouraging Westward Expansion Divided Public and Private Land in a Checkerboard Pattern, but Congress Provided for Access to The Public Land.**

The checkerboard pattern of public and private land in the West has historic antecedent in the Union Pacific Act of 1862 and its various subsequent amendments. John W. Sheridan, *The Legal Landscape of America's Landlocked Property*, UCLA Journal of Environmental Law and Policy, 37:2 (2019) at 232-234. Congress sought to encourage the building of a transcontinental

---

[9] https://wyofile.com/corner-crossing-hunters-challenge-public-land-access-issue-in-court/.

1926557

**AA103**                    **AA103**                    **AA103**

railroad and enacted a law granting contiguous rights of way within 200 feet on either side of newly laid track as well as establishing alternating 640 acre (one square mile) plots of land on either side of tracks for every ten to forty miles. *Id*. The ungranted and unsold land was either made available to the public through the Homestead Act of 1862 or retained by the federal government. *Id.* The land retained by the federal government became public land now administered by the Bureau of Land Management ("BLM") or U.S. Forest Service ("USFS"). Congress' decision in 1862 led to the checkerboard pattern of land ownership still seen today.

More than 130 years ago, in an attempt to settle the range wars erupting between cattlemen and farmers over access and use of land in the West, Congress passed the Unlawful Inclosures Act ("UIA"). 43 U.S.C. § 1061, *et seq*. The UIA set out broad prescriptions against enclosing public land. The legislation states that "[a]ll inclosures of any public lands . . . constructed by any person . . . to any of which land included within the inclosure the person . . . had no claim or color of title made or acquired in good faith . . . are declared to be unlawful." 43 U.S.C. § 1061. Even more relevant is Section 1063, where Congress stated that "[n]o person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct . . . any person from peaceably entering upon . . . any tract of public land . . . or shall prevent or obstruct free passage or transit over or through the public lands. . . ." 43 U.S.C. § 1063.

### III.   The Supreme Court Already Held that the UIA Protects Corner Crossing.

Federal law, not state law, governs the issue of whether private landowners can prevent corner crossing. The UIA reflects the exercise of Congress' police power to abate the nuisance of landowners proscribing access to public land at corners, overriding competing state law concerns. The UIA remains in force and continues to prevent landowners from using "force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means" to prevent access to public land. 43 U.S.C. § 1063.

In *Camfield v. United States*, the Supreme Court held that fences put up inches inside private land on the checkerboard border with public land was unlawful under the UIA because the fences prevented access to public lands via corners. 167 U.S. 518, 525 (1897). The Court provided a diagram showing how the fences were constructed, with the fences indicated by the dotted lines:

*Id.* at 520. To better illustrate the issue, the figure has been adapted to show public land in yellow, private land in gray, and the fences in red. The fences were placed inside private land, but plainly had the effect of enclosing public land by restricting access at the corners where private and public land intersect. *Id.* at 522.



The Supreme Court held that "[c]onsidering the obvious purposes of this structure, and the necessities of preventing the inclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual." *Id.*

The Supreme Court also held that Congress had the power to enact legislation like the UIA to avoid having federal territory appropriated by states and private property owners:

> The inconvenience, or even damage, to the individual proprietor does not authorize an act which is in its nature a purpresture of government lands. While we do not undertake to say that congress has the unlimited power to legislate against nuisances within a state which it would have within a territory, we do not think the admission of a territory as a state deprives it of the power of legislating for the protection of the public lands, though it may thereby involve the exercise of what is ordinarily known as the 'police power,' so long as such power is directed solely

1926557

to its own protection. A different rule would place the public domain of the United States completely at the mercy of state legislation.

*Id.* at 525-526. Importantly, the Supreme Court explained that its decision was not limited to stopping private landowners from using fences to keep the public of off public land. "It is only by treating [the UIA] as prohibiting all 'enclosures' of public land, by whatever means, that the act becomes of any avail." *Id.* at 525. It said that "[t]here is no doubt of the general proposition that a man may do what he will with his own, but this right is subordinate to another, which finds expression in the familiar maxim, '*Sic utere tuo ut alienum non laedas* [use your own property in such manner as not to injure that of another].'" *Id.* at 522.

The effect of blocking transit over the shared corners was sufficient to violate the UIA. "So far as the fences were erected near the outside line of the odd-numbered sections [the private land], there can be no objection to them; but, so far as they were erected immediately outside the even-numbered sections [the public land], they are manifestly intended to inclose the government's lands. . . ." *Id.* The Court also held that Congress' police power trumped private rights to prohibit access to federal lands via corners. "The device to which defendants resorted was certainly an ingenious one, but it is too clearly an evasion to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute." *Id.*

In short, *Camfield* shows that the UIA protects the public's right to access public land via corner crossing, and that Congress prohibited attempts by private landowners to restrict access.

**IV.   In Cases Spanning the Last Century, Courts Have Continued to Apply the UIA and *Camfield* to Prevent Private Landowners From Prohibiting Corner Crossing From Public Land to Public Land.**

Courts have repeatedly applied the UIA and *Camfield* to ensure access to public land via corner crossing, rejecting claims of state law trespass that would interfere with the public's right to move across public land.

In an early Wyoming case with parallels to the present case, the Eighth Circuit (before the creation of the 10th Circuit) applied the UIA and *Camfield* to a case of corner crossing and explicitly held that an individual had the right to trail his sheep across a shared public-private corner, even when fences were not present.

The company admitted [defendant's] right as to the public domain, but warned him not to go over any of its lands on penalty of prosecution for trespass. The odd-numbered sections touch at their corners and their points of contact, like a point in mathematics, are without length or width. If the position of the company were

sustained, a barrier embracing many thousand acres of public lands would be raised, unsurmountable except upon terms prescribed by it. Not even a solitary horseman could pick his way across without trespassing. In such a situation the law fixes the relative rights and responsibilities of the parties. It does not leave them to the determination of either party. As long as the present policy of the government continues, all persons as its licensees have an equal right of use of the public domain, which cannot be denied by interlocking lands held in private ownership.

*Mackay v. Uinta Dev. Co*., 219 F. 116, 118 (8th Cir. 1914).

The court in *Mackay* recognized the conflict between private property and public lands, and held that the landowner cannot use state trespass laws to prohibit access to public land via corner crossing. The court explained that the UIA, as interpreted by the Supreme Court, could lessen "in a moderate degree" what otherwise are considered the absolute rights of private property:

This case illustrates the conflict between the rights of private property and the public welfare under exceptional conditions. It is difficult to say that a man may not inclose his own land, regardless of the effect upon others; but the Camfield Case, supra, has been recognized as sustaining the doctrine that 'wholesome legislation' may be constitutionally enacted, though it lessens in a moderate degree what are frequently regarded as absolute rights of private property. This large body of land, with the odd-numbered sections of the company and the even-numbered sections of the public domain located alternately like the squares of a checkerboard, remains open as nature left it. Its appearance is that of a common, and the company is so using the contained public portions. In such use it makes no distinction between them and its own holdings. It has not attempted physically to separate the latter for exclusive private use.

*Id.* at 119 (cleaned up).

The court noted that the private landowner could legally restrict access to the private land while keeping open access over the corners to public land, but it cannot use threats of trespass to keep the public from using corners to cross between parcels of public land.

[The landowner] admits that Mackay had the right in common with the public to pass over the public lands. But the right admitted is a theoretical one, without utility, because practically it is denied except on terms it prescribes. Contrary to the prevailing rule of construction, it seeks to cast upon the government and its licensees all the disadvantages of the interlocking arrangement of the odd and even numbered sections because the grant in aid of the railroad took that peculiar form. It could have lawfully fenced its own without obstructing access to the public lands. That would have lessened the value of the entire tract as a great grazing pasture, but it cannot secure for itself that value, which includes as an element the exclusive use of the public lands, by warnings and actions in trespass.

*Id.* at 120.

The same is true here. Plaintiff cannot secure for itself the value of public land interspersed with its property by threatening trespass, since the government and its licensees (the public) have an equal right to access their lands. Plaintiff here would have been within his right

AA107                    AA107                    AA107

to fence his properties while keeping access to public lands open over the corners. Instead, he did the opposite, placing a fence only over the shared private/public corner. That is impermissible.

Similarly, in *Stoddard v. United States*, another pre-Tenth Circuit Court of Appeals case, the Eighth Circuit held that the UIA was "intended to prevent the obstruction of free passage or transit for any and all lawful purposes over public lands. It is a well-known fact that the free herding and grazing of cattle on the public lands is a legitimate use to which they may be put, and we think Congress must have had the preservation and protection of this use in mind in the enactment under consideration." 214 F. 566, 568–69 (8th Cir. 1914). Again, the court held that the free passage over corners was a legitimate use that Congress intended when it enacted the UIA.

Importantly, the same considerations have also been adopted in a more contemporary context. In *U.S. ex rel. Bergen v. Lawrence*, a Wyoming district court and the 10th Circuit acknowledged that the UIA continues to apply in the modern era, and that it prohibits landowners from blocking access to public land across shared corners. *U.S. ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414 (D. Wyo. 1985), *aff'd*, 848 F.2d 1502 (10th Cir. 1988). *Bergen* involved a landowner who owned property checkerboarded with public land. 848 F.2d at 1504. He fenced his private property, blocking the ability of pronghorns to travel over public land to their winter range. *Id.* The court found the impediment impermissible.

The 10th Circuit succinctly explained the UIA's modern relevance: "The UIA proscribes unlawful enclosures; enclosures are unlawful when they deny access to public lands for 'lawful purposes'. . . . Obviously, lawful uses of the public lands will change over time." *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1509 (10th Cir. 1988), *cert. denied*, 488 U.S. 980 (1988). The district court noted that modern laws continued to redefine the lawful purposes that the UIA protects, including recreation and hunting. "In the years since the 1885 passage of the UIA, the then-pressing concerns of settlement and range wars have faded. But, new present-day concerns have arisen. In the Federal Land Policy and Management Act (FLPMA) . . . Congress set out new goals for the public lands." *Bergen*, 620 F. Supp. at 1417. The district court in *Bergen* found it "proper to consider FLPMA statute in light of UIA, especially since Congress as recently as 1984 considered and amended the UIA." *Bergen*, 620 F. Supp. at 1417. One of the legislative policy goals of the FLPMA is that "public lands be managed in a manner . . . that will provide

food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

Examining the decisions in *Mackay* and *Stoddard*, the district court explained that "[s]urely, the free passage of hunters and their quarry is a lawful purpose for which the public may seek access to public lands. In light of these precedents, the Court is hardpressed to understand how the UIA could apply to cattle, but not to antelope." *Id.* Plainly, then, the UIA applies to ensuring access for deer, elk, and antelope (and the hunters who pursue those game) just as much as it does to the herder trailing sheep or cattle over the land more than a century ago.[10]

Courts consistently recognize that when Congress makes laws regarding federal land, it necessarily has the right to control conduct that impacts that land, even if that impacts state law. "Congress' power must extend to regulation of conduct on or off the public land that would threaten the designated purpose of federal lands." *State of Minn. by Alexander v. Block*, 660 F.2d 1240, 1249 (8th Cir. 1981). Congress "may sanction some uses and prohibit others, and may forbid interference with such as are sanctioned." *McKelvey v. United States*, 260 U.S. 353, 359 (1922) (citations omitted). Finally, in *Kleppe v. New Mexico*, the Court explained that "Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." 426 U.S. 529, 543 (1976) (cleaned up). Quoting *Camfield*, the Court noted that a "different rule would place the public domain of the United States completely at the mercy of state legislation." *Id.* The Court also explained that *Camfield* ruled on "the scope of congressional power to regulate conduct on Private land that

---

[10] The Supreme Court's decision in *Leo Sheep Co. v. U.S.*, 440 U.S. 668 (1979), is not to the contrary. That case involved an action to quiet title after the federal government asserted that it had an implied easement over a shared corner after it cleared a road touching both public and private land. *Id.* at 678. The Court held that the federal government had no implied easement or other right to build a road over private land. *Id.* at 679-680. The Court distinguished *Camfield* as being based on nuisance law and Congress' police powers, which were not applicable to the government's claim that it had a right to physically build a road on private land. *Id.* at 685.

In *Bergen*, the Tenth Circuit distinguished *Leo Sheep*, holding the decision inapplicable to the facts of the case because no taking or easement was implicated. "The UIA declares enclosures of federal lands to be unlawful and orders that such enclosures be removed. It creates no easements or servitudes. . . . We conclude with the district court that 'while *Leo Sheep* has no applicability in this matter, *Camfield* is dispositive of it.'" *Bergen*, 848 F.2d at 1506 (citation omitted).

affects the public lands. . . . *Camfield* contains no suggestion of any limitation on Congress' power over conduct on its own property; its sole message is that the power granted by the Property Clause is broad enough to reach beyond territorial limits." *Id.* at 538. Notably, "where those state laws conflict with . . . legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede." *Id.* at 543.

The upshot is that the UIA plainly prevents private landowners from prohibiting access to public land for lawful purposes, including the momentary crossing of private land / airspace at a corner to access another section of public land. A finding to the contrary effectively grants the landowner dominion over federal public land he does not own and that he has not paid for. The Supreme Court has cast a cold eye on such an outcome. "It seems but an ill return for the generosity of the government in granting these [rail]roads half its lands to claim that it thereby incidentally granted them the benefit of the whole." *Camfield*, 167 U.S. at 526.

## V.       Conclusion

A private landowner with half the ownership of a corner does not have a veto over access by the owner of the other half of the corner—namely the federal government, and by extension, the people of the United States. Federal law is clear that attempts to bar access to public lands, whether by fences or threats of trespass, are improper nuisances that Congress abated through the UIA. Many thousands of BHA members, as well as millions of public land recreators, have an interest in seeing this Court apply the clear tenor of federal law and find that private property owners cannot prevent corner crossing as practiced by defendants.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  December 5, 2022       By:   /s/ Eric B. Hanson
                                                         ERIC B. HANSON (admitted pro hac vice)
                                                         633 Battery Street
                                                         San Francisco, CA 94111-1809
                                                         Telephone:  415 391 5400
                                                         Facsimile:  415 397 7188

                                                         Attorneys for Amicus Curiae Backcountry
                                                         Hunters & Anglers

1926557

12



**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

| | |
|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 22-CV-00067-SWS ) |
| BRADLEY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual, | ) ) ) ) ) |
| Defendants. | ) ) |

**1:57 pm, 12/6/22**

**Margaret Botkins**
**Clerk of Court**

---

**BRIEF OF *AMICUS CURIAE* WYOMING STOCK GROWERS ASSOCIATION**
**AND WYOMING WOOL GROWERS' ASSOCIATION**

## Statement of Identity and Interest of *Amici*

The Wyoming Stock Growers Association (WSGA) was organized on April 4, 1872 to advance and protect the interest of the state's livestock producers. It was the second state cattlemen's organization created in the United States. The WSGA was the first association formed in the Wyoming territory and is the primary organization in the state focused on serving the needs of the cattle industry, which is the largest segment of Wyoming's agricultural production. WSGA's mission is to serve the livestock business and families by protecting their economic, legislative, regulatory, judicial, environmental, custom, and cultural interests. The WSGA advocates for the protection of private property rights from over burdensome regulatory interference.

The Wyoming Wool Growers Association (WWGA) is a membership organization whose mission is to protect and preserve the lamb and wool industry and the ranching

1

community lifestyle.  The WWGA works with the legislatures at the state and national levels, governmental officials and the general public to provide accurate information about the industry itself, private property rights, and other important issues.  They also work to educate their members on the latest production practices and state and federal laws that impact their livelihoods.

Combined, these *Amici* represent hundreds of agricultural producers owning thousands of acres of private land in the Wyoming. Many of these private lands share adjoining boundaries, including corners with federal or public[1] (collectively federal) lands. Accordingly, the *Amici* bring a unique perspective to this case because of the impact this case will have on their private property rights[2].

I.    **THE DETERMINATION AS TO THE SCOPE OF LANDOWNERS' RIGHTS IN THE AIRSPACE ABOVE THEIR PRIVATE PROPERTY IS A QUESTION OF STATE LAW.**

Wyoming statutes and common law make it clear that landowners hold a property right in the airspace above their lands. However, the scope of this property right regarding the physical trespass of third parties has yet to be fully determined by State law.

---

[1] Federal lands are reserved lands which cannot be eventually transferred into private hands through any homestead, Desert Land Entry, Small Tracts Act or other laws. Conversely public lands could be acquired by an individual through one of these Acts. The passage of the Federal Land Policy and Management Act in 1976 repealed most of the laws allowing the privatization of public lands changing the land from public lands to federal land.  Pub. L. 94-579, 90 Stat. 2787 § 702 (Oct. 21, 1976).

[2] Amici WSGA and WWGA take no position with regard to Defendant's claim that the fencing of Plaintiff's property violated the Unlawful Enclosures Act.  As explained in this brief, regardless of the fencing scheme on Plaintiff's property, Plaintiff's property interests in the air space are governed by state law, not the Unlawful Enclosures Act; Congress did not provide for access across common corners to the federal checkerboard lands; even the federal agencies themselves do not recognize trespass on private airspace at common corners to access federal lands.

*A. Questions as to the existence and scope of a property right is a state law issue.*

Questions as to the existence and scope of a person's property right have long been a creature of state law. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by … an independent source such as state law." *Cleveland Board of Ed. v. Loudermill*, 470 U.S. 532, 539 (1985*)*. "Generally speaking, state law defines property interests…." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 707 (2010).

