Case No. 23-8043
_____

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
_____

IRON BAR HOLDINGS, LLC,
*Plaintiff–Appellant*,

v.

BRADLY CAPE, et al.,
*Defendants–Appellees.*
_____

On Appeal from the United States District Court
For the District of Wyoming, No. 22-DV-67
Hon. Scott W. Skavdahl, United States District Judge

_____

## UNITED PROPERTY OWNERS OF MONTANA'S *AMICUS CURIAE*
## BRIEF IN SUPPORT OF PLAINTIFF–APPELLANT IRON BAR
## HOLDINGS, LLC
_____

Jack G. Connors
DONEY CROWLEY P.C.
P.O. Box 1185
Helena, MT 59624-1185
(406) 443-2211
Attorneys for Amicus Curiae, United
Property Owners of Montana, Inc.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, United Property Owners of Montana, Inc. ("UPOM") states it is a nonprofit organization, and no corporation owns more than 10% of its stock.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), UPOM certifies that counsel for UPOM has authored the brief in whole. No party or a party's counsel contributed money intended to fund preparing or submitting the brief. Further, no person—other than the amicus curiae and its members— has contributed money intended to fund preparing or submitting the brief.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

UPOM'S INTERESTS IN THIS CASE ............................................................. 1

ANALYSIS ............................................................................................................. 4

I.     Under Wyoming law, corner crossing is an unlawful trespass...................... 4

II.    The Eighth Circuit's decision in *Mackay* misapplied prior precedent and is contrary to more recent precedent. ....................................................................... 9

III.   The justification for the legal analysis from *Mackay* cited by the district court has been abrogated by the adoption of the Taylor Grazing Act and the end of the open range. .............................................................................................. 12

IV.   The Court should follow *Leo Sheep* in this case. ........................................ 17

V.    Unregulated corner crossing is poor public policy. ..................................... 20

     A.     Corner crossing is an imperfect remedy that will hurt efforts to establish public access in locations more appropriate for public access....... 20

     B.     Corner crossing opens federal property to use by the public without the government's input or public planning regarding the consequences of doing so. .............................................................................................. 21

     C.     Corner crossing deprives landowners of an important right; the right to receive compensation for providing public access................................. 22

CONCLUSION ....................................................................................24

CERTIFICATE OF COMPLIANCE...................................................................26

# TABLE OF AUTHORITIES

## Cases

*Anthony Wilkinson Live Stock Co. v. McIlquam*, 83 P. 364 (Wyo. 1905) ..............16

*Buford v. Houtz*, 133 U.S. 320 (1890) ...................................................... 14, 15, 16

*Camfield v. United States*, 167 U.S. 518 (1897) ............................................10, 11

*Cosgriff v. Miller*, 68 P. 206 (Wyo. 1902) ...................................................12, 16

*Haskins v. Andrews*, 76 P. 588, 590 (Wyo. 1904) .................................................16

*Hecht v. Harrison*, 40 P. 306 (Wyo. 1895) ......................................................6, 17

*Herrin v. Sutherland*, 241 P. 328, 332 (Mont. 1925) ............................................ 5

*Lazarus v. Phelps*, 152 U.S. 81 (1894) .................................................... 12, 15, 17

*Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) ....................................passim

*Leo Sheep Co. v. United States*, 570 F.2d 881 (10th Cir. 1977) .........................7, 19

*Light v. United States*, 220 U.S. 523 (1911) .........................................................17

*Mackay v. Uinta Dev. Co.*, 219 F. 116 (8th Cir. 1914) ............................. 10, 13, 17

*Martin v. Platte Valley Sheep Co.*, 76 P. 571 (Wyo. 1904) .............................12, 16

*Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93 (2014) ................19

*Potts v. United States*, 114 F. 52 (9th Cir. 1902) ................................................... 9

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82 (1980) .................................. 5

*Sammons v. Am. Auto. Ass'n*, 912 P.2d 1103, 1105 (Wyo. 1996) ........................... 5

*Seeley v. Peters*, 10 Ill. 130, 130 (1848) ................................................................ 15

*United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502 (10th Cir. 1988) ....... 9, 17

*United States v. 82.46 Acres of Land, More or Less, Situate in Carbon Cnty., Wyo.*,

    691 F.2d 474 (10th Cir. 1982) ........................................................ 19, 22, 25

*United States v. Douglas-Willan Sartoris Co.*, 22 P. 92 (Wyo. 1889) ........ 6, 7, 8, 24

*Winona & St. Peter R. Co. v. Barney*, 113 U.S. 618 (1885) .................................. 12

## Statutes

43 U.S.C. § 1715(a) ................................................................................................. 25

Mont. Code Ann. § 87-1-294 ................................................................................... 25

## Other Sources

Andrew McKean, *Is Corner Crossing Landlocked Public Property Trespassing?*, 4

## UPOM'S INTERESTS IN THIS CASE[1]

United Property Owners of Montana or UPOM is a nonprofit coalition of landowners, allied businesses, and supporters dedicated to the preservation of private property rights in Montana and the Western United States. Originally founded in 2007 by a group of Montana farmers and ranchers to advocate against punitive measures taken by Montana Fish, Wildlife, and Parks, UPOM is a grassroots organization in every sense of the term. Since its founding UPOM has grown into a comprehensive property rights organization, representing nearly two million acres of privately-owned land. UPOM's members, like most family farming operations in the west, prefer to focus on earning a living in agriculture rather than battling in the legal and regulatory arenas. Thus, they turn to UPOM to advocate for their interests.

