No. 23-8043

_____

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

IRON BAR HOLDINGS, LLC,
*Plaintiff-Appellant*,

v.

BRADLY H. CAPE, ET AL.,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the
District of Wyoming
D.C. No. 2:22-cv-00067-SWS
Hon. Scott W. Skavdahl, United States District Judge

_____

**ANSWERING BRIEF OF APPELLEES**
**BRADLY H. CAPE, ZACHARY M. SMITH,**
**PHILLIP G. YEOMANS, AND JOHN W. SLOWENSKY**

_____

Ryan Alexander Semerad
FULLER & SEMERAD, LLC
242 S. Grant Street
Casper, Wyoming 82601
(307) 265-3455

Lee Mickus
EVANS FEARS SCHUTTERT
  MCNULTY MICKUS
3900 E. Mexico Avenue, Ste. 1300
Denver, Colorado 80210
(303) 656-2199

Alexandria Layton
EVANS FEARS SCHUTTERT
  MCNULTY MICKUS
6720 Via Austi Parkway, Ste. 300
Las Vegas, Nevada 89119
(702) 901-7026

Oral Argument is requested.

January 5, 2024

## TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................... i

TABLE OF AUTHORITIES ................................................................ iii

PRIOR OR RELATED APPEALS..........................................................x

JURISDICTIONAL STATEMENT .......................................................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE ISSUE...............................................................6

STATEMENT OF THE CASE.................................................................6

    I.    A Checkerboard for a Railroad...........................................6

    II.    Iron Bar Buys Some Checkerboard Land on Elk Mountain...............7

    III.    The First Hunt ...................................................................14

    IV.    The Second Hunt and the Ladder .....................................15

    V.    Iron Bar Uses Trespass Law to Enclose Public Land.......................16

SUMMARY OF THE ARGUMENTS ...................................................18

IRON BAR CANNOT EXCLUDE OTHERS FROM PUBLIC LANDS BY ANY MEANS...................................................................................19

    I.    Leo Sheep Does Not Govern this Case...............................21

II.     Wyoming Trespass Law Cannot Be Used to Enclose and Obstruct the

Public Domain .................................................................................................25

III.    Tradition, History, and Modern Regulations Prohibit Using Trespass

Liability to Enclose and Interfere with Use of the Public Domain .....................32

     a.     Tradition and History: Abating the Nuisance of Private Domination

    of Public Space ............................................................................................32

       i.   Freedom at the Founding ...............................................................32

       ii.  When the Cattle Kings Tried to Take the West...........................34

       iii. Can Congress Outlaw the Cattle Kings' Abuses?.......................40

       iv.  High Noon for the Cattle Kings .....................................................49

     b.     Modern Public Land Regulations Reinforce the UIA ...................51

CONCLUSION ......................................................................................................54

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ...............................56

CERTIFICATE OF COMPLIANCE ....................................................................57

CERTIFICATE OF DIGITAL SUBMISSION .....................................................58

CERTIFICATE OF SERVICE ..............................................................................59

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Am. Wild Horse Pres. Campaign v. Jewell*,
    847 F.3d 1174 (10th Cir. 2016) ...........................................................................11

*Bruce v. Ogden City Corp.*,
    640 F. Supp. 3d 1150 (D. Utah 2022)..........................................................24 n.6

*Buford v. Houtz*,
    5 Utah 591, 18 P. 633 (Utah 1888).........................................................20, 29, 39

*Buford v. Houtz*,
    133 U.S. 320 (1890).................................................................................32, 39, 54

*Camfield v. United States*,
    66 F. 101 (8th Cir. 1895) ....................................................................................46

*Camfield v. United States*,
    167 U.S. 518 (1897)............................................10 n.4, 20, 26-30, 32, 42, 45-48

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021)..........................................................................................4

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992).............................................................................................26

*Defenders of Wildlife v. Everson*,
    984 F.3d 918 (10th Cir. 2020) ............................................................................26

*DeGroote v. City of Mesa*,
    Case Nos. CV 07-1969-PHX-MHM, CV 07-2123-PHX-LOA,
    2009 U.S. Dist. LEXIS 15082 (D. Ariz. Feb. 25, 2009) ....................................20

*Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*,
    458 U.S. 141 (1982).............................................................................................53

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)..................................................................................26, 30, 53

*Golconda Cattle Co. v. United States*,
  214 F. 903 (9th Cir. 1914) ...............................................................28, 49

*Grace United Methodist Church v. Cheyenne*,
  451 F.3d 643 (10th Cir. 2006) ..............................................................31

*Healy v. Smith*,
  14 Wyo. 263, 83 P. 583 (Wyo. 1906)...................................................31

*Herr v. U.S. Forest Serv.*,
  865 F.3d 351 (6th Cir. 2017) ...............................................................26

*Hill v. Winkler*,
  21 N.M. 5, 151 P. 1014 (N.M. 1915)..............................................31 n.9

*Hinman v. Pacific Air Transp.*,
  84 F.2d 755 (9th Cir. 1936) ..................................................................20

*Homer v. United States*,
  185 F. 741 (8th Cir. 1911) .............................................................27, 28, 49

*In re Smith*,
  10 F.3d 723 (10th Cir. 1993) ...............................................................23

*Kaiser Aetna v. United States*,
  444 U.S. 164 (1979)..............................................................................20

*Kerwhaker v. Cleveland, Columbus & Cincinnati R.R. Co.*,
  3 Ohio St. 172 (1854) ...........................................................................33

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976)..........................................................20-21, 26, 30

*Law v. Nettles*,
  18 S.C.L. (2 Bail.) 447 (S.C. Ct. App. 1831) ......................................33

*Leo Sheep Co. v. United States*,
  570 F.2d 881 (10th Cir. 1977) ................................................................6

*Leo Sheep Co. v. United States*,
  440 U.S. 668 (1979)...............................................................4, 10, 11, 42

iv

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005) ...................................................................24 n.6

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ...........................................................................4

*Lucas v. South Carolina Coastal Council*,
    505 U.S. 1003 (1992) .........................................................................4

*Lyman v. Childs*,
    2023 WY 16, 524 P.3d 744 (Wyo. 2023) .........................................31

*Mackay v. Uinta Develop. Co.*,
    219 F. 116 (8th Cir. 1914) ......................................7, 29, 32, 49, 51

*Macon & Western R.R. Co. v. Lester*,
    30 Ga. 911 (1860) ............................................................................33

*McKee v. Gratz*,
    260 U.S. 127 (1922) .........................................................................20

*McKelvey v. United States*,
    260 U.S. 353 (1922) ..............................................................27, 29, 30

*Mountain States Legal Found. v. Hodel*,
    799 F.2d 1423 (10th Cir. 1986) .....................................................6, 7

*Mount St. Scholastica, Inc. v. C. of Atchison*,
    482 F. Supp. 2d 1281 (D. Kan. 2007) ............................................25

*Payne v. Gould*,
    74 Vt. 208, 52 A. 421 (Vt. 1902) .................................................31 n.9

*Penn Central Transp. Co. v. New York City*,
    438 U.S. 104 (1978) ...............................................................24 n.6, 25

*Phillips v. Washington Legal Found.*,
    524 U.S. 156 (1998) .....................................................................20, 21

*Potts v. United States*,
    114 F. 52 (9th Cir. 1902) ................................................................28

v

*Pub. Lands Council v. Babbitt*,
    529 U.S. 728 (2000)............................................................................52

*Seeley v. Peters*,
    10 Ill. (5 Gilm.) 130 (1848) .............................................................33

*State v. Dupuis*,
    197 A.3d 343 (Vt. 2018)................................................................29 n.8

*Stoddard v. United States*,
    214 F. 566 (8th Cir. 1914) ..............................................................27, 49

*Tyler v. Hennepin Cnty.*,
    143 S. Ct. 1369 (2023)..............................................................20, 21, 53

*United States ex rel. Bergen v. Lawrence*,
    620 F. Supp. 1414 (D. Wyo. 1985).................................... 10, 23, 24, 27, 30, 32

*United States ex rel. Bergen v. Lawrence*,
    848 F.2d 1502 (10th Cir. 1988) ..............11, 22, 23, 25, 27, 28, 30-32, 48, 51-53

*United States v. Alford*,
    274 U.S. 264 (1927)........................................................................26

*United States v. Buford*,
    8 Utah 173, 30 P. 433 (Utah 1892) ..................................................28

*United States v. Camfield*,
    59 F. 562 (D. Colo. 1894)................................................................45

*United States v. Douglas-Willan Sartoris Co.*,
    3 Wyo. 287, 22 P. 92 (Wyo. 1889)................................. 10 n.4, 43-46

*United States v. Jenks*,
    22 F.3d 1513 (10th Cir. 1994) ..........................................................34

*United States v. Johnston*,
    172 F. 635 (N.D. Cal. Cir. 1908)....................................................28

*Wis. Cent. Ltd. v. United States*,
    138 S. Ct. 2067 (2018)................................................................28 n.7

*Wyoming v. United States*,
   279 F.3d 1214 (10th Cir. 2002) ...........................................................21

**Statutes and Rules**

10th Cir. L. R. 28.1 ................................................................................1 n.1

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ............................................................................................1

28 U.S.C. § 1332 ............................................................................................1

43 C.F.R. § 4140.1(b)(7) ..............................................................................52

43 U.S.C. § 315 ........................................................................3, 9, 51, 52

43 U.S.C. § 315e ...........................................................................................52

43 U.S.C. § 1061 ............................................................3, 19, 26-27, 30

43 U.S.C. § 1063 ................................................................3, 18, 27, 30

43 U.S.C. § 1701 ...............................................................................3, 51, 52

Final Rule: Grazing Administration – Exclusive of Alaska,
   60 Fed. Reg. 9894 (Feb. 22, 1995) ......................................................52

U.S. Const., art. IV, § 3, cl. 2 ................................................... 25-26

Wyo. Const. art. 21, § 26, cl. 1 .......................................................3, 31

Wyo. Stat. Ann. § 23-3-305(b) ...................................................3, 53

**Other**

1887 Sec'y Of The Interior Ann. Rep. for Fiscal Year Ending
   June 30, 1887, Vol. 1 (Nov. 1, 1887) .................................... 41-43, 49

Anne MacKinnon, *Historic and Future Challenges in Western Water
   Law: The Case of Wyoming*,
   6 Wyo. L. Rev. 291 (2006).................................................................35

Brian Sawers, *The Right to Exclude from Unimproved Land*,
83 TEMP. L. REV. 665 (2011) ...............................................................33

Burke Snowden, Comment, *New Life for the Unlawful Inclosures Act:
Immunizing Corner-Crossers from State Trespass Actions*,
90 U. CHI. L. REV. 2013 (2023) ....................................................29, 49

Chandra Rosenthal & Kara Gillon, *Don't Fence Me In: Application of
the Unlawful Inclosures of Public Lands Act to Benefit Wildlife*,
5 ANIMAL LAW 1 (1999) ......................................................................40

Clyde O. Martz, Esq. on behalf of Petitioners Leo Sheep Company
and Palm Livestock Company, Transcript of Oral Argument, Part I
of II (held on Jan. 15, 1979), *Leo Sheep Co. v. United States*, 440
U.S. 668 (1979) (No. 77-1686)....................................................... 21-22