The federal courts have respected this principal of property law even when the state court's determination of a property right may have national implications affecting federal powers. *U.S. v. Cress* dealt with a takings claim brought by landowners who claimed their lands and water rights were taken by flooding resulting from the federal government's construction and maintenance of locks and dams on the Cumberland and Kentucky Rivers. 243 U.S. 316, 318 (1917). These Rivers were important as they connected interstate commerce between several states. *Id.* at 326. According to the Supreme Court, "The states have authority to establish for themselves such rules of property as they may deem expedient with respect to the streams of water within their borders, both navigable and non-navigable, and the ownership of the lands forming their beds and banks." *Id.* at 319.  While navigable streams are subject to Congress's authority to control the navigation of water when necessary to regulate interstate commerce, each state's property laws dictate whether a person owns a property interest in those navigable waters or the stream beds the waters flowed over. *Id.* at 320.  Thus, the Court noted that Kentucky common law and statutes clearly indicated that landowners owned the stream beds of all rivers crossing their lands, regardless as to

3

their navigability and that the scope of navigable waters was limited to the flow of the stream in its natural state. *Id.* Thus, the Court determined amount of compensation due to the landowners from the United States because of the government's action of constructing dams and raising the water level was based on state law principals. *Id.* at 327. Thus, Wyoming's state law should determine whether the airspace above private property is owned by the property owner.

> *B. Wyoming law suggests that landowners hold a property interest in the airspace above their surface but does not define the scope of this interest.*

According to Wyoming statute, "The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath subject to the right of flight described in W.S. 10-4-303." Wyo. Stat. § 10-4-302. The "right of flight" refers to a general aircraft flight easement held by the State of Wyoming and the federal government over navigable airspace. Wyo. Stat. § 10-4-303. The question in this case however is, with the exception of the right of flight, if such airspace ownership includes the right to exclude others at adjoining corners if they trespass in the airspace. There should be no dispute that "Ownership of property implies the right of possession and control and includes the right to exclude others; that is, a true owner of land exercises full dominion and control over it and possesses the right to expel trespassers." *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82, (1980). One of the essential sticks in the bundle of property rights is the right to exclude others. *Kaiser Aetna v. United States*, 444 U.S. 164, 179–180 (1979). And, in Wyoming, the right to protect property is a state constitutional right. *Cross v. State,* 370 P.2d 371, 377 (Wyo. 1962). The question then is whether the right to exclude others extends to the airspace of above the landowners' private property, including the corners of that private

AA114                    AA114                    AA114

property.  *Amici* could find no Wyoming cases or statutes, except those specifically

discussing the "right of flight," that answers this question.

> *C. The Wyoming Courts and Legislature are well equipped to answer this state property law question.*

Like the courts of Kentucky, the Wyoming Supreme Court has a long history of

answering questions regarding the existence and scope of various property rights in

Wyoming.  *See for ex. Edgcomb v. Lower Valley Power and Light, Inc.*, 922 P.2d 850

(Wyo. 1996) (defining the general scope of easements in Wyoming); *Sammons v.

American Auto. Ass'n*, 912 P.2d 1103 (Wyo. 1996) (ruling that the right to exclude others

and expel trespassers is a right of property owners, but it is limited when a license is

given to the public to enter upon its premises for business purposes); *similarly See* Wyo.

Const. art. I, § 31 (Wyoming water is owned and controlled by the state); Wyo. Stat. § 11-

28-101 (defining who is considered an owner of a fence). Thus *Amici*  suggest that

Wyoming courts and legislature, rather than the federal courts, are the appropriate

entities to determine whether there is a property interest in the airspace at a shared

property corner which would allow a property owner to enforce a trespass claim.

Traditionally, when a central question of state law is determinative of a case

before the federal courts and there is no controlling precedent for its decision, those

courts have often appropriately remanded the decision back to the state courts or have

certified a question of law to the state's highest court. *See Murray v. BEJ Minerals, LLC*,

924 F.3d 1070 (9th Cir. 2019) (certifying a question of law to the Montana Supreme

Court as to whether dinosaur fossils belong to the surface owner or the mineral owner).

The United States Supreme Court has looked favorably at courts exercising their

discretion to either remand a case back to the state level or to certify the question before

the state's highest court when the case will turn on a state law question. In *Lehman Bros. v. Schein*, the Court recognized that federal courts have "not infrequently" stayed their hands and remitted the parties back to resolve the controlling state law on which the federal rule may turn. 416 U.S. 386, 390-91 (1974). In turn, the Court emphasized that "We do not suggest that where there is doubt as to local law and where the certification procedure is available, resort to it is obligatory. It does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism. Its use in a given case rests in the sound discretion of the federal court." *Id.* Wyoming allows federal courts to certify a question to the Wyoming Supreme Court "if there are involved in any proceeding before the federal court questions of law of this state which may be determinative of the cause then pending in the federal court, and as to which it appears to the federal court there is no controlling precedent in the existing decisions of the supreme court." Wyo. Stat. § 1-13-106. Thus, in order to promote cooperative judicial federalism, as well as save time and resources in the long run, the Court should certify a question to the Wyoming Supreme Court to determine the scope of a landowner's right to airspace over adjoining property corners shared with neighboring land.

## II.   CHECKERBOARD LAND GRANTS BY CONGRESS DO NOT INCLUDE AN IMPLIED OR EXPRESS GRANT OF PUBLIC ACCESS.

The term "checkerboard lands" refers to the pattern of alternating ownership that occurs in vast swaths of western lands. Odd sections are typically held by private interests and the even sections are generally owned by the U.S. government and

managed by the Bureau of Land Management (BLM).[3] Most checkerboard lands are
associated with the land grants that occurred in the mid-1800s which provided land for
the development of transcontinental railroads. However, the creation of
transcontinental railroads was not the first time this method was employed. Land grants
of alternating sections were also used to develop canals, wagon roads, and eastern
railways.

     A.    *Congress made early checkerboard land grants to states to enable
          internal improvements.*

In the early 1800s, the United States was a young country attempting to develop
its necessary infrastructure. *See* PAUL W. GATES, *History of Public Land Law
Development,* 341 (1968). Congress was heavily involved in this development,
appropriating money for road building and surveying, and eventually granting land to
fund internal improvement projects. *See id.* at 341-347. In 1827, Congress authorized
the first federal land grant for the creation of the Wabash and Erie Canal. *Id.* (citing Act
of Mar. 2, 1827, 4 Stat. 236). This granted to the State of Indiana:

> a quantity of land equal to one half of five sections in width, on each side
> of said canal, and reserving each alternate section to the United States to
> be selected by the commissioner of the land office, under the direction of
> the President of the United States, from one end thereof to the other; and
> the said lands shall be subject to the disposal of the legislature of said
> state, for the purpose aforesaid, and no other.

Act of Mar. 2, 1827, 4 Stat. 236. Similar grants were made to Ohio, Illinois, and Alabama
in 1827 and 1828, some following the alternating section pattern and others allowing
states to select lands at will. *See* GATES, at 345. For the following decades, land grants

---

[3] "The U.S. Public Land Survey System (PLSS) is the method of subdividing and describing
land, mainly in the Western United States." Bureau of Land Management, *About the Public Land
Survey System*, MINERAL AND LAND RECORDS SYSTEM (Nov. 15, 2020),
https://mlrs.blm.gov/s/article/PLSS-Information. "The PLSS components are state, prime
meridian, township, range, and section, and then further subdivided into aliquot parts, or lots."
*Id.* A section is an area of land covering a 640-acre square. *Id.*

became the common practice to fund development. The intent was that the granted

lands would be sold by the states to finance the project and reserved lands would be sold

by the federal government at a higher price due to their proximity to the improvement.

> [T]he price of the reserved sections was doubled so that it could be argued,
> as the *Congressional Globe* shows *ad infinitum*, that by giving half the
> land away and thereby making possible construction of the road, canal, or
> railroad, the government would recover from the reserved sections as
> much as it would have received from the whole.

*Id.* at 346. In 1838, the first grant was made to an incorporated company instead of a

state. *See id.* at 352. This grant included granting the odd sections and reserving the

even ones. *See id.*

The first checkerboard land grant for a railroad occurred in 1850 when Congress

enacted The Chicago and Mobile Act. It granted to Illinois, Mississippi, and Alabama "a

100-foot right-of-way, together with one half the land in even numbered sections within

6 miles of the line" with the added lands being "given to help finance the road." *Id.* at

357. This grant of land for a railway was a "continuation and indeed an expansion of a

policy that Congress had been pursuing since 1827 when if first granted land to Illinois

and Indiana for canals." *Id.* at 358. More land grants for railroads in eastern states

followed with a heavy emphasis in Minnesota, Iowa, and Missouri. *See id.* at 344. By the

end of 1853, over 2,600 miles of railroads were projected and over 8 million acres had

been granted for railroads. *See id.* at 360.

In 1862 the Pacific Railroad Act was passed by Congress, marking the first land

grant for a transcontinental railroad. *See id.* at 364. The Pacific Railroad Act was

established to "aid in the Construction of a Railroad and Telegraph Line from the

Missouri River to the Pacific Ocean." 12 Stat. 489 (1862). The act granted the odd

numbered sections within ten miles from each side of the railroad, resulting in ten

8

sections per mile. *See id.* at § 3. The grant was extended to twenty sections per mile in

1864. The Act of July 2, 1864, 13 Stat. 356 (1864). While these grants were given to

incorporated companies and not the states, the same plan applied. Railroads would sell

granted lands to raise funds and the federal government would sell the reserved lands at

an increased value. While this plan worked well in eastern states where people were

more willing to move, it did not prove as successful out west. The government was

unable to sell all of its lands, so it began disposing of them through the Homestead acts.

*See* Merry J. Chavez, *Public Access to Landlocked Public Lands*, 39 STANFORD L. REV.

1373, 1377-78 (1987). The lands that were not disposed of were retained by the

government with many now managed by the BLM. *See id.* at 1778.

      B.     *Congress did not reserve any means of access to reserved lands in the checkerboard.*

        Congress understood it could reserve rights unto itself when making

checkerboard land grants.  *See* The Pacific Railroad Act, 12 Stat. 489, § 3, 6 (1862)

(reserving mineral lands to the United States and granting a preference to the U.S.

government for use of the railway); The Act of March 2, 1827, ch. 52, 1827 Stat. 234, § 1

(1827) (requiring future use of canal by the U.S. government be free from toll or other

charges); and The Act of May 23, 1828, ch. 75, 1828 Stat. 290, § 7 (1828) (requiring

future use of improved rivers by the U.S. government be free from toll).  None of these

reservations included a right of access.  In contrast to the "checkerboard" land grants

described above, Congress specifically reserved access rights in the 1916 Stock-Raising

Homestead Act. 43 U.S.C. § 299(a). Unlike the Homestead and other preceding acts that

granted lands to settlers across the West, the 1916 Stock-Raising Homestead Act

specifically reserved all minerals to those lands for the federal government as well as to

those developing the reserved minerals, including the right to "reenter and occupy" as much of the private surface as needed for purposes "reasonably incident" to the mining of minerals beneath. This explicit, rather than implied right to access, allows a mineral developer to not only enter the land to develop the minerals on that land, but to also cross that private land in order to develop federal minerals on neighboring lands. *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1253, 55-56 (10th Cir. 2014).

This contrast between the reservations in the checkerboard land grants versus the Stock Raising Homestead Act must mean something. *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ...."). The absence of a specific access reservation in the "checkboard" grants in contrast to the specific access reservation in the 1916 Stock-Raising Homestead Act must be given recognition.  And even though Congress never considered that checkerboard land grants may inhibit public access because Congress assumed the land would be sold, the court cannot amend the law to fit what the court thinks Congress may have intended had Congress known what we do today. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 76 (1996) (stating "Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known.  If that effort is to be made, it should be made by Congress, and not by the federal courts.").  In this case, there is no statutory language or legislative history that shows that Congress intended to either reserve public access across private checkerboard corners or that Congress granted the right to public access to reach the federal checkerboard lands.[4]

_____

[4] Similarly, the U.S. Supreme Court has held that the federal government does not have any type of "easement by necessity" to cross private land to reach federal or public land.

### III. CORNER CROSSING HAS NEVER BEEN AN ACCEPTED MEANS OF ACCESSING FEDERAL LANDS.

Even if Congress can adopt legislation that overrides "conflicting state law" with respect to authorizing public access across private property to reach federal lands (including airspace), Congress has never adopted such legislation. Simply put, the Plaintiff's and *Amicus Curiae*'s argument that federal law authorizes trespass across private property is patently incorrect. Congress directly spoke on how public access is to be acquired across private lands to federal lands through the Federal Lands Policy and Management Act (FLPMA). 43 U.S.C. § 1715(a). FLPMA grants to the federal agencies the ability to acquire access across private lands to federal lands "by purchase, exchange, donation, or eminent domain, ... the Secretary may exercise the power of eminent domain only if necessary to secure access to federal lands, and then only if the lands so acquired are confined to as narrow a corridor as is necessary to serve such purpose." *United States v. 82.46 Acres of Land, More or Less, Situate in Carbon Cnty., Wyo.*, 691 F.2d 474 (10th Cir. 1982) (quoting 43 U.S.C. § 1715(a)). In that case, the court described the need for the access across the private lands because:

> The present problem has its genesis in the federal land grants of the 1800's, whereby the federal government, which initially owned all the land here involved, conveyed alternate sections to private parties. Such grants resulted in a "checkerboard" pattern of land ownership in many western states, to the end that sections granted to private parties frequently are surrounded by public lands, and, conversely retained public land is often completely surrounded by land owned by private parties.

691 F.2d at 475. FLPMA granted the only authorization to the Federal government to acquire the necessary access across the private lands. *Id.* In another ruling, the Tenth

---

*Leo Sheep Co. v. United States.* 440 U.S. 668, 678 (1979). According to the Court, if the federal government wishes to have access to the landlocked parcels, the Government must utilize its powers of eminent domain or some other legal means because no easement of any kind otherwise exists. *See id.*

11

Circuit again recognized that access over private lands to the federal lands is to be

acquired through purchase, exchange, donation or eminent domain. *Deane v. United*

*States*, 329 F. App'x 809, 813 (10th Cir. 2009).  Had Congress believed that access to

federal lands across private lands could have been accomplished by trespassing across

corners of private land, it would not have passed statutes authorizing the acquisition of

access across private property.

Neither the BLM nor the U.S. Forest Service believe that they have the

jurisdiction or authority to authorize trespass across private lands to access federal

lands.  According to a pamphlet published by the BLM Wyoming State Office, even in

the areas containing checkerboard lands or fragmented land patterns, the federal

government does not authorize trespass across private lands, including in the

"airspace." *See* Exhibit 1.  Access to the federal lands across private lands can only be

provided pursuant to the FLPMA or by the willingness of private landowners to

voluntarily allow public access. *See id.*

Similarly, a 1980 brochure developed by the U.S. Forest Service, BLM, Wyoming

State Lands Office, Wyoming Game and Fish Department, Wyoming State Parks and

Historic Sites and the Wyoming State Planning Coordinator's Office, includes the

following notations regarding access across private lands to federal lands for

recreational purposes (including hunting):

- Ask first before entering private land;
- State lands must be legally accessed;
- There is no specific state or federal law with regard to corner crossing. Corner crossings in the checkerboard land pattern area are not considered public access;
- Public access to public lands is often limited in checkerboard and other public and private intermingled landownership areas in Wyoming.  If there is a legal public road through the checkerboard or intermingled land,

then a person has legal access to those public land sections which are traversed by the public road;

- **Unless a public agency acquires a right-of-way for the road across private land, the landowner is completely within their legal right to close the road at any time, to be selective in who is allowed to use the road, or to charge a fee for use of the road;**

Exhibit 2 (emphasis in original).

These pronouncements that the federal statutes do not authorize trespass to reach federal lands remain true today.  As recently as March 12, 2019, Congress adopted the John D. Dingell Jr., Conservation, Management and Recreation Act (Dingell Act) which included a provision permanently funding the Land and Water Conservation Fund (LWCF) to improve public access across private lands to federal lands.  Pub. L. No. 116-9, 133 Stat. 586, § 3001.  Initially enacted in 1965, the LWCF was created to preserve, develop, and ensure access to outdoor recreational activities.  U.S. Congressional Research Service, *Land and Water Conservation Fund: Overview, Funding, History, and Issues,* Report RL33531, June 19, 2019, Land and Water Conservation Fund: Overview, Funding History, and Issues (congress.gov) (last accessed May 18, 2022).  In response to the new funding in the Dingell Act, the BLM and Forest Service have now established a database whereby the public can nominate areas where greater access across private land is needed.  No such nomination system would be necessary if Congress has authorized trespass on private lands.

Neither the legislative history nor any federal statute evidence Congress's intent to repeal state property law by implication.  *U.S. v. Barrett*, 837 F.2d 933, 934 (10th Cir. 1988).  Since as late as 2019, Congress was fashioning legislation allowing the acquisition of public access across private lands, Congress must not have believed that the Unlawful Enclosures Act granted the public some lawful authority to trespass on

13

private lands for access to federal lands. *Watt v. Alaska*, 451 U.S. 259, 266-267 (1981) (holding that even if two statutes somewhat conflict, a court must read them so as to give effect to both). The Unlawful Enclosures Act did not repeal the prohibition against trespass on private lands to access federal lands.

So too do the Wyoming statutes limit the manner in which access can be acquired across private land to federal lands including for recreational purposes. Access across private lands for recreation can only be acquired by "purchase, lease, agreement, gift or devise, not including the powers of eminent domain." Wyo. Stat. § 23-1-302(a)(iii). The purpose for such acquisition includes providing suitable access roads leading to federal lands. *Id.* § (a)(iv). Additionally, in 2021 the Wyoming Legislature passed HB 122 which imposed an additional $9.00 fee on the purchase of conservation stamps by each sportsman to specifically fund the Wyoming Access Yes Program. H.B. 0122, 66th Leg., 2021 Gen. Sess. (Wyo. 2021). The Wyoming Access Yes Program is used by the Wyoming Game and Fish Commission "for the purposes of purchasing access easements or other agreements to provide public access to private, federal and state lands that are difficult to access or inaccessible by the public for hunting and fishing purposes." *Id.* Some of those funds have been used to purchase access to "checkboard" lands that did not otherwise have public access. *See* "Carbon 1 and Carbon 6" found https://wgfd.wyo.gov/Public-Access/Walk-In-Hunting/Carbon-County/Carbon-County-Walk-In-Area-1 and https://wgfd.wyo.gov/Public-Access/Walk-In-Hunting/Carbon-County/Carbon-County-Walk-In-Area-6. Thus, had the Wyoming legislature believed that the public could simply trespass across private corners, it would not needed to have provided the authority to acquire public access across private lands to federal lands.