UPOM has been involved in a variety of advocacy efforts on issues that directly impacts its member including litigation both as a party in litigation and as an *amicus curiae*. UPOM has spearheaded legislation to establish regulatory takings laws, reform the zoning process, strengthen trespassing laws, and protect property rights in relation to state issued hunting permits. Relevant here, UPOM has long focused on the issue of corner crossing, and it has an entire section of its website devoted to the issue https://upom.org/corner-trespass-2/.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for UPOM has contacted counsel for the Applicant and the Appellees and they have consented to the filing of this amicus brief.

## INTRODUCTION

*"For every complex problem there is an answer that is clear, simple and wrong." — H. L. Mencken.*

The district court's decision to allow a group of elk hunters to step over private property without facing civil liability for trespassing is, superficially, a clear and simple solution to a perceived problem that Congress created over a century ago; it is also wrong.

In general, increasing opportunities for the public to recreate on federal property is a laudable goal, but it must be achieved in an orderly and legal manner that respects private property rights. As noted in Iron Bar Holdings' Opening Brief, the federal government has long understood that the public has no right to corner cross private property. State governments in the west also agree there is no right to corner cross. It is only a minority of recreationalists who have asserted a right to access federal property by crossing private property at section corners where private and federal properties adjoin.

The issue of whether it is legal to corner cross private property has been percolating in Western states for a while. Special interest groups in favor of public access have advocated to amend state laws to legalize corner crossing, but those efforts have all failed. In parallel, individual hunters have long sought to bring a legal test case that would establish a right to corner cross. To do so hunters have intentionally corner crossed private property hoping to be charged criminally or sued civilly to establish a favorable legal precedent. Andrew McKean, *Is Corner*

*Crossing Landlocked Public Property Trespassing?*,
https://www.petersenshunting.com/editorial/is-corner-crossing-landlocked-public-property-trespassing/365140 (nothing that the author's friend "longs to get ticketed for trespassing [when corner crossing] in order to test what he considers one of the central injustices of the West [i.e., checkerboard federal property].").

Prosecutors, however, hesitate to bring criminal charges against corner crossers given the lack of concrete property damage and the more serious criminal matters that local prosecutors must address. And most landowners are unwilling to file civil litigation given the costs of litigation, the negative publicity the landowner would receive, and the other options available to deter trespassers.[2]

That is why this case is important to landowners and hunters across the west; it combines hunters who are willing to intentionally cross private property and face criminal and civil liability for doing so, with a landowner that is willing to spend the time and money to litigate the issue. It is well established that Congress did not reserve an easement to access the checkerboarded federal property that resulted from grants to the railroad in the nineteenth century, but this case presents the first opportunity for an appellate court (state or federal) to consider whether there is some other legal justification that would allow recreational hunters to corner cross private property without facing civil liability for doing so. Given the district court's

---

[2] Prior to the District Court's decision, a strategically placed fence or a "no trespassing" sign located on private land near a section border was generally sufficient to deter most corner crossers, and there was no need for the landowner to establish a legal precedent establishing the right to prevent corner crossing.

decision was (implicitly) based on a federal right that preempts state law, this

Court's decision will determine whether hunters have the right to corner cross in

the six western states that comprise the Tenth Circuit. The decision will also have

significant precedential value in the other western states given that litigation on

this issue is rare, making it unlikely the issue will reach another appellate court in

the near future. As a practical matter, this Court has been tasked with deciding

whether corner crossing is trespassing or legally permitted throughout the Western

United States.

## ANALYSIS

### I. Under Wyoming law, corner crossing is an unlawful trespass.

As the District Court noted, whether an invasion of private property is

considered an actionable trespass is a matter of state law. In Wyoming "exclusive

possession is a fundamental element of property ownership." *Sammons v. Am.

Auto. Ass'n*, 912 P.2d 1103, 1105 (Wyo. 1996). "Ownership of property implies

the right of possession and control and includes the right to exclude others" and "to

expel trespassers." *Id*. (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82

(1980)). The same is true in other states throughout the west. In 1925, the Montana

Supreme Court noted "it seems to be the consensus of the holdings of the courts in

this country that the air space, at least near the ground, is almost as inviolable as

the soil itself." *Herrin v. Sutherland*, 241 P. 328, 332 (Mont. 1925). The court thus

held that a hunter could be sued for trespassing when he "fired a shotgun over

4

plaintiff's premises," but did not physically touch the property. *Id*. at 331. Simply put, a trespass is a trespass, no matter how small.