Earl W. Hayter, *Barbed Wire Fencing—A Prairie Invention: Its Rise
and Influence in the Western States*,
13 AGRIC. HIST. 189 (1939) ............................................................35, 36

ERIC T. FREYFOGLE, DALE D. GOBLE, AND TODD A. WILDERMUTH,
WILDLIFE LAW: A PRIMER (2d ed. 2019) ......................................29 n.8

ERNEST STAPLES OSGOOD, THE DAY OF THE CATTLEMAN (1929) ..........................34

GALVESTON NEWS, June 1, 1883 ..........................................................36

H.R. Exec. Doc. No. 1, 48th Cong., 1st Sess. (1883), *Annual Report of
the Comm'r of the General Land Office 1883* ............................... 36-38

H.R. EXEC. DOC. No. 49-166 (Feb. 15, 1887) (Letter from the Sec. of
the Interior) ........................................................................................40

H.R. Exec. Doc. No. 1, 50th Cong., 2nd Sess. (1888) (1888 SEC'Y OF
THE INTERIOR ANN. REP. FOR FISCAL YEAR ENDING JUNE 30, 1888,
Vol. 1, at xvi (Nov. 24, 1888)) ....................................................42, 43

*Inclosure*, WEBSTER'S PRACTICAL DICTIONARY OF THE ENGLISH
LANGUAGE (1884)................................................................................28

Kevin Frazier, *Corner Crossing: Unlocking Public Lands or Invading
the Airspace of Landowners?*,
46 PUB. LAND & RESOURCES L. REV. 91 (2023).................................29

MARK E. MILLER, BIG NOSE GEORGE: HIS TROUBLESOME TRAIL
(High Plains Press 2021)......................................................................7

Michael C. Blumm & Kara Tebeau, *Antimonopoly in American Public Land Law*,
28 GEO. ENVTL. L. REV. 155 (2016) ...................................... 32-34, 38

Pamela Baldwin, *Livestock Water on Federal Rangelands*,
1 GREAT PLAINS NAT. RESOURCES J. 351 (1996) ...............................36

POWELL ON REAL PROPERTY: MICHAEL ALLAN WOLF DESK EDITION, §
64A.01 (LexisNexis 2009)...................................................................20

Robert S. Fletcher, *The End of Open Range in Eastern Montana*,
16 MISS. VALLEY HIST. REV. 188 (1929) ...........................................36

Shelby D. Green, *No Entry to the Public Lands: Towards a Theory of a Public Trust Servitude for a Way over Abutting Private Land*,
14 WYO. L. REV. 19 (2014).................................................................34

S. Rep. No. 48-979 (1885) ......................................................................40

Stanley N. Katz, *Thomas Jefferson & the Right to Property in Revolutionary America*,
19 J. L. & ECON. 467 (1976) ...............................................................33

Terry L. Anderson & P. J. Hill, *The Evolution of Property Rights: A Study of the American West*,
18 J.L. & ECON. 163 (1975)................................................................35

WALTER PRESCOTT WEBB, THE GREAT PLAINS (2d ed. 2022)................................35

Wayne Gard, *The Fence Cutters*,
51 SW. HIST. Q. 1 (1947) ...................................................................36

WOODY GUTHRIE, *This Land is Your Land*, WoodyGuthrie.org,
https://www.woodyguthrie.org/Lyrics/This_Land.htm.........................2

Yasuhide Kawashima, *Farmers, Ranchers, and the Railroad: The Evolution of Fence Law in the Great Plains*,
30 GREAT PLAINS Q. 21 (2010)...........................................................35

## PRIOR OR RELATED APPEALS

None.

## JURISDICTIONAL STATEMENT

Appellees Bradly H. Cape, Zachary M. Smith, Phillip G. Yeomans, and John W. Slowensky (the "hunters") are satisfied with Appellant Iron Bar Holdings, LLC's jurisdictional statement and agree that this Court has jurisdiction under 28 U.S.C. § 1291. Save for one clarification.

The hunters removed Iron Bar's state court action to federal court under 28 U.S.C. § 1331 as well as 28 U.S.C. § 1332(a)(1). *See* App. V1:15-44.[1] The hunters removed Iron Bar's lawsuit under 28 U.S.C. § 1331 because Iron Bar's state-law claims necessarily raised and artfully excluded a substantial question of federal law—*i.e.*, whether Iron Bar could use trespass law to enclose the public domain. App. V1:15-38. Because the District Court concluded that it could hear Iron Bar's suit under 28 U.S.C. § 1332(a)(1), it chose not to address whether "federal-question jurisdiction also exists." App. V1:68-69.

\* \* \* \* \*

-----

[1]Citations to the appendix will be made as "App." followed by volume number (V1), colon, then page number range (15-44). *See* 10th Cir. L. R. 28.1(A).

**INTRODUCTION**

> This land is your land, this land is my land
> From California to the New York island,
> From the redwood forest to the Gulf Stream waters;
> This land was made for you and me.
>
> [. . .]
>
> As I went walking I saw a sign there
> And on the sign it said "No Trespassing."
> But on the other side it didn't say nothing,
> That side was made for you and me.

WOODY GUTHRIE, *This Land is Your Land*, WoodyGuthrie.org, https://www.woodyguthrie.org/Lyrics/This_Land.htm (last visited Jan. 4, 2024).

In America, landowners have *never* had a right to exclude people from the public domain. Yet, through this lawsuit, Iron Bar seeks to enforce this nonexistent right by denying people reasonable passage to the public domain in an area of the American West known as the "Checkerboard." Congress and the courts have rejected *every* device that has the effect of enclosing the public domain in the Checkerboard and obstructing reasonable access thereto. This Court should likewise reject Iron Bar's lawsuit as one more device that would unlawfully enclose public land.

In the Checkerboard, private and public lands are interspersed in alternating 640-acre rectangular sections. So the only terrestrial path for accessing nearly all public land is at section corners shared by private and public sections—*i.e.*, the

2

common corners. Some landowners in the Checkerboard, like Iron Bar, say that they must prevent passage through these common corners to protect their own land. The only effect of such "corner-locking" is the enclosure of public land.

That is the case here. Under the guise of protecting *its* land, Iron Bar claims a right to exclude people from the common corners. To enforce this claimed right, it has sued the hunters in the hopes that the judiciary will legalize corner enclosures.[2]

But federal law declares that any enclosure of public lands by whatever means is unlawful. *See* 43 U.S.C. § 1061. Even claiming an *exclusive* right to use "any part" of the public domain—like the common corner—is unlawful. *See id.* So too is obstruction of "free passage or transit over or through the public lands." 43 U.S.C. § 1063. And American tradition and history as well as modern regulations reinforce this federal law. *See* Taylor Grazing Act (TGA), 43 U.S.C. § 315 *et seq.*; Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*; WYO. CONST. art. 21, § 26, cl. 1; Wyo. Stat. Ann. § 23-3-305(b) (effective July 1, 2023).

---

[2]On this score, Iron Bar wants to have its cake and eat it too. It now argues that corner crossing should *not* be decided by the judiciary when it held a different posture when it brought this lawsuit. *Compare* App. V1:74-76 (seeking a judicial declaration that corner crossing is illegal), *with* Appellant's Br. at 53-61 (arguing that "courts are not institutionally suited" to determine the legality of corner crossing).

3

Iron Bar retains the right to exclude others from its own lands—it simply cannot accomplish *lawful* exclusion by effecting an *unlawful* enclosure of the public lands.

A prologue on what this case is *not* about: This is not a takings case. The hunters did *not set foot* on Iron Bar's property, let alone "*build* a road across" it or "*construct* public thoroughfares" through it. *Contra Leo Sheep Co. v. United States*, 440 U.S. 668, 669, 687–88 (1979) (emphasis added). The hunters have not forced Iron Bar to suffer any *permanent* physical occupation of *its property*. *Contra Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). The hunters have not deprived Iron Bar of *any*, let alone *all*, economically beneficial use of *its property*. *Contra Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). Nor have the hunters appropriated Iron Bar's right to exclude from *its property*. *Contra Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2076 (2021). Instead, the hunters defended themselves against Iron Bar's trespass claim by asserting that Iron Bar cannot use a lawsuit like a fence to enclose and prevent reasonable access to public land in the Checkerboard.

The undisputed trial record establishes that Iron Bar does not make any use of the common corners at issue.[3] It does not farm or ranch in those locations. It has no

---

[3]Iron Bar did not dispute these points below. *See* App. V4:733; Appellees' Supp. Appendix V1:4-27, 44.

fixtures, outbuildings, or operations there.  It does not otherwise occupy these corners.  Even so, Iron Bar demands an exclusive right over these corners—its portion and the public's portion—because, it claims, this right protects its land from trespassers.  But this claimed right does not protect Iron Bar's land; it only encloses and prevents people from accessing the adjacent public land.  Thus, Iron Bar's trespass claim is no different from the unlawful enclosures of many others—a nuisance requiring abatement.

To perpetuate its nuisance, Iron Bar brought the full weight of the legal system onto the shoulders of four lifelong public land hunters—a fence builder (Cape), his then-23-year-old employee (Smith), a military veteran and current diesel mechanic (Yeomans), and a high school band director (Slowensky).  Iron Bar pressed a criminal prosecution against the hunters where their liberty was at stake and then filed a civil lawsuit seeking millions of dollars in damages and permanent injunctive relief.  This case is not about Iron Bar's desire to exclude people from pockets of air above *its private land*—a picayune prize.  This case is about Iron Bar's desire to exclude people from *public land*—that is, to secure an empire.

The District Court correctly concluded that Iron Bar may not lawfully exclude the public from the section corners shared by Iron Bar's land and public land in the Checkerboard.  That Iron Bar, like other landowners, must bear the "temporary incursion into a minimal portion of its airspace while the corner crosser must take

5

pains to avoid touching private land or otherwise disturbing private property." App. V5:878. Because any other conclusion would subjugate the public lands of the Checkerboard to the will of landowners like Iron Bar, effectively gifting them to these landowners, this Court should affirm the District Court's decision.

## STATEMENT OF THE ISSUE

Whether a landowner in the American West's Checkerboard may enclose the public domain and exclude people from those lands by asserting a right to exclusive use and control of the common corners shared by its private land and the public domain.

## STATEMENT OF THE CASE

### I.    *A Checkerboard for a Railroad*

"The checkerboard scheme of land ownership is a result of the Union Pacific Act passed in 1862." *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1424 n.1 (10th Cir. 1986). Under that Act, "the Union Pacific Railroad Company was awarded the odd-numbered lots of public land along the railbed right-of-way," extending twenty miles on each side of the railbed, "as the company completed each mile of the transcontinental railroad." *Id.* "By granting to the railroad the odd-numbered sections, and retaining the even-numbered sections, a checkerboard effect resulted." *Leo Sheep Co. v. United States*, 570 F.2d 881, 885 (10th Cir. 1977), *rev'd*, 440 U.S. 668 (1979).

6

"With some exceptions, odd-numbered sections were surrounded on all four sides by even-numbered sections which were part of the public domain." *Id.* Likewise, for the even-numbered sections. *See id.* "Today, more than half of the [C]heckerboard remains under federal ownership, while the remainder is held privately." *Mountain States Legal Found.*, 799 F.2d at 1424 n.1.