Appellate Case: 23-8043    Document: 010110947718    Date Filed: 11/06/2023    Page: 125

### CONCLUSION

Checkerboard land grants were used for decades by the federal government to enable internal improvement projects and settlement of new areas. Some of these lands were granted with reservations for minerals or requirements that the federal government be able to use the transportation systems being built upon them. These reservations make it clear that Congress was well aware of its ability to reserve necessary rights in granted lands. However, Congress did not reserve any rights for public access in the "checkerboard lands" in western states. Consequently, the agencies who administer these lands have long cautioned members of the public against crossing private lands to access federal lands. When accessing federal lands, the public is subject to state property laws and risks trespassing if it crosses private property to do so. The scope of property rights on private lands in common corners has yet to be decided in the State of Wyoming; this question should be certified to the Wyoming Supreme Court before it can be determined whether the act of corner crossing is considered a trespass.

RESPECTFULLY SUBMITTED this 16th day of August, 2022.

Karen Budd-Falen (Wyo. Bar No. 5-2467)
Rachael L. Buzanowski (Wyo. Bar. No. 8-6693)
BUDD-FALEN LAW OFFICES, LLC
Post Office Box 346
300 East 18th Street
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
Karen@buddfalen.com
Rachael@buddfalen.com

15

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2022, a true and correct copy of the foregoing was transmitted by email and U.S. Mail to the following:


Ryan A. Semerad, Esq.
The Fuller Law Firm
242 South Grant Street
Casper, Wyoming 82601
semerad@thefullerlawyers.com

*Counsel for Defendants*

M. Gregory Weisz, Wyo. Bar #6-2934
Crystal D. Stewart, Wyo. Bar #7-6057
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003-0765
gweisz@penceandmac.com

*Counsel for Plaintiff*

Eric B. Hanson – pro hac vice
Keker, Van Nest & Peters LLP
633 Battery Street
San Fransisco, CA  94111-1809

*Counsel for* Amicus Curiae *Backcountry Hunters & Anglers*

Budd-Falen Law Offices, LLC



# Wyoming
## Bureau of Land Management
# ACCESS MANAGEMENT POLICY



**EXHIBIT 1-1**

# Introduction

Access is one of the most sensitive issues in the west today. Recreation groups are concerned about access to public lands. Private landowners are concerned about their property rights and the potential for adverse impacts to leased public lands and adjacent private property. The Bureau of Land Management (BLM) has developed an access policy to address these concerns.

The purpose of this document is to (1) describe BLM intentions for management of access to and on public lands in Wyoming, (2) to achieve better overall public understanding of the program, (3) establish greater management efficiency for lands and resources through identification and prioritization of access needs, and (4) provide guidance to BLM managers in planning for and managing access in their areas of responsibilities.

2

**EXHIBIT 1-2**

## Policy

It will be the policy of the BLM in Wyoming to manage access to BLM administered lands in order to achieve the multiple use resource management goals and objectives contained in the Federal Policy and Management Act (FLPMA) of 1976.

Access, in a BLM management context, involves more than the physical and/or legal ability to enter or use land. This program includes such diverse activities as public land signing, mapping, public education, intergovernmental coordination, and land and easement acquisition through purchase or exchange. Proper management of access may also involve the restriction or closure of public lands to protect fragile lands or resources and for health and safety reasons. All of the above concepts will be considered from a balanced perspective and based on land use plans and subsequent transportation plans developed with public involvement.

The public land pattern in Wyoming is complex. Access to some of the 17.9 million acres of public land is difficult or impossible as a result of a long history of public disposal laws (railroad grants, homesteading, state selection, etc.). Modern-day conflicts over access can occur where prime resource values or recreational demands involve checkerboard or fragmented land patterns. Some of these conflicts can be, and are, resolved by the willingness of some private landowners to voluntarily allow public access.

Legal access is needed for proper multiple use management of public land. However, legal access and its use must be properly managed to meet management goals while protecting public and private property rights.

Uncontrolled access is sometimes not in the public interest. In certain situations, limited, restricted, or regulated public access is appropriate. These restrictions usually result from the need to prevent damage to public lands and resources. Public safety and protection of private property rights may also be reasons for regulating access.

A logical access management program can only be initiated after a thorough analysis of current and future needs. Generally, legal access, in some form, is sought for administrative purposes of the agency, for authorized users, and for the general public. Legal access obtained for any of these reasons may involve an easement, right-of-way, land exchange, memorandum of agreement, cooperative agreement, and/or condemnation as a *last resort*.

## Access Goals and Objectives

The BLM shall endeavor to maintain existing access, meet future access needs, and manage access to public lands in coordination with other Federal agencies, State and local governments, and private landowners. Access management decisions will be made only after a thorough analysis and study of land use potential, resource values and public demand, and should achieve the following objectives.

*1.* Maintain and update the information base (transportation plans) on existing access and future needs.

*2.* Continue public education and interagency cooperation with specific emphasis on the following efforts:

*Operation Respect* - This program has been very successful in reducing conflicts between hunters and landowners. The program provides maps, answers to questions regarding access and land status, and serves as a contact point for hunters and landowners.

*Brochures* - Continue to distribute the Public Land Access Handbook, developed jointly by several Federal and State agencies, which answers a number of questions regarding access to and use of State and Federal lands in Wyoming. Revise the handbook and develop other informational material as needed.

*Interagency Cooperation* - Continue to participate in the Interagency Committee established under the Memorandum of Understanding between the Wyoming Board of Land Commissioners, Wyoming Game and Fish Department, United States Forest Service, and BLM. The agreement provides for coordinating access acquisition efforts and pooling resources to achieve a more efficient and effective access program.

*3.* Increase the use of signs on BLM roads, trails, and other public access points.

*4.* Protect, maintain, and manage existing access to public lands.

*5.* Obtain access to public lands as defined in land use plans, district transportation plans, and activity management plans. Any acquisitions must be in conformance with an approved land use plan and a district transportation plan.

*6.* Manage access to public lands within the Bureau's multiple use mandate.

3

4

EXHIBIT 1-3

## Access Program Direction

Legal and physical access to public lands by BLM employees, contractors, and licensees, as well as the general public, is a basic need. Acquisition priorities will be based on issues and resource management needs identified during the planning process.

Legal and physical access needs may be obtained through any of the means described in the Access Acquisition Methods section below. Acquisition by land exchanges or direct purchase of easements are the preferred methods.

The land use plan, and subsequent transportation and activity plans, should identify the areas of public land which need legal and/ or physical access in priority order (note: changes in national or regional resource priorities and economies may change these priorities from time to time). The types of access (exclusive, nonexclusive, or temporary) will normally be addressed at the project or activity planning stage. In some instances, this may be addressed during the land use planning process. Planning of specific routes will normally be done during preparation of activity plans and/or transportation plans.

Currently access to the public lands is available by the following means:

○   State and county roads which adjoin or cross public land.

○   Bureau-owned or controlled roads and trails.

○   Roads over which the Bureau has acquired nonexclusive (permanent and/or temporary) easements from the owners. In this case, the ownership of the road remains with the individual landowner. The Bureau only acquires the right to use the road along with its agents, licensees, and permittees for a specific purpose. Rights for the general public are not obtained.

○   Written permission of the landowners to cross private lands to reach a particular tract of public land. Such permission may be withdrawn at any time by the landowner and could be lost with a change of ownership. This category includes cooperative agreements between BLM and the landowner for specific areas or tracts of land and permission granted to specific individuals or groups.

Access needs are to be determined on the basis of the following program management considerations:

**1. Resource Values -** The commercial, casual use or protection of the public lands are important management issues for the Bureau. Resource values and their use or nonuse require a multiple use perspective including various access oriented considerations. Important considerations include but are not limited to:

*- Forest-Management -* Legal access will normally be obtained to all stands of merchantable timber which are scheduled to be sold by competitive bid. This access may be in the form of a temporary easement across private land in certain instances. However, permanent rights are preferred where continued access is needed for subsequent timber sales, reforestation, or the management of other resources.

*- Recreation -* Legal access is to be provided to rivers, water bodies, trails, and tracts of public lands having significant values for outdoor recreation. The 43 CFR 8300.0-6 provides that: "In cooperation with State and local government and private landowners, the Bureau of Land Management shall endeavor to provide for public access to public lands with outdoor recreational values."

*- Wildlife -* Provide access or control of access to wildlife habitat, for hunting, fishing, or nonconsumptive wildlife uses.

*- Minerals -* Although the Bureau is not required to provide access to mineral resources, the planning and acquisition of such access could be helpful in preventing uncontrolled networks of access routes within the same general area. The planning of major access routes across public lands for future road construction, either by the Bureau or subsequent mineral developers, should also be considered in some areas.

**2. Public Demand -** Public demand is closely tied to resource use. As the need for a resource changes, its value fluctuates accordingly. Demand is one of the key criteria in prioritization of access needs.

**3. Size -** The size of the public land tract is an important consideration. As a rule, large tracts have a priority. But, resource values, such as recreational sites, may justify acquisition of access to smaller tracts. We will not attempt to acquire access to every parcel of public land.

**4. Bureau Investment -** Legal access will be required when the Bureau has or will invest substantial funds or effort to improve the public land. Capital improvements or investments can only be made on Bureau roads which are on the District transportation plan and legalized by exclusive easements.

5

6

**EXHIBIT 1-4**

Access Acquisition Methods

The following is a list of potential acquisition methods and specific policies, which should be considered when additional access must be obtained:

**1. Public Access by Easement Acquisition** - An easement is an interest in land entitling the owner or holder, as a matter of right, to enter upon another person's land for a particular purpose. An exclusive road easement grants control to the U.S., rights for the public, and allows the U.S. to authorize third party use and set road use rules. A nonexclusive road easement to the U.S. Government only allows use by the U.S. Government and its agents and those authorized to do business on public lands. The underlying land-owner still controls the road use, subject to the right granted to the U.S.

Permanent exclusive use easements are preferred when public use is a major objective or significant public investments are involved. Temporary or nonexclusive easements are appropriate when access for only administrative or resource management purposes is needed. In either case acquisition of an appropriate easement by exchange or purchase will be the preferred method of meeting access needs in Wyoming.

**2. Land Exchanges** - Exchanges can be used as a flexible means of acquiring access. For example, land can be exchanged for land or it may be exchanged for easements. Care will be exercised to ensure that in any land exchange the public interest will be served.

**3. Reciprocal Right-of-Way Grants.** Reciprocal right-of-ways (ROW) involve granting a ROW across public land in exchange for an equivalent ROW across private land. All ROW applications will be evaluated to determine the potential for obtaining a reciprocal ROW. The key factor to be considered is that a reciprocal right-of-way must be equivalent in extent and for a similar purpose.

**4. Acquiring Access Through Condemnation Procedures** - This procedure may be used when a landowner is unable to convey a clear title and, occasionally, in emergency situations. Under these circumstances this is usually mutually acceptable by all parties.

Condemnation may also be used to acquire access when an impasse is reached in negotiations and the landowner's objections cannot be resolved through administrative remedies. **Condemnation procedures will be initiated *only after all other possible means of obtaining access have been exhausted, and the access is absolutely essential for carrying the Bureau's multiple use mandate.***

~ ✗ ✗

7

**5. Other Methods of Acquiring Access** - The following are access acquisition methods, which will be considered if the opportunity arises.

*- Land and Water Conservation Fund* - The Land and Water Conservation fund can be used to acquire easements, as well as land. Individual proposals need to be fully developed in the budgeting process. They must be fully coordinated within the BLM and with other outside interests.

*- Donations* - These include both donations or gifts. They are simply voluntary transfers of land or interests in land to the United States without payment by the United States.

*- Assignments from Other Federal Agencies* - If a Federal agency has an easement across private land and the easement document states that the grant is to the United States, its successors and assignees, then this easement could be assigned to another Federal agency. Since the easement already vests title in the United States, the right-of-way will continue to exist and the jurisdictional responsibility may be reassigned. The agency relinquishes its jurisdiction over the easement and assigns the same to the other Federal agency. This will only be considered in cases where land or resource management functions are being transferred to BLM or where BLM is taking over road maintenance responsibility.

*- Easement Transfer from Oil and Gas Companies* - Under certain circumstances, it may be possible for an oil and gas company to transfer its interest in access across private land to BLM. These types of transfers may involve some type of payment, or they may take the form of a gift or donation. This is anticipated to be a very rare situation and should be considered only with the full knowledge and consent of the affected landowner.

*- Private Landowner Cooperative Agreements* - Agreements may be negotiated with landowners concerning access for public use. Any agreement will be consistent with existing BLM policy and formats must conform to existing manual guidance. The use of this method is encouraged especially in those cases where it is mutually advantageous to both the landowner and the BLM to close certain areas to public use and access to other lands can be obtained. Formal and informal reciprocal agreements with landowners are another form of cooperative agreement, where portions of private land may be opened to the public in return for closing tracts of public land during specified times of the year.

8

EXHIBIT 1-5

For further information concerning access in Wyoming contact one of the following BLM offices:

**Wyoming State Office**
2515 Warren Avenue
Cheyenne, Wyoming 82001
(307)775-6256

**Pinedale Resource Area**
431 W. Pine St.
Pinedale, Wyoming 82941
(307)367-4358

**Worland District Office**
101 South 23rd
Worland, Wyoming 82401
(307)347-9871

**Casper District Office**
1701 East "E" Street
Casper, Wyoming 82601
(307)261-7600

**Cody Resource Area**
1714 Stampede Avenue
Cody, Wyoming 82414
(307) 587-2217

**Platte River Resource Area**
815 Connie
Mills, Wyoming 82644
(307)261-7500

**Rawlins District Office**
1300 Third Street
Rawlins, Wyoming 82301
(307)324-7171

**Buffalo Resource Area**
189 North Cedar
Buffalo, Wyoming 82834
(307)684-5586

**Lander Resource Area**
125 Sunflower
Lander, Wyoming 82520
(307)332-7822

**Newcastle Resource Area**
1101 Washington Blvd.
Newcastle, Wyoming 82701
(307)746-4453

**Great Divide Resource Area**
812 E. Murray
Rawlins, Wyoming 82301
(307)324-4841



**Rock Springs District Office**
Highway 191 North
Rock Springs, Wyoming 82902-1869
(307)382-5350

**Kemmerer Resource Area**
415 Highway 30 North
Kemmerer, Wyoming 83101
(307)877-3933

**Green River Resource Area**
79 Winston Drive
Rock Springs , Wyoming 82902-1170
(307)362-6422

BLM-WY-AE-91-003-2300

AA133                              AA133                    EXHIBIT 1-7

AA133



Wyoming

*Jsm @ WYSGA.Org*



# Public Land
# ACCESS

  

AA134                              AA134                   **EXHIBIT 2-1**

# PUBLIC LANDS

 **What is Public Land?**

### Federal Land

For purposes of this handbook, public land is defined as:

*Any land surface which is under the jurisdiction of (managed by) one of the following agencies:*

> *Bureau of Land Management,*
> *U.S. Department of Interior*
> *or*
> *Forest Service,*
> *U.S. Department of Agriculture*
> *(National Forests and*
> *National Grasslands)*

These lands are generally open to public recreational use, including hunting and fishing, in accordance with regulations prescribed by the managing agency.

> *Wyoming is a mixture of public, state, and private land, each with different laws and regulations. So, use common sense. Know where you are at all times. Ask first before entering private land. Observe signs and posted areas. Avoid travel that will cause damage to the land. Don't litter. Leave all gates the way you found them.*
>
> *In other words... be a good neighbor. Respect both public and private land.*

1

### State Land

State of Wyoming lands are not "public" lands in the same sense as the federal lands managed by the Federal land management agencies. Almost all of the 3.8 million acres of Wyoming's state-owned land are "trust lands" granted to the state on its admission to the Union. These trust lands are managed to produce income for the support of the state's schools and public institutions.

In general, state lands, other than cultivated croplands, are available for public hunting, fishing and casual recreational day uses. The lands must be legally accessed, and public users must comply with the regulations of the Wyoming Board of Land Commissioners. These regulations prohibit any off-road motor vehicle use, overnight camping, or open fires. Any activity which would damage state lands, roads, improvements or lessee property interests is also prohibited. Motor vehicle use is restricted to established roads. The Board may close specific State land roads and areas to public use on a permanent, temporary, or seasonal basis. While lessee permission is not required to use legally accessed state lands, public users are encouraged to notify state grazing lessees as a courtesy, whenever it is reasonably possible to do so.



2

Ⓠ **What are the rights of the public to cross private lands to access public land?**

The public may cross private lands to access public lands only when a public road or right-of-way (easement) for public access exists across the private lands. In the absence of such a right-of-way, the public has no right to cross private lands without first obtaining permission from the landowner. *The landowner is under no obligation to grant such permission.*

Ⓠ **What does the law say with regard to corner crossing?**

There is no specific state or federal law with regard to corner crossing. Corner crossings in the checkerboard land pattern area are not considered legal public access.

*Loveless*

Ⓠ **What is the access situation on BLM checkerboard lands and intermingled lands?**

Public access to public lands is often limited in checkerboard and other public and private intermingled landownership areas in Wyoming. If there is a legal public road through the checkerboard or intermingled land, then a person has legal access to those public land sections which are traversed by the public road.