It is important to note this case does not involve the issue of unintentional trespass or hunters getting lost and mistakenly entering private property. The defendants intentionally and repeatedly entered Iron Bar Holdings' property after being told they did not have the right to do so. After being warned in 2020 that they were trespassing on private property, the defendants returned in 2021 to do so once again, and they even brought a device specifically intended to aid in their efforts to trespass. This was deliberative and provocative conduct with the apparent intent to force criminal prosecution or civil litigation that would trigger a test case to push their legal theories in court.

Key to understanding whether corner crossing is legal in Wyoming is the Supreme Court for the Territory of Wyoming's decision in *United States v. Douglas-Willan Sartoris Co.*, 22 P. 92 (Wyo. 1889), as the court considered the relevant issues in this appeal: Wyoming law, checkerboard federal property, the application of the Unlawful Inclosures Act, and a landowner's right to limit public access.[3] The court begin its analysis by noting the creation of the checkerboard pattern ownership of private and federal property due to the Union Pacific Act and the access issues the Act created — the same issue before the Court here.

---

[3] UPOM draws the Court's attention to this decision as it appears that none of the parties cited the decision in their briefing to the District Court. In *Hecht v. Harrison*, 40 P. 306 (Wyo. 1895), the court noted that *Douglas-Willan Sartoris* conflicted with decisions from other courts, "but the question has never been directly decided by the federal supreme court." 40 P. at 307.

By the congressional grant of 1862, the title to the odd–numbered sections therein described vested absolutely in the Union Pacific Railroad Company. The grant was made in an improvident fashion. The government established the rectangular system of surveying, and so separated the odd from the even numbered sections as to leave between them only a geometrical line. It thus made the possibility of a clash of whatever conflicting interests might ensue between it and its grantees, when that conflict could have been easily avoided by originally making the section lines, or the lines of alternate tiers of sections, the center of passways or common roads. . . . I do not charge that the congress is guilty of culpable negligence[4] in making the grant without reserving the way, or providing the method by which free access could be had to retained sections, but it may not be amiss to call attention to that principle which estops one who is himself guilty of blame from invoking the maxim, *sic utere, etc*.

*Douglas-Willan Sartoris*, 22 P. 92 at 96.

The court resolved whether there was public right to access federal property by reducing the question "to its last and its true legal analysis:" "shall the United States have a way over defendant's land? It is this, or it is nothing. Unquestionably the way may be obtained, but not by invoking the police power of the government.

---

[4] It is interesting to note that various courts have reached different conclusions regarding Congress' "negligence" when adopting the railroad acts in the nineteenth century. In 1977, this Court said "in granting land to the Union Pacific Railroad in 1862, Congress by implication intended to reserve an easement to permit access to the even-numbered sections which were surrounded by lands granted the railroad. To hold to the contrary would be to ascribe to Congress a degree of carelessness or lack of foresight which in our view would be unwarranted." *Leo Sheep Co. v. United States*, 570 F.2d 881, 885 (10th Cir. 1977). The Supreme Court however disagreed stating "[i]t is possible that Congress gave the problem of access little thought; but it is at least as likely that the thought which was given focused on negotiation, reciprocity considerations, and the power of eminent domain as obvious devices for ameliorating disputes." *Leo Sheep Co. v. United States*, 440 U.S. 668, 681 (1979). Even if Congress was careless or negligent in its decisions, it is not the judiciary's role to correct Congress' mistakes.

It must be bought and paid for in the manner and according to the methods prescribed for the condemnation of lands." *Id.* at 97. The same question is presented here: Do hunters, as licensees of the United States, have a right to access federal property by crossing over private property? Just as the Supreme Court of Wyoming held over 130 years ago, this Court should answer the question in the negative.

The Supreme Court of Wyoming also considered the application of the Unlawful Inclosures Act and the argument that a landowner has an obligation to remove fencing to permit access to federal property. The court decided there was no need to remove the fencing because the public did not have a right to cross private property to access federal property.

> An injunction forbids the completion of [fencing]; and the whole country, in a physical sense, is thrown open. But is it in a legal sense thrown open to public travel? Is it the law or the fence which secures to the owner of property its exclusive enjoyment? The fence is made for beasts; the law is made for man. Though my field shall have never a rail upon it, yet my neighbor dare not make it his pathway without my consent. He cannot use my land any more than he can my horse. . . . The fence destroyed, what greater facility of access to the retained sections will the public then have than if the fence had remained? In the former case a physical obstacle would be out of the way, but a legal obstacle would remain. The former may be stepped over; the latter presents an impassable barrier.