## II.    *Iron Bar Buys Some Checkerboard Land on Elk Mountain*

In 2005, Iron Bar purchased several odd-numbered sections in the Checkerboard surrounding Elk Mountain in Wyoming. *See* App. V1:80-81; App. V1:82-84; App. V3:372. At the northern end of the Medicine Bow Mountains, Elk Mountain "stands as a beacon above the surrounding terrain, even while riding horseback at dark, and . . . is a prominent landmark for orientation." MARK E. MILLER, BIG NOSE GEORGE: HIS TROUBLESOME TRAIL 40 (High Plains Press 2021).

Because the mosaic of public and private lands around Elk Mountain are largely open, unfenced, and unimproved, App. V4:773, the area has the "appearance of a common[.]" *Mackay v. Uinta Develop. Co.*, 219 F. 116, 119 (8th Cir. 1914); *see* App. V2:274; App. V5:798-800, 806-807. Though two lone t-posts, a chain, lock, and "No Trespassing" signs frame a particular section corner. App. V3:414, 433-441.

Northwest of Elk Mountain, Rattlesnake Pass Road (County Road 400), App. V3:588, winds through several sections of public land adjacent to Iron Bar's

property.  *See* App. V3:372.  The following map depicts the Checkerboard lands relevant here with Rattlesnake Pass Road visible, the section lines and numbers marked, ownership signified by color (dark green—federal public land; light green—state public land; yellow—Iron Bar's land), and the first common corner at-issue marked with a red "X":



*See* App. V3:372; *see also* App. V2:231.

8

Iron Bar holds grazing permits from the Bureau of Land Management (BLM) applicable to public land sections within the grazing district covering Elk Mountain, including Sections 14, 24, and 30. *See* App V3:409-412. Iron Bar does not own or hold title to these public lands. App. V3:366. Thus, as Iron Bar admitted below, App. V3:411-415, it cannot restrict or interfere with hunting or fishing on these lands. 43 U.S.C. § 315 ("Nothing in this Act shall be construed as in any way altering or restricting the right to hunt or fish within a grazing district in accordance with the laws of the United States or of any State, or as vesting in any permittee any right whatsoever to interfere with hunting or fishing within a grazing district.").

So a hunter could drive Rattlesnake Pass Road to Section 14, a section of federally owned public land, walk from the road to the southeast corner of the section, and step over the corner to enter Section 24 and similarly access other public land sections beyond. At least, she could *physically* do so if the corner is unobstructed. *Cf.* App. V3:418-419. But Iron Bar believes this walk requires trespassing on its property.

Iron Bar claims that ownership of *adjacent* sections of land entitles it to deny entry to "the airspace" situated above the section corners its land shares with public lands in the Checkerboard. *See* App. V3:394-396; App. V3:438-440; App. V3:446-447. Iron Bar thus believes it has the power to enclose public land at these corners, obstructing passage there and controlling any use of the public lands beyond. App.

9

V3:380.  Iron Bar came to these beliefs through a wishful interpretation of the Supreme Court's decision in *Leo Sheep*.

A misreading of *Leo Sheep* has brought many landowners to the belief that ownership of several odd-numbered sections in the Checkerboard entitles them to control access to neighboring public sections—a belief as old as the Checkerboard itself.[4]  This misreading has encouraged enclosure-by-corner-locking: that is, obstructing or denying entry to public land in the Checkerboard at common corners. *See, e.g., United States ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414, 1419–20 (D. Wyo. 1985), *aff'd*, 848 F.2d 1502 (10th Cir. 1988).  Trouble is, the Supreme Court and even the private litigants in *Leo Sheep* recognized that the case provided no fountainhead for this belief or practice.

In the 1970s, the United States bulldozed a road on the surface of private land near common corners in Wyoming's Checkerboard without obtaining the consent of or compensating the affected landowners.  *See Leo Sheep*, 440 U.S. at 669, 677–78.  The United States asserted the doctrine of easement-by-necessity and the UIA gave it authority to build this road on private property without permission or compensation.  *Id.* at 679.

---

[4]*See, e.g., United States v. Douglas-Willan Sartoris Co.*, 3 Wyo. 287, 293, 298–300, 22 P. 92, 94, 96–97 (Wyo. 1889), *overruled by Camfield v. United States*, 167 U.S. 518 (1897).

10

The Supreme Court disagreed. *Id.* at 680–87. It reasoned that the United States, as a sovereign, cannot avail itself of the easement-by-necessity doctrine because its power of eminent domain removes any true "need" for the sovereign's passage. *Id.* at 680–81. It also concluded that the UIA and related caselaw did not "suggest that the Government has the authority" to construct a road on private land absent permission or compensation. *Id.* at 683–87.

Whether landowners had a right to exclude others from common corners was simply not before the Court in *Leo Sheep*. *See* 440 U.S. at 669 (identifying the issue as "[w]hether the Government has an implied easement to build a road across [private] land"). Applicable federal law has "long prohibited" landowners in the Checkerboard from enclosing these public lands by any means, including enclosures at common corners. *See Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1179 (10th Cir. 2016); *Accord United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1505–08 (10th Cir. 1988), *cert. denied*, 488 U.S. 980.

Still, Iron Bar took *Leo Sheep* and ran with it to police corner crossing aggressively and seek the removal of any person found on the public lands next to its property. *See* App. V3:375-377, 433-443, 448-450. Indeed, Iron Bar's multi-faceted practices targeting corner crossing effectively blocked access to much of the public lands around Elk Mountain.

11

Since about 2009, Iron Bar deployed a "confront-and-remove" approach to any person found on public land adjacent to its property on Elk Mountain. *See* App. V3:376-377; 392-393. If Iron Bar observed anyone on a public land section beyond Section 14, Iron Bar confronted that person as a trespasser and would demand the individual leave the area no matter how that person arrived at that spot. *See id.*; App. V3:376-377; App. V3:448-450. The encounter would end only if the person agreed to leave. App. V3:377, 392.

Otherwise, Iron Bar would threaten to call law enforcement and, if that threat went unheeded, Iron Bar would repeatedly contact law enforcement until it received a satisfactory response—removal, arrest, or citation. *See* App. V3:378-380, 400-402, 520-528, 580-600. If the law enforcement approach failed, Iron Bar would haul the supposed trespasser before a civil court demanding injunctive relief and damages, as it did here. App. V1:173; App. V3:383; App. V3:611.

Then, sometime in 2015, Iron Bar's ranch manager, Steve Grende, hammered two steel t-posts into the ground a few inches from the common corner of Sections 13, 14, 23, and 24. *See* App. V3:372 (the red "X"), 433-434. On each t-post, Mr. Grende affixed signs facing Rattlesnake Pass Road to the northwest that read "No Trespassing" in red font against a white background. App. V3:437-438. Until four days before it sued the hunters, Iron Bar hung a metal chain and lock connecting the two t-posts through the air above this section corner. *See* App. V3:418; App.

V3:435, 437.  A strand of wire also linked the t-posts above the signs.  *See* App.

V3:418-419 (depicted below).

 

These obstacles would physically block any person from walking directly over the

common corner into Section 24.  *See* App. V3:418-419, 440.

Iron Bar does not maintain similar obstructions, signs, posts, fences, or other

fixtures at any section corner beyond this first corner off Rattlesnake Pass Road.

App. V3:443; App. V4:736.  Iron Bar acknowledged that it placed obstructions only

at this very first corner off Rattlesnake Pass Road because, with this corner blocked,

the public lands beyond would be inaccessible by any reasonable mode of travel.

App. V3:460-462; *cf.* App. V3:462 ("A: [T]here is other ways to access [public

land]." Q: How can you do that? A: Helicopter.").

13

Meanwhile, Iron Bar's owner and his personal guests enjoyed exclusive use of the public lands past Section 14. *See* App. V3:367, 387. In fact, Iron Bar's owner and friends were hunting Elk Mountain when the hunters visited the area in 2021.[5] *See* App. V3:554. This lawsuit is Iron Bar's attempt to maintain an exclusive right to access the public lands on Elk Mountain.

### III.    The First Hunt

In late September 2020, Cape, Yeomans, and Smith drove together from Missouri to Wyoming to hunt Elk Mountain. App. V3:478, 495, 508. They took Rattlesnake Pass Road to Section 14, parked off the side of the road, and set up camp. App. V3:524-525. They walked to the southeast corner of Section 14. *See id.* Because Iron Bar's obstructions prevented them from stepping directly over the corner, each man gripped a t-post and swung around it to reach Section 24. App. V3:490-491. While hiking 9 miles each day, the men never set foot on Iron Bar's property. App. V3:482.

---

[5]Iron Bar warns that "hunters with high-powered rifles" roaming freely on public lands in the Checkerboard create the potential for "accidents (and worse)." Appellant's Br. at 56. The record below shows that any danger posed by errant gunfire in the Checkerboard stemmed from Iron Bar's inexperienced guests, not the hunters. *Compare id.*, *with* App. V3:470 at 2:49-3:01 (Grende to law enforcement: "I have guys with rifles ready to shoot anything . . . they're from the city—they don't f***ing know.").

14

The hunt was largely an uninterrupted success.  At one point, however, Iron Bar's ranch manager confronted the hunters on Section 36—a public section—and interrogated them about their hunt and travels.  App. V3:471, 472-475.  Mr. Grende asserted that corner crossing was illegal in Carbon County and complained that the men had touched a t-post located on private land.  App. V3:471.

Carbon County Deputy Sheriff Roger Hawks also talked to the hunters after Iron Bar's owner demanded their immediate arrest for criminal trespass.  App. V3:524-525.  To Iron Bar's chagrin, Deputy Hawks did not arrest the hunters.  *See id.*  Deputy Hawks did not issue the hunters any warnings or citations, nor did he assert that they had done anything wrong.  App. V3:485.  To the contrary, Deputy Hawks politely sent them on their way.  *See id.*

## IV.     *The Second Hunt and the Ladder*

Given their success in 2020, Cape, Yeomans, and Smith were eager to hunt the public land on Elk Mountain again the next year.  They invited another friend, John Slowensky, to join them.  Being mindful of Mr. Grende's expressed concern about touching the t-post, they brought an A-frame ladder welded from steel pipe so they could climb over the t-posts this time.  App. V3:480, 599.

The hunters encountered far greater hostility from Iron Bar in 2021—though, again, they never set foot on private land.  *See* App. V3:482.  After they arrived in late September, the four hunters endured near-constant surveillance with their travels

and activities documented by Iron Bar.  *See* App. V3:569-572; App. V3:581-582.
Iron Bar also tried to sabotage their hunt.  *See id.*  Mr. Grende reported the hunters
to the local law enforcement several times each day.  App. V3:583.

At first, neither Wyoming Game & Fish nor the Sheriff's Office would agree
to cite the hunters for trespassing.  *See* App. V3:452.  Iron Bar's owner instructed
Mr. Grende to keep trying and encouraged directly lobbying the Carbon County
Attorney.  App. V3:452-453.  As part of his efforts, Mr. Grende told Game Warden
Jake Miller and two deputies that, if the hunters were not prosecuted for corner
crossing, Iron Bar's owner would "shut down" all the land on Elk Mountain.  App.
V3:470; App. V3:463-464.