Ⓠ **What are the rights and privileges of lessees and permittees on federal lands?**

Federal grazing lease or permit privileges are only for grazing purposes. Like any other private landowner, a federal grazing lessee or permittee can control access across his private property; however, he has no authority to control access on or use of public land, nor can he restrict travel over a public road or a road with an easement that allows public travel. Lessees and permittees are not allowed to charge the public for the privilege of using public lands.

*A private landowner holding a grazing lease or permit from the BLM or Forest Service does not have to allow or provide public access across his private property as a condition of the lease or permit.*

A federal lease or permit holder may not exclude the public from their lease or permit area, if appropriate public easements exist. However, they do have the right to exclude the public from entering any buildings they may have been authorized to construct on the area under permit. Additionally, some areas may be closed to public entry by order of the federal land management agency. An example of this is a mining operation that has been closed for reasons of public safety.

3

4

**EXHIBIT 2-3**

AA136

**Q** What are the rights and privileges of lessees and permittees on state lands?

Lessees on state lands have specific rights and privileges under their leases, such as using the land for grazing and agricultural purposes.  There are also special use leases issued for non-agricultural purposes on state land.  A state lessee does not have to allow or provide public access across his private property as a condition of the lease.

Lessees, and others, are not allowed to charge for or receive payments from persons engaged in hunting, fishing or other recreational use of state lands, unless specifically authorized to do so under a special use lease or other Board authorization.  Lessees cannot exclude the public from legally accessible state land, other than cultivated cropland, unless the land has been closed by the Board.  However, lessees do have a legitimate and legal interest in protecting the forage they lease, protecting the condition of and improvements placed on state lands, and protecting their livestock. If public use privileges are abused or lessee interests damaged, public uses of state lands will be restricted by the Board. Any closure or posting of state lands must be approved by the Board of Land Commissioners.

Lessees and permittees on land owned by the Wyoming Game and Fish Commission and the Wyoming Department of Commerce do not have the right to exclude the public from their lease and permit area.

**Q** Do rivers and streams offer legal access to public lands?

Boating or floating on rivers and streams is an allowable means of accessing public lands so long as any use of the stream bed itself, while on private lands, is restricted to incidental contact necessary to dislodge the boat or circumvent hazards.

**Q** Can a wounded animal be pursued onto private land?

This can occur only with the permission of the private landowner.



5

6

**EXHIBIT 2-4**

AA137

# Q What are the State of Wyoming's trespass laws?

Two separate Wyoming Statutes pertain to public trespass:

## 1. W.S. 6-3-303 Criminal trespass:

(a) *A person is guilty of criminal trespass if he enters or remains on or in the land or premises of another person, knowing he is not authorized to do so, or after being notified to depart or to not trespass. For purposes of this section, notice is given by:*

   (i) *Personal communication to a person by the owner or occupant, or his agent, or by a peace officer; or*

   (ii) *Posting of signs reasonably likely to come to the attention of intruders.*

(b) *Criminal trespass is a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750), or both.*

## 2. W.S. 23-3-305 Hunting from highway; entering enclosed property without permission; hunting at night without permission prohibited:

(a) *No person shall hunt, shoot, or attempt to kill any wildlife from any public road or highway.*

(b) *No person shall enter upon the private property of any person to hunt, fish or trap without the permission of the owner or person in charge of the property.*

(c) *No person shall fire any firearm from, upon, along, or across any public road or highway.*

(d) *No person knowingly shall fire any rifle from the enclosed lands of one person onto or across the enclosed lands of another without the permission of both persons.*

(e) *No person shall hunt at night upon privately owned or leased lands except with written permission of the landowner or lessee.*

Violation of this statute is a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than four hundred dollars ($400), or both.

7

8

EXHIBIT 2-5

AA138

 **What recourses are available if access problems arise?**

### Federal Agencies

Immediately report the incident to the nearest Forest Service, Wyoming Game and Fish, or BLM field office with all the specifics of the incident, particularly the exact location where the incident occurred. An Access Problem Identification Form has been jointly develped for use in reporting incidents of this nature on state and federal lands. A copy of this form is available at agency field offices identified in this brochure.

### State Agencies

The State Land Office will investigate state land access related problems and complaints which involve actions that are either illegal or contrary to State Land Board regulations and lease terms. If the problem/complaint can be documented and verified the parties involved will be contacted and requested to immediately correct the situation. Non-compliance with lease terms and related Board regulations is grounds for lease cancellation. Non-compliance with the Board's public use rules (such as off-road vehicle use), vandalism or property damage on state lands are grounds for arrest by any duly authorized peace officer and prosecution under pertinent Wyoming statutes.

       

AA139              AA139              **EXHIBIT 2-6**

AA139

# PUBLIC ROADS

### Q What is a public road?

#### Federal Lands

For purposes of this handbook, a public road is any road which is under the jurisdiction of the State Highway Department, county and municipal government, or one of the public land management agencies mentioned earlier. These roads are open to public travel unless closed by order of the agency having jurisdiction. Roads may be closed or use restricted to fulfill management objectives such as protecting public health and safety or preserving resources.

#### State Lands

On state land, "public roads" are only those roads identified and maintained as state, federal, or county roads which are constructed on an easement or right-of-way which include the provisions for public use. Other established roads on state land which have been graded or constructed to carry vehicular traffic, or on which repeated vehicular traffic has created well defined tracks, are available for use by persons engaged in hunting, fishing and casual recreational use, unless closed by order of the Board. Such roads may be closed to prevent resource damage, to protect other Board authorized uses, or to protect public health and safety.

### Q How can public roads be identified and located?

State and some county roads are shown on the official Wyoming State Highway Map. Public roads under the jurisdiction of land management agencies are less easy to identify. They can normally be identified by signing on the ground but may not be readily identifiable from maps published by the managing agency. Many maps published by land management agencies and topographic maps published by the U.S. Geological Survey show all roads that physically exist. These maps may not differentiate between private and public roads. Inquiry at the local office of the managing agency is suggested in order to avoid being denied access on a private road.

As mentioned, many maps show all existing roads whether public or private. The owners of many private roads (that is, those not under the jurisdiction of a government agency) have allowed the public to use their roads for access to public lands. *Unless a public agency acquires a right-of-way for the road across private land, the landowner is completely within their right to close the road at any time, to be selective in who is allowed to use the road, or to charge a fee for use of the road.*

11

12

**EXHIBIT 2-7**

 **What are travel management policies and practices of public agencies?**

### Federal Lands

The majority of BLM and Forest Service roads open to the public are open to vehicular use. However, roads could be open to the public for horseback or foot travel only.

The BLM and the Forest Service may regulate the use of all roads and lands under its jurisdiction in order to accomplish specific land management objectives, protect resources, or for public safety. This may include restricting vehicle travel to designated travelways, either during specific periods of time, or yearlong. It may include closing areas to specific modes of travel or specific types of vehicles. All such restrictions are posted on the ground. Information and maps showing restrictions are available at Forest Service offices. *Anytime a BLM road open to the public is closed or any restriction is placed on the road, the closure or restriction is announced in local newspapers and news media.* The public can find out which BLM roads are open to the public by contacting the nearest BLM Office.

### State Lands

Motor vehicle use on state land for recreation purposes is restricted to public roads and other established roads which have been graded or constructed to carry vehicular traffic, or on which repeated vehicular traffic has created well defined tracks. **No off-road motor vehicle use is allowed.** No new roads or extensions of existing roads may be created without specific Board authorization. The Board may restrict the use of certain established roads, or close such roads entirely. Such restrictions and closures will be posted at the directon of the Board.

### Game and Fish Department

The majority of roads on lands owned by the Game and Fish Commission are open for public use. Travel is restricted to established roads and some roads may be regulated for resource protection.

**What is a prescriptive right?**

A prescriptive right-of-way may exist when use of a road has been open and notorious, adverse and continuous for the period specified by statute, which in Wyoming is 10 years. A prescriptive right can only be confirmed through court action. There are no prescriptive rights which can apply against state or federal lands.

13

14

**EXHIBIT 2-8**

 **What are the access acquisition management policies of ~~federal~~ agencies?**

**BLM**

The Bureau of Land Management strives to acquire legal access, with rights for the public, to the larger blocks of public land. BLM has the responsibility to manage public lands in accordance with laws passed by Congress. In areas where there are intermingled public and private lands, it is neither practical or feasible for the government to secure easements to ensure public access to *all* public land. It is the Bureau's policy to increase legal access into large blocked-up areas of public land that have high values for public recreation and use. The BLM has authority to condem rights-of-way for public access. However, "public access" may not be a suitable justification. The need for such action must be well justified and the landowner must be paid just compensation.

**Forest Service**

The Forest Service policy is to acquire, on a priority basis, rights-of-way needed to provide reasonable access to the National Forests and National Grasslands. Many roads which provide access to these lands may have been open to the public, courtesy of the landowner, for some years. However, the landowner may change his mind and deny access on these routes at any time in the absence of a formal right-of-way. The Forest Service has an annual program to acquire additional rights-of-way, many of which are for roads of this type.

The Forest Service does have authority to condemn rights-of-way for public access. The need for such action must, however, be well justified, and the landowner must be paid just compensation.

It should be recognized that not all existing access routes are necessarily needed to provide reasonable access to public lands. Most large blocks of Forest Service administered lands are legally accessible to the public to some degree even though some users may feel other private roads provide more convenient access.



15

16

**EXHIBIT 2-9**
AA142



**Q** **What are the access acquisition management policies of state agencies?**

Access is acquired and developed for necessary state land management purposes on an as needed, case-by-case basis. The State Land Office also cooperates with other state, local, and federal entities in the acquisition, development and management of access to state and federal lands.

The Wyoming Game and Fish Department has an active access acquisition program to provide public access for hunting, fishing and other consumptive and nonconsumptive uses of wildlife. Priorities for access acquisition are based on public demand and wildlife population management needs. Access acquisition is primarily in the form of easements for stream or lakeside public pedestrian access, or rights-of-way across private lands for private vehicular access to these easements and other public and state lands. All transactions are conducted on a willing buyer-willing seller basis. The department also purchases lands for wildlife habitat management areas. These lands are open to public use but may have some seasonal or site specific restrictions to protect wildlife resources. Game and Fish Department access areas are marked with informational signs and permission is not required from lessees or permittees.





17                                                                 18

EXHIBIT 2-10

# INFORMATION

## Bureau of Land Management Offices

**Wyoming State Office**
2515 Warren Ave.
P.O. Box 1828
Cheyenne, WY 82003
(307) 775-6256

**Casper District Office**
1701 East E Street
Casper, WY 82601
(307) 261-7600

**Platte River
Resource Area**
815 Connie Street
Mills, WY 82644
(307) 261-7500

**Buffalo Resource Area**
189 N. Cedar
Buffalo, WY 82834
(307) 684-5586

**Newcastle
Resource Area**
1101 Washington Blvd.
Newcastle, WY 82701
(307) 746-4453

**Worland District Office**
101 South 23rd
P.O. Box 119
Worland, WY 82401
(307) 347-9871

**Cody Resource Area**
1714 Stampede Avenue
Cody, WY 82414
(307) 587-2216

**Grass Creek
Resource Area**
101 South 23 Street
Worland, WY 82401
(307) 347-9871

**Washakie
Resource Area**
101 South 23 Street
Worland, WY 82401
(307) 347-9871

**Rock Springs
District Office**
U. S. Highway 191 N.
P.O. Box 1869
Rock Springs, WY 82902
(307) 382-5350

**Green River
Resource Area**
79 Winston Drive
Rock Springs, WY 82902
(307) 362-6422

**Kemmerer
Resource Area**
415 Highway 30 North
Kemmerer, WY 83101
(307) 877-3933

**Pinedale
Resource Area**
431 West Pine Street
Pinedale, WY 82941
(307) 367-4358

**Rawlins District Office**
1300 Third Street
P.O. Box 670
Rawlins, WY 82301
(307) 324-7171

**Great Divide
Resource Area**
812 E. Murray
Rawlins, WY 82301
(307) 324-4841

**Lander Resource Area**
125 Sunflower Street
Lander, WY 82520
(307) 332-7822

## U. S. Forest Service Offices

**Big Horn National Forest**
1969 South Sheridan Ave.
Sheridan, WY 82801
(307) 672-0751

**Black Hills National Forest**
RR 2, Box 200
Custer, SD 57730
(605) 673-2251

**Bridger-Teton National Forest**
P.O. Box 1888
Jackson, WY 83001
(307) 733-2752

**Medicine Bow National Forest**
*(including Thunder Basin
National Grasslands)*
605 Skyline Drive
Laramie, WY 82070
(307) 745-8971

**Shoshone National Forest**
225 W. Yellowstone Ave.
P.O. Box 2140
Cody, WY 82414
(307) 527-6241

**Wasatch-Cache National Forest**
8230 Federal Building
125 S. State Street
Salt Lake City, UT 84138
(801) 524-5030

## Ranger District Offices

| | |
|---|---|
| Afton | (307) 886-3166 |
| Big Piney | (307) 276-3375 |
| Buffalo | (307) 684-7981 |
| Cody | (307) 526-6241 |
| Douglas | (307) 358-4690 |
| Dubois | (307) 455-2466 |
| Encampment | (307) 327-5481 |
| Evanston | (307) 780-3194 |
| Greybull | (307) 765-4435 |
| Jackson | (307) 733-4755 |
| Kemmerer | (307) 877-4415 |
| Lander | (307) 332-5460 |
| Laramie | (307) 745-8971 |
| Lovell | (307) 548-6541 |
| Meeteetse | (307) 868-2379 |
| Moran | (307) 543-2386 |
| Mountain View | (307) 782-6555 |
| Newcastle | (307) 746-2783 |
| Pinedale | (307) 367-4326 |
| Powell | (307) 754-2407 |
| Saratoga | (307) 326-5258 |
| Sheridan | (307) 672-0751 |
| Sundance | (307) 283-1361 |
| Worland | (307) 347-8291 |

   

19

20

EXHIBIT 2-11

# Wyoming Game & Fish Department

**Cheyenne State Headquarters**
5400 Bishop Blvd.
Cheyenne, WY 82006
1-800-842-1934

**Casper District Office**
2800 Pheasant Drive
Casper, WY 82604
1-800-233-8544

**Cody District Office**
2820 State Highway 120
Cody, WY 82414
1-800-654-1178

**Green River District Office**
351 Astle
Green River, WY 82935
1-800-843-8096

**Jackson District Office**
360 North Cache
Jackson, WY 83001
1-800-423-4113

**Lander District Office**
260 Buena Vista
Lander, WY 82520
1-800-654-7862

**Laramie District Office**
528 South Adams
Laramie, WY 82070
1-800-843-2352

**Pinedale District Office**
117 S. Sublette Ave.
Pinedale, WY 82941
(307) 367-4353

**Sheridan District Office**
Sheridan County
Airport Road
Sheridan, WY 82801
1-800-331-9834

# Other State Agencies

**Wyoming State Land and Farm Loan Office**
122 West 25th Street
Herschler Building
Cheyenne, WY 82002
(307) 777-7331

**Wyoming State Parks and Historic Sites**
**Department of Commerce**
2301 Central Avenue
Barrett Building
Cheyenne, WY 82002
(307) 777-6323

**Wyoming State Planning Coordinator's Office**
122 West 25th Street
Herschler Building
Cheyenne, WY 82002
(307) 777-7574

# Game Wardens

| | | | |
|---|---|---|---|
| Afton | (307) 886-3717 | Lusk | (307) 334-3281 |
| Baggs | (307) 383-2160 | Medicine Bow | (307) 379-2337 |
| Big Piney | (307) 276-3359 | Meeteetse | (307) 868-2212 |
| Buffalo | (307) 684-5223 | Mt. View | (307) 782-6467 |
| Cokeville | (307) 279-3466 | Moorcroft | (307) 756-3357 |
| Dayton | (307) 655-9495 | Newcastle | (307) 746-2248 |
| Douglas | (307) 358-3249 | Powell | (307) 754-5290 |
| Dubois | (307) 455-2424 | Rawlins | (307) 324-2973 |
| Elk Mountain | (307) 348-7311 | Riverton | (307) 856-9005 |
| Evanston | (307) 789-3285 | Rock Springs | (307) 382-5658 |
| Gillette | (307) 682-4353 | Saratoga | (307) 326-5583 |
| Glenrock | (307) 436-9617 | Sundance | (307) 283-1276 |
| Greybull | (307) 765-2163 | Ten Sleep | (307) 366-2213 |
| Jeffrey City | (307) 544-2347 | Thermopolis | (307) 864-3834 |
| Kaycee | (307) 738-2455 | Torrington | (307) 532-2433 |
| Kemmerer | (307) 877-3278 | Wheatland | (307) 322-2067 |
| Lovell | (307) 548-7310 | Worland | (307) 347-3650 |



*This brochure was developed in cooperation with the following agencies:*

*U.S. Department of Agriculture*
*Forest Service*

*U.S. Department of the Interior*
*Bureau of Land Management*

*Wyoming State Land Office*

*Wyoming Game and Fish Department*

*Wyoming State Parks and Historic Sites*

*Wyoming State Planning Coordinator's Office*

**AA145**                    **AA145**                    EXHIBIT 2-12   AA145

BLM-WY-AE-89-017-2300

AA146                            AA146

EXHIBIT 2-13

AA146

UNITED STATES DISTRICT COURT

DISTRICT OF WYOMING

IRON BAR HOLDINGS, LLC, a North )
Carolina limited liability company registered )
to do business in Wyoming, )
       )
      Plaintiff, )
       )
      vs. )     Case No. 22-CV-00067-SWS
       )
BRADLY H. CAPE, an individual, )
ZACHARY M. SMITH, an individual, )
PHILLIP G. YEOMANS, an individual, and )
JOHN W. SLOWENSKY, an individual, )
       )
      Defendants. )

---

## PLAINTIFF'S EXPERT WITNESS DESIGNATION

COMES NOW Plaintiff, Iron Bar Holdings, LLC, by and through its attorney M. Gregory Weisz of Pence and MacMillan LLC, and makes its expert witness designation as set forth below. Plaintiff designates the following persons that may be called to provide expert opinion testimony in this matter on behalf of Plaintiff pursuant to Fed. R. Evid. 702, 703, and 705:

   A.  **David R. Coffey, P.E., L.S.**
      Coffey Engineering & Surveying, LLC
      902 South 3rd Street
      Laramie, WY 82070
      (307) 742-7425
      dcoffey@coffey-engineering.com

Mister Coffey's designation and description of the subjects of his testimony is as set forth in the "Report/Affidavit of David. R. Coffey" of even date herewith and attached hereto.