*Id.*

The portion of the *Douglas-Willan Sartoris* that found the Unlawful Inclosures Act "unconstitutional and void," *id.* at 97, is no longer good law given later United States Supreme Court decisions upholding the Act. Yet *Douglas-*

*Willan Sartoris*'s discussion of the difference between an obligation to remove a fence under the Unlawful Inclosures Act and permitting a trespass is still relevant.

As in *Douglas-Willan Sartoris*, the "legal obstacle" that prohibited the Defendants in this case from crossing over Iron Bar Holdings' private property was Wyoming law — not the two fence posts that the district court held violated the Unlawful Inclosures Act. The Unlawful Inclosures Act makes it unlawful to enclose federal property; it does not create a right to trespass on private property.

"The [Act] declares enclosures of federal lands to be unlawful and orders that such enclosures be removed. It creates no easements or servitudes." *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1506 (10th Cir. 1988); *Potts v. United States*, 114 F. 52, 54-55 (9th Cir. 1902) ("It is only when, under the guise of inclosing his own land, a person builds a fence for the purpose and with the intention of inclosing the public lands of the government, that the fence or inclosure becomes unlawful.").

It is well established under Wyoming law that the Unlawful Inclosures Act does not create a right to trespass on private property. Therefore, when the defendants intentionally and deliberately entered Iron Bar Holdings' property under the guise of "corner crossing" they were subject to civil liability under Wyoming law.

**II.    The Eighth Circuit's decision in *Mackay* misapplied prior precedent and is contrary to more recent precedent.**

The district court found the defendants were entitled to summary judgment and could not be sued civilly for trespassing based on its understanding that there was an implied right to corner cross under federal law. The court apparently reached this conclusion based on its understanding of the Unlawful Inclosures Act and its belief the Eighth Circuit recognized corner crossing (or a more general right to cross private property to access federal land) in *Mackay v. Uinta Dev. Co.*, 219 F. 116 (8th Cir. 1914), and that *Mackay* was more relevant and persuasive than the U.S. Supreme Court's decision in *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979). Order on Cross Motion for Summary Judgment, Addendum to Iron Bar Holdings' Opening Brief, at 20-23 ("Order") ("*Leo Sheep* is so materially different from the case at bar as to offer practically no persuasive value on the matter. The Court concludes *Mackay* remains valid and finds it is the authority most directly on point to the questions in this case."). The district court's reliance on *Mackay* was misplaced for several reasons.

First, the analysis of then-existing precedent in *Mackay* was faulty and the decision is contrary to subsequent precedent. Citing the Supreme Corut's decision in *Camfield v. United States*, 167 U.S. 518 (1897), *Mackay* said, "[the Unlawful Inclosures Act] has been construed to prohibit every method that works a practical denial of access to and passage over the public lands." *Mackay*, 219 F. at 119. The Supreme Court reached the opposite conclusion in *Camfield*, however. Under the

9

Unlawful Inclosures Act, an "owner would doubtless have the right" to fence the boundaries of his private property so long as each section of private property was fenced separately, and the Court acknowledged that doing so would "***practically*** exclude the government from the even-numbered sections" retained by the government. *Camfield*, 167 U.S. at 527-28 (emphasis added). The Court said this was permissible given a lack of access "was a contingency which the government was bound to contemplate in granting away the odd-numbered sections." *Id.* In *Leo Sheep*, the Supreme Court confirmed that "if odd-numbered lots are individually fenced, the access to even-numbered lots is obstructed. Yet the *Camfield* Court found that this was not a violation of the Unlawful Inclosures Act." 440 U.S. 668, at 99. Therefore, *Mackay*'s analysis of public access and the Unlawful Inclosures Act was contrary to then existing precedent that recognized fencing individual sections of private land was a valid method to "practically" exclude the public from accessing federal property.

The decision in *Mackay* was also based on the Eighth Circuit's misunderstanding of the applicable cannons of construction. In *Mackay*, the court said its decision was supported by the "rule of construction" that provided the "government and its licensees [i.e., the public]" should not suffer "the disadvantages of the interlocking arrangement of the odd and even numbered sections because the grant in aid of the railroad took that peculiar form." *Mackay*, 219 F. at 119-20. But the Supreme Court had previously said the cannon of construction noted in *Mackay* did not apply with equal force to the grants to the

railroad. *Winona & St. Peter R. Co. v. Barney*, 113 U.S. 618, 625 (1885). In *Leo Sheep*, the Supreme Court reiterated, "this Court long ago declined to apply this canon in its full vigor to grants under the railroad Acts." 440 U.S. at 682. Instead, "[t]he solution of [ownership] questions [involving the railroad grants] depends, of course, upon the construction given to the acts making the grants; and they are to receive such a construction as will carry out the intent of Congress . . .'" *Id.* (quoting *Winona*, 113 U.S. at 625; brackets in *Leo Sheep*).