Ultimately, Iron Bar's pressure campaign succeeded: Warden Miller ordered
the hunters off the public lands beyond Section 14, App. V3:517, and the Sheriff's
Office, under orders from the County Attorney, issued each hunter a citation for
criminal trespass, App. V3:591.  At a jury trial in April 2022, the hunters were
acquitted of all charges.  *See* App. V3:601-608.

## V.    *Iron Bar Uses Trespass Law to Enclose Public Land*

While the criminal cases were still pending, Iron Bar filed this lawsuit.  App.
V1:48-57.  Iron Bar requested "a declaration from the Court" that corner crossing
was illegal.  *See* V1:48-49.  It also requested injunctive relief and damages.  V1:52-
57.

Iron Bar asked for a judicial declaration that its ownership of adjacent lands granted it the absolute right to exclude people from "the airspace at the corner[s]" its property shares with public land. App. V1:51. Iron Bar also demanded monetary compensation for the hunters' acts of stepping through the airspace at several common corners, computing its "actual damages arising from [the hunters'] conduct" at several million dollars. App. V3:611. Iron Bar even submitted an expert report contending its damages could exceed $9,000,000.00. App. V1:173. Iron Bar's expert reasoned that Iron Bar's property value included a premium of "at least twenty-five percent, perhaps as high as thirty percent" because it could exclude others from common corners. *Id.*

Iron Bar's lawsuit proceeded to summary judgment. Iron Bar argued that, under Wyoming law, its ownership of half the land at common corners entitles it to exclusive use of the whole corner. *See* App. V2:216-218. The hunters countered that this conception of Iron Bar's property rights at common corners conflicts with federal law, state law, and historical tradition and practice by permitting landowners to enclose public land in the Checkerboard. *See* App. V3:343-360; App. V4:774-792.

The District Court rejected Iron Bar's claims as a matter of law, concluding that a person cannot be subject to trespass liability for corner crossing by foot without touching or damaging the adjacent private property. App. V5:855.

17

Although recognizing that a landowner has a right to exclude others from its property, the District Court reasoned that background principles of nuisance and property law, including preexisting federal law, limit the enforcement of that right at common corners. *See* App. V5:867-868. The District Court synthesized caselaw concerning the cooperative and shared use of the unenclosed, unimproved lands in the Checkerboard to conclude that landowners cannot use trespass actions to deny others a reasonable way of passing into the public domain at section corners. *See* App. V5:875-876, 878.

Applying these principles, the District Court found that the hunters were entitled to summary judgment based on their 2021 hunt because they did not physically touch, let alone damage, Iron Bar's property when they stepped across common corners. App. V5:878-879. It further found that the hunters were entitled to summary judgment based on their 2020 hunt because they only made incidental contact with the t-posts, the erection of which was unlawful under 43 U.S.C. § 1063. App. V5:879-881.

## SUMMARY OF THE ARGUMENTS

Iron Bar cannot use a trespass lawsuit—or any other device—to protect a property right it does not have and that conflicts with longstanding federal law. Because landowners have no right to enclose public land at common corners in the

Checkerboard, obstructing passage to the public lands and effectively excluding all others from these lands, Iron Bar's lawsuit is fatally flawed.

The Unlawful Inclosures of Public Lands Act (UIA), 43 U.S.C. §§ 1061 *et seq.*, prohibits landowners from enclosing and preventing access to public land at common corners. Iron Bar's asserted "right to exclude" at common corners is, thus, outlawed by the UIA.

Separate from the UIA, tradition, custom, caselaw, and modern regulations also prohibit Iron Bar's claimed right to exclude people from common corners. Wyoming law itself forbids this claim.

Judicial endorsement of Iron Bar's claimed right to exclude others common corners in the Checkerboard would effectively block the most reasonable means of accessing the public lands—*e.g.*, walking to them from other public land. And so, stripped to its essence, Iron Bar really wants a right to exclusive use of its land *and* the public land on Elk Mountain. Thus, because Iron Bar's application of trespass law here would completely enclose Elk Mountain, this Court should reject Iron Bar's claim and affirm.

### IRON BAR CANNOT EXCLUDE OTHERS FROM PUBLIC LANDS BY ANY MEANS

Iron Bar has no right to exclude others from section corners it shares with public land in the Checkerboard. Because Iron Bar's lawsuit seeks to enforce this nonexistent right, this Court should affirm the District Court's decision and deny

19

Iron Bar a monopoly over neighboring public land in the Checkerboard accessible only by crossing at these common corners.

Although the right to exclude others is a core property right, *see Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979), it has limits. *See Hinman v. Pacific Air Transp.*, 84 F.2d 755, 758 (9th Cir. 1936); *see also* POWELL ON REAL PROPERTY: MICHAEL ALLAN WOLF DESK EDITION, § 64A.01 at n.23 (LexisNexis 2009) (collecting cases on the limits of trespass liability).  For example, a landowner's right to exclude does not extend to "any area they do not own." *DeGroote v. City of Mesa*, Case Nos. CV 07-1969-PHX-MHM, CV 07-2123-PHX-LOA, 2009 U.S. Dist. LEXIS 15082, at *9 (D. Ariz. Feb. 25, 2009).  Other property principles, like tradition, custom, and necessity, can further relax a landowner's right to exclude in certain unique locations.  *See Buford v. Houtz*, 5 Utah 591, 596, 18 P. 633, 634 (Utah 1888), *aff'd,* 133 U.S. 320 (1890); *McKee v. Gratz*, 260 U.S. 127, 136 (1922).

A landowner's right to exclude, like other property rights, is drawn from and limited by "existing rules or understandings."  *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998).  "State law is one important source.  But state law cannot be the only source."  *Tyler v. Hennepin Cnty.*, 143 S. Ct. 1369, 1375 (2023) (internal citations omitted).  Otherwise, state law could be used to "sidestep" important constitutional principles, *see id.*, like federal supremacy and Congress's plenary power over the public domain.  *See Camfield*, 167 U.S. at 526; *Kleppe v.*

*New Mexico*, 426 U.S. 529, 538, 543 (1976); *Wyoming v. United States*, 279 F.3d 1214, 1227 (10th Cir. 2002). To understand properly the right to exclude and its limits, courts must "also look to 'traditional property law principles,' plus historical practice and this Court's precedents." *Tyler*, 143 S. Ct. at 1375 (citing *Phillips*, 524 U.S. at 165–68).

Applying this rubric here, this Court should affirm the District Court's order. The UIA and Wyoming law prohibit any private landowner from asserting exclusive rights to any part of public land in the Checkerboard, including common corners. Iron Bar cannot enforce nonexistent rights with unlawful enclosures. And abating every means of unlawfully enclosing public land is justified by American tradition, custom, and modern regulations.

## I.    *Leo Sheep Does Not Govern this Case*

To begin, Iron Bar mischaracterizes the issue before this Court as well as this Court's power to address this issue. Iron Bar says this is an easement case like *Leo Sheep* where the UIA and related laws do not apply. *See* Appellant's Br. at 4, 31-39. But even the petitioners in *Leo Sheep* conceded that access to public land by corner crossing was *not* before the Court:

> the issue today is not really whether the United States or any other private party has a right of access to cross a section of land to reach an adjoining section of land.

Clyde O. Martz, Esq. on behalf of Petitioners Leo Sheep Company and Palm Livestock Company, Transcript of Oral Argument, Part I of II (held on Jan. 15, 1979) at 11-12, *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) (No. 77-1686). Because Iron Bar gets *Leo Sheep* wrong, it gets this case wrong too.

Iron Bar argues the hunters committed a trespass by entering airspace at common corners because they did not have Iron Bar's permission to do so. Appellant's Br. at 25-26, 27-39. So, in Iron Bar's conception, the District Court effectively granted the hunters an easement through Iron Bar's airspace at these corners without compensation—"one of the broadest judicial takings of private property in American history" that would "erase billions of dollars of private-property value." *Id.* at 4, 57. Iron Bar tilts at this windmill throughout its brief, arguing that *Leo Sheep* eliminated "a generalized right of access to checkerboarded public land" at common corners, *id.* at 16, while positing this judicial taking would unleash rampant trespassing elsewhere on its property. *See id.* at 53-61.

Neither a majority of the Supreme Court nor any federal court of appeals have recognized a judicial taking. *See Pavlock v. Holcomb*, 35 F.4th 581, 587 (7th Cir. 2022). Even still, "adjudication of disputed and competing claims cannot be a taking." *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 425 (3d Cir. 2013).

That said, this Court has already rejected Iron Bar's exact framing of the issue and related deflections. *Bergen*, 848 F.2d at 1508–12. This Court should reject Iron

Bar's rendition of the same points.  *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993).

In *Bergen*, Taylor Lawrence maintained a 28-mile-long fence that was physically located on private land except "where it crosses at the common corners of state and federal sections."  *Bergen*, 620 F. Supp. at 1415–16, 1418.  Lawrence's fence enclosed about 9,600 acres of public land.  *Bergen*, 848 F.2d at 1504.  After the District Court found that Lawrence's fence violated the UIA and ordered its removal, *Bergen*, 620 F. Supp. at 1420, Lawrence appealed.  *See Bergen*, 848 F.2d at 1504.

Lawrence argued that the District Court had committed a judicial taking by granting an easement across his land without compensation.  *Id.* at 1505.  He also argued that the UIA did not apply because its "purpose was to prevent the continuation of 'range wars,' and that it should not be extended beyond this purpose."  *Id.* at 1506.  He relied on *Leo Sheep* to justify his positions.  *See id.* at 1505–06.  This Court rejected both Lawrence's characterization of the issue and his attempt to sidestep the UIA.  *See id.*

First, it observed that the District Court's decision did not constitute a taking, but rather "abated a nuisance proscribed by federal law." *Id.* at 1507.[6] "[W]e can find nothing of Lawrence's that has been 'taken.'" *Id.* To the contrary, "Lawrence retains the right to exclude antelope from his own lands if he can accomplish that exclusion without at the same time effecting an enclosure of the public lands. [. . .] All that Lawrence has lost is the right to exclude others, including wildlife, from the public domain -- a right he never had." *Id.* at 1507–08.

Second, it disagreed that *Leo Sheep* confined the UIA to ending the "range wars." *Id.* at 1506. "If the UIA was only meant for such a limited purpose, the Court would have said so in *Camfield*, and Congress should have repealed it in 1934 when the Taylor Grazing Act was passed to end public land disputes." *Id.* (quoting *Bergen*, 620 F. Supp. at 1419–20).

> [U]nder Lawrence's reasoning, the UIA became superfluous as early as 1934 when the Taylor Grazing Act put an end to the open public range, or at the latest in 1976 when the last of the homesteading acts was repealed by [FLPMA]. Yet the UIA remains federal law, and was amended in 1984 when Congress modified a procedural provision. We refuse to repeal the UIA by implication and therefore, must give effect to its provisions.

---

[6]*See also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 145 (1978) (Rehnquist, J., dissenting) (regulating nuisances is not a taking); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005); *Accord Bruce v. Ogden City Corp.*, 640 F. Supp. 3d 1150, 1164–65 (D. Utah 2022), *aff'd*, 2023 U.S. App. LEXIS 31746 (10th Cir. Dec. 1, 2023).

*Id.* at 1506–07.