Mister Coffey has not authored any publications pertinent to any issue in this case. In the last four years, Mr. Coffey testified as an expert witness in this Court in the case entitled *Cupps,*

*December 2022*           1

*et al. v. Pioneer Canal-Lake Hattie Irrigation District*, United States District Court, District of Wyoming, 16-CV-86-S; Mr. Coffey testified in one hearing, two depositions, and two trials in the 2016-2021 period in that litigation.  Mister Coffey has no unusual or special requirements with respect to the taking of his deposition.  His rate to testify in a deposition or at trial is as described in his fee schedule attached to his report & affidavit, including travel time, stand-by time, actual time spent giving testimony and any review of his deposition testimony.

B. **James H. Rinehart**
   Mason & Morse Ranch Company, LLC
   2616 W. Colorado Ave. Suite 13
   Colorado Springs, CO 80904
   (970) 237-3300
   sales@ranchland.com

   Mister Rinehart's designation and description of the subjects of his testimony is as set forth in the "Affidavit & Report of James H. Rinehart" of even date herewith.

   Mister Rinehart has not authored any publications pertinent to any issue in this case.  In the last four years, Mr. Rinehart has not testified as an expert witness in any court.  Mister Rinehart has no unusual or special requirements with respect to the taking of his deposition.  His rate to testify in a deposition or at trial is $200.00 per hour, including travel time, stand-by time, actual time spent giving testimony and any review of his deposition testimony.

C. **Rebuttal expert**

   Any expert witness necessary to rebut the testimony of any witness or expert witness designated or called by any of the Defendants in this action.

*December 2022*                                    2

**AA148**                          **AA148**                          **AA148**

RESPECTFULLY SUBMITTED on this 15th day of December, 2022.

> */s/ M. Gregory Weisz*
> M. Gregory Weisz, Wyo. Bar No. 6-2934
> Crystal D. Stewart, Wyo. Bar No. 7-6057
> PENCE AND MACMILLAN LLC
> 5908 Yellowstone Road
> P.O. Box 765
> Cheyenne, WY 82003
> (307) 638-0386 (telephone)
> (307) 634-0336 (fax)
> gweisz@penceandmac.com
> cstewart@penceandmac.com
> Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December, 2022, a true and correct copy the above and foregoing document was served by CM/ECF upon the following:

Ryan A. Semerad, Wyo. Bar No. 7-6270
The Fuller-Semerad Law Firm
242 South Grant Street
Casper, WY 82601
*Defendants' Attorney*

Lee Mickus
3200 Cherry Creek Drive South
Suite 380
Denver, CO 80209
*Attorney for Defendants*

Patrick J. Lewallen
Trevor J. Schenk
Chapman Valdez & Lansing
P.O. Box 2710
Casper, WY 82602
*Attorneys for Backcountry Hunters*

Eric B. Hanson
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
*Attorneys for Backcountry Hunters*

*December 2022*                                    3

Karen Budd-Falen, Wyo. Bar No. 5-2647
Rachael L. Buzanowski, Wyo. Bar No. 8-6693
Budd-Falen Law Offices, LLC
P.O. Box 346
Cheyenne, WY 82003-0346
*Attorneys for Wyoming Stockgrowers Association and Wyoming Wool Growers Association*

                                        */s/ M. Gregory Weisz*
                                        Pence and MacMillan LLC

*December 2022*                    4

## REPORT/AFFIDAVIT OF DAVID R. COFFEY, P.E., L.S.

David R. Coffey, being first duly sworn upon his oath, does hereby declare under penalty of perjury that the following statements are true and correct to the best of his knowledge, information, and belief, and does depose and state as follows:

1. My name is David R. Coffey. I am an adult person over the age of eighteen years.

2. I am the owner and CEO of Coffey Engineering & Surveying, LLC.

3. I am a licensed Professional Engineer (licensed since 2002) and a licensed Professional Land Surveyor (licensed since 2009), Wyoming License No. 9329.

4. I have been a resident of Laramie, Albany County, Wyoming for 37 years.

5. I was born and raised in Laramie, Wyoming.

6. As part of my work as an engineer and surveyor I have spent considerable time in the field in rural areas of Wyoming.

7. I am familiar with the Elk Mountain, Wyoming area, including the area commonly referred to as the checkerboard, where private and public lands are interspersed.

8. As a licensed Professional Engineer and Professional Land Surveyor I routinely conduct land surveys and review land surveys carried out by other surveyors.

9. As a licensed Professional Land Surveyor I have extensive experience relating to surveys and maps of rural and ranch lands, including but not limited to locating and identifying monuments, land boundaries, section corner locations, and landmarks/boundaries of lands in the Public Land Survey System. My work includes but is not limited to: (i) surveying, (ii) review, analysis, and retracement of surveys, which includes the review and analysis of field notes, survey calls, the information used to prepare a survey, (iii) the review and analysis of survey maps/plats as well as location certificates, (iv) consideration of the baseline information and datum used to compile surveys and survey maps and plats, (v) review and retracement of government survey lines and boundaries of lands, and (vi) the offering of professional opinions on boundaries, encroachments, and location of objects within boundaries.

10. I was asked by Iron Bar Holdings, LLC to locate a certain number of corners of sections of land in Carbon County, Wyoming, that are part of the Elk Mountain Ranch.

11. Specifically, I was asked to locate section corners in Township 20 North, Range 82

West, 6th P.M., Carbon County, Wyoming; Township 20 North, Range 81 West, 6th P.M., Carbon County, Wyoming; Township 19 North, Range 82 West, 6th P.M., Carbon County, Wyoming; and Township 19 North, Range 81 West, 6th P.M., Carbon County, Wyoming. The corner intersections I have been hired to identify are described on Exhibit A to this report.

12.    I started my work to locate these corner intersections in the fall of 2022, but weather conditions prevented me from completing the location of all of the corners.

13.    The corners I was able to identify are: (i) SE corner of Section 14 T20N R82W, 6th PM, (ii) SE corner of Section 23 T20N R82W 6th PM, and (iii) SE corner of Section 24 T20N R82W 6th PM. I will locate the other corners in the spring of 2022 as soon as weather conditions allow me to do so.

14.    The information I have been able to gather to date is attached hereto as Exhibit B.

15.    I have been asked to record information about any corner markers, brass caps, monuments, or other identifying information related to the corner; to take photographs of any marker, cap, monument at each corner, as well as any signage, fencing, or other items of interest in the area of the corner. Additionally, I will compare the information I am able to obtain from my professional land surveying equipment with information from a cell phone application known as OnX Hunt, which many people use to identify land ownership and land boundaries and on-the-ground locations while in the field.

16.    All of the opinions and conclusions I make in this report and affidavit are based on a reasonable degree of certainty in the engineering and survey profession, and are of the type that I commonly review and rely upon in my profession as a licensed Professional Engineer and Professional Land Surveyor.

17.    To support my testimony, I may use as exhibits any of the materials I generate as part of my work in the field in the case, as well as topographic maps of the Elk Mountain, Wyoming area.

18.    My resume is attached hereto and incorporated herein by reference to show my educational and professional qualifications to testify as an expert witness in this matter. I have not authored any publications within the last ten years.

19.    In the last four years, I have testified as an expert witness in this Court in the case entitled *Cupps, et. al v. Pioneer Canal-Lake Hattie Irrigation District*, United States District Court for the District of Wyoming, 16-CV-86-S. I testified in one hearing, two depositions, and two trials in the 2016-2021 period in that litigation.

20.    The compensation for my study, testimony and work is as set forth in the attached rate schedule.

All of the opinions and conclusions I make in this report and affidavit are based on a reasonable degree of certainty in the engineering and surveying profession and are of the type that I commonly review and rely upon in my profession as a licensed engineer and surveyor.

FURTHER AFFIANT SAYETH NAUGHT.

Dated this 15ᵗʰ day of December, 2022.

David R. Coffey

STATE OF ARIZONA        )
                        ) ss.
COUNTY OF YAVAPAI       )

The foregoing document was subscribed and sworn (or affirmed) to before me on the 15ᵗʰ day of December, 2022, by David R. Coffey.

Witness my hand and official seal.

JESSICA A. BUCKLES
Notary Public, State of Arizona
Yavapai County
Commission # 606908
My Commission Expires
May 31, 2025

Signature of Notarial Officer
Title: Notary Public

My Commission Expires: May 31, 2025

Intersections of:

1. Section 14, T20N, R82W and Section 24, T20N, R82W, 6th P.M.
2. Section 24, T20N, R82W and Section 26, T20N, R82W, 6th P.M.
3. Section 24, T20N, R82W and Section 30, T20N, R81W, 6th P.M.
4. Section 30, T20N, R81W and Section 36, T20N, R82W, 6th P.M.
5. Section 36, T20N, R82W and Section 6, T19N, R81W, 6th P.M.
6. Section 30, T20N, R81W and Section 32, T20N, R81W, 6th P.M.
7. Section 32, T20N, R81W and Section 28, T20N, R81W, 6th P.M.

The section numbers above are BLM-managed land or State of Wyoming lands.

1

Exhibit A

**November 15, 2022 Elk Mountain Ranch Survey:**

- Weather Conditions: 16 Degrees, Light Snow, Wind WSW at 13-15 mph. Ground is snow covered with 3-12 in higher elevations.
- Equipment Used:
  - Trimble R12 Base and Receiver
    - Data Sheet attached
  - Trimble TDL 450 Radio
  - Polaris Ranger 4x4 UTV
  - 4x4 Truck and Trailer
- Survey Type RTK (Real Time Kinematic) with Logging and infill
- Surveyors on Site
  - Dave Coffey PE/LS
  - Ryan Sirdoreus Survey Party Chief

We setup R-12 Base Receiver in Section 14, right off Rattle Snake Pass Road and near the SE corner of section 14.

The Crew hiked to the Southeast Corner of Section 14, T20N R82W. Found a 3 ¼" Brass Cap on 3" pipe approx. 10" above ground level. The corner of Sections 14, 13, 23, 24 is located in rolling hills with grass, sagebrush and Grease wood. On each side of the Corner marker is a t-post. A 3 second averaged shot was taken; the receiver was reinitiated and another 3 second averaged shot was taken. These two points were points 6000 and 6001.

We then traveled by UTV up the county road to an access road to the ranch. Then traveled to the top of the first ridge. There we set a Radio Repeater for the RTK (Real Time Kinematic) Signal. (Point 6002).

We traveled up and over the ridge and down into the valley. There we found the Southeast Corner of Section 23, T20N R82W, a 3 ¼" Brass Cap on 3" pipe approximately 6" above ground level. The corner of Sections 23, 24, 26, 25 is located in sage brush at the base of the east facing hill side below some granite boulders. There is an old t-post and wooded post laying next to the corner marker. A 3 second averaged shot was taken for point number 6003.

We then traveled back up to the main mountain access road via UTV and up and around to access the Southeast Corner of Section 24, T20NR82W. The corner of Sections 24, 19, 25, 30 is located on a West facing hill side in greasewood and willows approximately halfway up the ridge. There we found a 2 ½" Brass on 2" pipe, approximately 12" above ground level. A 3 second averaged shot was taken; the receiver was reinitiated and another 3 second averaged shot was taken. These two points were 6004, and 6005.

The farther we traveled up the Elk Mountain the more difficult the travel was due to amount of snow. It was determined that it was going to be too difficult to access the other points at this time. The points will be surveyed at another time to be determined.

Exhibit B

**Trimble R12 RTK Points**

SE Corner of Sec 14 T20NR82W   **Point 6000**

Shot in field 11/15/2022 8:01:21 AM

N41.69879, -106.57541 or N41°41'55.62810", W106°34'31.46856""



SE Corner of Sec 23 T20NR82W   **Point 6003**

Shot in field 11/15/2022 8:43:17 AM

N41.6843000, -106.57504 or N41°41'03.46763", W106°34'30.14737"



SE Corner of Sec 24 T20NR82W **Point 6004**

Shot in field at 0916am 11/15/22

N41.684600, -106.55610 or N41°41'04.57010", W106°33'21.95929"



onXmaps Waypoints

*(Centered on Section Corner by hand in Field using application.)*

SE Corner of Sec 14 T20NR82W **Related to Point 6000**

Shot in field at 0805am 11/15/22

N41.69879, -106.57539 or N41° 41' 55.644", W106° 34' 31.404"


SE Corner of Sec 23 T20NR82W **Related to Point 6003**

Shot in field at 0849am 11/15/22

N41.68428, -106.57505 or N41° 41' 3.408", W106° 34' 30.18"


SE Corner of Sec 24 T20NR82W **Related to Point 6004**

Shot in field at 0916am 11/15/22

N41.68462, -106.55609  or N41° 41' 04.632", W106° 33' 21.924"

Computed Horizontal Distance Between Surveyed Points and onX Map Points

Points 6000 > XYOnXPts_221115 1
From:  765752.716, 1519313.646, 42.848 ft
To:  765751.063, 1519308.764, 7487.895 ft
Azimuth: 251°17'59.5"
Horizontal: 5.155 ft
Slope Distance: 7445.049 ft
Slope: 1:1444.22



Points: 6003 > XYOnXPts_221115 2
From: 760466.463, 1519453.037, 42.444 ft
To: 760472.519, 1519455.460, 7810.688 ft
Azimuth: 21°47'58.7"
Horizontal: 6.523 ft
Slope Distance: 7768.246 ft
Slope: 1:1190.91



Points: 6004 > XYOnXPts_221115 3
From: 760636.503, 1524630.746, 42.316 ft
To: 760630.213, 1524628.125, 7960.995 ft
Azimuth: 202°37'16.2"
Horizontal: 6.814 ft
Slope Distance: 7918.682 ft
Slope: 1:1162.11



DATASHEET



# ☰ Trimble R12

## GNSS SYSTEM

### KEY FEATURES

- ► Next generation Trimble® ProPoint™ GNSS positioning engine. Engineered for improved accuracy and productivity in challenging GNSS conditions.
- ► 672-channel solution with Trimble 360 satellite tracking technology
- ► Trimble SurePoint™ tilt compensation and precise position capture
- ► Trimble xFill® correction outage technology
- ► Support for RTK level precision Trimble CenterPoint® RTX corrections technology
- ► Optimized for Trimble Access™ field software
- ► Android™ and iOS platform support
- ► Cellular, Bluetooth®, Wi-Fi data connectivity
- ► Military-spec rugged design and IP-67 rating
- ► Ergonomic form factor
- ► All day battery with built-in status indicator
- ► 6 GB internal memory

**Learn more:**
**geospatial.trimble.com/R12**



**☰ Trimble.**

## Trimble R12 GNSS SYSTEM

### HARDWARE

**PHYSICAL**

| | |
|---|---|
| Dimensions (W×H) | 11.9 cm × 13.6 cm (4.6 in × 5.4 in) |
| Weight | 1.12 kg (2.49 lb) with internal battery, internal radio with UHF antenna. |
| | 3.95 kg (8.71 lb) items above plus range pole, Trimble TSC7 controller & bracket |

| Temperature | | −40 °C to +65 °C (−40 °F to +149 °F) |
|---|---|---|
| | Operating | −40 °C to +75 °C (−40 °F to +167 °F) |
| | Storage | 100%, condensing |
| Humidity | | IP67 dustproof, protected from temporary immersion to depth of 1 m (3.28 ft) |
| Ingress protection | | |

Shock and vibration (Tested and meets the following environmental standards)

| | Shock | Non-operating: Designed to survive a 2 m (6.6 ft) pole drop onto concrete. Operating: to 40 G, 10 msec, sawtooth |
|---|---|---|
| | Vibration | MIL-STD-810F, FIG 514.5C-1 |

**ELECTRICAL**

Power 11 to 24 V DC external power input with over-voltage protection on Port 1 and Port 2 (7-pin Lemo)

Rechargeable, removable 7.4 V, 3.7 Ah Lithium-ion smart battery with LED status indicators

Power consumption is 4.2 W in RTK rover mode with internal radio

| Operating times on internal battery | | |
|---|---|---|
| | 450 MHz receive only option | 6.5 hours |
| | 450 MHz receive/transmit option (0.5 W) | 6.0 hours |
| | 450 MHz receive/transmit option (2.0 W) | 5.5 hours |
| | Cellular receive option | 6.5 hours |

### COMMUNICATIONS AND DATA STORAGE

| | |
|---|---|
| Serial | 3-wire serial (7-pin Lemo) |
| USB v2.0 | Supports data download and high speed communications |
| Radio modem | Fully integrated, sealed 450 MHz wide band receiver/transmitter with frequency range of 403 MHz to 473 MHz, support of Trimble, Pacific Crest, and SATEL radio protocols: |
| | Transmit power 2 W |
| | Range 3–5 km typical / 10 km optimal |
| Cellular | Integrated 3.5 G modem, HSDPA 7.2 Mbps (download), GPRS multi-slot class 12, EDGE multi-slot class 12, Penta band UMTS/HSDPA (WCDMA/FDD) 800/850/900/1900/2100 MHz, Quad-band EGSM 850/900/1800/1900 MHz, GSM CSD, 3GPP LTE |
| Bluetooth | Version 4.1 |
| Wi-Fi | 802.11 b,g, access point and client mode, WPA/WPA2/WEP64/WEP128 encryption |
| I/O ports | Serial, USB, TCP/IP, IBSS/NTRIP, Bluetooth |
| Data storage | 6 GB internal memory |
| Data format | CMR+, CMRx, RTCM 2.1, RTCM 2.3, RTCM 3.0, RTCM 3.1, RTCM 3.2 input and output |
| | 24 NMEA outputs, GSOF, RT17 and RT27 outputs, 1 PPS output |