Finally, *Mackay* may have been decided based on a misunderstanding of Wyoming open range laws, which made a distinction between permitting cattle to run at large and willfully driving cattle on to private property. In *Martin v. Platte Valley Sheep Co.*, 76 P. 571 (Wyo. 1904) the Supreme Court of Wyoming said:

> In this state cattle are permitted to run at large, and the principle in force here is that no actionable trespass is committed when domestic animals lawfully running at large wander upon and depasture the uninclosed lands of a private owner. *But it is well settled that this principle will not permit the owner of such animals to willfully and knowingly drive them upon the premises of another, although uninclosed.*

76 P. at 575 (citing, *e.g.*, *Cosgriff v. Miller*, 68 P. 206, 211 (Wyo. 1902) ("The rule, however, does not go to the extent of permitting the owner of cattle or sheep to willfully and knowingly drive them upon the premises of another, although unenclosed . . . It is generally held that one has no right to drive his animals upon such ground against the consent and expressed will of the owner.")). The United States Supreme Court noted this distinction in *Lazarus v. Phelps*, 152 U.S. 81 (1894):

> [Texas state law did not] authorize cattle owners deliberately to take possession of such lands, and depasture their cattle upon them, without making compensation, particularly if this were done against the will of the owner, or under such circumstances as to show a deliberate intent to obtain the benefit of another's pasturage.

U.S. 81 at 85. The court in *Mackay* noted *Lazarus* in passing but it did not apply the precedent from *Cosgriff* and *Martin*, which were controlling on the issue of Wyoming trespass laws. If *Mackay* had appreciated the nuisance in of Wyoming trespass laws between permitting livestock to run at large and willfully driving livestock on to private property, it likely would have found the defendant had trespassed when he "drove his sheep, over the protest and prohibition of the plaintiff, upon and along a strip of land three-fourths of a mile wide upon and across the entire length or width of some of the plaintiff's sections of land, and caused his sheep to consume nine-tenths of the grass thereon . . ." *Mackay*, 219 F. at 121-22 (Sanborn, J., dissenting).

In deciding whether *Mackay* supports the district court's Order, the Court should first consider the flaws in the Eighth Circuit's analysis and whether other precedent is more persuasive.

### III. The justification for the legal analysis from *Mackay* cited by the district court has been abrogated by the adoption of the Taylor Grazing Act and the end of the open range.

To further understand why *Mackay* is not controlling here, it is necessary to put the decision in historical context, and to consider the significant legal and factual changes that have occurred since *Macky* was decided. A court "may with

propriety recur to the history of the times . . .” *Leo Sheep*, 440 U.S. at 668. This history includes the open range customs that prevailed in the west that created an implied right to access federal property for grazing purposes, and why changes in federal law and policy have terminated that implied right.

"The early 19th century—from the Louisiana Purchase in 1803 to the Gadsden Purchase in 1853—saw the acquisition of the territory we now regard as the American West.” *Id.* at 670. As part of its efforts to secure and settle the newly acquired land, “Congress enacted the Union Pacific Act in May 1862.” *Id.* at 676. "The land grants made by the Union Pacific Act included all the odd-numbered lots within 10 miles on either side of the track. When the Union Pacific’s original subscription drive for private investment proved a failure, the land grant was doubled by extending the checkerboard grants to 20 miles on either side of the track.” *Id.* at 676-77.

Concurrent with the federal government’s promotion of transcontinental railroads, livestock ranching on the open range dominated in the west. *Buford v. Houtz*, 133 U.S. 320, 326 (1890) (“For many years past a very large proportion of the beef which has been used by the people of the United States is the meat of cattle thus raised upon the public lands without charge, without let or hindrance or obstruction. The government of the United States in all its branches has known of this use, has never forbidden it, nor taken any steps to arrest it.”) This practice created a legal framework regarding fencing and trespass unique to that period and region. According to the English common law prevailed in the east, “[t]he owner

of such cattle must confine them to his own land, and will be liable for trespasses committed by them upon the unclosed lands of others." *Lazarus*, 152 U.S. at 84. This rule, however, never prevailed in the west.

> [I]n the newer states of the west generally, vast areas of land, over which, so long as the government owned them, cattle had been permitted to roam at will for pasturage, it was not thought proper, as the land was gradually taken up by individual proprietors, to change the custom of the country in that particular, and oblige cattle owners to incur the heavy expense of fencing their land, or be held as trespassers by reason of their cattle accidentally straying upon the land of others.

*Id.* at 86. The U.S. Supreme Court noted with approval the Supreme Court of Illinois' articulation of the open range customs:

> "Perhaps there is no principle of the common law so inapplicable to the condition of our country and people as the one which is sought to be enforced now for the first time since the settlement of the state. It has been the custom in Illinois, so long that the memory of man runneth not to the contrary, for the owners of stock to suffer them to run at large. Settlers have located themselves contiguous to prairies for the very purpose of getting the benefit of the range. The right of all to pasture their cattle upon unclosed ground is universally conceded."