Iron Bar plows the same barren ground here.  Like Lawrence, Iron Bar has no right to exclude others from the public domain in the Checkerboard by maintaining an enclosure or obstructing access at common corners.  *See Bergen*, 848 F.2d at 1508.  And eliminating this nonexistent property right is still not a taking.  *See id.* at 1507–08.  *See also Mount St. Scholastica, Inc. v. C. of Atchison*, 482 F. Supp. 2d 1281, 1298 (D. Kan. 2007) ("That plaintiff has assumed, incorrectly, that it had [a property right] for the last sixteen years, does not create a taking.") (following *Penn Central*).  *Leo Sheep* does not upend this logic.

Unlike *Leo Sheep*, the issue here is whether Iron Bar can use trespass liability to exclude others from common corners, enclosing the public domain.  *See* App. V2:216-218.  The District Court held that Iron Bar cannot.  App. V5:878.  This Court should too.

## II.      *Wyoming Trespass Law Cannot Be Used to Enclose and Obstruct the Public Domain*

Turning now to substantive law, the UIA and Wyoming law declare that monopolization and enclosure of the public domain in the Checkerboard are unlawful.  Thus, Iron Bar cannot use a lawsuit to enforce exclusive rights to common corners and obstruct access to public land.

The Property Clause of the U.S. Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the

Territory or other Property belonging to the United States."  U.S. CONST., art. IV, §

3, cl. 2.  "[W]hile courts must eventually pass upon them, determinations under the

Property Clause are entrusted primarily to the judgment of Congress."  *Kleppe*, 426

U.S. at 536.  Congressional judgments concerning the use and protection of public

lands "necessarily override[ ] conflicting state laws," *Kleppe*, 426 U.S. at 540–42

(citing U.S. Const., Art. VI, cl. 2), as a different rule "would place the public domain

of the United States completely at the mercy of state legislation."  *Camfield*, 167

U.S. at 526.  "State laws," under a supremacy analysis, include state common-law

claims asserted in civil lawsuits.  *See, e.g., Cipollone v. Liggett Grp., Inc*., 505 U.S.

504, 522–24 (1992); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000).

Under the Property Clause, "Congress may prohibit the doing of acts upon

privately owned lands that imperil the publicly owned [lands]."  *United States v.*

*Alford*, 274 U.S. 264, 267 (1927); *cf. Defenders of Wildlife v. Everson*, 984 F.3d 918,

944 (10th Cir. 2020) (assuming the same).  For example, it may prohibit enclosures

situated on private property.  *See Herr v. U.S. Forest Serv.*, 865 F.3d 351, 356 (6th

Cir. 2017) (citing *Camfield*, 167 U.S. at 525).

The UIA provides, in pertinent part:

> All inclosures of any public lands in any State or Territory of the United
> States, heretofore or to be hereafter made, erected, or constructed by
> any person, party, association, or corporation . . . are hereby declared
> to be unlawful, and the maintenance, erection, construction, or control
> of any such inclosure is hereby forbidden and prohibited; and the

26

> assertion of a right to the exclusive use . . . of any part of the public
> lands . . . is likewise declared unlawful, and hereby prohibited.

43 U.S.C. § 1061.

> No person, by force, threats, intimidation, or by any fencing or
> inclosing, or any other unlawful means, shall prevent or obstruct . . .
> any person from peaceably entering upon . . . any tract of public land
> subject to . . . entry under the public land laws of the United States, or
> shall prevent or obstruct free passage or transit over or through the
> public lands[.]

43 U.S.C. § 1063.

This statutory language is "clear" and comprehensive: the UIA prohibits "all 'enclosures' of public lands, by whatever means[.]" *Bergen*, 848 F.2d at 1509–10 (quoting *Camfield*, 167 U.S. at 525). In doing so, the UIA protects free passage to the public domain. *See McKelvey v. United States*, 260 U.S. 353, 357–59 (1922); *Accord Bergen*, 620 F. Supp. at 1417. "Passage or transit is free in the sense intended when it is open to all." *McKelvey*, 260 U.S. at 357.

Early cases recognized the UIA's intent and broad scope. For example, in *Stoddard*, the Eighth Circuit held that the UIA "was intended to prevent the obstruction of free passage or transit for any and all lawful purposes over public lands," including the passage of people to these lands. *Stoddard v. United States*, 214 F. 566, 568–68 (8th Cir. 1914). Over time, a split emerged over whether the UIA only prohibited *intentional* enclosures or obstructions that were expressly created to enclose the public lands. *See Homer v. United States*, 185 F. 741, 745–

27

46 (8th Cir. 1911); *compare Potts v. United States*, 114 F. 52, 54–55 (9th Cir. 1902),

*with United States v. Buford*, 8 Utah 173, 175–77, 30 P. 433, 434 (Utah 1892).  Still,

the courts on both sides of this split recognized that the UIA demanded "reasonable

access by the public to the public domain."  *Golconda Cattle Co. v. United States*,

214 F. 903, 909 (9th Cir. 1914); *United States v. Johnston*, 172 F. 635, 636 (N.D.

Cal. Cir. 1908).  As the Eighth Circuit put it:

> Purchasers of odd numbered sections of land from the railroad company
> take the same with knowledge that the United States may retain the
> ownership of the even numbered sections indefinitely[.] [. . .] [W]e
> think, that . . . an opening should be made in the general inclosure as
> will allow free ingress and egress to the public lands in question.

*Homer*, 185 F. at 747.

To protect "free ingress and egress to the public lands," *id.*, the UIA declares

that all enclosures of or obstructions to the public domain "by whatever means"—

permanent or temporary, tangible or intangible—are unlawful nuisances which must

be removed.  *See Camfield*, 167 U.S. at 525; *Bergen*, 848 F.2d at 1505; *see also*

*Inclosure*, WEBSTER'S PRACTICAL DICTIONARY OF THE ENGLISH LANGUAGE (1884)

("Act of, state of being, or thing which is inclosed; space contained; that which

incloses: a barrier, fence.").[7]  Over time, landowners have used different "device[s]"

---

[7]The Supreme Court often relies on a contemporaneous version of Noah Webster's
dictionary to determine the meaning of a statutory text.  *See Wis. Cent. Ltd. v. United
States*, 138 S. Ct. 2067, 2074 (2018).

to enclose or obstruct passage to the public domain. *See, e.g., Camfield*, 167 U.S. at 519–20 (fencing on odd-numbered sections of land); *McKelvey*, 260 U.S. at 355–56 (armed militias on public land); *Mackay*, 219 F. at 117–20 (trespass lawsuit); *Buford*, 5 Utah at 596, 18 P. at 634 (same).[8]  Regardless of its nature, if a landowner's chosen device has the effect of enclosing the public domain or obstructing free passage thereto, the UIA prohibits it. *See Camfield*, 167 U.S. at 525–28; *McKelvey*, 260 U.S. at 355–59.  Using a trespass lawsuit to enclose and obstruct access to public land at section corners is no different. *See* Burke Snowden, Comment, *New Life for the Unlawful Inclosures Act: Immunizing Corner-Crossers from State Trespass Actions*, 90 U. CHI. L. REV. 2013, 2037–47 (2023); Kevin Frazier, *Corner Crossing: Unlocking Public Lands or Invading the Airspace of Landowners?*, 46 PUB. LAND & RESOURCES L. REV. 91, 108–11 (2023).

Despite conceding that no reasonable method of accessing the public domain in the Checkerboard exists apart from stepping over common corners, *cf.* App. V3:462, Iron Bar asserts a right to prevent anyone from accessing the public domain

---

[8]"Posting" land with "No Trespassing" notices constitutes a modern enclosure. *See, e.g., State v. Dupuis*, 197 A.3d 343, 357 (Vt. 2018) (Carroll, J., dissenting); *Accord* ERIC T. FREYFOGLE, DALE D. GOBLE, AND TODD A. WILDERMUTH, WILDLIFE LAW: A PRIMER 46-47 (2d ed. 2019) ("'Unenclosed' is now understood to mean not posted[.]").

this way.  *See* Appellant's Br. at 27-31.  Iron Bar's claim is a buffet of UIA violations.

First, the UIA prohibits enclosures of the public domain "by whatever means." *Camfield*, 167 U.S. at 525; *Bergen*, 848 F.2d at 1505.  On this score, the UIA specifically identifies the assertion of a right to exclusive use of "any part of the public lands" as unlawful.  *See* 43 U.S.C. § 1061; *Bergen*, 848 F.2d at 1508–09. Thus, Iron Bar's claim to exclusive rights over common corners violates the UIA as these *shared* corners are at least "part" public land.  *See* 43 U.S.C. § 1061.

Second, the UIA prohibits any obstruction of free passage through the public domain for lawful purposes.  *See* 43 U.S.C. § 1063; *McKelvey*, 260 U.S. at 357–59. Among other outdoor activities, hunting is a lawful purpose.  *Bergen*, 620 F. Supp. at 1417 ("[T]he free passage of hunters and their quarry is a lawful purpose for which the public may seek access to public lands.").  Iron Bar's claimed dominion over common corners permanently obstructs reasonable passage—corner crossing on foot—to the public domain for lawful purposes.

Thus, even if Iron Bar could use Wyoming trespass law to maintain corner enclosures and seize exclusive enjoyment of unappropriated public land under state law for itself (which it cannot), the judgment of Congress expressed through the UIA would "necessarily override" this application of state law.  *See Kleppe*, 426 U.S. at 540–42; *cf. Geier*, 529 U.S. at 886, 873.

That said, Wyoming law forbids corner enclosures too.  Like the UIA, the Wyoming Constitution expressly disclaims any assertion of right "to the unappropriated public lands within the [state's] boundaries."  *See* WYO. CONST. art. 21, § 26, cl. 1.  Wyoming law also bars any *de facto* privilege to exclusive use of public land, *see Healy v. Smith*, 14 Wyo. 263, 286, 83 P. 583, 588 (Wyo. 1906) ("[N]o ground is presented for equitable interference as to the use of the public lands by [the public].")[9] as well as "unreasonable, unwarranted, or unlawful" uses of private property that obstruct or interfere with the use of public land.  *See Grace United Methodist Church v. Cheyenne*, 451 F.3d 643, 674 (10th Cir. 2006).  Thus, Wyoming landowners cannot lawfully assert exclusive rights to use, possess, or obstruct common corners.  *See Bergen*, 848 F.2d at 1504.  And absent an established exclusive right in the property at-issue, "one cannot bring a trespass claim" under Wyoming law.  *Lyman v. Childs*, 2023 WY 16, ¶ 46, 524 P.3d 744, 758 (Wyo. 2023).  Thus, Wyoming law disallows Iron Bar's use of trespass law here.

Iron Bar does not possess exclusive rights to section corners its property shares with public land.  Nor can it assert or enforce such rights through trespass lawsuits when the effect is the exclusion of others from the public domain, *see, e.g.,*

_____

[9]So too does the law of other states.  *See, e.g., Hill v. Winkler*, 21 N.M. 5, 9–14, 151 P. 1014, 1015–17 (N.M. 1915); *Payne v. Gould*, 74 Vt. 208, 52 A. 421 (Vt. 1902).