### WEBUI

Offers simple configuration, operation, status, and data transfer

Accessible via Wi-Fi, Serial, USB, and Bluetooth

### SUPPORTED CONTROLLERS & FIELD SOFTWARE

Trimble TSC7, Trimble T10, Trimble T7, Android and iOS devices running supported apps

Trimble Access 2019.10 or later

### CERTIFICATIONS

FCC Part 15 (Class B device), 24, 32, CE Mark, RCM, PTCRB, BT SIG



DATASHEET

## PERFORMANCE SPECIFICATIONS

### GNSS MEASUREMENTS

Constellation agnostic, flexible signal tracking and improved positioning in challenging environments with Trimble ProPoint GNSS technology

Increased measurement productivity and traceability with Trimble SurePoint eBubble tilt compensation

Advanced Trimble Custom Survey GNSS chips with 672 channels

Reduced downtime due to loss of radio signal or cellular connectivity with Trimble xFill technology

Signals tracked simultaneously

GPS: L1C, L1C/A, L2C, L2E, L5
GLONASS: L1C/A, L1P, L2C/A, L2P, L3
SBAS (WAAS, EGNOS, GAGAN, MSAS): L1C/A, L5
Galileo: E1, E5A, E5B, E5 AltBOC, E6[?]
BeiDou: B1, B1C, B2, B2A, B3
QZSS: L1C/A, L1S, L1C, L2C, L5, L6
NavIC (IRNSS): L5
L-band: CenterPoint RTX

Iridium filtering above 1616 MHz allows antenna to be used up to 20 m away from iridium transmitter

Japanese LTE filtering below 1510 MHz allows antenna to be used up to 100 m away from Japanese LTE cell tower

Digital Signal Processor (DSP) techniques to detect and recover from spoofed GNSS signals

Advanced Receiver Autonomous Integrity Monitoring (RAIM) algorithm to detect and reject problem satellite measurements to improve position quality

Improved protection from erroneous ephemeris data

Positioning Rates | 1 Hz, 2 Hz, 5 Hz, 10 Hz, and 20 Hz

## POSITIONING PERFORMANCE[1]

### CODE DIFFERENTIAL GNSS POSITIONING

| | |
|---|---|
| Horizontal | 0.25 m + 1 ppm RMS |
| Vertical | 0.50 m + 1 ppm RMS |
| SBAS[2] | typically <5 m 3DRMS |

### STATIC GNSS SURVEYING

High Precision Static

| | |
|---|---|
| Horizontal | 3 mm + 0.1 ppm RMS |
| Vertical | 3.5 mm + 0.4 ppm RMS |

Static and Fast Static

| | |
|---|---|
| Horizontal | 3 mm + 0.5 ppm RMS |
| Vertical | 5 mm + 0.5 ppm RMS |

### REAL TIME KINEMATIC SURVEYING

Single Baseline <30 km

| | |
|---|---|
| Horizontal | 8 mm + 1 ppm RMS |
| Vertical | 15 mm + 1 ppm RMS |

Network RTK[6]

| | |
|---|---|
| Horizontal | 8 mm + 0.5 ppm RMS |
| Vertical | 15 mm + 0.5 ppm RMS |

RTK start-up time for specified precisions[5] | 2 to 8 seconds

### TRIMBLE RTX™ TECHNOLOGY (SATELLITE AND CELLULAR/INTERNET (IP))

CenterPoint RTX[7]

| | |
|---|---|
| Horizontal | 2 cm RMS |
| Vertical | 5 cm RMS |
| RTX convergence time for specified precisions + Worldwide | <15 min |
| RTX QuickStart convergence time for specified precisions | <1 min |
| RTX convergence time for specified precisions in select regions (Trimble RTX Fast Regions) | <1 min |

### TRIMBLE XFILL[8]

| | |
|---|---|
| Horizontal | RTK[?] + 10 mm/minute RMS |
| Vertical | RTK[?] + 20 mm/minute RMS |

DATASHEET

# Trimble R12 GNSS SYSTEM





CE C Bluetooth

NORTH AMERICA
Trimble Inc.
10368 Westmoor Dr
Westminster CO 80021
USA

EUROPE
Trimble Germany GmbH
Am Prime Parc 11
65479 Raunheim
GERMANY

ASIA-PACIFIC
Trimble Navigation
Singapore PTE Limited
3 HarbourFront Place
#13-02 HarbourFront Tower Two
Singapore 099254
SINGAPORE

www.trimble.com

Trimble.



**COFFEY**
ENGINEERING & SURVEYING
0022 South 3rd Street • Laramie, WY 82070
www.mysurvey.com, [P] 307-742-7475  [F] 307-742-7403

# David R. Coffey, P.E. L.S.
Chief Executive Officer
dcoffey@coffey-engineering.com

**EDUCATION:**
Colorado School of Mines,
B.S. Civil Engineering – '96

**REGISTRATION:**
Professional Engineer and
Land Surveyor
Registration #9329, WY

**EXPERIENCE:**
20 Years

**PROFESSIONAL
AFFILIATIONS:**
American Consulting Engineers Council

Professional Land Surveyors of
Wyoming (PLSW)

Wyoming Association of Consulting
Engineers and Surveyors

Wyoming Engineering Society



## EXPERIENCE

Dave Coffey is CEO of Coffey Engineering & Surveying, LLC,
and has owned the third-generation company since 2004.
His professional experience spans 20 years and includes civil
engineering as well as land surveying. His civil engineering
experiences includes subdivision design, street design, water
and sewer utility design, construction contract
administration, preparation of construction plans, drafting,
site and grading design, and storm water design. He is also
familiar with geotechnical engineering.

Mr. Coffey is also a licensed land surveyor and has a
background including property boundary surveys,
topographic surveys, construction surveys, water rights and
route surveys.

## PROJECT EXPERIENCE

A variety of projects with different requirements has served
Dave well in preparation to lead a multi service consulting
company like Coffey. Dave has been a lead design engineer,
a project manager or a surveyor on:

- Big Horn Orthodontic Clinic Civil Design and
  Construction Testing – Powell, Wyoming
- Park County Forest District #1 Boundary Survey –
  Cody, Wyoming
- Bloedorn Lumber Civil Design and Construction
  Testing – Powell, Wyoming
- Maverick Convenience Store Design and
  Construction Testing – Powell, Wyoming
- Reynolds Crossing Commercial Center Civil Design –
  Laramie, Wyoming
- Prairies Edge Residential Subdivision Design and
  Construction– Laramie, Wyoming
- Snowy Range Residential Subdivision Design and
  Construction– Laramie, Wyoming

These projects and many others have provided Dave with the
diverse background necessary to become a well rounded Chief
Executive Officer for Coffey. He is able to stay in tune with daily
project functions, budget and proposal preparation, project
submittals and direct the marketing of his company. When he
needs to be called on, Dave does not hesitate to participate in
project completion and is a valuable resource to his project
teams.



EXHIBIT B

COFFEY ENGINEERING & SURVEYING, LLC FEE SCHEDULE FOR PROFESSIONAL SERVICES

Effective July 13, 2022

| Classification | Hourly Rate |
|---|---|
| Professional/Engineer/Surveyor/Project Manager VII | $255.00 |
| Professional/Engineer/Surveyor/Project Manager VI | $200.00 |
| Professional/Engineer/Surveyor/Project Manager V | $165.00 |
| Professional/Engineer/Surveyor/Project Manager IV | $150.00 |
| Professional/Engineer/Surveyor/Project Manager III | $140.00 |
| Professional/Engineer/Surveyor/Project Manager II | $130.00 |
| Professional/Engineer/Surveyor/Project Manager I | $120.00 |
| Staff Engineer/Surveyor VI | $135.00 |
| Staff Engineer/Surveyor V | $130.00 |
| Staff Engineer/Surveyor IV | $125.00 |
| Staff Engineer/Surveyor III | $120.00 |
| Staff Engineer/Surveyor II | $115.00 |
| Staff Engineer/Surveyor I | $110.00 |
| Technician VI | $110.00 |
| Technician V | $100.00 |
| Technician IV | $95.00 |
| Technician III | $85.00 |
| Technician II | $80.00 |
| Technician I | $75.00 |
| Field Crew Leader | $105.00 |
| Field Crew Technician | $80.00 |
| 1-Man Survey Crew | $135.00 |
| CAD/GIS Specialist III | $135.00 |
| CAD/GIS Specialist II | $125.00 |
| CAD/GIS Specialist I | $115.00 |
| Business Development Director | $130.00 |
| Project Support IV | $95.00 |
| Project Support III | $85.00 |
| Project Support II | $75.00 |
| Project Support I | $65.00 |
| Expert Witness | 2X rate |

Page 1 of 3

| Materials and Equipment | Cost |
|---|---|
| Aluminum Cap(s) with Rebar, 1 ½" (typical property corner) | $10.00 each |
| Aluminum Monuments, 3" (section corners/property corners) | $40.00 each |
| ATV per hour | $25.00/hour |
| Snowmobile or Tracked ATV per hour | $25.00/hour |
| UTV per Hour (two seat ATV, i.e., Polaris Ranger) | $35.00/hour |
| Drawing Plots 24" x 36" | $10.00 each |
| Drawing Plotter Paper(s), Mylar (24" x 36") | $20.00 each |
| GPS or Robotic Total Station per hour | $60.00/hour |
| Survey Materials (hubs, spikes, stakes, lath, pin flagging) | $1.00 each |
| Spatial Imaging Scanner – Trimble VX | $100.00/hour |
| Conventional Total Station per Hour | $30.00/hour |
| Vehicle per day (5 hours or more) | $55.00/day |
| Vehicle per hour | $8.00/hour |
| Mileage | $1.10/mile |
| Field Computer per hour | $10.00/hour |
| Compressive Strength Testing of Specimen (concrete, grout, mortar) | $20.00 each |
| Nuclear Density Gauge per hour | $10.00/hour |
| Core Machine per hour | $80.00/hour |
| Large Sieve Gradation | $100.00 each |
| Small Sieve Gradation with Wash Sieve | $150.00 each |
| Plastic Index Test | $100.00 each |
| Standard Proctor | $250.00 each |
| Modified Proctor | $300.00 each |
| Soil Classification | $350.00 each |
| Laboratory Testing | Cost plus 20% OR by Quotation |
| Incidental Costs (postage, UPS, copies, and other misc. costs) | Cost plus 20% |
| Subconsultant Services | Cost plus 20% |
| Additional Services | By Quotation |

- For all work requiring EPA/MSHA/OSHA health and safety training and/or medical monitoring, the above hourly rates will be increased by thirty-five percent (35%).
- Field charges commence at the time of departure from and terminate at the time of return to the principal office or to the place of lodging near the field site. Personnel breaks and/or lunch periods are not included in charges.
- Rates apply to all phases of a project, including but not limited to: travel time, standby time, project management/consultation, and report/document preparation unless noted otherwise.
- Work at a client's request or convenience that requires over 40 hours per week, on a weekend, a holiday, or as an expedited/rush request will be billed at an hourly increase of thirty-five percent (35%).
- Invoices not paid within thirty (30) days of a billing date will be billed with an interest rate of one and three quarter percent (1.75%) per month, and/or an annual rate of twenty-one percent (21%). Interest is charged on the prior month's outstanding balance. Customer agrees to pay Coffey Engineering & Surveying, LLC costs in collection of any amount due hereunder or in the enforcement of its rights against customer including, but not limited to, costs and reasonable attorney fees, whether or not suit is actually initiated.
- Fees for expert witness services are twice the hourly rate listed.

Page 2 of 3

**COVID-19 Disclaimer:**

☐ Client acknowledges and agrees that due to the dynamic and fluid nature of the coronavirus pandemic (COVID-19) (the "Coronavirus Pandemic"), Coffey may face uncertainty regarding its ability to perform the work contemplated by the Agreement in accordance with the schedule and contracted price. As a result of the Coronavirus Pandemic, the schedule, and related scope and fee, provided in the Agreement may be impacted due to issues outside of Coffey's control including, but not limited to, the following: (a) shortages in labor (including employees and consultants); (b) direction or guidance from any applicable governmental authority or applicable law that renders Coffey's or it's subconsultants' performance impossible, impracticable, or contrary to such direction or guidance; (c) delays in governmental approvals; and (d) other causes beyond Coffey's reasonable control, regardless of whether such impacts are direct or indirect.

Page 3 of 3

AA169          AA169          AA169

## AFFIDAVIT & REPORT OF JAMES H. RINEHART

December 15, 2022

James H. Rinehart, being first duly sworn upon his oath, does hereby declare under penalty of perjury that the following statements are true and correct to the best of his knowledge, information, and belief, and does depose and state as follows:

1. My name is James H. Rinehart. I am an adult person.

2. Presently I am an Associate Broker with the real estate firm of Mason & Morse Ranch Company, LLC. I associated with Mason & Morse in 2019.

3. Prior to my association with Mason & Morse, I was the owner and managing broker of Western United Realty, LLC, a Wyoming limited liability company. Western United Realty was a ranch real estate brokerage located in Wyoming. After I associated with Mason & Morse, I dissolved Western United Realty.

4. I am licensed by the Wyoming Real Estate Commission as an Associate Broker, License No. 2667. I was first licensed in Wyoming in 1991.

5. I am licensed by the Colorado Division of Real Estate as an Associate Broker, License No. EA.040016160. I was first licensed in Colorado in 1999.

6. I have been a resident of Albany County, Wyoming for over fifty-seven years, all but three years of my life.

7. During my time as a licensed real estate professional, I have been involved in the listing, marketing, sale, and closing of over one-hundred fifty ranches in the western United States.

8. Although I am licensed in Wyoming and Colorado, I have worked in many other western states by associating with licensed real estate firms in those other states.

10. Mason & Morse is based in Colorado, but operates in Arizona, Arkansas, Colorado, Kansas, Louisiana, Missouri, Montana, Nebraska, New Mexico, North Carolina, Oklahoma, Oregon, South Dakota, Texas, and Wyoming.

11. Mason & Morse provides real estate services in a wide variety of settings, including farms, vacant land, ranches, grazing land, horse properties, hunting properties, fishing properties, timberland, forest property, ranchettes, and country estates.

12. During the entire time I have worked as a licensed real estate professional, I have worked almost exclusively in rural real property transactions and ranch real property transactions.

1

In my work with Mason & Morse I have continued to focus on ranch properties and rural real property parcels.

13. As a real estate broker, I work with both buyers and sellers.

14. As a Wyoming native and a lifelong resident of southeast Wyoming, I am familiar with the checkerboard pattern of land ownership, both in Wyoming and other western states.

15. The checkerboard land ownership pattern has been an issue in many of the ranch and rural property transactions I have been involved in.

16. In 2005, I assisted Iron Bar Holdings, LLC in the purchase of the Elk Mountain Ranch located near the town of Elk Mountain, Wyoming.

17. Additionally, I worked with the member of Iron Bar Holdings, LLC, Fred Eshelman, on the purchase and sale of other ranch properties in Carbon County, Wyoming.

18. I have had continual contact and association with Mr. Eshelman since Iron Bar Holdings, LLC bought the Elk Mountain Ranch in 2005. I worked with Mr. Eshelman concerning not only real estate matters but also worked on other issues related to the ranch, such as providing input on ranch management issues, conservation easement issues, wildlife management issues, exchange issues and the like.

19. I am actively involved in hunting and wildlife issues, on a voluntary basis by associating with wildlife conservation organizations and occasionally working as a licensed big game hunting guide.

20. I am familiar with the "corner crossing" issue that is the focus of the Wyoming federal court case, Iron Bar Holdings, LLC v. Cape, Smith, Yeomans, and Slowensky.

21. While the corner crossing issue in this case is focused on the checkerboard area, corner crossing is also an issue outside of the checkerboard where private lands border lands owned by a government agency such as a local government, county, state, or the various federal land management agencies such as the Bureau of Land Management, United States Forest Service, National Park Service, and U.S. Fish and Wildlife Service. Additionally, while corner crossing is commonly encountered in the corners of private-public lands, corner crossing could be an issue with privately-owned lands that share corners.

22. The corner crossing issue is not just in the checkerboard pattern of southern Wyoming, as there are multiple public land patterns where a person could access public lands and then move further into a ranch via the corner crossing idea. Thus, I've taken some time to look over several other areas where corner crossing could affect property values, so as to have a broader picture.

2

23. Having sold ranches for over thirty years both with, and without, interspersed public lands (and thus corner crossing issues), there is no doubt that those without interspersed public lands will be in higher demand, and thus have a higher value, with other parts of the valuation being somewhat equal.

24. I have dealt with the corner crossing issue my entire real estate career. Over the years, the vast majority of potential sellers and potential buyers have expressed concern that corner crossing is a primary factor to consider in determining what price a ranch property should be listed for sale, or the price that a buyer should offer when making a purchase offer. Only a small minority of potential sellers/buyers have considered corner crossing to be a minor concern.

25. One point of this issue that will be considered by a ranch buyer is the extra miles of private land boundary that must be patrolled or controlled in the face of increased public access. A number of public citizens will disregard private land boundaries (in areas other than corners) once on public land inside the outer boundary of the ranch, creating extraordinary hardship on the private landowner in many ways by forcing them to patrol much more of their property than would otherwise be the case.

26. Additionally, corner crossing impacts the wildlife resources, as chopped-up access issues from corner crossing will cause increased habitat fragmentation, and could be considered a de-facto subdivision if every other section would have to be considered its own property for control work.

27. As a general opinion, based on my experience as a licensed real estate professional for over thirty years, if a rural or ranch property is subject to forced/lawful corner crossing, such could impact the value at which a client and I would determine to list the property for sale, or the price to make in an offer to purchase.