*Buford*, 133 U.S. at 330-31 (quoting *Seeley v. Peters*, 10 Ill. 130, 130 (1848)).

Likewise, the same customs and fencing laws prevailed in Wyoming at the time *Mackay* was decided:

> The common-law rule has been abrogated, or held never to have obtained, in many of the other states of this country. The rule here, as stated in [*Cosgriff*], is that "no trespass is committed when animals lawfully running at large wander upon and depasture the unclosed lands of a private owner." 10 Wyo. 190, 68 Pac. 206. . . . It is the duty

of the landowner to protect his premises by fence or otherwise from
the invasion of roving cattle.

*Haskins v. Andrews*, 76 P. 588, 590 (Wyo. 1904) (some citations omitted);

*Cosgriff*, 68 P. at 211 ("In this Western country, where the native grasses are

adapted to the growth and fattening of domestic animals, it is a firmly settled rule

of law that no trespass is committed when animals lawfully running at large

wander upon and depasture the unclosed lands of a private owner"); *Martin*, 76

P. at 574 ("In this state cattle are permitted to run at large, and the principle in

force here is that no actionable trespass is committed when domestic animals

lawfully running at large wander upon and depasture the unclosed lands of a

private owner."); *Anthony Wilkinson Live Stock Co. v. McIlquam*, 83 P. 364, 369

(Wyo. 1905) ("So long as the private owner permits his land to remain open, no

doubt the plaintiff's cattle while running at large might graze thereon without

rendering him liable in trespass therefor.")

     The western customs of the open range created what is known as the "fence-

out" rule. Simply put, if you do not want free wandering livestock on your property

and eating your grass, you have to fence them out. This rule applied to both private

property and public property owned by the federal government. A landowner's

failure to fence his property resulted in "an implied license" for livestock to cross

private property to reach federal property, where the livestock could graze without

charge from the federal government. *Buford*, 133 U.S. at 323. This license

permitted "cattle to run at large, without responsibility for their straying upon the

lands of others." *Lazarus*, 152 U.S. at 84–85; *Hecht v. Harrison*, 40 P. 306, 310 (Wyo. 1895) (the plaintiff "enjoy[s] what is common to all, the privilege of grazing his cattle upon the public domain, under the implied license of the government").

The key portion of *Mackay* that the district court relied on was the statement "McKay was entitled to a reasonable way of passage over the unenclosed tract of land without being guilty of trespass." 219 F. at 120. *Mackay* acknowledged this was based on the "well-known fact that the free herding and grazing of cattle on the public lands is a legitimate use to which they may be put . . ." *Id.* at 119 (quotation omitted). *Mackay* also noted, the rule was based on the federal policy that allowed the public to do so, and the rule would only be relevant "*[a]s long as the present policy of the government continues . . .*" *Id.* (emphasis added).

The federal policy allowing unregulated public grazing on public lands ended in 1934 when Congress enacted the Taylor Grazing Act. "[T]he Taylor Grazing Act put an end to the open public range." *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1506 (10th Cir. 1988). Since 1934, there has been no public right to freely graze livestock on federal property and therefore there is no longer an implied "reasonable way of passage" across private property to reach federal grazing lands. *See Light v. United States*, 220 U.S. 523, 535 (1911) (the federal government's "failure to object, however, did not confer any vested right on the complainant, nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes."). The

change in federal law and policy ending the open range undermines the value of *Mackay* to resolve the questions here.

Finally, by applying the historical caselaw and statutes arising out of commercial livestock production on the open range to the unrelated issue of corner crossing private property for recreational purposes, a distinctively twenty-first century issue, the district court was attempting to fit a square peg in a round hole. *Mackay* involved the right to run livestock on the open range, but this right has never been extended to noncommercial or recreational pursuits such as hunting. Instead, in *Leo Sheep* the United States Supreme Court squarely addressed whether there was an implied right to access federal property for recreational purposes, making *Leo Sheep* specifically relevant here.

## IV.   The Court should follow *Leo Sheep* in this case.

In *Leo Sheep*, the federal government asserted an implied right to access a reservoir located on federal property that would be used "by the public for fishing and hunting." 440 U.S. 677-78. The Wyoming Federal District Court ruled in favor the landowner. This Court reversed and ruled for the federal government based on its understanding that there was an implied right to access federal property for recreational purposes:

> [I]n granting land to the Union Pacific Railroad in 1862, Congress by implication intended to reserve an easement to permit access to the even-numbered sections which were surrounded by lands granted the railroad.

*Leo Sheep Co. v. United States*, 570 F.2d 881, 885 (10th Cir. 1977). The Supreme Court soundly rejected this conclusion, holding "we are unwilling to imply rights-of-way [] with the substantial impact that such implication would have on property rights granted over 100 years ago." 440 U.S. at 682.