*Mackay*, 219 F. at 117–20; *Buford v. Houtz*, 133 U.S. 320, 321–24, 332 (1890), any more than it could fence in the corners.  *See, e.g., Bergen*, 848 F.2d at 1508–12; *Camfield*, 167 U.S. at 525–28.  For "[i]t is not the fence itself, but its *effect* which constitutes the UIA violation."  *Bergen*, 620 F. Supp. at 1419 (emphasis added).  Thus, Iron Bar cannot assert a trespass claim for corner crossing.

### III.     *Tradition, History, and Modern Regulations Prohibit Using Trespass Liability to Enclose and Interfere with Use of the Public Domain*

Iron Bar's assertion of trespass liability for accessing public land at common corners also conflicts with American tradition and history as well as modern regulations.

#### a. <u>Tradition and History: Abating the Nuisance of Private Domination of Public Space</u>

Examining the tradition and history of the public lands in the Checkerboard reveals that Iron Bar's efforts here—however modern and genteel by comparison—are cut from the same cloth as the barbed-wire empires that unlawfully dominated these lands over a century ago: another nuisance that must be abated.

##### i.    *Freedom at the Founding*

Post-Revolution American ideals required an overhaul of English property law.

> Early republicanism relied upon equitable property distribution to [promote equality of political power]: "an equality of property, with a necessity of alienation, constantly operating to destroy combinations of powerful families, is the very *soul* of the republic."

Michael C. Blumm & Kara Tebeau, *Antimonopoly in American Public Land Law*, 28 GEO. ENVTL. L. REV. 155, 160 (2016) (emphasis original) (quoting Stanley N. Katz, *Thomas Jefferson & the Right to Property in Revolutionary America*, 19 J. L. & ECON. 467, 483–484 (1976)).

Part of this vision included the public's right to travel through the unimproved lands of the continent. *See* Brian Sawers, *The Right to Exclude from Unimproved Land*, 83 TEMP. L. REV. 665, 666, 674–75 (2011). Excluding others from unimproved lands as trespassers was unthinkable:

> A man could not walk across his neighbor's unenclosed land, nor allow his horse or his hog, or his cow, to range in the woods nor to graze on the old fields, or the 'wire grass,' without subjecting himself to damages for a trespass. Our whole people, with their present habits, would be converted into a set of trespassers. We do not think that such is the law.

*Macon & Western R.R. Co. v. Lester*, 30 Ga. 911, 914 (1860); *see also Kerwhaker v. Cleveland, Columbus & Cincinnati R.R. Co.*, 3 Ohio St. 172, 182 (1854) ("[M]ore than nine-tenths of the business men of the State become for this cause, tort feasors every day of the year, and liable to suit for damages."); *Seeley v. Peters*, 10 Ill. (5 Gilm.) 130, 142 (1848); *Law v. Nettles*, 18 S.C.L. (2 Bail.) 447, 447 (S.C. Ct. App. 1831).

The freedom to travel throughout the unimproved countryside did not disappear when Congress issued the railroad land grants creating the Checkerboard. Instead, Congress issued these land grants with this expectation of liberty in mind.

As it issued odd-numbered land sections to the railroad companies, Congress also tried to sell the even-numbered sections of public land. *See* Shelby D. Green, *No Entry to the Public Lands: Towards a Theory of a Public Trust Servitude for a Way over Abutting Private Land*, 14 WYO. L. REV. 19, 29 (2014). Congress later sought to dispose of the federally owned sections in the Checkerboard through homesteading. *See id.* Although these efforts failed, Congress never worried that prospective purchasers or homesteaders could be barred from entering checkerboarded public lands because adjacent landowners had a right to exclude them. *See United States v. Jenks*, 22 F.3d 1513, 1515 (10th Cir. 1994).

Thus, the birth of the Checkerboard did not orphan the interior public lands. Rather, Congress incorporated the history, tradition, and custom of "unimpeded access" to public lands into the creation of the Checkerboard. *See id.* ("[I]t was presumed that 'an implied license' to use public lands would provide settlers with unimpeded access to their property."). That understanding, however, did not stop a few would-be cattle kings from trying to leverage ownership of railroad sections in the Checkerboard to obtain exclusive control over the entire landscape. *See* Blumm & Tebeau, 28 GEO. ENVTL. L. REV. at 181–82.

    *ii.*   <u>When the Cattle Kings Tried to Take the West</u>

In the 1860s, "[t]here was room enough for all[.]" ERNEST STAPLES OSGOOD, THE DAY OF THE CATTLEMAN 182 (1929). By the 1870s, "the West was filling up at

34

a rapid rate . . . [and] the agricultural frontier was crowding into the eastern margin of the cattle kingdom.  The cattleman wanted an open range for his stock; the farmer wanted open fields for his crops."  WALTER PRESCOTT WEBB, THE GREAT PLAINS 272 (2d ed. 2022).  A conflict erupted.

At first, custom favored the cattlemen.  Early colonial tradition imposed a duty on landowners to fence *out* roaming livestock rather than to fence *in* their own animals.  *See* Yasuhide Kawashima, *Farmers, Ranchers, and the Railroad: The Evolution of Fence Law in the Great Plains*, 30 GREAT PLAINS Q. 21, 21 (2010).  The Plains territories largely followed this tradition.  *Id.*  But because wood and rock were scarce, people could rarely afford fencing to protect their crops from roaming stock, leaving the landscape largely unfenced.  *See id.*; *see also* Terry L. Anderson & P. J. Hill, *The Evolution of Property Rights: A Study of the American West*, 18 J.L. & ECON. 163, 172 (1975).  In the Wyoming Territory, cattlemen dominated as they drove Texas cattle over the North Platte onto the "prime grazing lands of northeast Wyoming," recently emptied of buffalo.  *See* Anne MacKinnon, *Historic and Future Challenges in Western Water Law: The Case of Wyoming*, 6 WYO. L. REV. 291, 295–96 (2006).

The invention of cheap barbed wire in the mid-1870s threatened this status quo by slashing the cost of fencing.  *See* Anderson & Hill, 18 J.L. & ECON. at 172; Earl W. Hayter, *Barbed Wire Fencing—A Prairie Invention: Its Rise and Influence*

*in the Western States*, 13 AGRIC. HIST. 189, 195 (1939). A few rich cattlemen adapted quickly. By the 1880s, these cattle barons had erected barbed-wire fences enclosing huge areas of land, including the public domain. Robert S. Fletcher, *The End of Open Range in Eastern Montana*, 16 MISS. VALLEY HIST. REV. 188, 194 (1929). Barbed-wire fencing was strung far and wide:

> [O]verambitious fencers . . . often had little or no regard for the convenience of travelers. They set up mile after mile of fence without making a gate. Roads were cut off . . . and in Archer County even the county seat was blocked off so that farmers and stockmen could not reach the courthouse except by cutting someone's barbed wire.

Wayne Gard, *The Fence Cutters*, 51 SW. HIST. Q. 1, 4 (1947) (citing GALVESTON NEWS, June 1, 1883). These aggressive fencing practices sabotaged development:

> Fencing . . . retarded for a time the building of churches and schools. A petition from some settlers in Pratt County, Kansas . . . asserted that the 'fence in many instances runs so near the lands owned or occupied by actual settlers that it interfears [sic] with . . . further settlement of the public domain.

Hayter, 13 AGRIC. HIST. at 202. Cattlemen also fenced off the exceedingly few water sources on the arid plains to expand their control over the range. Pamela Baldwin, *Livestock Water on Federal Rangelands*, 1 GREAT PLAINS NAT. RESOURCES J. 351, 373 (1996).

On September 29, 1883, the Commissioner of the General Land Office described the widespread enclosure of public land in the West. *See* H.R. Exec. Doc. No. 1, 48th Cong., 1st Sess. (1883), *Annual Report of the Comm'r of the General*

36

*Land       Office       1883*       at       30,       *available       at*
https://digitalcommons.law.ou.edu/indianserialset/5727/ (last visited Jan. 4, 2024).

Encirclement of public lands "west of the Mississippi River" covered "several
hundred thousand acres." *Id.* at 30. "Foreign as well as American capital is
understood to be largely invested in stock-raising enterprises involving unlawful
appropriation of the public lands." *Id.* "Legal settlements by citizens of the country
are arbitrarily prohibited, [and] public travel is interrupted[.]" *Id.* "Reports have
been received of the use of violence to intimidate settlers or expel them from the
inclosed lands." *Id.*

The Special Service Division also described the enclosure of public lands in
the West. *See id.* at 210. "Almost daily complaint is made of the illegal fencing of
public land by large cattle companies and wealthy individual cattle raisers." *Id.* The
Special Service Division further observed, with concern: "[t]he actual ownership of
land by the party or parties erecting the fences within these vast pastures being
confined to a few tracts which embrace springs or water holes, entered under pre-
emption or homestead laws, title to these few tracts having frequently been obtained
by doubtful or fraudulent means." *Id.* A special agent reported:

> The next fence in regular line of my travel, was what is known as the
> Brighton Ranch, and I went through a gate into this inclosure, and
> traveled for two hours and three-quarters over a direct road before
> reaching the other side of the inclosure, my horses going at a steady trot
> all the time. I think there is no doubt but that I traveled at least 12 or
> 14 miles within this huge pasture, and some of the land passed over was

very fine farming land.  In fact, I believe, from the information I gathered that there are thousands of acres of good farming lands inside of this fence that settlers would be glad to take, were it not for the fence and the fear of injury if it was molested.  I was informed by parties that I believe were reliable, that the fenced land of this company embraces from 75,000 to 100,000 acres, and that they are still fencing.

*Id.*

Referring to a circular from April 1883, the Commissioner stated that a territorial court in Wyoming had affirmed the federal government's right to remove illegal enclosures of the public lands and strengthened "the executive department in its efforts to abate the evils complained of."  *Id.* at 30–31.  Combating unlawful enclosures through litigation was slow so the Commissioner wrote that "some remedy at law" should be enacted.  *Id.* at 31.  "I renew the recommendation that an act be passed imposing penalties for the unlawful inclosures of public lands and preventing by force and intimidation legal settlement and entry."  *Id.*

Apart from any laws enacted to protect public entry to and use of the public domain, the Supreme Court independently recognized that history and tradition guaranteed reasonable public access to the public domain in the Checkerboard in *Buford v. Houtz*.  In *Buford*, a cattle rancher filed a trespass suit against several shepherds for driving their sheep across public and private lands in the Checkerboard.  *See* Blumm & Tebeau, 28 GEO. ENVTL. L. REV. at 182 (analyzing *Buford*).  The Utah Territorial Court rejected the rancher's effort to "achieve in effect

exclusive use of the publicly owned parcels—and thus uninterrupted use of the entire checkerboard." *Id.*

The territorial court reasoned that, in the Checkerboard, "the strict rules regarding trespass upon lands are not entirely applicable, or, at least, are very much modified." *See Buford*, 5 Utah at 596, 18 P. at 634. On review, the Supreme Court declared that a near century-old custom of grazing public rangeland ensured that "the public lands of the United States . . . shall be free to the people who seek to use them where they are left open and unenclosed, and no act of the government forbids this use." *Buford*, 133 U.S. at 326. "The owner of a piece of land, who had built a house or enclosed twenty or forty acres of it, had the benefit of this universal custom, as well as the party who owned no land." *Id.* at 327. The Supreme Court found the rancher's claim inequitable as it

> undertakes to deprive the defendants of this recognized right to permit their cattle to run at large over the lands of the United States and feed upon the grasses found in them, while, under pretence of owning a small proportion of the land which is the subject of controversy, they themselves obtain the monopoly of this valuable privilege.