28. While corner crossing in this case is focused on the hunting activities of the four Missouri hunters who are the defendants, in my experience, corner crossing also involves other activities such as fishing, camping, hiking, antler hunting, scenic touring, climbing, and other various outdoor recreation activities. Corner crossing is also an issue for landowners dealing with or contending with access by various organizations that gather data on wildlife, livestock grazing, range conditions, mineral and oil and gas resources, and other natural resources.

29. I was asked by Iron Bar Holdings, LLC to provide my opinion about the impacts of corner crossing on the listing, marketing, sale, and closing of rural and ranch properties, specifically focusing on the impact of corner crossing on the Iron Bar Holdings, LLC Elk Mountain Ranch.

30. During my work in rural and ranch real estate transactions, it is common for me to analyze how hunting/fishing/recreational use issues and roads, easements, fences, neighboring private lands, neighboring public lands, trespass issues, boundary issues, and land ownership patterns affect the value of real property with respect to listing, marketing, and sale of the property.

3

31. Additionally, I am familiar with issues relating to potential subdivision of real estate, the use of conservation easements, and how those issues affect the marketing and sale of the property.

32. Both in my real estate profession and in my experience with hunting, fishing, and wildlife conservation issues I have long dealt with the impact of trespassing on properties. Additionally, I have been involved in patrolling property boundaries to attempt to prevent trespass and damages associated with trespass.

33. As part of my work in preparing this report, I consulted with other licensed real estate professionals and discussed the issue with landowners about the impact of corner crossing in the listing, marketing, and sale of rural and ranch properties.

34. In the event a court declares that corner crossing is legal, such a ruling would negatively impact my ability as a licensed real estate broker to list, market, and attempt to sell rural and ranch properties.

35. I am familiar with the fact that Iron Bar Holdings, LLC estimated that the value of its real property could be negatively impacted anywhere from ten to twenty-five percent in value if forced corner crossing is declared lawful.

36. In my opinion, my ability as a licensed real estate professional to market and sell the Elk Mountain Ranch if forced corner crossing is declared legal would be impacted by at least twenty-five percent, perhaps as high as thirty percent.

37. Thus, if I were approached to list, market, and attempt to sell the Elk Mountain Ranch owned by Iron Bar Holdings, LLC, if a court were to declare that Iron Bar Holdings must allow corner crossing, it would be my advice to list the property at a discount of at least thirty percent (30%) from the appraised or perceived value of the ranch before taking corner crossing impacts into account.

38. Depending on the situation and the number of corners, a landowner desiring to sell its property might need to reduce the listing price even more.

39. I have not written or authored any publications in the real estate field within the last ten years.

40. I have not testified as an expert witness at a trial or deposition at any time in the last four years.

41. The compensation I am being paid for this matter is $200.00 per hour, plus reimbursement of mileage, costs, and expenses. I do not require any special accommodations for the giving of testimony.

42. A short bio summarizing my career is attached hereto as Exhibit A.

4

All of the opinions and conclusions I make in this report and affidavit are based on a reasonable degree of certainty in the real estate profession, and are of the type that I commonly review and rely upon in my profession as a licensed real estate broker.

FURTHER AFFIANT SAYETH NAUGHT.

Dated this _15_ day of December, 2022.

James H. Rinehart

STATE OF ARIZONA    )
                    )ss.
COUNTY OF _La Paz_ )

The foregoing document was subscribed and sworn (or affirmed) to before me on the _15_ day of December, 2022, by James H. Rinehart.

Witness my hand and official seal.

_____
*Signature of Notarial Officer*
*Title:* Notary Public

My Commission Expires: 7 - 31 - 23

Notary Public State of Arizona
La Paz County
Linda M Darland
My Commission Expires 07/31/2023
Commission Number 565061

SEAL

5

# JAMES RINEHART

Associate Broker & Principal Owner

- 265 N 4th Street, Laramie, Wyoming, USA
- 1-307-459-0035

*"I cannot think of another thing I would rather do than be able to show clients the wonderful attributes Wyoming has to offer and help facilitate their farm, ranch, recreational land real estate transactions. "*

## About James Rinehart

As an avid hunter and a desire to call Wyoming home, James Rinehart obtained his real estate license in 1991, and he knew his focus would be on rural farm, ranch and recreational real estate brokerage throughout Wyoming.

After more than 27 successful years in the ranch real estate brokerage business, an opportunity presented itself to merge resources with Mason & Morse Ranch Company. The changing dynamics of land brokerage and James's commitment to provide his experience and effective marketing services for clients were key decision factors in selecting Mason & Morse Ranch Company as a partner.

In today's land brokerage environment how properties are marketed requires personal knowledge and experience to understand accurately a property's special characteristics that bring value. It also requires a greater geographical marketing reach to provide the best marketing services for clients.

When the opportunity to merge with Mason & Morse Ranch Company presented itself, James knew it was the right time and a great match. He recently made the choice to merge his firm, Western United Realty, and resources with Mason & Morse Ranch Company and team of like minded and experienced land brokerage professionals.



Exhibit A

With roots dating back to 1961 Mason & Morse Ranch Company has long been an outstanding brokerage firm throughout Colorado, Wyoming and the American west.  Combining resources will further enable Mason & Morse Ranch Company to enhance client services in Wyoming with the addition of James Rinehart's years of experience, honesty, integrity and respect in the industry.

James's satisfaction as a farm and ranch broker stems from helping improve wildlife habitat and wide-open spaces through the sales of quality hunting and fishing properties utilizing conservation practices.  Over the years the opportunities to be involved in conservation ranch brokerage has increased.  James has been involved in approximately 75,000 acres of conservation easement related transactions for buyers and sellers, either through the sale of eased ranches, the placement of easements after the sale or lands being placed under permanent protection.

In addition to conservation practices, James has taken pride in his ability to showcase the details of ranch properties better than most, and to facilitate the necessary due diligence ensuring those details are brought forward at an early stage in the transaction process for buyers and sellers.

**Professional Experience and Affiliations**

- Licensed in Wyoming and Colorado
- Twenty seven years of Real Estate experience, all of those specializing in the ranch brokerage business
- Owner and Broker Western United Realty, Laramie Wyoming
- Board of Directors, First Interstate Bank, Laramie
- Board of Directors, Wyoming Wild Sheep Foundation
- Life member, Wild Sheep Foundation
- Life Member, Habitat Partner, Rocky Mountain Elk Foundation
- Education: Bachelor of Science 1986, Business Administration, University of Wyoming
- Owner and Founder of www.ranchbrokers.com

www.ranchland.com/all-brokers



February 15, 2023

## REPORT OF WILLIAM R. FEHRINGER, P.L.S., CFEDS

My name is William R. Fehringer and have been employed at Civil Engineering Professionals, Inc. (CEPI), 6080 Enterprise Drive, Casper, Wyoming since 1985. I have been the survey manager at CEPI for over 25 years. I have been in the land surveying profession for over 40 years. I was licensed as a professional Land surveyor in Wyoming in 1988. I am also licensed in Montana, Colorado and North Dakota. I have been licensed as a Certified Federal Land Surveyor #1427 since 2011. My current curriculum vitae/resume, my expert witness rate sheet, and my past experience providing testimony in other matters follows this report.

I have been asked to provide some information on the Public Land Survey System (PLSS) in Wyoming.

The Public Land Survey System was established by the Land Ordinance of 1785. The Ordinance set up a standardized system where settlers could purchase title to farmland in the undeveloped west. Land was to be surveyed into townships that are six miles on each side. Each township was to be divided into thirty-six sections that are one mile square, encompassing approximately 640 acres. The initial point for the PLSS is where Ohio, Pennsylvania and now West Virginia met on the north shore of the Ohio River. The PLSS surveys originated at that location and expanded to the west from there.

The official surveys of the PLSS are called cadastral surveys. Cadastral surveys deal with the ownership of land. They *"create, mark, retrace or reestablish the boundaries and subdivisions of the public lands of the United States."* (Glossary of BLM Surveying and Mapping Terms, pg. 10). Cadastral surveys cannot be repudiated, altered, ignored or corrected. The boundaries created by them cannot be changed. (BLM 2009 Manual of Surveying Instructions, pg. 8). Through my experience and training as a professional land surveyor as well as continuing education courses relating to land surveying I have attended and completed, I have become familiar with the Land Act of February 11, 1805 (2 Stat. 313; 43 U.S.C. § 752), which codified the principles of the PLSS into federal law and remains highly significant for all land surveyors. (Cazier, pgs. 47-49) According to the current version of the United States Department of Interior, Bureau of Land Management's Manual of Surveying Instructions, the 1805 Act, codified as 43 U.S.C. § 752, provides that original corners established by a cadastral survey *"shall forever remain fixed in position, even disregarding technical errors which may have passed undetected before acceptance of the survey."* (BLM 2009 Manual of Surveying Instructions, pg. 105, § 4-2).

Typically surveying instructions for the early cadastral surveys were provided by the Surveyor General to the cadastral surveyors in the field. In the 1830's detailed instructions were issued by the Commissioner of the General Land Office for surveys and plats. These instructions were then bound by individual Surveyors General for use in the field by the deputy surveyors. From these instructions the Manual of Surveying Instructions evolved. The BLM Manual of Surveying Instructions represents a critical source every surveyor of public lands should refer to when surveying or retracing public lands. The Manual has been through several publications starting in 1851. Editions include the versions published in 1855, 1881, 1890, 1894, 1902, 1930, 1947, 1973, and the current edition in 2009.

The cadastral surveys reached Wyoming in the early 1870's. The township lines of T.20N., R.81W. were surveyed in August, 1877. The interior section lines of this township were surveyed

Civil Engineering Professionals, Inc.
6080 Enterprise Dr. • Casper, WY 82609
Phone 307.266.4346 • Fax 307.266.0103
www.cepi-casper.com

at the same time. The official maps and field notes of these surveys are attached in Exhibit 2 to this report. The township lines of T.20N., R.82W. were also surveyed in August, 1877. The interior section lines were surveyed in July, 1878. The official maps and field notes of these surveys are attached in Exhibit 1 to this report. The original survey calls out that granite stone monuments, with the required markings, were used in marking the actual corner locations.

During the early years of the PLSS cadastral surveys, the section corners were monumented using a variety of different materials. The surveyors used wood posts, pits, stones, trees, mounds, dinosaur bones and almost anything else they could find in the area. Eventually wood posts and pits, or mounds, were discontinued because they have a tendency to deteriorate over time. The most common markers in these areas were stone. Each stone section corner monument would have a specific series of notches, or grooves, on the stone faces depending on where it was located within the township.

Corners and monuments do not have the same meaning. Many times, these terms are used interchangeably, but, in the context of surveying, they are different. A corner is an exact point determined by a surveying process. A monument is a physical object placed to mark the corner location.

For the purposes of my report and this particular case, it appears that there are seven corners in question. These corners are listed below:

1. Section 14, T20N, R82W and Section 24, T20N, R82W, 6th P.M.
2. Section 24, T20N, R82W and Section 26, T20N, R82W, 6th P.M.
3. Section 24, T20N, R82W and Section 30, T20N, R81W, 6th P.M.
4. Section 30, T20N, R81W and Section 36, T20N, R82W, 6th P.M.
5. Section 36, T20N, R82W and Section 6, T19N, R81W, 6th P.M.
6. Section 32, T20N, R81W and Section 28, T20N, R81W, 6th P.M.
7. Section 32, T20N, R81W and Section 28, T20N, R81W, 6th P.M.

In researching the BLM survey records, I found that when these townships were originally surveyed in 1877 and 1878, as mentioned above, the corners were monumented with granite or sandstone objects. They also referenced these monuments with pits dug alongside the stones or a mound of stones alongside the corner. The type of reference would depend on the location of the corner and if additional stones were available to create a mound. The mound of stone was preferred as they are more durable than a pit. The pits have a tendency to blow in over the years and become difficult to find over the years. The monuments placed at the above listed corner locations, according to the original field notes, are listed below:

**Corner #1:  Section 14, T20N, R82W and Section 24, T20N, R82W, 6th P.M.**
    A granite 18 x 10 x 9 set 12 in deep with pits mkd 1 notch on E side and 3 notches on S edge for cor to Secs 13, 14, 23 and 24.  (Exhibit 1, EXP000013)

**Corner #2:  Section 24, T20N, R82W and Section 26, T20N, R82W, 6th P.M.**
    A granite 19 x 6 x 4 set 13 in deep with pits mkd 1 notch on E side and 2 notches on S edges for cor to Secs 23, 24, 25 and 26. (Exhibit 1, EXP000009)

**Corner #3:  Section 24, T20N, R82W and Section 30, T20N, R81W, 6th P.M.**
    Sandstone 18 x 12 x 4 with pits set 12" deep and mkd 2 notches on S and 4 notches on N side for cor to Secs 19, 20, 24 & 25. (Exhibit 1, EXP000030)

**Corner #4:  Section 30, T20N, R81W and Section 36, T20N, R82W, 6th P.M.**
    Sandstone 19 x 16 x 10 in with pits set 13" deep and marked 1 notch on S and 5 notches on N side for cor to Secs 30, 31, 25 & 36.  (Exhibit 1, EXP000029)



Civil Engineering Professionals, Inc.
6080 Enterprise Dr. • Casper, WY 82609
Phone 307.266.4346 • Fax 307.266.0103
www.cepi-casper.com

**Corner #5:  Section 36, T20N, R82W and Section 6, T19N, R81W, 6th P.M.**
Granite stone 30 x 19 x 15 in mound of stone, set 20" deep and marked 6 notches on N., S., E., W. sides for corner to Twp 19 & 20 N, Rg 81 & 82 West (Exhibit 1, EXP000026, EXP000028).

**Corner #6:  Section 32, T20N, R81W and Section 28, T20N, R81W, 6th P.M.**
A granite stone 20 x 16 x 4 with pits set 15" deep and mkd 1 notch on S and 5 notches on E edges for cor to Secs 29, 30, 31 & 32.  (Exhibit 2, EXP000071, EXP000084-85)

**Corner #7:  Section 32, T20N, R81W and Section 28, T20N, R81W, 6th P.M.**
Granite stone 20 x 18 x 10 with pits, set 15" deep and mkd 1 notch on south and 4 notches on east edges for cor to Secs 28, 29, 32 & 33.  (Exhibit 2, EXP000058, EXP000081)

Exhibit 3, attached to this report, includes several photographs of original stone monuments from other surveys I have been involved in.  These **are not** photographs of the corners discussed above.  They are included as a reference only, to provide an example of how these original corner monuments appear and might have been placed.

During the original survey there were no marks placed on these stone monuments to depict the actual location of the corner location.  Typically, when surveying to these stone monuments a surveyor will measure to a prominent feature on the stone, such as a high point on the top of the rock.  If there is nothing prominent the surveyor may go to the center on the top of the stone.  To my knowledge there is nothing in the BLM Manual that instructs the surveyor where to survey to on an original stone monument.

In 1967, the BLM authorized dependent resurveys of T20N, R81W and T20N, R82W.  A dependent resurvey is *"a reconstruction of land boundaries and subdivisions accomplished by rerunning and re-marking the lines represented in the field note record or on the plat of a previous official survey."*  (BLM 2009 Manual of Surveying Instructions, pg. 129).  Portions of these two townships were resurveyed at this time.  These resurveys were in the areas of the corners in question.  There was also a dependent resurvey of Section 14, T20N, R82W authorized in 2012.  The southeast corner of Section 14, referenced above as corner #1, was located in this survey and noted as the government brass cap set in the 1967 resurvey. The official notes and maps created from these resurveys are attached to this report as Exhibits 1 and 2.

The official maps and field notes of the original surveys and dependent resurveys of the public lands are public information.  They can be found on the Bureau of Land Management website: www.wy.blm.gov/cadastral/products.htm.  All of the BLM mapping and field notes attached to this report were obtained between January and February 2023 from the BLM's official website.

During the dependent resurveys mentioned above, most of the original corner monuments were located.  In these locations, a standard BLM brass cap was placed.  According to the original notes of the 1967 resurvey *"All field corner positions described in these field notes, unless otherwise stated, are monumented with the Bureau of Land Management's standard iron post cadastral survey monument, consisting of an inscribed die-cast brass cap, permanently mounted on a galvanized iron pipe, 29 ins. Long, 2½ ins. diameter."* (Exhibit 1, EXP000035).  The original stone monuments were then buried alongside the brass cap.  In locations where the original stone monuments were not found, the corner locations were re-established by using the nearest original corners.  These actions were all explained and described in the BLM field notes for the resurvey.



Civil Engineering Professionals, Inc.
6080 Enterprise Dr. • Casper, WY 82609
Phone 307.266.4346 • Fax 307.266.0103
www.cepi-casper.com

It is my opinion that, based upon the BLM 2009 Manual of Surveying Instructions and associated legal practices regarding land surveying, the original monuments placed at each of the corners at issue in this case during the original survey in 1877 and 1878 fixed the position of the corner of the property lines according to the PLSS. The current brass cap monuments installed during the dependent resurveys in 1967 and, in one case resurveyed in 2012, simply re-monumented these corners, but did not and could not alter the position of the corners.

I further understand that airspace, airspace boundaries, and ownership of airspace are at issue in this case.

According to the Glossary of BLM Surveying and Mapping Terms, the definition of land surveying is *"surveying of areas for their correct determination and description and for conveyancing, or for the establishment or re-establishment of land boundaries and the plotting of lands and subdivisions thereof."* (Glossary of BLM Surveying and Mapping Terms, pg. 35)

Nothing that I have found references any connection between land surveying and the airspace above the earth, and, in my own training and experience, surveying practices are tied to the surface of the land and features upon the surface of the land alone. There are zoning requirements inside city limits that might have some restrictions on height of buildings. These zoning requirements apply primarily to residential or commercial properties in developed areas – for example, someone cannot build an extremely tall building that is out of character with the rest of the neighborhood, and block another landowner's view, access to solar, and so on. There are some surveys that refer to airspace, but these surveys are mostly used in the discussion of condominiums and the ownership of units within the walls of the building.