Following the Supreme Court's holding in *Leo Sheep*, this Court has recognized that the "checkerboard ownership pattern necessarily impedes the ability of government employees and the general public to travel to and from federal land, as frequently the only access routes traverse private property." *United States v. 82.46 Acres of Land, More or Less, Situate in Carbon Cnty., Wyo.*, 691 F.2d 474, 475 (10th Cir. 1982).

To avoid the Supreme Court's decision in *Leo Sheep* and this Court's holding in *82.46 Acres of Land*, the district court avoided using the terms "implied" "easement" and "right-of-way," but that is what the court recognized when it said the defendants had the right "corner cross[] on foot within the checkerboard from public land to public land without touching the surface of private land." Order at 26. Since the district court recognized a right to enter and use private property to access public property, the right recognized by the court is best characterized as an easement. *See Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105 (2014) ("An easement is a 'nonpossessory right to enter and use land in the possession of another . . . .'" (quoting *Restatement (Third) of Property: Servitudes* § 1.2(1) (1998)).

18

In *Leo Sheep*, the United States Supreme Court rejected the notion that an easement to access federal property was created or reserved by Congress. "[T]he intent of Congress in making the Union Pacific grants was clear: 'It was to aid in the construction of the road by a gift of lands along its route, without reservation of rights, except such as were specifically mentioned . . . .'" 440 U.S. at 679 (quoting *Missouri, K. & T. R. Co. v. Kansas Pac. R. Co.*, 97 U.S. 491, 497 (1878)). No specific reservation for public access was included in the grant to the Union Pacific railroad. To the contrary, an amendment was offered that would have reserved a limited right for public access, but the proposed amendment was defeated. *Leo Sheep*, 440 U.S. at 681, n. 1. The Supreme Court instead refused to add to the list of explicit reservations "by divining some 'implicit' congressional intent" to do so, and unequivocally said, "we are unwilling to imply rights-of-way [] with the substantial impact that such implication would have on property rights granted over 100 years ago." *Id*. at 679, 682.

Congress may not have anticipated the dilemma faced by the defendants in this case, but that does not change the fact that "[g]enerations of land patents have issued without any express reservation of the right now claimed by [the defendants]." *Leo Sheep*, 440 U.S. at 687. Contrary to the Supreme Court's instructions in *Leo Sheep*, the district court's decision, if affirmed, will "upset settled expectations" of landowners across the west "to accommodate some ill-defined" right to corner cross. *Id.*

The clear, simple, and *correct* answer to the question in this case is to hold that no federal law or common law rule granted the Defendants a right to corner cross private property and whether they trespassed should be decided based on Wyoming law on remand.

**V.      Unregulated corner crossing is poor public policy.**

The defendants here corner crossed based on their self-serving desire to access better hunting opportunities. While their motivations are understandable when viewed from their perspective, the district court did not consider the larger policy implications of its decision. Ultimately public access to federal property is a matter of policy and this Court should not lose sight of the broader implications of corner crossing.

**A. Corner crossing is an imperfect remedy that will hurt efforts to establish public access in locations more appropriate for public access.**

As a practical matter, corner crossing is difficult and potentially dangerous as an individual must locate the exact location where four sections of land intersect, which is often unmarked or not clearly marked, and then carefully step over private property without touching the soil. Many section corners are in difficult to access locations such as rivers, mountain tops, or cliffs where it is dangerous to access federal property. While the motivated hunters were able to corner cross, disabled individuals, the elderly, and even the average hunter may be

unable to do so. In establishing public access, it is necessary to consider the needs of the public in general and not the self-serving desires of a few hunters. That is why most government agencies and public access advocates generally seek to establish access at locations *other* than section corners.

Legalizing corner crossing, however, will impact efforts to establish access in better suited locations since most funding for establishing public access is tied to establishing access to "landlocked" federal property. For example, in *82.46 Acres of Land*, this Court held the Department of Interior could use the power of eminent domain to secure access to federal property, but only if doing so was "necessary to secure access to public lands." 691 F.2d at 475. If federal property is accessible by corner crossing, the Department of the Interior may lose it ability to use eminent domain to secure access locations other than section corners since the power would no longer be "necessary to secure access to public lands."

The imperfect remedy of allowing corner crossing will harm legitimate efforts to establish public access to federal property in appropriate locations that are well suited for use by the general public and not the adventurous few.

## B. Corner crossing opens federal property to use by the public without the government's input or public planning regarding the consequences of doing so.

The district court overlooked the federal government's interests in limiting when and where corner crossing may occur. Currently, checkerboard federal lands act as *de facto* wildlife preserves that receive little or no hunting pressure. If

affirmed, the district court's decision will likely result in thousands of hunters and other recreationalists accessing millions of acres of federal land that were previously protected. While the federal government may support corner crossing at some locations, it would likely decide that corner crossing is not appropriate in other locations. But establishing an unlimited and unregulated right to corner cross in a judicial decision prevents the federal government from deciding where access to federal property should be allowed and where it should be prohibited.