*Id.* at 332.

To be sure, *Buford* concerned grazing on public land. *See id.* at 321–24. Even so, the Supreme Court did not suggest that custom protected public access *only* for grazing to the exclusion of other recognized lawful uses of public land. To the contrary, the Court spoke in broad terms: "[T]he public lands . . . shall be free to the

people who seek to use them . . . and no act of the government forbids this use." *See*

*id.* at 326.

And then, just as private monopolization of the public domain through barbed-wire enclosures nearly toppled this American tradition, history, and custom, Congress brought in the cavalry.

### iii.    *Can Congress Outlaw the Cattle Kings' Abuses?*

> The necessity of additional legislation to protect the public domain because of illegal fencing is becoming every day more apparent. Without the least authority, and in open and bold defiance of the rights of the Government, large, and oftentimes foreign, corporations deliberately enclose by fences areas of hundreds of thousands of acres, closing the avenues of travel and preventing the occupancy by those seeking homes.

S. Rep. No. 48-979, at 1 (1885) (quoted in Chandra Rosenthal & Kara Gillon, *Don't Fence Me In: Application of the Unlawful Inclosures of Public Lands Act to Benefit Wildlife*, 5 ANIMAL LAW 1, 5 (1999)).  On February 25, 1885, Congress enacted the UIA.

Two years later, the United States Attorney General, A.H. Garland, concluded that enclosures at "contiguous corners" in the Checkerboard violated the UIA.  *See* H.R. EXEC. DOC. No. 49-166 (Feb. 15, 1887) at 2 ("Such an exclusion . . . of the Government from the right of passage to and from its unsold lands, as the law now stands, is clearly unlawful.").  "The right of the Government to enter upon, control, and enjoy its unsold lands cannot lawfully be denied."  *Id.*

For his part, the Secretary of the Interior, Lucius Q. C. Lamar II, lauded the UIA as successfully "returning to the people the large areas of the public land hitherto illegally appropriated by corporations and individuals engaged in the cattle business on the plains[.]" 1887 SEC'Y OF THE INTERIOR ANN. REP. FOR FISCAL YEAR ENDING JUNE 30, 1887, Vol. 1, at 12 (Nov. 1, 1887). The UIA was "[t]he first step taken to overthrow and stop" the increasing enclosure of the public domain. *Id.* at 13. Still, Secretary Lamar cautioned that many "hardened violators of the law" had ignored the UIA or concocted "cunning evasion[s] of the law," which threatened its remedial potential. *See id.* at 13-15.

Secretary Lamar recommended that "if [the UIA] is to be thus ignored and action under it paralyzed," further curative legislation should be considered to better secure access to public lands. *Id.* at 15. For example, Congress should consider establishing public highways around every section of land in the Checkerboard with the section lines "being the center of such highways." *Id.* at 15. And if constructing these highways required taking lands held by private landowners, then "the bill should provide for necessary compensation" though these payments should be "a comparatively small amount, owing to the present low value of these lands." *See id.*

That is, Secretary Lamar described a contingency plan. *See id. If* landowners continued to ignore or evade the UIA without consequence, Congress should take

additional measures. And *if* new measures are required, then compensation should be provided where these measures require the taking of private lands. *See id.*

As this history shows, Iron Bar's assertion that the federal government has always "acted on the assumption that 'access rights' to checkerboarded public land 'had to be purchased,'" is incorrect. *See* Appellant's Br. at 35 (citing *Leo Sheep*, 440 U.S. at 681 n.18, 687, 687 n.25). Iron Bar portrays Secretary Lamar's 'in case of emergency, break glass' plan for buying access as a presumption that such purchases were a prerequisite to access. Not so. And, as it happened, Secretary Lamar's contingency plan was never needed because the Supreme Court eventually upheld the UIA in the face of one particular "evasion of the law." *See Camfield*, 167 U.S. at 524–27.

Following Secretary Lamar's report, the new Secretary of the Interior, William F. Vilas, revisited the "invasion and appropriation of the public lands by private parties"—"upwards of 7,000,000 acres." *See* H.R. Exec. Doc. No. 1, 50th Cong., 2nd Sess. (1888) (1888 SEC'Y OF THE INTERIOR ANN. REP. FOR FISCAL YEAR ENDING JUNE 30, 1888, Vol. 1, at xvi (Nov. 24, 1888)). Although many illegal fences had been removed since the UIA's passage, Secretary Vilas wrote that uncertainty remained as to the UIA's power to eradicate entirely the "peculiar abuse" of landowners enclosing "whole sections of the public lands." *Id.*

42

Secretary Vilas wrote that the Department of Justice had brought a suit "in the district court of Wyoming to test the right of the Government and resulted adversely there.  It is now pending on appeal in the supreme court of the Territory." *Id.* at xvii. That case—*United States v. Douglas-Willan Sartoris Co.*, 3 Wyo. 287, 22 P. 92 (Wyo. 1889)—would be decided the next year in the first ruling to reckon with the UIA's power to combat the "wholesale appropriation of the public domain."  *See* 1887 SEC'Y OF THE INTERIOR ANN. REP. at 13.

In *Douglas-Willan Sartoris Co.*, the United States sued under the UIA to require the Douglas-Willan Sartoris Company to remove a barbed-wire fence it had erected on its private land in the Checkerboard that, if completed, would enclose "200 even-numbered sections in 12 townships" or about 128,000 acres of public land. *Douglas-Willan Sartoris Co.*, 3 Wyo. at 288–89, 22 P. at 92–93.

In a split decision, the Territorial Supreme Court held that, although the company's fence violated this new law, the UIA was not a "valid and constitutional enactment."  *Id.* at 293, 22 P. at 94.  The majority reasoned that any enclosure situated solely on private land was merely a physical manifestation of a property owner's right to enjoy his land "to the exclusion of all the world." *Id.* at 298–300, 22 P. at 96–97.  Accordingly, removal of an enclosure located on private land without compensation was an unconstitutional taking, not the abatement of a nuisance, even if the enclosure impeded access to public land.  *See id.*

43

Chief Justice William Lyman Maginnis dissented.  In his view, Congress had the power to abate any use of private property that arrogated exclusive enjoyment of public land to the landowner.  *Id.* at 300–01, 22 P. at 97–98 (Maginnis, C.J., dissenting).  "If property is used for an unlawful purpose, then the sovereign power has the inherent right to abate such use, and it is well settled that such an abatement is no infringement upon what is commonly called the 'private right of property.'"  *Id.* at 301, 22 P. at 97.  Chief Justice Maginnis concluded:

> I take it that the unauthorized use of public property is *per se* unlawful. [. . .]  It has been the policy of the United States government impliedly to consent to the use of all of its public lands by the public in common. Congress has seen fit in the act in question [the UIA] to revoke such consent in case a person attempts to exercise an exclusive use of such land.  There can be no doubt of its power to do so.  The person, then, who exercises an exclusive use of any public land to which he has no claim or color of title, is necessarily engaged in an unlawful act, and any instrumentalities by which he asserts such right are also unlawful, and proper subjects of abatement.  For this reason I am satisfied that it is a proper exercise of the legislative function to forbid the assertion (and by that is meant a substantial or material assertion) of a right to the exclusive use and occupancy of public land, to any of which the person making the assertion has no claim or color of title.  *There are numberless ways in which such an assertion might be made.*

*Id.* at 301–02, 22 P. at 97–98 (emphasis added).  Less than a decade later, the Supreme Court would follow Chief Justice Maginnis's dissent in *Camfield*.

44

In the early 1890s, Daniel A. Camfield and William Drury erected a peculiar fence in Colorado's Checkerboard. They built their fence on only their odd-numbered sections of land. *See Camfield*, 167 U.S. at 519. The dotted lines below illustrate their fence:



*Id.* at 519–20.

The United States sued Mr. Camfield and Mr. Drury under the UIA. The Circuit Court ordered the men to "abate and remove" the fence because it unlawfully "makes an inclosure of public lands" in violation of the UIA. *See United States v. Camfield*, 59 F. 562, 563 (D. Colo. 1894). The Court rejected the men's reliance on *Douglas-Willan Sartoris Co. See id.*

Mr. Camfield and Mr. Drury appealed to the Eighth Circuit, again citing *Douglas-Willan Sartoris Co.  See Camfield v. United States*, 66 F. 101, 104 (8th Cir. 1895).  The Eighth Circuit panel unanimously affirmed the lower court, again rejecting *Douglas-Willan Sartoris Co.  See id.* ("[W]e cannot concur in the views expressed by the majority of the court in that case.").

Mr. Camfield and Mr. Drury appealed to the Supreme Court.  *See Camfield v. United States*, 167 U.S. 518 (1897).  There, the Supreme Court unanimously affirmed the lower courts' decisions requiring removal of Mr. Camfield and Mr. Drury's fence which unlawfully enclosed public lands.  *Id.* at 528.  The Supreme Court agreed that the two men's fence was "certainly within the letter of [the UIA]." *Id.* at 522.  And, echoing Chief Justice Maginnis, the Supreme Court held that Congress had the power to "protect[ ] the public lands from nuisances erected upon adjoining property."  *See id.* at 528.

The Supreme Court reasoned that "[i]t needs no argument to show that the building of fences upon public lands with intent to enclose them for private use would be a mere trespass, and that such fences might be abated by the officers of the Government or by the ordinary processes of court of justice.  To this extent no legislation was necessary to vindicate the rights of the Government as a landed proprietor."  *Id.* at 524.

But the evil of permitting persons, who owned or controlled the alternate sections, to enclose the entire tract, and thus to exclude or

> frighten off intending settlers, finally became so great that Congress
> passed the [UIA], forbidding all enclosures of public lands, and
> authorizing the abatement of the fences.  If the act be construed as
> applying only to fences actually erected upon public lands, it was
> manifestly unnecessary, since the Government as an ordinary
> proprietor would have the right to prosecute for such a trespass.  It is
> only by treating it as prohibiting all 'enclosures' of public lands, *by
> whatever means*, that the act becomes of any avail.

*Id.* at 524–25 (emphasis added).  And so, to abate the nuisance of unlawful

monopolization of public lands, the Supreme Court concluded Congress could

regulate the use of private land to enclose or obstruct access to public land.  *Id.* at

525.

The Supreme Court rejected the notion Congress "incidentally" gave away the

whole Checkerboard to private landowners through the railroad grants:

> We are not convinced . . . that the fact that a fence, built in the manner
> indicated, will operate incidentally or indirectly to enclose public lands,
> is a necessary result, which Congress must have foreseen when it made
> the grants, of the policy of granting odd sections and retaining the even
> ones as public lands; and that if such a result inures to the damage of
> the United States it must be ascribed to their improvidence and
> carelessness in so surveying and laying off the public lands, that the
> portion sold and granted by the Government cannot be enclosed by the
> purchasers without embracing also in such enclosure the alternate
> sections reserved by the United States.  Carried to its logical conclusion,
> the inference is that, because Congress chose to aid in the construction
> of these railroads by donating to them all the odd-numbered sections
> within certain limits, it thereby intended incidentally to grant them the
> use for an indefinite time of all the even-numbered sections.  It seems
> but an ill return for the generosity of the Government in granting these
> roads half its lands to claim that it thereby incidentally granted them the
> benefit of the whole.
>
> [. . .]