In my opinion, land surveys do not apply to, refer to, or govern the ownership of airspace above the surface of the land. I know of no practice or methods in the land surveying profession to establish airspace boundaries through the PLSS.

Finally, in reviewing the survey report prepared by David R. Coffey, PLS, in this case, which was dated December 15, 2022, I understand that Mr. Coffey has provided survey coordinates for three corners that he was able to travel to in November, 2022, before weather and snow stopped his survey. Mr. Coffey has pictures and information of the monuments included in his report for corners 1, 2 & 3. He also provides coordinates he acquired from the OnX Maps program in the field and states these were obtained by hand in the field centered on the section corner. The difference between the surveyed coordinates and the OnX Maps coordinates ranges between 5 and 6 feet. I understand some of the defendants were using the OnX Maps feature to assist them in navigating the public lands in the Elk Mountain area of Carbon County, Wyoming. Based on Mr. Coffey's findings and report about the difference between the coordinates produced by the OnX Maps feature and the actual survey coordinates for the three corners he identified, it is my opinion that the OnX Maps feature would have guided the defendants to within 5 or 6 feet of the corners in question. It is my further opinion, based on my experiences searching for corners or corner monuments in the field over the past 40 years, the 5 or 6 foot proximity to the actual corners provided by the OnX Map feature should be close enough for a person, such as the defendants, to locate the actual corner monuments with the person's naked eye and to cross the land at the monuments themselves.

## REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK



Civil Engineering Professionals, Inc.
6080 Enterprise Dr. • Casper, WY 82609
Phone 307.266.4346 • Fax 307.266.0103
www.cepi-casper.com

**AA180**     **AA180**     **AA180**

In preparing this report, I consulted with David Fehringer, Wyoming PE & LS #10052, fes@wyoming.com., 307-349-0840., and Bradley D. Neumiller, Wyoming LS #13836, bneumiller@cepi-casper.com, 307307-251-0891.

**DATED this 15th day of February, 2023.**

William R. Fehringer, P.L.S., CFEDS

STATE OF WYOMING      )
                                         )ss.
COUNTY OF NATRONA   )

On this 15th day of February, 2023, William R. Fehringer appeared before me and verified and affirmed under oath that he had read the above *Report,* and that the same is true to the best of his knowledge, information and belief.

Witness my hand and official seal.

NOTARY PUBLIC
**LINDSEY OLIVER**
STATE OF WYOMING
COUNTY OF NATRONA
My Commission Expires April 19, 2024

NOTARY PUBLIC

My Commission Expires

April 19, 2024

References:   BLM 1973 and 2009 Manual of Surveying Instructions
                    Surveys and Surveyors of the Public Domain 1785-1975
                        Lola Cazier, University of Michigan Library
                    Glossary of BLM Surveying and Mapping Terms



Civil Engineering Professionals, Inc.
6080 Enterprise Dr. • Casper, WY 82609
Phone 307.266.4346 • Fax 307.266.0103
www.cepi-casper.com

**AA181**                          **AA181**                          **AA181**



**Name,** William Fehringer
Principal – Survey Manager
**Civil Engineering Professionals, Inc. (CEPI)**

**Project Role:** Vice President, Survey Manager, Professional Land Surveyor
**Education:** NORTHEAST TECHNICAL COMMUNITY COLLEGE, NORFOLK, NEBRASKA
        A.S. IN ENGINEERING, 1977

**Licensure:** PROFESSIONAL LAND SURVEYOR, WYOMING L.S. NO. 5528
        PROFESSIONAL LAND SURVEYOR, COLORADO L.S. NO. 31152
        PROFESSIONAL LAND SURVEYOR, MONTANA L.S. NO. 15295
        PROFESSIONAL LAND SURVEYOR, NORTH DAKOTA L.S. NO. 6856
        CERTIFIED FEDERAL SURVEYOR, REGISTRATION NO. 1427

**Experience and Expertise** Mr. Fehringer has over 40 years of experience in land surveying.   He has been responsible for surveying and field coordination for Civil Engineering Professionals, Inc. since 1999.   Mr. Fehringer has been managing up to three survey crews on numerous projects.  His responsibilities include preliminary field evaluation, site and topographic surveying, easement surveying and preparation, boundary calculations, water, sewer and oil/gas pipeline layout and alignments, and all levels of construction staking and cadastral surveys. Mr. Fehringer also works closely with landowners, developers and City and County staff in the preparation and layout of subdivision plats, site plans and road and highway permits and licenses.

- In the mid 1980's Mr. Fehringer was the lead survey crew chief on several U.S. Forest Service projects in Oregon, Idaho and South Dakota.  These projects involved retracing the boundaries between U.S.F.S land and private property.  During the two years of working on these projects, Bill managed up to three survey crews in several states.  It required retracing hundreds of miles of section lines, remonumenting over three hundred section corners and scribing countless new bearing trees.

- In 2009 Bill was the lead surveyor in charge on the Dunlap Wind Energy Project at the Dunlap Wind Farm in Carbon County.  CEPI prepared an ALTA survey for the 19,000 acre Dunlap Ranch, which was purchased by Pacificorp.  This project involved retracing, searching for and/or monumenting over 120 section corners in fifteen sections in four townships and ranges.

- In 2010 Bill Fehringer began a retracement project in northeast Montana along the North Dakota state line.  We retraced every section line in one and a half townships.  As a result, we located, and/or remonumented almost every section corner and quarter corner in these townships.  Many of the corners were the original stone monuments from the GLO survey in the late 1800's.  We also found, and had to deal with, numerous cases of double monumentation due to the original corners being buried two to three feet below the surface and not having been excavated for many years.  This was a very interesting and exciting project.

Civil Engineering Professionals, Inc
6080 Enterprise Dr. • Casper, WY 82609
Phone 307.266.4346 • Fax 307.266.0103
www.cepi-casper.com

- Between 2012 and 2014, Bill Fehringer was the project manager for the surveying, layout and construction staking for a rail loadout facility west of Casper, Wyoming near the Casper/Natrona County International Airport. This project involved the topographic and construction surveying of the entire area for the rail loadout facility, which included several miles of rail, six large storage facilities, interior piping between the storage tanks and a six mile crude oil transmission line. CEPI worked with the Owners, design engineers, landowners and numerous Contractors to bring this Project to completion. Not only did CEPI provide all the construction staking for the rail facility and storage tanks but we also selected the pipeline alignment, negotiated with landowners for easements and prepared the easements. We worked with Natrona County and Union Pacific Railroad for crossing permits and even got the railroad to abandon a portion of old track and deed it to the County. We staked out the pipeline and performed a portion of the as built surveying during construction.

- In December, 2014, the United States Department of Defense was under contract to sell the Teapot Dome Naval Preserve near Midwest, Wyoming. The purchasers were required to provide an ALTA survey of the property and it had to be completed by the end of the year. CEPI retraced the boundary of the over 9000 acre Naval Preserve and located and/or monumented over 110 property corners. The project also involved utilizing available GIS mapping to verify hundreds of miles of existing roads, pipelines, power lines, easements and over 1000 existing well pads. The initial exhibit was submitted for review before Christmas and finalized the first week in January.

- In 2018, CEPI was asked by Black Hills Energy to assist in the planning, layout and construction of two miles of a 6" HDPE natural gas pipeline along Force Road in Campbell County, Wyoming. Bill was the Project Manager on this project which included selecting the alignment, contacting landowners, preparing easements and negotiating with the landowners for easement payments. Mr. Fehringer worked closely with the City of Gillette, Campbell County Road & Bridge, landowners and BHE personnel in the acquisition of the easements and permits necessary to construct the project. CEPI also provided the construction staking requested by BHE and the Contractor.

- In November, 2017, Black Hills Energy contracted with CEPI to assist with the layout and surveying of the 35 mile natural gas pipeline project from Natural Bridge Road in Converse County to Casper, Wyoming. CEPI utilized aerial mapping and our knowledge of the area and selected an alignment for the pipeline. We then worked closely with the landowners to acquire access to begin the surveying process of the entire alignment. CEPI also contacted the utility and pipeline companies for locates so they could be accurately shown in the base mapping. Easements for approximately 25 landowners were prepared and provided to BHE for negotiations. Bill worked with BHE right-of-way and engineering departments, the design engineers and the project managers to complete the design of this project. Once the design was completed and accepted by BHE, CEPI was contracted to provide the construction staking for the 35 mile pipeline. We staked out the entire easement alignment and provided 2 to 3 inspectors and survey crews to collect all the necessary data for the installation of this 12" diameter welded steel pipeline. We also provided all the as constructed data to the design engineers for the record drawings of the project.



Civil Engineering Professionals, Inc
6080 Enterprise Dr. • Casper, WY 82609
Phone 307.266.4346 • Fax 307.266.0103
www.cepi-casper.com



**2023 Schedule of Fees**

**ENGINEERING SERVICES**

| | |
|---|---|
| PRINCIPAL: | $200.00/hr |
| SENIOR PROJECT MANAGER: | $185.00/hr |
| PROJECT MANAGER: | $170.00/hr |
| EXPERT WITNESS | $150.00/hr |
| DESIGN ENGINEER: | $150.00/hr |
| LANDSCAPE ARCHITECT: | $160.00/hr |
| LANDSCAPE DESIGNER | $145.00/hr |
| AUTOCAD TECHNICIAN (Includes Computer Charges): | $125.00/hr |
| ENGINEERING TECHNICIAN: | $100.00/hr |
| RESIDENT PROJECT REPRESENTATIVE (Construction Monitor): | $100.00/hr |
| SURVEY MANAGER: | $150.00/hr |
| SURVEYOR LS: | $140.00/hr |
| SURVEYING TECHNICIAN: | $115.00/hr |
| SURVEY CREW (2 Man with GPS/Robotic Equipment): | $185.00/hr |
| DRONE SURVEY: | $300.00/hr |
| WORD PROCESSING/OFFICE ADMINISTRATION: | $65.00/hr |

**EQUIPMENT AND OTHER CHARGES**

| | |
|---|---|
| VEHICLE CHARGES: | $75.00 per day plus $0.75 per mile |
| FOUR-WHEELER | $140.00 per day |
| COPIES, PRINTS, ETC. | Invoice Cost |
| CONSULTANTS: | Invoice Cost + 10% |
| PER DIEM: | $40.00 per day/per person |
| TRAVEL EXPENSE: | Invoice Cost |

Civil Engineering Professionals, Inc.
6080 Enterprise Dr. • Casper, WY 82609
Phone 307.266.4346 • Fax 307.266.0103
www.cepi-casper.com



**PREVIOUS FOUR (4) YEARS OF EXPERT TESTIMONY OF WILLIAM R. FEHRINGER, P.L.S., CFEDS**

2018 – *D'Elia Family Trust and Wagonhound Land & Livestock, LLC v. Little Medicine Creek Ranch, Inc.*, Civil Action No. 34080 (expert witness testimony at deposition)

2022 – *Wagonhound Land & Livestock, LLC v. Boot Ranch, LLC*, Civil Action No. 18204 (non-expert witness testimony at deposition)

Civil Engineering Professionals, Inc.
6080 Enterprise Dr. ▪ Casper, WY 82609
Phone 307.266.4346 ▪ Fax 307.266.0103
www.cepi-casper.com

M. Gregory Weisz, Wyo. Bar No. 6-2934
Crystal D. Stewart, Wyo. Bar No. 7-6057
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386 telephone
gweisz@penceandmac.com
cstewart@penceandmac.com
Plaintiff's Attorneys

# UNITED STATES DISTRICT COURT

# DISTRICT OF WYOMING

| | | |
|---|---|---|
| IRON BAR HOLDINGS, LLC, a North Carolina limited liability company registered to do business in Wyoming, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 22-CV-00067-SWS |
| BRADLY H. CAPE, an individual, ZACHARY M. SMITH, an individual, PHILLIP G. YEOMANS, an individual, and JOHN W. SLOWENSKY, an individual, | ) ) ) ) ) | |
| Defendants. | ) | |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW Plaintiff, Iron Bar Holdings, LLC, by and through its attorneys M. Gregory Weisz and Crystal D. Stewart of Pence and MacMillan LLC, and pursuant to Fed. R. Civ. P. 56(a), hereby respectfully moves the Court to enter an order granting partial summary judgment in favor of Plaintiff and against Defendants on its claims sounding in civil trespass. Plaintiff makes this *Motion* on the grounds and for the reasons as follows:

1.      This case is a declaratory judgment and civil trespass action in which Plaintiff seeks a declaration from the Court that the Defendants committed multiple civil trespasses on, over, and/or through Plaintiff's real property. The basis for Plaintiff's civil trespass claims is that

1

Defendants carried out so-called "corner crossings" whereby they intentionally and knowingly traveled from real property managed by the United States Department of Interior Bureau of Land Management ("BLM"), across/through Plaintiff's real property and then onto BLM-managed land in an area in Carbon County, Wyoming commonly known as the "checkerboard." Notably, however, some of the real property not owned by Plaintiff where the Defendants crossed corners *is not* federal public land, but is land owned by the State of Wyoming or the Town of Hanna, Wyoming.

     2.     Plaintiff respectfully requests this Court enter an order:

     A.     Declaring that Plaintiff owned both the surface of the real property and the airspace above that surface at the eight different locations where the Defendants purposely crossed over four section corners (and that at each of the eight separate locations, Plaintiff owned two of those sections);

     B.     Declaring that the airspace above the surface of Plaintiff's real property is owned by Plaintiff Iron Bar Holdings, LLC as part of its fee simple ownership of real property;

     C.     Declaring that Plaintiff possessed and/or had the right to exclusively possess and control the airspace above the surface of all of its real property as described in Exhibit 1 at each of the eight separate corner locations;

     D.     Declaring the Defendants' actions in crossing over the eight separate corner locations -- when Plaintiff possessed/had the right to possess and control the airspace over its two sections of land at each such location -- were each separate acts of civil trespass, as to which Plaintiff is entitled to prove damages at trial for each such trespass;

E.       That to the extent the Defendants might claim their civil trespasses were somehow privileged, that they bear the burden of proof at trial of any such assertions.

F.       That with respect to the above requests for relief, the Court determine there are no genuine issues of material fact as to these requests for relief and that Plaintiff is entitled to judgment as a matter of law with respect to each such request, and

G.       Granting such other relief as the Court deems just, equitable, and appropriate under the circumstances.

3.       In support of this *Motion for Partial Summary Judgment* and incorporated herein by this reference on even date herewith, Plaintiff submits its *Memorandum in Support of Motion for Partial Summary Judgment*.

4.       The exhibits in support hereof are as follows:

Exhibit 1:                   Warranty Deed to Iron Bar Holdings, LLC, November 18, 2005

Exhibit 2:                   Photo of corners 23/24/25/26 taken by one of the Defendants

Exhibit 3:                   Photo of corners 25/30/31/36 taken by one of the Defendants

Exhibit 4:                   Photo of corners 1/6/31/36 taken by one of the Defendants

Exhibit 5a
and Exhibit 5b:        Photo of corners 25/26/35/36 taken by one of the Defendants

Exhibit 6:                   Photo of corners 5/6/7/8 taken by one of the Defendants

Exhibit 7:                   Photo of corners 5/6/31/32 taken by one of the Defendants

Exhibit 8:                   Demonstrative map that depicts the eight locations where the Defendants crossed corners

Exhibit 9:                   Photo of the step ladder Defendants used in 2021

Exhibit 10:                 November 5, 1997 Interior Department memorandum

Exhibit 11:                 Sample photograph of a stile from Wikipedia Commons

3

Exhibit 12:          Access Tips for Hunting on BLM Lands, Bureau of Land Management, BLM Colorado State Office, August 29, 2013

The undersigned certifies that the exhibits described above are true and correct copies of the originals of each document, to the best knowledge, information, and belief of the undersigned. Per U.S.D.C.L.R. 7.1(c)(1), each exhibit is separately attached to the above-described memorandum.

RESPECTFULLY SUBMITTED this 12th day of April, 2023.


   /s/ M. Gregory Weisz
M. Gregory Weisz, Wyo. Bar No. 6-2934
Crystal D. Stewart, Wyo. Bar No. 7-6057
PENCE AND MACMILLAN LLC
P.O. Box 765
Cheyenne, WY 82003
(307) 638-0386
(307) 745-8669 fax
gweisz@penceandmac.com
cstewart@penceandmac.com
Plaintiff's Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of April, 2023, a true and correct copy of the above and foregoing document was served by CM/ECF upon the following:

Ryan A. Semerad, Wyo. Bar No. 7-6270
The Fuller & Semerad Law Firm
242 South Grant Street
Casper, WY 82601
*Defendants' Attorney*

Alexandria Layton
Evans Fears & Schuttert LLP
6720 Via Austi Parkway, Suite 300
Las Vegas, NV 89119
*Attorney for Defendants*

4

Lee Mickus
Evans Fears & Schuttert LLP
3900 E. Mexico Avenue, Suite 1300
Denver, CO 80210
*Attorney for Defendants*

Patrick J. Lewallen
Trevor J. Schenk
Chapman Valdez & Lansing
P.O. Box 2710
Casper, WY 82602
*Attorneys for Backcountry Hunters*

Eric B. Hanson
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
*Attorneys for Backcountry Hunters*

Karen Budd-Falen, Wyo. Bar No. 5-2647
Rachael L. Buzanowski, Wyo. Bar No. 8-6693
Budd-Falen Law Offices, LLC
P.O. Box 346
Cheyenne, WY 82003-0346
*Attorneys for Wyoming Stockgrowers Association and Wyoming Wool Growers Association*

                                                   *M. Gregory Weisz*
                                                   Pence and MacMillan LLC

AA190                                    AA190                                    AA190