The federal government has long benefited from the general understanding that corner crossing was illegal since very few people actually did so. This has limited the burden on the federal government to monitor, protect, and police millions of acres of its property and increased burden on the federal government would be significant. It will also result in damage to federal property when hunters concentrate at section corners, resulting in erosion and other property damage. It also places additional law enforcement responsibilities on the federal government as, inevitably, there will be issues with poaching, littering, fires, and other crimes on previously inaccessible federal land.

### C. Corner crossing deprives landowners of an important right; the right to receive compensation for providing public access.

All of the sticks in the bundle that make up private property have economic value, including the right to allow public access in exchange for compensation.

Many ranchers, farmers, and other landowners across the west are in the situation of being "land rich, cash poor," meaning they may own a significant

amount of land, but the land does not generate a significant amount of revenue. Negotiating an agreement to allow for public access across private property in exchange for compensation, may make the difference between a successful family business and one that fails. Corner crossing, and allowing the public to cross private property to access public lands in general, has an economical component and the district court's decision denies landowners the right to receive compensation for allowing corner crossing.

As the Supreme Court of the Territory of Wyoming noted over 130 years ago, the answer to checkerboard federal property is providing just compensation to landowners to establish access. "When reduced to its last and its true legal analysis, the point in controversy is, shall the United States have a way over defendant's land? . . . Unquestionably the way may be obtained, but not by invoking the police power of the government. It must be bought and paid for in the manner and according to the methods prescribed for the condemnation of lands." *Douglas-Willan Sartoris Co.*, 22 P. at 97. Likewise, the United States Supreme Court has noted the need for compensation to landowners when a private property right is taken to establish access to checkerboard land.

> In 1887 the Secretary of the Interior recommended that Congress enact legislation providing for a public road around each section of public land to provide access to the various public lots in the checkerboard scheme. The Secretary also recommended that to the extent building these roads required the taking of property that had passed to private individuals, "the bill should provide for necessary compensation."

*Leo Sheep*, 440 U.S. at 688, n. 25.

To partially address the issue, in 1976 Congress enacted the Federal Land Policy Management Act (FLPMA) which included a provision that authorized the Secretary of the Department of the Interior to exercise the power of eminent domain "if necessary to secure access to public lands." 43 U.S.C. § 1715(a). Western states have adopted laws and policies to provide compensation to landowners in exchange for providing public access. For example, Montana has adopted a law specifically designed to provide compensation for allowing corner crossing. *See* Mont. Code Ann. § 87-1-294(5)(a)(ii) (compensating landowners "who own land adjacent to the point where the corners of two parcels of public land meet [i.e., corner crossing]" and "grant access through the landowner's land to establish a corridor between the two parcels of public land.").

In *82.46 Acres of Land*, the landowner was unhappy about the government's exercise of the power of eminent domain to establish public access at section corners, but at least he was offered over $15,000 in compensation. 691 F.2d at 475. Here, a similar property right was taken, but Iron Bar Holding did not receive any compensation.

## CONCLUSION

UPOM welcomes the Court's consideration of the important issues in this appeal. For the reasons above, the Court should reverse the district court's decision granting summary judgment.

DATED this 13th day of November, 2023.

DONEY CROWLEY P.C.

/s/ Jack G. Connors

_____
Jack G. Connors
*Attorneys for Amicus United Property Owners of Montana, Inc.*

## CERTIFICATE OF COMPLIANCE

1.  The foregoing amicus brief complies with the type-volume limitations of

    Fed. R. App. P. 32(a)(7)(B)(i) and with Fed. R. App. P. 29(a)(5) because

    the brief contains 6,287 words, excluding the parts of the brief exempted

    by Fed. R. App. P. 32(f).

2.  The brief also complies with the typeface requirements of Fed. R. App. P.

    32(a)(5) and the typestyle of Fed. R. App. P. 32(a)(6) because this brief

    has been prepared in proportionally spaced typeface using Microsoft

    Word in Times New Roman 14-point font.


Dated:  November 13, 2023.            _____/s/ Jack G. Connors_____
                                      Jack G. Connors

**CERTIFICATE OF DIGITAL SUBMISSION
AND PRIVACY REDACTIONS**

I certify that all required privacy redactions have been made in this brief pursuant to 10th Cir. R. 25.5. I further certify that the hard copies of this brief to be submitted to the Court will be exact copies of the version submitted electronically and that the electronic submission of this brief was scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:  November 13, 2023.           /s/ Jack G. Connors
                                     Jack G. Connors

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2023, I electronically filed the above brief with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users.

Dated: November 13, 2023.           _____/s/ Jack G. Connors_____
                                       Jack G. Connors