47

> The defendants were bound to know that the sections they purchased of the railway company could only be used by them in subordination to the right of the Government to dispose of the alternate sections as it seemed best, regardless of any inconvenience or loss to them, and were bound to avoid obstructing or embarrassing it in such disposition. If practices of this kind were tolerated, it would be but a step further to claim that the defendants, by long acquiescence of the Government in their appropriation of public lands, had acquired a title to them as against every one except the Government, and perhaps even against the Government itself.

*Id.* at 526–27.

Iron Bar counters that landowners in the Checkerboard have a "doubtless" right to enclose their land regardless of the enclosure's effect on access to adjacent public lands. *See* Appellant's Br. at 38 (discussing *Camfield*, 167 U.S. at 527–28). This right may permit a landowner to fence himself in, depriving himself of access to and control over the adjacent public lands at the same time. But this right does not permit the construction or maintenance of any device that, *in effect*, encloses public land, appropriating the public domain for a landowner's private use. Otherwise, *Camfield* would have been a self-defeating decision.

And, for what it's worth, the actual fence at issue in *Camfield* did not follow the so-called "lawful fencing" pattern Iron Bar illustrates in its brief and contained "swinging gates at section lines to afford access." *See Bergen*, 848 F.2d at 1511. Iron Bar's "lawful fencing" pattern would, in fact, still be unlawful under *Camfield* and the UIA because its *effect* would be to impede access to public land. *See id.*

48

("[I]t is not the fence itself, but its effects which constitutes the UIA violation."); *see also* Snowden, 90 U. CHI. L. REV. at 2026–27.

    iv.    *High Noon for the Cattle Kings*

So, when the dust settled, the Supreme Court recognized that the UIA was good law and could not be ignored or paralyzed by spite. Congress did not need to enact additional laws or construct roads while compensating a "class of law-breakers" endowed with "especial privileges" over the public lands. *See* 1887 SEC'Y OF THE INTERIOR ANN. REP. at 16. Secretary Lamar's contingency plan was unneeded.

In *Camfield*'s wake, courts consistently applied the UIA, sometimes alongside tradition and custom, to end private domination of the public domain through various devices. *See Stoddard*, 214 F. at 568–69; *Homer*, 185 F. at 745–47; *Golconda*, 214 F. at 909. *Mackay* is an important example. There, John Mackay sought to drive a band of sheep across Wyoming's Checkerboard to reach his winter range. *See Mackay*, 219 F. at 117–18. A cattle company warned Mackay not to cross the odd-numbered sections that it owned in the area. *Id.* at 118. Mackay "nevertheless started across with his sheep and at the company's instance [sic] was arrested on the way." *Id.* The cattle company also civilly sued Mackay alleging trespass. *See id.*

At trial in the civil action, Mackay sought a declaration of law that, if the cattle company refused to designate a reasonable path to the public domain for him and

his flock, then "he was entitled to select a reasonable way." *Id.* at 118. The trial court refused this request and, at trial, found that Mackay had committed a trespass. *See id.*

On appeal, the Eighth Circuit reversed, holding that all people have "an equal right of use of the public domain, which cannot be denied by interlocking lands held in private ownership." *Id.* Like *Buford*, the Eighth Circuit considered history, tradition, and custom. *See id.* at 118–20. And, like *Camfield*, it applied the UIA within this legal milieu. *See id.* The Court synthesized these property law principles to recognize that the UIA "has been construed to prohibit every method that works a practical denial of access to and passage over the public lands." *Id.* at 119 (surveying cases). It concluded that, in the Checkerboard, landowners can use neither fences nor "warnings and actions in trespass" to obstruct access to public lands and "secure for itself that value, which includes as an element the exclusive use of the public lands[.]" *Id.* at 120.

The Eighth Circuit also rejected the cattle company's claim that the UIA could not apply in "an action between private litigants." *Id.* "We think, however, that a private litigant cannot recover from another for an invasion of an alleged right founded upon his own violation of the statute." *Id.* "The erection of fences to accomplish what they sought by intangible means would have been a nuisance and a misdemeanor." *Id.* Thus, the UIA prevented the cattle company from denying

Mackay "a reasonable way of passage over the uninclosed tract of land" through a

trespass action. *Id.*

Iron Bar spills much ink criticizing the District Court's reliance on *Mackay*.

Appellant's Br. at 43-61. Whatever differences might exist between *Mackay* and

this case, *Mackay* analyzes the same issues (using trespass law to exclude others

from the public domain), involving the same territory (Wyoming's Checkerboard),

using much of the same law (trespass law, the UIA, *Camfield*, *Buford*). *See Mackay*,

219 F. at 117–20. *Mackay* may not be a binding precedent or factually

indistinguishable, but it is not useless. *See Bergen*, 848 F.2d at 1507, 1509 (relying

on *Mackay* to distinguish *Leo Sheep* and to interpret the UIA). Instead, *Mackay* is a

trailhead signaling the way forward. *See id.*

### b. <u>Modern Public Land Regulations Reinforce the UIA</u>

From the TGA, 43 U.S.C. § 315 *et seq.*, to FLPMA, 43 U.S.C. § 1701 *et seq.*

to recently amended Wyoming law, modern public land laws have only reinforced

access to the public domain in the Checkerboard.

Because the UIA and *Buford* protect *lawful* uses of public land and "lawful

uses of public land will change over time," courts need to consider congressional

guidance to determine whether a particular land use is lawful and so protected by the

UIA. *Bergen*, 848 F.2d at 1509. To do so, courts look to the TGA, the FLPMA, and

related regulations. *See id.*

Congress enacted the TGA in 1934 over the objection of a "few big men" controlling "lands which they do not own" to "promote the highest use of the public lands." *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 732–33 (2000). Through the TGA, Congress regulated private use of the range while also—like *Buford* and the UIA—proscribing private actors from restricting "the . . . ingress and egress over the public lands in [grazing] districts for all proper and lawful purposes . . . ." *See* 43 U.S.C. 315e. The TGA expressly prohibits private rangeland users from restricting or interfering with another person's "right to hunt or fish within a grazing district." *See* 43 U.S.C. § 315. And so, the TGA affirmatively protects access for hunting and fishing. *See Bergen*, 848 F.2d at 1510.

Similarly, in FLPMA, Congress declared "outdoor recreation and human occupancy and use" are lawful uses of public land. 43 U.S.C. §1701(a)(8). The BLM also identifies as lawful uses "[h]iking, birding, camping, fishing, hunting, mountain biking and mineral development activities . . . ." *See* Final Rule: Grazing Administration – Exclusive of Alaska, 60 Fed. Reg. 9894, 9895 (Feb. 22, 1995). To this end, the BLM promulgated regulations mirroring the UIA's and the TGA's prohibitions on interference with the lawful use of BLM-managed land, "including obstructing free transit through or over public lands by force, threat, intimidation, signs, barrier or locked gates." 43 C.F.R. § 4140.1(b)(7).

Iron Bar cannot use state law to circumvent these federal regulations. Being the supreme law of the land, these laws, like the UIA, displace state-law claims that stand as an obstacle to accomplishment of Congress's full purposes and objectives. *See Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153–54 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes[.]"); *Geier*, 529 U.S. at 872, 881, 886; *cf. Tyler*, 143 S. Ct. at 1375.

That said, state law protects access for hunting here. Beyond the bedrock state-law sources cited above, *see supra* 30-31, newly amended Wyoming trespass law expressly protects access to public lands through common corners to hunt, fish, collect antlers or horns, or trap just like the TGA, FLPMA, and related federal regulations. *See* Wyo. Stat. Ann. § 23-3-305(b) (requiring a person to touch or drive on the surface of private land to commit trespass for these purposes). In this way, state law adds another voice to the chorus prohibiting the use of trespass actions to control the lawful use of public land.

Even under modern regulatory regimes, Iron Bar cannot prevent others from traversing common corners in the Checkerboard to access public land for lawful endeavors. *See Bergen*, 848 F.2d at 1510–11. Because the law writ large *still* "preserves access to federal lands for 'lawful purposes.'" *Id.* at 1510.

## CONCLUSION

Before the UIA, American tradition protected access to the public domain. Then, cattlemen and powerful others tried to upend this tradition with barbed wire. Congress responded by enacting the UIA to end all such exclusionary practices. At first, these public land monopolists ignored, evaded, or tried to invalidate the UIA, but their efforts withered under repeated judicial scrutiny. Times and laws have changed, yet the principle that public lands "shall be free to the people who seek to use them where they are left open and unenclosed, and no act of government forbids this use" remains. *Buford*, 133 U.S. at 326.

Just as the hunters may not trample upon its private lands, Iron Bar may not deny reasonable passage over common corners to reach the public lands in the Checkerboard for lawful purposes. Instead, the hunters and Iron Bar must equally bear the burden of sharing these uniquely situated public lands. Accordingly, Iron Bar cannot use a trespass lawsuit to transform common corners into hardened checkpoints blocking access to the public lands beyond, and so the District Court properly rejected Iron Bar's claims.


* * * * *

For these reasons, this Court should affirm the decision below.

Dated: January 5, 2024

Respectfully submitted,

/s/ Ryan A. Semerad

Ryan Alexander Semerad
FULLER & SEMERAD, LLC
242 S. Grant Street
Casper, Wyoming 82601
(307) 265-3455

Lee Mickus
EVANS FEARS SCHUTTERT
    MCNULTY MICKUS
3900 E. Mexico Avenue, Suite 1300
Denver, Colorado 80210
(303) 656-2199

Alexandria Layton
EVANS FEARS SCHUTTERT
    MCNULTY MICKUS
6720 Via Austi Parkway, Suite 300
Las Vegas, Nevada 89119
(702) 901-7026

**STATEMENT OF COUNSEL AS TO ORAL ARGUMENT**

Pursuant to 10th Cir. L. R. 28.2(C)(2), the hunters posit that oral argument is necessary because the issues raised have great public significance that have evaded judicial review for decades, leading to widespread uncertainty and confusion.

## CERTIFICATE OF COMPLIANCE

1.    The above brief complies with the type-volume limitations of Fed. R.

App. P. 32(a)(7)(B)(i) because the brief contains 12,984 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(f).  The word count was calculated using

Microsoft Word 365's word count review feature and includes headings, footnotes,

and quotations.

2.    The brief also complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

brief was prepared in a proportionally spaced typeface using Microsoft Word 365 in

Times New Roman 14-point font.


Dated: January 5, 2024                    Respectfully submitted,

                                          */s/ Ryan A. Semerad*
                                          Ryan Alexander Semerad

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that all required privacy redactions have been made in this brief pursuant to 10th Cir. R. 25.5.  I further certify that the hard copies of this brief to be submitted to the Court will be exact copies of the version submitted electronically and that the electronic submission of this brief was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.


Dated: January 5, 2024                              Respectfully submitted,

                                                    */s/ Ryan A. Semerad*
                                                    Ryan Alexander Semerad

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2024, I electronically filed the above brief with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users.

Dated: January 5, 2024           Respectfully submitted,

                                        */s/ Ryan A. Semerad*
                                        Ryan Alexander Semerad