No. 23-8043

---

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

IRON BAR HOLDINGS, LLC,
*Plaintiff-Appellant*,

v.

BRADLY H. CAPE, ET AL.,
*Defendants-Appellees*.

---

On Appeal from the United States District Court for the
District of Wyoming
D.C. No. 2:22-cv-00067-SWS
Hon. Scott W. Skavdahl, United States District Judge

---

## APPELLEES' SUPPLEMENTAL APPENDIX VOLUME 1
## (SA1-SA67)

---

Ryan Alexander Semerad
FULLER & SEMERAD, LLC
242 S. Grant Street
Casper, Wyoming 82601
(307) 265-3455

Lee Mickus
EVANS FEARS SCHUTTERT
    MCNULTY MICKUS
3900 E. Mexico Avenue, Ste. 1300
Denver, Colorado 80210
(303) 656-2199

Alexandria Layton
EVANS FEARS SCHUTTERT
    MCNULTY MICKUS
6720 Via Austi Parkway, Ste. 300
Las Vegas, Nevada 89119
(702) 901-7026

Oral Argument is requested.

January 5, 2024

**SA001**

## INDEX

District Court Docket Sheet ...................................................................SA3

Transcript of Motion Hearing Proceedings (Summary Judgment) ...................SA14

APPEAL,CASP,TERMED

## U.S. District Court
### District of Wyoming (Cheyenne)
### CIVIL DOCKET FOR CASE #: 2:22−cv−00067−SWS

Iron Bar Holdings LLC v. Cape et al
Assigned to: Honorable Scott W Skavdahl
Referred to: Honorable Kelly H Rankin
Case in other court:  USCA, 23−08043
            Second Judicial District − Carbon County,
            Wyoming, Civil Act. No. 22−00034
Cause: 28:1441 Petition for Removal

Date Filed: 03/22/2022
Date Terminated: 06/01/2023
Jury Demand: Both
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**Iron Bar Holdings LLC**
*a North Carolina limited liability*
*company registered to do business in*
*Wyoming*

represented by **M Gregory Weisz**
PENCE & MACMILLAN LLC
1720 Carey Avenue, Suite 600
PO Box 765
Cheyenne, WY 82003
307/638−0386
Fax: 307/634−0336
Email: gweisz@penceandmac.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin Arthur**
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, CO 80202
303−892−7280
Fax: 303−893−1379
Email: kristin.arthur@dgslaw.com
*TERMINATED: 08/07/2023*
*PRO HAC VICE*

**Theresa Wardon Benz**
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, CO 80202
303−892−9400
Fax: 303−893−1379
Email: theresa.benz@dgslaw.com
*TERMINATED: 08/07/2023*
*PRO HAC VICE*

V.

**Defendant**

**Bradly H Cape**
*also known as*
Bradley H Cape

represented by **Ryan A Semerad**
THE FULLER LAW FIRM
242 South Grant Street
Casper, WY 82609
307−265−3455
Fax: 307−265−2859
Email: semerad@thefullerlawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandria LaVonne Layton**
EVANS FEARS & SCHUTTERT LLP

**SA003**

6720 Via Austi Parkway
Ste 300
Las Vegas, NV 89119
702–805–0290
Fax: 702–805–0291
Email: alayton@efstriallaw.com
*ATTORNEY TO BE NOTICED*

**Lee A Mickus**
Evans Fears & Schuttert LLP
3900 E Mexico Avenue
Ste 1300
Denver, CO 80210
303–656–2199
Email: lmickus@efstriallaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Zachary M Smith**                    represented by   **Ryan A Semerad**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Alexandria LaVonne Layton**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Lee A Mickus**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Phillip G Yeomans**                  represented by   **Ryan A Semerad**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Alexandria LaVonne Layton**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Lee A Mickus**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**John W Slowensky**                   represented by   **Ryan A Semerad**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Alexandria LaVonne Layton**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Lee A Mickus**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**Backcountry Hunters & Anglers**      represented by   **Eric B Hanson**
                                                        KEKER, VAN NEST & PETERS

**SA004**

633 Battery St.
San Francisco, CA 94111
415–676–2349
Email: ehanson@keker.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Lewallen**
CHAPMAN VALDEZ & LANSING
125 West 2nd Street
PO Box 2710
Casper, WY 82601
307/237–1983
Email: plewallen@bslo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trevor James Schenk**
Chapman Valdez & Lansing Law Office
PO Box 2710
Casper, WY 82602
307–237–1983
Email: tschenk@bslo.com
*LEAD ATTORNEY*

**Amicus**

**Wyoming Stockgrowers Association**     represented by **Karen J Budd–Falen**
BUDD–FALEN LAW OFFICES
300 East 18th Street
P O Box 346
Cheyenne, WY 82003
307/632–5105
Fax: 307/637–3891
Email: karen@buddfalen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Wyoming Wool Growers Association**     represented by **Karen J Budd–Falen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/22/2022 | 1 | NOTICE OF REMOVAL from Second Judicial District – Carbon County, Wyoming, Civil Act. No. 22–34. (Filing fee $ 402 receipt number AWYDC-2078664), filed by Phillip G Yeomans, Bradley H Cape, Zachary M Smith, John W Slowensky. (Attachments: # 1 Exhibit Exhibit A to Notice of Removal, # 2 Exhibit Exhibit B to Notice of Removal, # 3 Exhibit Exhibit C to Notice of Removal, # 4 State Court Complaint, # 5 Civil Cover Sheet) (Semerad, Ryan) (Attachment 5 replaced with flattened document 3/22/2022) (Court Staff, stbd). (Additional attachment(s) added on 3/22/2022: # 6 Order on Removal) (Court Staff, stbd). (Entered: 03/22/2022) |
| 03/22/2022 | 2 | STATE COURT COMPLAINT filed 2/15/2022 filed by Iron Bar Holdings LLC. (Court Staff, stbd) (Entered: 03/22/2022) |
| 03/22/2022 | 3 | Notice of Judge Assignment and Consent to Proceed before a Magistrate Judge. The case has been assigned to the Honorable Kelly H. Rankin (Presiding Judge). (Court Staff, stbd) (Entered: 03/22/2022) |

**SA005**

| 03/28/2022 | 4 | MOTION to Dismiss filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 03/28/2022) |
|---|---|---|
| 03/28/2022 | 5 | MEMORANDUM in Support of 4 Motion to Dismiss filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 03/28/2022) |
| 03/30/2022 | 6 | ORDER REASSIGNING CASE. Case reassigned to the Honorable Scott W Skavdahl as Presiding Judge and the Honorable Kelly H Rankin as Referral Judge for all further proceedings by the Honorable Scott W Skavdahl.(Court Staff, sjlg) (Entered: 03/30/2022) |
| 03/31/2022 | 7 | ORDER ON REMOVAL by the Honorable Scott W Skavdahl. See Order for details. (Copy of Order sent to Clerk of Second Judicial District Court, Carbon County via U.S. mail). (Court Staff, skb) (Entered: 03/31/2022) |
| 04/04/2022 | 8 | TRANSMITTAL of State Court Record. (Attachments: # 1 Docket Sheet Docket Sheet and all filings) (Semerad, Ryan) (Entered: 04/04/2022) |
| 04/05/2022 | 9 | STATE COURT DOCKET SHEET. (Court Staff, stbd) (Entered: 04/05/2022) |
| 04/05/2022 | 10 | ACCEPTANCE OF SERVICE filed in Second Judicial District Court on 3/2/2022 by All Defendants. (Court Staff, stbd) Modified text to correct date of filing on 4/5/2022 (Court Staff, stbd). (Entered: 04/05/2022) |
| 04/06/2022 | 11 | SUPPLEMENT re 1 Notice of Removal (Attorney),, filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Semerad, Ryan) (Entered: 04/06/2022) |
| 04/11/2022 | 12 | MEMORANDUM in Opposition to 4 MOTION to Dismiss filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 04/11/2022) |
| 04/14/2022 | 13 | MOTION to Remand filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 04/14/2022) |
| 04/14/2022 | 14 | MEMORANDUM in Support of 13 Motion to Remand filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 04/14/2022) |
| 04/18/2022 | 15 | REPLY BRIEF re 4 Motion to Dismiss filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 04/18/2022) |
| 04/28/2022 | 16 | RESPONSE in Opposition re 13 Motion to Remand filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 04/28/2022) |
| 05/02/2022 | 17 | REPLY to 16 Response in Opposition to Motion filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 05/02/2022) |
| 05/06/2022 | 18 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Eric Hanson to appear pro hac vice; Check not tendered; filed by Movant Backcountry Hunters & Anglers. (Attachments: # 1 Exhibit Affidavit of Eric Hanson, # 2 Proposed Order)(Schenk, Trevor) Modified text to correct movant on 5/6/2022 (Court Staff, stbd). (Entered: 05/06/2022) |
| 05/06/2022 | 19 | ORDER by the Honorable Kelly H Rankin granting 18 MOTION for Eric Hanson to appear pro hac vice; filed by Backcountry Hunters & Anglers. (cc: Counsel via email)(Court Staff, stbd) Modified text to correct movant on 5/6/2022 (Court Staff, stbd). (Entered: 05/06/2022) |
| 05/06/2022 | 20 | Notice of Pro Hac Vice Attorney Appearance by Eric B Hanson on behalf of Backcountry Hunters & Anglers Filing fee $ 100, receipt number AWYDC–2099019. (Hanson, Eric) Modified text to correct movant on 5/6/2022 (Court Staff, stbd). (Main Document 20 replaced on 5/10/2022 to flatten document) (Court Staff, skb). (Entered: 05/06/2022) |
| 05/06/2022 | 21 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Leave to File Reply/Brief/Supplement (Non–Dispositive) *amicus curiae brief* filed by Movant Backcountry Hunters & Anglers. (Attachments: # 1 Proposed Order, # 2 Exhibit Proposed amicus curiae brief)(Hanson, Eric) (Entered: 05/06/2022) |

**SA006**

| 05/19/2022 | 22 | ORDER by the Honorable Scott W Skavdahl denying 13 Motion to Remand (Court Staff, scat) (Entered: 05/19/2022) |
|---|---|---|
| 07/20/2022 | 23 | ORDER by the Honorable Scott W Skavdahl denying 4 Motion to Dismiss. This matter shall be referred to the magistrate judge for an initial pretrial conference under Fed. R. Civ. P. 16. (Court Staff, skb) (Entered: 07/20/2022) |
| 07/27/2022 | 24 | (TEXT–ONLY) NOTICE of Initial Pretrial Conference: BY TELEPHONE – All parties shall appear by telephone through the Courts conference call system. Guests call: Toll Free 1–888–398–2342| Access code 3107456#. | Join as guest Press # |Security code 1001#. Parties should have their calendars on hand for scheduling. Under Local Rule 16.1(a)(2) the parties are reminded to file a written Joint Case Management Plan three business days prior to the Initial Pretrial Scheduling Conference. The Plan form may be located at www.wyd.uscourts.gov/judges–info under Judge Rankin. **Initial Pretrial Conference set for 9/1/2022 at 09:00 AM before Honorable Kelly H Rankin.** (Court Staff, smxb) (Entered: 07/27/2022) |
| 07/29/2022 | 25 | ANSWER to 2 Complaint with Affirmative Defenses, with Jury Demand by Phillip G Yeomans, Bradley H Cape, Zachary M Smith, John W Slowensky. (Semerad, Ryan) (Entered: 07/29/2022) |
| 08/15/2022 | 26 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Order Granting Leave to File Amicus Brief filed by Movants Wyoming Stockgrowers Association, Wyoming Wool Growers Association. (Attachments: # 1 Proposed Amici Brief, # 2 Exhibit, # 3 Exhibit, # 4 Proposed Order)(Budd–Falen, Karen) (Attachment 1 replaced with correct version per counsel on 8/16/2022) (Court Staff, stmo). Modified text on 8/16/2022 (Court Staff, stmo). Modified text on 8/17/2022 (Court Staff, skb). (Entered: 08/15/2022) |
| 08/22/2022 | 27 | (TEXT–ONLY) NOTICE Resetting Initial Pretrial Conference: BY TELEPHONE – All parties shall appear by telephone through the Courts conference call system. Guests call: Toll Free 1–888–398–2342| Access code 3107456#. | Join as guest Press # |Security code 1001#. Parties should have their calendars on hand for scheduling. Under Local Rule 16.1(a)(2) the parties are reminded to file a written Joint Case Management Plan three business days prior to the Initial Pretrial Scheduling Conference. The Plan form may be located at www.wyd.uscourts.gov/judges–info under Judge Rankin. **Initial Pretrial Conference reset for 9/1/2022 at 11:00 AM before Honorable Kelly H Rankin.** (Court Staff, smxb) (Entered: 08/22/2022) |
| 08/26/2022 | 28 | Proposed JOINT CASE MANAGEMENT PLAN by Iron Bar Holdings LLC. (Weisz, M) (Entered: 08/26/2022) |
| 08/31/2022 | 29 | ORDER by the Honorable Kelly H Rankin denying as moot 21 Motion to File Reply/Brief/Supplement.(Court Staff, sag) (Entered: 08/31/2022) |
| 08/31/2022 | 30 | ORDER by the Honorable Kelly H Rankin granting 26 Motion for Leave to File Amicus Brief. It is ordered the Associations shall file their Amicus Curiae Brief within three (3) business days of the entry of this Order. (Court Staff, sag) Modified text on 9/1/2022 (Court Staff, sjlg). (Entered: 08/31/2022) |
| 09/01/2022 | 31 | INITIAL PRETRIAL ORDER by the Honorable Kelly H Rankin.Motions to Amend deadline 11/1/2022. Dispositive Motions filing deadline 4/12/2023. Dispositive Motion response deadline 4/26/2023. **Dispositive Motions Hearing set for 5/10/2023 01:00 PM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl.** Other Fact Witness Deadline 3/1/2023 Expert Witness Designation–Plaintiff deadline 12/15/2022. Expert Witness Designation–Defendant deadline 2/15/2023. Discovery due by 4/12/2023. Stipulation Deadline 5/17/2023. Motion in Limine deadline 5/17/2023. Motions in Limine Response Deadline 5/24/2023. **Final Pretrial Conference set for 6/6/2023 01:00 PM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl. Jury Trial (4 days/stacked #1) set for 6/26/2023 09:00 AM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl.** (Court Staff, sag) (Entered: 09/01/2022) |
| 09/02/2022 | 32 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Amend Caption filed by Defendants Bradley H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Proposed Order)(Semerad, Ryan) Modified text on 9/2/2022 (Court Staff, skb). (Entered: 09/02/2022) |

| 09/06/2022 | 33 | ORDER by the Honorable Kelly H Rankin granting 32 MOTION to Amend Caption. IT IS ORDERED that the caption in this matter going forward shall be amended to reflect the correct spelling of Defendant Bradly H. Cape's first name. (Court Staff, smxb) (Entered: 09/06/2022) |
| --- | --- | --- |
| 09/28/2022 | 34 | NOTICE of Attorney Appearance by Lee A Mickus on behalf of Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans (Mickus, Lee) (Entered: 09/28/2022) |
| 11/01/2022 | 35 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Amend/Correct 2 Complaint filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Proposed Order)(Weisz, M) (Entered: 11/01/2022) |
| 11/01/2022 | 36 | ORDER by the Honorable Kelly H Rankin granting 35 MOTION to Amend/Correct 2 Complaint. Plaintiff shall file its First Amended Complaint within three business days. (Court Staff, sjdl) (Entered: 11/01/2022) |
| 11/01/2022 | 37 | AMENDED COMPLAINT against Defendant Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans, filed by Iron Bar Holdings LLC. (Attachments: # 1 Exhibit) (Weisz, M) (Entered: 11/01/2022) |
| 11/15/2022 | 38 | NOTICE by Plaintiff Iron Bar Holdings LLC *Notice to Other Party of Subpoena to Produce Documents, Information, or Objects in a Civil Action to James Hasskamp* (Stewart, Crystal) (Entered: 11/15/2022) |
| 11/15/2022 | 39 | ANSWER to 37 Amended Complaint with Affirmative Defenses, with Jury Demand, by Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 11/15/2022) |
| 11/29/2022 | 40 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Leave to File an Amicus Curiae Brief filed by Movant Backcountry Hunters & Anglers. (Attachments: # 1 Exhibit [Proposed] Brief of Amicus Curiae Backcountry Hunters & Anglers, # 2 Affidavit [Proposed] Declaration of Eric B. Hanson in Support of Brief of Amicus Curiae Backcountry Hunters & Anglers (with exhibits 1–4), # 3 Proposed Order Granting Backcountry Hunters & Anglers Motion for Leave to File an Amicus Curiae Brief)(Hanson, Eric) Modified text on 12/1/2022 (Court Staff, skb). (Entered: 11/29/2022) |
| 11/30/2022 | 41 | ORDER by the Honorable Kelly H Rankin granting 40 Motion to File Amicus Brief. Movant may file its amicus brief within three business days. (Court Staff, sjdl) (Entered: 11/30/2022) |
| 12/05/2022 | 42 | BRIEF OF AMICUS CURIAE, filed by Amicus Backcountry Hunters & Anglers. (Attachments: # 1 Affidavit of Eric B. Hanson In Support of Brief of Amicus Curiae Backcountry Hunters & Anglers (with exhibits 1–4)) (Hanson, Eric) Modified text on 12/7/2022 (Court Staff, skb). (Entered: 12/05/2022) |
| 12/06/2022 | 43 | NOTICE of *Return of Non−Service of Subpoena to James Hasskamp* by Plaintiff Iron Bar Holdings LLC re 38 Notice to Other Party of Subpoena to Produce Documents, Information, or Objects in a Civil Action to James Hasskamp (Weisz, M) Modified text on 12/7/2022 (Court Staff, skb). (Entered: 12/06/2022) |
| 12/06/2022 | 44 | NOTICE OF FILING BRIEF OF AMICUS CURIAE by Amicus Parties Wyoming Stockgrowers Association, Wyoming Wool Growers Association. (Court Staff, stbd) (Entered: 12/06/2022) |
| 12/06/2022 | 45 | BRIEF OF AMICUS CURIAE filed by Amicus Parties Wyoming Stockgrowers Association, Wyoming Wool Growers Association. (Court Staff, stbd) (Entered: 12/06/2022) |
| 12/07/2022 | 46 | DISREGARD – DOCKETING ERROR. Counsel to refile. ~~Amended NOTICE by Plaintiff Iron Bar Holdings LLC~~ *~~Amended Notice To Other Party Of Subpoena To Produce Documents, Information, Or Objects In A Civil Action To James Hasskamp~~* ~~(Weisz, M)~~ Modified on 12/7/2022 (Court Staff, skb). (Entered: 12/07/2022) |
| 12/07/2022 | 47 | Amended NOTICE to Other Party of Subpoena to Produce Documents, Information, or Objects in a Civil Action to James Hasskamp (Stewart, Crystal) Modified text and filer on 12/7/2022 (Court Staff, skb). (Entered: 12/07/2022) |

**SA008**

| 12/15/2022 | 48 | Designation of Expert Witnesses by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 12/15/2022) |
|---|---|---|
| 12/20/2022 | 49 | NOTICE of Change of Address by Lee A Mickus, attorney on behalf of Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans (Mickus, Lee) (Entered: 12/20/2022) |
| 12/21/2022 | 50 | RETURN of Subpoena by Plaintiff Iron Bar Holdings LLC upon James A. Hasskamp on December 9, 2022. (Weisz, M) (Entered: 12/21/2022) |
| 01/10/2023 | 51 | MOTION in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit, # 2 Proposed Order)(Semerad, Ryan) (Entered: 01/10/2023) |
| 01/24/2023 | 52 | RESPONSE in Opposition re 51 MOTION in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 01/24/2023) |
| 01/24/2023 | 53 | MOTION for hearing re 51 MOTION in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order) (Weisz, M) Modified event and text on 1/27/2023 (Court Staff, skb). (Entered: 01/24/2023) |
| 01/27/2023 | 54 | ORDER by the Honorable Scott W Skavdahl denying 53 Motion for hearing re 51 Motion in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart. Defendants may submit a reply to Plaintiff's response on or before February 3, 2023. (Court Staff, skb) (Entered: 01/27/2023) |
| 01/30/2023 | 55 | REPLY BRIEF in Support of 51 MOTION in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith. (Mickus, Lee) Modified text and add link on 2/6/2023 (Court Staff, skb). (Entered: 01/30/2023) |
| 02/15/2023 | 56 | Designation of Expert Witnesses by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Semerad, Ryan) (Entered: 02/15/2023) |
| 02/17/2023 | 57 | ORDER by the Honorable Scott W Skavdahl denying 51 Motion in Limine regarding Order to Exclude Opinion Testimony of Plaintiff's Proposed Expert Witness James H. Rinehart. With the limited applicability noted herein, James Rinehart's proposed expert testimony will not be precluded under Rule 702/Daubert. (Court Staff, skb) (Entered: 02/17/2023) |
| 03/01/2023 | 58 | Witness List by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) Modified text on 3/2/2023 (Court Staff, skb). (Entered: 03/01/2023) |
| 03/01/2023 | 59 | Witness List by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 03/01/2023) |
| 03/28/2023 | 60 | NOTICE of Attorney Appearance by Alexandria LaVonne Layton on behalf of Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans (Layton, Alexandria) Modified text on 3/30/2023 (Court Staff, skb). (Entered: 03/28/2023) |
| 04/10/2023 | 61 | MOTION for Leave to File Excess Pages regarding Brief in Support of Motion for Summary Judgment filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Proposed Order)(Semerad, Ryan) (Entered: 04/10/2023) |
| 04/11/2023 | 62 | ORDER GRANTING DEFENDANTS' MOTION FOR LEAVE TO EXCEED PAGE LIMIT FOR BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT by the Honorable Scott W Skavdahl re 61 Motion to File Excess Pages. The Defendants may file a brief in support of their motion for summary judgment that does not exceed thirty−five (35) pages.(Court Staff, stbd) (Entered: 04/11/2023) |
| 04/12/2023 | 63 | MOTION for Partial Summary Judgment, filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 04/12/2023) |

**SA009**

| 04/12/2023 | 64 | MEMORANDUM in Support of 63 Motion for Partial Summary Judgment filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5a, # 6 Exhibit 5b, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit Deposition of Steven Grende, # 15 Exhibit Deposition of Bradly H. Cape, # 16 Exhibit Deposition of Phillip G. Yeomans, # 17 Exhibit Deposition of Zachary M. Smith, # 18 Exhibit Deposition of John W. Slowensky) (Weisz, M) (Entered: 04/12/2023) |
| 04/12/2023 | 65 | MOTION for Summary Judgment, filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 04/12/2023) |
| 04/12/2023 | 66 | MEMORANDUM in Support of 65 Motion for Summary Judgment filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y) (Semerad, Ryan) (Entered: 04/12/2023) |
| 04/26/2023 | 67 | MEMORANDUM in Opposition to 65 MOTION for Summary Judgment, filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Exhibit 13, # 2 Exhibit 14, # 3 Exhibit 15a, # 4 Exhibit 15b, # 5 Exhibit 15c, # 6 Exhibit 15d, # 7 Exhibit Depo, # 8 Exhibit Depo, # 9 Exhibit Depo, # 10 Exhibit Depo, # 11 Exhibit Depo, # 12 Exhibit Depo, # 13 Exhibit Depo) (Weisz, M) (Entered: 04/26/2023) |
| 04/26/2023 | 68 | MEMORANDUM in Opposition to 63 MOTION for Partial Summary Judgment, filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Semerad, Ryan) (Entered: 04/26/2023) |
| 04/26/2023 | 69 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Order Granting Leave to Attend Hearing Virtually filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Proposed Order)(Semerad, Ryan) Modified to unrefer motion on 4/27/2023 (Court Staff, skb). (Entered: 04/26/2023) |
| 04/27/2023 |  | Motions No Longer Referred: 69 MOTION for Order Granting Leave to Attend Hearing Virtually. (Court Staff, skb) (Entered: 04/27/2023) |
| 04/27/2023 | 70 | MOTION for Leave to File Reply/Brief/Supplement (Dispositive) filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Proposed Order)(Semerad, Ryan) (Entered: 04/27/2023) |
| 04/27/2023 | 71 | MEMORANDUM in Opposition to 70 MOTION for Leave to File Reply/Brief/Supplement (Dispositive) filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Weisz, M) (Entered: 04/27/2023) |
| 04/27/2023 | 72 | REPLY to 71 Memorandum in Opposition to Motion, filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Semerad, Ryan) (Entered: 04/27/2023) |
| 04/28/2023 | 73 | ORDER by the Honorable Scott W Skavdahl granting 70 Motion to File Reply/Brief/Supplement (Dispositive). On or before May 3, 2023, Defendants may file a reply brief of no more than 5 pages addressing only Section V of Plaintiff's opposition brief (located at ECF 67 p. 24) (Court Staff, skb) (Entered: 04/28/2023) |
| 04/28/2023 | 74 | ORDER by the Honorable Scott W Skavdahl denying 69 Motion for Order Granting Leave to Attend Hearing Virtually. (Court Staff, skb) (Entered: 04/28/2023) |
| 05/03/2023 | 75 | REPLY BRIEF re 67 Memorandum in Opposition to Motion, filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Semerad, Ryan) (Entered: 05/03/2023) |

| | | |
|---|---|---|
| 05/10/2023 | 76 | MINUTES for proceedings held before Honorable Scott W Skavdahl: Motions Hearing held on 5/10/2023. (Court Reporter Megan Strawn.) (Court Staff, skb) (Entered: 05/10/2023) |
| 05/17/2023 | 77 | MOTION in Limine regarding Exclude Testimony filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 05/17/2023) |
| 05/17/2023 | 78 | DISREGARD. Counsel to refile. ~~STIPULATION OF FACTS filed by Iron Bar Holdings LLC. (Weisz, M)~~ Modified on 5/18/2023 (Court Staff, skb). (Entered: 05/17/2023) |
| 05/17/2023 | 79 | PROPOSED STIPULATION OF FACTS filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) Modified text on 5/18/2023 (Court Staff, skb). (Entered: 05/17/2023) |
| 05/17/2023 | 80 | STIPULATION OF FACTS filed by Iron Bar Holdings LLC. (Weisz, M) (Entered: 05/17/2023) |
| 05/17/2023 | 81 | PROPOSED STIPULATION OF FACTS filed by Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) Modified text on 5/18/2023 (Court Staff, skb). (Entered: 05/17/2023) |
| 05/24/2023 | 82 | RESPONSE in Opposition re 77 MOTION in Limine regarding Exclude Testimony filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Semerad, Ryan) (Entered: 05/24/2023) |
| 05/26/2023 | 83 | ORDER by the Honorable Scott W Skavdahl denying 63 Motion for Partial Summary Judgment; granting in part and denying in part 65 Motion for Summary Judgment. See Order for details. (Court Staff, skb) (Entered: 05/26/2023) |
| 05/30/2023 | 84 | MOTION REFERRED TO Judge Kelly H Rankin. Stipulated MOTION for Extension of Time (Non–Dispositive) requesting extension of Final Pretrial Order filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 05/30/2023) |
| 05/30/2023 | 85 | ORDER by the Honorable Kelly H Rankin granting 84 Motion for Extension of Time. The parties shall have up to and including June 1, 2023, to submit their joint proposed Final Pretrial Order. (Court Staff, sjdl) (Entered: 05/30/2023) |
| 06/01/2023 | 86 | NOTICE of Withdrawal of Remaining Claim by Plaintiff Iron Bar Holdings LLC re 83 Order on Motion for Partial Summary Judgment, Order on Motion for Summary Judgment. (Weisz, M) Modified text on 6/1/2023 (Court Staff, skb). (Entered: 06/01/2023) |
| 06/01/2023 | 87 | JUDGMENT in favor of Defendants against Plaintiff by the Honorable Scott W Skavdahl.(Court Staff, skb)The AO133 Bill of Cost form is available at https://www.wyd.uscourts.gov/forms/bill–costs. (Entered: 06/01/2023) |
| 06/15/2023 | 88 | BILL OF COSTS filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit A) (Semerad, Ryan) (Entered: 06/15/2023) |
| 06/23/2023 | 89 | NOTICE by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans *of Firm Name Change* (Mickus, Lee) (Entered: 06/23/2023) |
| 06/23/2023 | 90 | NOTICE by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans *of Firm Name Change* (Layton, Alexandria) (Entered: 06/23/2023) |
| 06/29/2023 | 91 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Theresa Wardon Benz to appear pro hac vice; Check not tendered; filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 06/29/2023) |
| 06/29/2023 | 92 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Kristin Arthur to appear pro hac vice; Check not tendered; filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 06/29/2023) |
| 06/29/2023 | 93 | NOTICE OF APPEAL as to 87 Judgment filed by Plaintiff Iron Bar Holdings LLC. Filing fee $ 505, receipt number AWYDC–2277551. (Weisz, M) (Entered: 06/29/2023) |

**SA011**

| 06/29/2023 | 94 | ORDER by the Honorable Kelly H Rankin granting 91 MOTION for Theresa Wardon Benz to appear pro hac vice & 92 MOTION for Kristin Arthur to appear pro hac vice filed by Iron Bar Holdings LLC.(cc: Counsel via email)(Court Staff, stbd) (Entered: 06/29/2023) |
|---|---|---|
| 06/29/2023 | 95 | Preliminary Record of appeal sent to USCA and counsel re 93 Notice of Appeal (Attorney) **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 06/29/2023) |
| 06/29/2023 | | FINANCIAL ENTRY: $100 PRO HAC VICE FEE PAID ON BEHALF OF THERESA WARDON BENZ AND KRISTIN ARTHUR ($200 Received – Receipt #2–1733) (Court Staff, stmo) (Entered: 06/29/2023) |
| 06/30/2023 | 96 | Appeal Number **23–8043** received from USCA for 93 Notice of Appeal (Attorney) filed by Iron Bar Holdings LLC. Docketing statement due 07/14/2023 for Iron Bar Holdings, LLC. Transcript order form due 07/14/2023 for Iron Bar Holdings, LLC. Notice of appearance due on 07/14/2023 for Bradley H. Cape, Iron Bar Holdings, LLC, John W. Slowensky, Zachary M. Smith and Phillip G. Yeomans. Disclosure statement due on 07/14/2023 for Iron Bar Holdings, LLC. (Court Staff, stbd) (Entered: 06/30/2023) |
| 06/30/2023 | 97 | TRANSCRIPT ORDER FORM by court reporter Megan Strawn. Transcripts due 07/30/2023. (Strawn, Megan) (Entered: 06/30/2023) |
| 07/05/2023 | 98 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion for Summary Judgment held on 05/10/2023 before Judge Scott W. Skavdahl re 93 Notice of Appeal (Attorney). To purchase a copy of this transcript, please contact Court Reporter Megan Strawn, phone (307) 232–2626 or email strawnreporting@yahoo.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 7/12/2023. Notice of Redaction Request due 7/26/2023. Redacted Transcript Deadline set for 8/5/2023. Release of Transcript Restriction set for 10/3/2023. (Strawn, Megan) (Entered: 07/05/2023) |
| 07/05/2023 | 99 | Transcript Letter transmitted to USCA re 93 Notice of Appeal (Attorney). All transcripts that have been ordered from this reporter for this appeal are now filed with the United States District Court, District of Wyoming. (Strawn, Megan) (Entered: 07/05/2023) |
| 07/05/2023 | 100 | Appeal Remark – Notice that the transcript was filed by Ms. Megan Strawn in district court on 07/05/2023 re 93 Notice of Appeal (Attorney). **Record on appeal/Notice due 7/12/2023** (Court Staff, stbd) (Entered: 07/05/2023) |
| 07/05/2023 | 101 | CLERK'S Bill of Costs regarding 88 Bill of Costs filed by Defendant Phillip G Yeomans, Defendant Zachary M Smith, Defendant John W Slowensky, Defendant Bradly H Cape Defendants awarded costs in the amount of $5,192.60. (Court Staff, skb) (Entered: 07/05/2023) |
| 07/07/2023 | 102 | Notice of Pro Hac Vice Attorney Appearance by Kristin Arthur on behalf of Iron Bar Holdings LLC (Arthur, Kristin) (Entered: 07/07/2023) |
| 07/07/2023 | 103 | Notice of Pro Hac Vice Attorney Appearance by Theresa Wardon Benz on behalf of Iron Bar Holdings LLC (Benz, Theresa) (Entered: 07/07/2023) |
| 07/07/2023 | 104 | MOTION to stay case filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Affidavit of Rebecca Englert, # 2 Exhibit 1 – Postcard, # 3 Exhibit 2 – April 23, 2023 Email, # 4 Exhibit 3 – April 25, 2023 Email, # 5 Exhibit 4– March 9, 2023 Email, # 6 Exhibit 5– Facebook Message, # 7 Exhibit 6– B. Cape Deposition & Z. Smith Deposition)(Benz, Theresa) Modified text on 7/7/2023 (Court Staff, skb). (Entered: 07/07/2023) |
| 07/17/2023 | 105 | APPEAL ORDER from USCA – Briefing on the merits is suspended pending further order. Appellant's memorandum brief due 07/28/2023 for Iron Bar Holdings, LLC (please see order for further details) as to 93 Notice of Appeal (Attorney) filed by Iron Bar Holdings LLC. (Court Staff, stbd) (Entered: 07/17/2023) |

| 07/18/2023 | 106 | Transcript Letter transmitted to USCA re 93 Notice of Appeal (Attorney). All transcripts ordered for this appeal are now filed with the United States District Court, District of Wyoming. For purposes of appeal, the record is now ready. (Court Staff, stbd) (Entered: 07/18/2023) |
| --- | --- | --- |
| 07/18/2023 | 107 | MOTION to Alter/Amend Judgment filed by Plaintiff Iron Bar Holdings LLC. (Attachments: # 1 Proposed Order)(Weisz, M) (Entered: 07/18/2023) |
| 07/19/2023 | 108 | AMENDED JUDGMENT in favor of Defendants against Plaintiff by the Honorable Scott W Skavdahl. (Court Staff, skb) (Entered: 07/19/2023) |
| 07/21/2023 | 109 | RESPONSE in Opposition re 104 MOTION to stay case filed by Defendants Bradly H Cape, John W Slowensky, Zachary M Smith, Phillip G Yeomans. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Semerad, Ryan) (Entered: 07/21/2023) |
| 07/27/2023 | 110 | REPLY to 109 Response in Opposition to Motion filed by Plaintiff Iron Bar Holdings LLC. (Weisz, M) (Entered: 07/27/2023) |
| 07/31/2023 | 111 | ORDER by the Honorable Scott W Skavdahl denying 104 Motion to Stay Pending Appeal. (Court Staff, skb) (Entered: 07/31/2023) |
| 08/07/2023 | 112 | NOTICE by Plaintiff Iron Bar Holdings LLC *of Withdrawal of Kristin L. Arthur* (Arthur, Kristin) (Entered: 08/07/2023) |
| 08/07/2023 | 113 | NOTICE by Plaintiff Iron Bar Holdings LLC *of Withdrawal of Theresa Wardon Benz* (Benz, Theresa) (Entered: 08/07/2023) |

**SA013**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

IRON BAR HOLDINGS, LLC, a North
Carolina limited liability
company registered to do
business in Wyoming,

        Plaintiff,

        vs.

BRADLY H. CAPE, an individual;
ZACHARY M. SMITH, an individual;
PHILLIP G. YEOMANS, an
individual; and JOHN W.
SLOWENSKY, an individual,

        Defendants.

Case No. 22-CV-67-SWS

Casper, Wyoming

May 10, 2023
1:03 p.m.

---

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE SCOTT W. SKAVDAHL
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff:    M. GREGORY WEISZ
                Pence & MacMillan, LLC
                1720 Carey Avenue
                Suite 600
                Cheyenne, Wyoming 82003


For the Defendants:    RYAN A. SEMERAD
                The Fuller & Semerad Law Firm
                242 South Grant Street
                Casper, Wyoming 82601

2

APPEARANCES:   (Cont.)

                           LEE MICKUS
                           ALEXANDRIA LAYTON
                           Evans Fears & Schuttert LLP
                           2900 E. Mexico Avenue
                           Suite 1300
                           Denver, Colorado 80210


Court Reporter:            MEGAN E. STRAWN, RPR, CRR
                           111 South Wolcott Street, Room 217
                           Casper, Wyoming  82601
                           (307) 232-2626


*Proceedings recorded by stenography; transcript produced by
computer-aided transcription.*

**SA015**

3

I N D E X

ORAL ARGUMENT                                                    PAGE

Mr. Weisz                                                          4
Mr. Semerad                                                   27, 41
Mr. Mickus                                                        31

SA016

 1          (Proceedings commenced at 1:03 p.m., May 10, 2023.)

 2              THE COURT:  Court is in session in the matter of Iron

 3   Bar Holdings, LLC, Plaintiff, v. Bradly H. Cape, et al.,

 4   Defendants, Case No. 22-CV-067.  I note the presence of

 5   Mr. Weisz on behalf of the Plaintiff and the presence of

 6   Mr. Semerad, Mr. Mickus --

 7              MR. MICKUS:  Yes, Your Honor.

 8              THE COURT:  -- and Ms. Layton on behalf of the

 9   Defendants.

10              The matter is before the Court on cross-motions for

11   summary judgment, and I would -- I've allotted 30 minutes a

12   side, because they are cross-motions.  The first filer goes

13   first.  And I would hear first from Mr. Weisz on behalf of

14   Plaintiff, and then I would hear from the Defense.

15              Mr. Weisz.

16              MR. WEISZ:  May it please the Court.

17              THE COURT:  Counsel.

18              MR. WEISZ:  Counsel.

19              As noted, Your Honor, Greg Weisz on behalf of

20   Plaintiff, Iron Bar Holdings.  I am with Pence and MacMillan,

21   LLC, Cheyenne, Wyoming.

22              As noted, Your Honor, we are here today on

23   cross-motions for summary judgment.  It is the Plaintiff's

24   contention that it is entitled to summary judgment in this

25   matter.

                                             **SA017**

1          As you know, Your Honor, the parties have briefed the

2    issues, I believe, honestly, with a lot of zeal and detail.

3    And so I'd like to, in large part, rely on the briefs that

4    have been filed.  But for the purposes of consideration of the

5    motion, as I prepared for today, I asked myself, you know, Are

6    there issues that perhaps I should emphasize to the Court as

7    it considers the motions?

8          And the thing that occurred to me that has not been

9    front and center in the case so far is understanding the

10   history of the checkerboard landownership pattern that we're

11   dealing with in this case.  As the Court knows, the

12   checkerboard landownership pattern in southern Wyoming came

13   about because of grants made by Congress under the 1862

14   Railroad Act, July 1 of 1862 and then amended in 1864.

15         Significant to this case is the fact that Congress,

16   to encourage the development of the railroad, the

17   transcontinental railroad, and the settlement of the West,

18   determined that it would grant the lands occupied by the rail

19   line to the Union Pacific Railroad and the Central Pacific

20   Railroad coming from California traveling east.  And they

21   would grant to the railroad companies every other section of

22   land 10 miles north of the rail line.  That was expanded,

23   eventually, to 20 miles north.

24         And so the point to be emphasized is that the U.S.

25   government, to encourage the settlement of the West, gave

**SA018**

1    every other section to the railroad.  But importantly, to

2    serve the government's goal that not only the transcontinental

3    railroad be constructed but that the Western United States be

4    settled was a requirement in the Act that, once the rail line

5    was completed, the railroad companies had to sell their

6    sections within three years.

7                And the idea was is that over the course of time, the

8    railroad would sell its sections, and then the lands that the

9    U.S. government retained, the even-numbered sections of land,

10   would be sold outright to encourage settlement of the West.

11               And this, of course, is discussed in detail in the

12   *Leo Sheep* case where the Supreme Court talked about how that

13   was the plan.  And the significance of this discussion is

14   this, Your Honor, is that the BLM lands that we're talking

15   about in this case, managed by the BLM, the intention of the

16   U.S. government was not that those lands would be retained;

17   that, in fact, they would be sold.

18               And of course, as *Leo Sheep* dealt with, that Court

19   found that there was no implied easement reserved --

20               THE COURT:  But in that intended sale, though, it was

21   also intended that the public would remain the holder of those

22   even-numbered sections.

23               MR. WEISZ:  No.  That's my point, Your Honor, is that

24   the plan was is that the even-numbered sections would be sold

25   by the government or homesteaded.  And so the idea -- and *Leo*

SA019

1 | *Sheep* talks about this -- is that there was no intention on

2 | the part of the government to retain those even-numbered

3 | sections of land.  They were to be disposed of.

4 |       And as *Leo Sheep* pointed out, ultimately, that

5 | obviously did not happen with the level that the government

6 | had intended.

7 |       But I will point out that the Railroad Act was passed

8 | only three months after the 1862 Homestead Act.  And,

9 | remember, Your Honor, this was right at the beginning of the

10 | Civil War, and the Union was desperately trying to establish

11 | not only the transcontinental railroad but to encourage

12 | settlement of the Rocky Mountain West and the Western United

13 | States to aid with the Civil War.

14 |       And so that's the point is all of the lands in

15 | question -- both the public lands, originally, and then the

16 | lands that were given to the railroad -- the idea was those

17 | were going to be disposed of.

18 |       And, in fact, it's clear from looking at federal law,

19 | on the books from 1862 until 1976, the theme of the government

20 | with regard to lands that are now managed by the BLM -- and

21 | I'm differentiating from public lands that are managed by the

22 | United States Forest Service and lands that are managed by the

23 | Park Service, talking specifically about the unreserved public

24 | lands originally managed by the General Land Office and then

25 | managed with the creation of the BLM in 1946.

**SA020**

22-CV-67                        Mr. Weisz                                8

1          The theme was disposal, and there were a number of

2    acts under federal law that were meant to carry out that

3    disposal of these public lands managed by the GLO and then the

4    BLM:  The 1862 Homestead Act; the 1866 Southern Homestead Act;

5    the Timber Culture Act of 1873; the 1866 Irrigation Act; R.S.

6    2477, granting rights-of-way on public lands in 1866; the

7    Forest Homestead Act; the Enlarged Homestead Act; the

8    Stock-Raising Homestead Act.  All of those were put in place

9    by Congress to attempt to encourage the settlement of the

10   West.

11         What happened in 1976 to change the policy of

12   disposal of unreserved federal lands?  It was the enactment of

13   the Federal Land Policy and Management Act; and all of those

14   statutes that I just described, in large part, were repealed

15   by FLPMA in 1976.

16         However, even though most of those statutes were

17   repealed, the U.S. government, even yet today, has a disposal

18   policy with certain unreserved federal lands managed by the

19   BLM.  The Desert Land Act of 1877 remains in effect today.  I,

20   in fact, have helped people apply for homestead entries under

21   that act.  It applies right here in Wyoming.

22         Another example of disposal is the 1872 Mining Law,

23   which remains on the books.

24         So the point of this discussion, Your Honor, is to

25   emphasize that when the checkerboard pattern was created, all

SA021

 1    of the lands in question were intended to be disposed of.  And

 2    it wasn't until -- the development of the West did not

 3    materialize as Congress had intended.  It wasn't until 1976

 4    that, basically, what I call the organic act for the BLM,

 5    FLPMA, was put in place.

 6             And so the point is, is that the Union Pacific

 7    Railroad and the Central Pacific Railroad took title to these

 8    odd-numbered sections of land.  They did transfer those out

 9    into private ownership, as evidenced by the fact that Iron Bar

10    Holdings is now the owner of a number of those sections --

11             THE COURT:  Those sections, though, it was forced.

12    Within three years --

13             MR. WEISZ:  Yes.

14             THE COURT:  -- they had to dispose of them.  On the

15    even-numbered sections, there was no such -- they were

16    attempting to dispose of them, but there was no legal

17    compulsion for those to be sold or to be conveyed.

18             MR. WEISZ:  I agree.  And my response to that, Your

19    Honor, is there's only so much that the government can do to

20    entice homesteaders.  And, obviously, there are parts of the

21    Western United States that are more attractive than others.

22    And, you know, the government can't say, We -- you know, we

23    insist that people buy these lands.  They tried to encourage

24    settlement by these various homestead acts.

25             But you're right.  There was no mandate that those

**SA022**

1    lands, you know, be sold outright, because you can't force

2    somebody to buy something they may not want.

3            The point simply is, with regard to the checkerboard,

4    is that Iron Bar Holdings, LLC, and all other private

5    landowners in the Western United States who own deeded

6    property in the checkerboard, they didn't create the

7    checkerboard.  And, in fact, as evidenced by this case, it's a

8    burden in a lot of ways to those private landowners to have to

9    deal with the issues that come about from the checkerboard

10   landownership pattern.

11           So turning to the facts of the case at bar, in a lot

12   of ways, this case is relatively straightforward from a fact

13   standpoint and from a legal standpoint.  As you know, Your

14   Honor, we are dealing with the fact there are eight different

15   corners of land that the Defendants crossed.  And, in

16   particular, we're talking about the airspace above the surface

17   of the deeded property owned by Iron Bar Holdings.

18           And so the first question is, in examining any

19   potential trespass, is to ask yourself, is the -- is the

20   property interest in question, is it actually property?

21           And, of course, this is discussed in the brief.  In

22   English common law and then as adopted in the United States,

23   the ad coelum doctrine initially held that the owner of the

24   surface estate owned, you know, from the surface to the

25   heavens.

**SA023**

Case 2:22-cv-00067-SWS   Document 98   Filed 07/05/23   Page 11 of 54
Appellate Case: 23-8043   Document: 010110979266   Date Filed: 01/05/2024   Page: 24

22-CV-67                          Mr. Weisz                          11

1          With the advent of air travel, obviously, a solution

2    needed to emerge.  And as was discussed by the U.S. Supreme

3    Court in the *Causby* case, the ad coelum doctrine was modified

4    to account for the fact that the owner of the surface does own

5    the airspace above the surface up to the level of what is

6    commonly called the aircraft servitude.

7          And that, of course, is embodied in Wyoming Statute

8    10-4-302, which adopted, basically codified, the ad coelum

9    doctrine and said that the surface -- the surface of the air

10   is not the only -- the surface of the land is not the only

11   property interest of the private owner but as is the airspace

12   up to the level of the aircraft servitude.

13         And so *Causby* emphasized the fact that that private

14   property is subject to ownership by private persons; and if

15   it's trespassed at a height below the aircraft servitude,

16   there are remedies at law for that trespass.

17         The second question with regard to potential trespass

18   is considering how is trespass addressed in the law.  And as

19   pointed out in the plaintiff's brief, the U.S. Supreme Court

20   and the Wyoming Supreme Court have both said that the right to

21   exclude others from your private property is fundamental.  In

22   fact, it's one of the guiding principles of law.

23         The briefs point out that even as recently as 2021,

24   the U.S. Supreme Court relied on Blackstone in talking about

25   the need to be able to exclude others from your property,

**SA024**

1    including --

2            THE COURT:  Mr. Weisz, in this case, it's your

3    position -- your client's position that you own up to the

4    heavens, down to hades.  And in order for anyone to cross the

5    corner, they have to, at some point in time, cross that

6    infinitesimal space that is owned by your client and,

7    therefore, a trespass under Wyoming law and, thus, a violation

8    of your client's property stick.

9            MR. WEISZ:  One clarification, Your Honor.  My client

10   does not assert ownership of the airspace to the heavens, just

11   to the level of the aircraft servitude.

12           THE COURT:  That was adjusted by the FAA.

13           MR. WEISZ:  Yes.  Yeah.  Well, and, in fact, by

14   *Causby*, also.

15           But -- but you are correct, Your Honor.  The reality

16   is, is that it is physically impossible for people to step

17   from BLM land onto an adjacent section of BLM land without

18   physically invading the airspace above my client's private

19   property surface.

20           THE COURT:  And if I apply that rule, is the public

21   land encompassed within the private owner -- owned sections no

22   longer public?

23           MR. WEISZ:  I'm sorry.  Could I ask you to state that

24   again, Your Honor?

25           THE COURT:  Can the public access the public lands if

**SA025**

22-CV-67                          Mr. Weisz                          13

 1    they are encompassed within the private sections of the

 2    checkerboard --

 3              MR. WEISZ:  In --

 4              THE COURT:  -- without permission or an easement

 5    being granted by people such as your client?

 6              MR. WEISZ:  It is possible, Your Honor.  In fact,

 7    there's been some history of this at the Elk Mountain Ranch is

 8    that --

 9              THE COURT:  Helicopters.

10              MR. WEISZ:  Helicopters and airplanes, if they stay

11    above the level of the aircraft servitude.

12              But with respect to the surface of the property, I

13    agree with you, Your Honor, is that in order for the public to

14    access the checkerboarded sections of BLM-managed land, they

15    have to cross through the airspace above the surface of my

16    client's property.

17              THE COURT:  Absent ownership or lease or rental of

18    that aircraft, then the public has no access.

19              MR. WEISZ:  I agree.  And, in fact, you'll note in my

20    brief, Your Honor, that we pointed out that Congress itself

21    has recognized that there are public lands to which there is

22    no legally enforceable access.  And, in fact, there are

23    programs in place, particularly with the BLM, for the

24    government to go in and to condemn access across those corners

25    where it deems it important to have access to those particular

**SA026**

1    public lands.

2          THE COURT:  And based upon what you've submitted,

3    that access right would cost about $7.5 million for your

4    client's property.

5          MR. WEISZ:  I think that there's a misunderstanding

6    about that figure, Your Honor.  What the real estate broker

7    that we hired evaluated is the financial impact of the overall

8    value of the Iron Bar deeded property if the Court were to

9    find that corner-crossing was legal.

10          And the real estate broker said that if he was going

11    to list the property for sale, he would recommend that the

12    listing price be reduced by at least 30 percent, maybe more,

13    because of the impact.

14          THE COURT:  So to the extent your client has the

15    legal right to preclude public access to those lands -- public

16    lands within his private property sections, it is -- the right

17    to preclude that access is valued at $7 million.

18          MR. WEISZ:  I disagree, Your Honor, because the

19    government has the power to condemn across these corners.

20    And, you know, it's an individual question of --

21          THE COURT:  But if I condemned across those corners,

22    isn't your expert saying that if you do not have the power to

23    keep the public out that the loss of value of your private

24    lands would be $7 to $7.5 million?

25          MR. WEISZ:  Well, that's assuming that every single

**SA027**

 1    corner is crossed -- is taken by the government and crossed,

 2    by condemnation.

 3          But on an individual basis, you know, it's a fact

 4    question of if the government were to condemn 15 feet on

 5    either side of my client's property to get in, you know, just

 6    one section, is that a million dollars?  No, it's not.  I

 7    mean, the reality is there would be some examination of the

 8    value of the property interest taken.

 9          THE COURT:  Is there a difference in *Leo Sheep*

10    between a road and the trailing of cattle across the public

11    lands and the private lands, the checkerboard?

12          MR. WEISZ:  Well, *Leo Sheep* did not deal specifically

13    with the trailing of cattle across the public land.

14          So it, of course, dealt with the service of the land

15    and the fact that the BLM had constructed a road across the

16    corners without permission.  It did not squarely tackle the

17    question of access by livestock.

18          THE COURT:  What about *Buford v. Houtz?*

19          MR. WEISZ:  *Buford v. Houtz,* of course, was a case

20    that they did talk about access by livestock, and that's a

21    question, of course -- and this goes to the real heart of why

22    the Unlawful Inclosures Act was put in place.  It was because

23    of egregious violations where people, ranchers who owned the

24    deeded property in the checkerboard, would erect monumental

25    obstructions to prevent access to the public lands.

                                                              SA028

1          For example, in the *Camfield* case in Colorado, the

2    landowner enclosed over 20,000 acres of land, and the

3    landowner admitted that they were intending to enclose all of

4    the lands in question.

5          In the *Bergen* case here from Wyoming, in southern --

6    southwest Wyoming, the landowner constructed a fence that was

7    28 miles long and enclosed over 20,000 acres of land.

8          THE COURT:  How many square miles of land would be

9    off access to the public if your client is allowed to preclude

10   any corner-crossing?

11         MR. WEISZ:  I honestly have not done that

12   calculation, Your Honor.

13         THE COURT:  But it would be 20,000 acres?

14         MR. WEISZ:  I would -- I don't think it would be that

15   much, Your Honor.  I would guess that it would be in the

16   vicinity of between 5,000 acres, maybe 7500.  I'm just not

17   sure.  I've not carried out that analysis.

18         THE COURT:  I guess my point is, does it matter if

19   it's a fence or a chain and two steel posts?

20         MR. WEISZ:  It absolutely does.  I mean, the reality

21   is, is that two posts and two signs, "No Trespassing" -- and

22   there was a chain and a lock at some point -- is dramatically

23   different than all of the other actions which the federal

24   courts have found a violation of the Unlawful Inclosures Act.

25   They're not even close.

**SA029**

 1          THE COURT:  What about *Mackay v. Uinta Development*?

 2          MR. WEISZ:  And that case, of course, was issued

 3   before *Leo Sheep*.  And the essence of that case is that Court

 4   essentially said there was an implied easement.  And, of

 5   course, *Leo Sheep* firmly rejected that.

 6          THE COURT:  But didn't it say:  *The question here,*

 7   *which we think should be answered in the affirmative, is*

 8   *whether Mackay was entitled to a reasonable way of passage*

 9   *over the unenclosed tract of land without being guilty of*

10   *trespass*?

11          MR. WEISZ:  That's exactly what it said, and that's

12   my point, Your Honor, is that was well before *Leo Sheep*.  And

13   *Leo Sheep* said, No, there is no implied easement.

14          THE COURT:  But *Leo Sheep* dropped a footnote, did

15   they not, about *Buford v. Houtz* and noted that in *Buford v.*

16   *Houtz*, they were dealing with access limitations for the

17   purposes of preventing others from using or accessing the

18   public lands with their -- I guess, in that case, it was the

19   sheep versus the cattle?

20          MR. WEISZ:  Yes.  That's exactly right, Your Honor,

21   but my point is that was before the *Leo Sheep* case.  And I'll

22   point out, remember what the Court said -- the Supreme Court

23   said in the *Camfield* case.  The *Camfield* Court said that it

24   would not be a violation for a landowner in the checkerboard

25   to individually fence their sections even if that had the

SA030

22-CV-67                          Mr. Weisz                              18

1   effect of obstructing access to the even-numbered sections of

2   land retained by the Government.

3         THE COURT:  If there was -- was that limited, though,

4   to a legitimate purpose, for use of their land, as opposed to

5   just precluding access from others?

6         MR. WEISZ:  It is.  The *Camfield* Court said if they

7   construct a fence in a manner that really is -- it's a guise

8   or a disguise, if you will, of trying to attempt to control

9   access to the public lands --

10        THE COURT:  What was the purpose of the two fence

11  posts in this case?

12        MR. WEISZ:  My clients testified -- all three of the

13  representatives of Iron Bar said that, first of all, "No

14  Trespass" signs were put up at the advice of Wyoming Game and

15  Fish Department so that a criminal trespass complaint could be

16  lodged, because you have to give notice to the public to bring

17  a criminal trespass case.

18        My clients testified without exception, without

19  waiver, with absolute clarity that the purpose of the "No

20  Trespassing" signs was to say to people stay off of and out of

21  Iron Bar private property.

22        THE COURT:  And if they were found inside of that

23  sign on public lands, were they not told to leave after they

24  were on the public lands?

25        MR. WEISZ:  Not necessarily, depending how -- how

SA031

Megan E. Strawn, RPR, CRR                              (307) 232-2626

 1    they got there.  You know, as --

 2            THE COURT:  Well, how else could they get there?

 3    They had to, based upon the circumstances, did they not, have

 4    to cross your client's airspace?

 5            MR. WEISZ:  Well, again, if they're on foot, yes.

 6    But --

 7            THE COURT:  How many helicopters have flown there

 8    other than the one instance?

 9            MR. WEISZ:  I'm aware of two that have flown in.  And

10    there's been -- there was an incident after this case was

11    filed where two pilots from Laramie flew planes in to allow a

12    *Wall Street Journal* reporter to come in and look at the

13    situation.

14            But, you know, the reality is when someone is on

15    public land, my client has a right -- if they're on foot, my

16    client has a right to assume that they most likely trespassed

17    across my client's private property unless maybe somebody

18    allowed them, somebody gave them permission.  The ranch

19    manager may have granted permission.

20            So, yeah, my client's made it clear.  When they found

21    someone on those sections of land managed by the BLM, there

22    was an inquiry made.  But the important thing to note is that

23    if a person made an honest mistake and said, I didn't know I

24    couldn't do this, I didn't know I had trespassed, my client is

25    clear.  Okay -- and I cited this.  Dr. Eshelman said, No harm,

**SA032**

 1    no foul.

 2            But it's only when someone becomes belligerent or

 3    obnoxious or obstructive that, you know, my client has decided

 4    to pursue remedies, whether criminal remedies or civil

 5    remedies.

 6            THE COURT:  And that was while they were in or on the

 7    public lands, not on the private lands.

 8            MR. WEISZ:  I'm not sure I understand your point,

 9    Your Honor.

10            THE COURT:  When your client -- or the ranch manager

11    would approach them, they were on public lands.  They were

12    told, You got here by trespass.

13            MR. WEISZ:  I don't know if that was the testimony.

14    I believe there was an incident -- in 2020, one of the ranch

15    managers for Iron Bar did meet the Defendants on a section of

16    land.  I actually think it was State of Wyoming land, not BLM

17    land.  But, yeah, the discussion was, How did you get here?

18    You must have trespassed.  If you're on foot, you had to

19    trespass through this corner.

20            THE COURT:  Okay.

21            MR. WEISZ:  I'd like to talk -- I've got about five

22    minutes left.  I want to talk about the Unlawful --

23            THE COURT:  I'll give you five more, and I'll give

24    the other side five.

25            MR. WEISZ:  -- thank you, Your Honor -- Unlawful

**SA033**

1    Inclosures Act.  So of course, there's been a heated

2    discussion of whether or not preemption applies.  This is

3    pointed out in the brief.  The federal government is vested

4    with the authority -- the sole authority to enforce the

5    Unlawful Inclosures Act.  There's no private cause of action,

6    and there simply is no preemption.

7            The reality is, is that a private, civil trespass

8    case absolutely has no impact on the decision of the U.S.

9    Attorney whether or not to investigate a supposed violation of

10   the Act.  And, in fact, that happened in this case.

11           The Plaintiff's Exhibit 13 and 14 demonstrate that a

12   citizen of Wyoming filed a complaint with the U.S. Attorney,

13   complaining about supposed Unlawful Inclosures Act violations

14   by Iron Bar and by another landowner elsewhere in Wyoming.

15           The U.S. Attorney looked into the matter and, with

16   respect to Iron Bar Holdings, came back and said, There is no

17   unlawful enclosure of public land.

18           But with respect to the other landowner that was

19   complained of, the U.S. Attorney's letter to the person that

20   filed the affidavit basically said, Yeah, we've contacted that

21   other landowner, and they have cured their violation of the

22   Act.

23           And so the question is, is there any -- can there be

24   any preemption whatsoever when the U.S. Attorney has complete

25   and absolute discretion on whether or not to sue to enforce

**SA034**

22-CV-67                         Mr. Weisz                          22

1    the Act?

2            I would also point out, to emphasize, that the

3    original purpose of the Unlawful Inclosures Act was to

4    basically allow people to homestead.  And in fact, Section

5    1066 of the Act indicates that if the enclosure of public

6    lands in question, if that parcel is smaller in size than 160

7    acres, the U.S. Attorney has to get the permission of the

8    Secretary of Interior to bring a prosecution action.

9            And so the Unlawful Inclosures Act, the reality is,

10   is that the U.S. Attorney has absolute authority to enforce

11   that Act.  A civil trespass action has no impact whatsoever on

12   the U.S. Attorney's decision to enforce the Act.  And, as I

13   pointed out in the brief, if the U.S. Attorney for Wyoming had

14   determined that my client had violated the Unlawful Inclosures

15   Act, he retained authority to initiate such an action, and yet

16   he did not do so.

17           So the simple point of the matter is there is no

18   preemption that applies whatsoever with regard to the Unlawful

19   Inclosures Act.

20           I'll also point out, from a fact standpoint, as I

21   noted, there are eight corner sections where the Defendants

22   have acknowledged crossing over Iron Bar Holdings' private

23   property through the airspace.  Eight different locations.

24           One of those locations the Unlawful Inclosures Act

25   absolutely does not apply:  when the lands in question are

**SA035**

22-CV-67                           Mr. Weisz                              23

 1    owned by the Town of Hanna, Wyoming, and the State of Wyoming.

 2    The Unlawful Inclosures Act only applies to federal public

 3    lands.  That's Location No. 5 on Plaintiff's Exhibit 8.

 4           There's a trespass that took place there, and it is

 5    not privileged in any way.  The Unlawful Inclosures Act

 6    doesn't apply.

 7           There are three other locations -- 2, 3, and 4 --

 8    where the lands in question are a combination of BLM-managed

 9    land and land owned by the State of Wyoming.  Only if the

10    persons in question, the Defendants in this case, are crossing

11    into the BLM section would the Unlawful Inclosures Act apply.

12    Their entry into the State of Wyoming sections that I've just

13    discussed, those are also not subject to the Unlawful

14    Inclosures Act.

15           And so there are at least four situations where there

16    absolutely has been a trespass on or through Iron Bar's

17    private property, and the Unlawful Inclosures Act does not

18    apply.

19           As to the seven other occasions, Locations 1 through

20    7, at all of those locations, it's important to point out

21    there were no "No Trespassing" signs.  There were no T-posts.

22    There were no chains.  There were no locks.  There was

23    absolutely nothing done by my client to try to do anything to

24    control access even across its own property at those

25    locations.

                                                    **SA036**

1          And in fact, the Defendants admitted to crossing

2    those corners, and they admitted to finding the brass caps --

3    the survey brass caps, and they indicated that they crossed

4    over those sections where those brass caps were located.

5          And so from a fact standpoint, even though the

6    Defendants have been afforded an opportunity by this Court to

7    apply the Unlawful Inclosures Act as a defense, the reality is

8    there is absolutely no obstruction, nothing done whatsoever by

9    my client that would have done anything to prevent those --

10   those Defendants from stepping over those corners.  And that's

11   exactly what they did.  So there can be no Unlawful Inclosures

12   Act violation with regard to those seven corners.

13         As to the -- what's being called the main corner or

14   the first corner where the county road goes through a section

15   of BLM-managed property, here's my take on that situation,

16   Your Honor, is that's where the two steel posts were located

17   on the Iron Bar property with the "No Trespassing" signs.

18   Those did not obstruct the Defendants from accessing the

19   public land.  They used the posts to get to the public land.

20         THE COURT:  They swung around -- but there was a

21   chain that had to go over the public land as well as the

22   private land.

23         MR. WEISZ:  There was a chain -- and here's the issue

24   is Mr. Grende, the Iron Bar manager, indicated that the chain

25   did not obstruct access.  He indicated he could crawl

**SA037**

 1    through -- could have gone through that corner just fine

 2    between the posts.

 3          THE COURT:  But he grabbed that post in order to get

 4    over it, and that post was on your client's property.

 5          MR. WEISZ:  No.  I'm talking about the Iron Bar

 6    employee, Mr. Grende.  He indicated he could pass freely

 7    between the posts even with the chain.

 8          And I -- I would admit that with regard to the

 9    Defendants, because of all the gear that they had on their

10    back, they were not going to be able to go through those two

11    T-posts without regard to whether there was a chain there or

12    not.  And, eventually, Mr. Grende removed the chains finding

13    it, you know, served no purpose.

14          THE COURT:  About a week before the filing of this

15    lawsuit.

16          MR. WEISZ:  I think that -- I think that's correct,

17    yes, and while the criminal prosecution was continuing

18    before -- before that trial.

19          So the reality is, Your Honor, is that at a bare

20    minimum, my client is entitled to partial summary judgment

21    with respect to trespass across corner locations 5, 2, 3, and

22    4, as well as 1 -- I've confused myself here.  Essentially, 1

23    through 7, all of those corners.  There's been no -- there

24    were no actions taken by my client that could in any way be

25    deemed to be some type of obstruction to those corners.

**SA038**

1           And the Defendants admitted they crossed.  It's not a

2    privileged entry in any way.  It was done without my client's

3    permission.

4           The reality of this entire case is this, Your Honor,

5    is that the Defendants are attempting to use the Unlawful

6    Inclosures Act to create access.  And the case law that's

7    construed the Act from its beginning have made it clear that

8    the Act is not meant to create access.  The Supreme Court said

9    so in *Leo Sheep*.  And, in fact, what the *Bergen* case says is

10   that the Act is meant to preserve access if it otherwise

11   legally exists.

12          And so the simple fact of the matter is, is that, in

13   2020, the three Defendants decided to go through one corner

14   and then into a series of other corners.  They used the steel

15   posts to help them get across the Iron Bar property.

16          The next year they brought a stepladder with them,

17   and, as was addressed by a BLM regional solicitor, that did

18   not cure any trespass issue.  Even the BLM solicitor

19   acknowledged the existence of private property in the

20   airspace.

21          And so as clarified in my response brief, Your Honor,

22   assuming that the Court grants my client's motion and finds

23   that the Defendants trespassed across its property, it will

24   withdraw its damages claim against the individual Defendants

25   and would ask for judgment accordingly.  Thank you.

**SA039**

1          THE COURT:  Thank you, Mr. Weisz.

2          Mr. Mickus.

3          MR. SEMERAD:  Mr. Semerad.

4          THE COURT:  Mr. Semerad.

5          MR. SEMERAD:  Counsel.

6          MR. WEISZ:  Counsel.

7          MR. SEMERAD:  May it please the Court.

8          THE COURT:  Counsel.

9          MR. SEMERAD:  This case represents a $7 or nearly

10   $7.5 million monumental obstruction to our -- my clients' and

11   the rest of the public's access to the public lands on Elk

12   Mountain.  And, by implication, it suggests a legal principle

13   of such obstruction elsewhere.

14          In 1897, the United States Supreme Court said

15   something that I think we need to pay attention to in the

16   historical context of this case.  In the *Camfield* decision, it

17   wrote:  *It seems but an ill return for the generosity of the*

18   *government in granting these railroads half its lands to claim*

19   *that it thereby incidentally granted them the benefit of the*

20   *whole.*  The benefit of the whole.  Not legal title, not deed,

21   but the benefit.  An ill return.

22          That's not what happened.  That's not what the

23   railroad grant did.  And the UIA is an effort to clarify just

24   that.  I believe there is confusion in this case about what

25   the primary issue is.  This is not a case about the freedom to

**SA040**

22-CV-67                            Mr. Semerad                            28

 1 | or the right to corner-cross.  This is about freedom from,

 2 | negative liberty.  This is about freedom from unlawful

 3 | interference with public access to a public asset.

 4 |         THE COURT:  But is that public access truly public if

 5 | you have to go through private lands to gain it?

 6 |         MR. SEMERAD:  Respectfully, Your Honor, in this

 7 | instance, in this case, my clients did not travel through

 8 | public land at the surface.  And insofar as there is

 9 | incidental --

10 |         THE COURT:  Did not travel through public land?

11 |         MR. SEMERAD:  Or -- excuse me -- private land.

12 | Excuse me.  Private land at the surface.  They did travel

13 | through, incidentally, airspace situated around these section

14 | corners.

15 |         THE COURT:  The airspace, if I apply Wyoming law, is

16 | owned by Mr. Eshelman and Iron Bar.

17 |         MR. SEMERAD:  That is true.  That incidental, super-

18 | adjacent airspace is owned by the private landowner.

19 | That's -- that's true.

20 |         THE COURT:  And is that not part of the bundle of

21 | sticks that the property owner has?

22 |         MR. SEMERAD:  That certainly is part of the bundle of

23 | sticks.

24 |         THE COURT:  What is the basis for you to take that

25 | stick?

**SA041**

1          MR. SEMERAD:  Your Honor, we are not taking something

2    from the landowner that it has.

3          THE COURT:  But if you're imposing -- if we go with

4    *Leo Sheep,* we're imposing a burden upon that estate, are we

5    not?

6          MR. SEMERAD:  So *Leo Sheep* doesn't do all the work

7    that I think Plaintiff represents it to do, respectfully.  *Leo*

8    *Sheep* involved the federal government paving a road over

9    fees corners or other surfaces.  That's a permanent fixture.

10   It's a permanent component of the surface, and it's imposed by

11   the federal government, a sovereign.

12         THE COURT:  But did the government say -- or did the

13   Court in *Leo Sheep* say that it's the nature of the extent of

14   the obligation versus just the existence?  I mean, did they

15   not reject any claim of an easement or a license to cross

16   that?

17         MR. SEMERAD:  They did, but not in the way that

18   Plaintiff is positing.  They rejected this easement

19   conversation because they were -- one of the parties was a

20   sovereign with the power of eminent domain and condemnation,

21   as Mr. Weisz points out to this Court.

22         That's not the same posture we're in today.  And, in

23   fact, it was for that very reason that the U.S. Supreme Court

24   said that the UIA was of no significance to the controversy.

25   It was not applicable because the UIA wasn't a grant of some

**SA042**

1    affirmative rights or powers to the government.  It was a

2    restraint on the actions and activities of adjacent private

3    landowners.  That's precisely what *Camfield* articulated.

4         THE COURT:  So as long as the action is brought by

5    private citizens seeking to gain access, it would be okay; but

6    if it's brought by the government, it would not because the

7    government has the power of eminent domain.

8         MR. SEMERAD:  Not quite because we are not bringing

9    the action, Your Honor.  And this is --

10        THE COURT:  But in *Leo Sheep*.

11        MR. SEMERAD:  Sure.  In *Leo Sheep,* it was a quiet

12   federal action that was also brought by the private landowner.

13   The defendant was the government.

14        So we are in the shoes of the government, but we're

15   not a sovereign.  And moreover, we are not using the UIA to

16   create something or to make a claim.  We are using the UIA as

17   a defense, a UIA defense like the -- the sheepherder, I

18   believe it was, in *Mackay*.

19        We are trying to say that we have the freedom from

20   unlawful interference by a private landowner who is, in

21   effect, wresting exclusive control and a monopolistic effect,

22   the benefit of the whole, over those public lands, which, by

23   my just quick sketching out in this case, is, at a minimum,

24   6,000 acres.

25        Your Honor, I -- I want to point out something more

**SA043**

1    technical first, and then I'm actually going to hand this over

2    to Mr. Mickus to address some preemption issues.  But the more

3    technical point that I wanted to raise is that our statement

4    of undisputed facts is largely admitted to, or unchallenged.

5    We have provided 68 facts in the first 15 pages of our brief.

6    By my scoring, Plaintiff, in its opposition, has denied or at

7    least partially denied three and a half of them.

8            And under Rule 56(e)(2), we would ask that all facts

9    save for the first half of 13, Fact 29, Fact 63, and Fact 67

10   in Defendant's Motion For Summary Judgment be considered

11   deemed admitted.  There was no response or no objection to

12   those.

13           And certainly, Plaintiff has adequate counsel and has

14   had an opportunity to respond to those things and chose not

15   to.  And I would like to flag that first.

16           At this point, however, I'm going to turn it over to

17   my co-counsel, Mr. Mickus, to address preemption and the UIA

18   violation issues, and I will return to address some of the

19   remaining issues.

20           THE COURT:  Very well.

21           MR. MICKUS:  Thank you, Your Honor.  Lee Mickus on

22   behalf of the Defendants with respect to the preemption

23   issues.

24           Your Honor, the claims asserted in this case present

25   an archetypal instance of conflict between state and federal

SA044

1    law in which application and enforcement of those state laws

2    would frustrate and obscure the purpose of the federal laws

3    that are involved.

4         I say it's an archetypal instance because the federal

5    laws involved, namely, the UIA as well as those Department of

6    Interior regulations that are cited in the brief, prohibit the

7    action that Plaintiff is now trying to take with this lawsuit

8    that would enclose or obstruct access to the federal lands.

9         And I note, in response to a point that counsel

10   raised toward the end, that there are no physical obstructions

11   deeper into the lands on Elk Mountain, that both the

12   regulations and the UIA do not require physical obstructions.

13   Rather, they treat intangible actions in the same manner in

14   which physical obstructions are treated.

15        And in this instance we have a litany of intangible

16   actions ranging from direct confrontation with the Defendants

17   while they are on public land to contacting and encouraging

18   criminal trespass actions and, maybe most significantly to

19   this lawsuit, the bringing of this lawsuit seeking injunctive

20   relief that would use the state laws to actually erect the

21   obstruction, namely, injunctive relief, preventing these

22   Defendants from ever returning to the public lands on which

23   they hunted in 2020 and 2021.

24        The state laws --

25        THE COURT:  What about those -- what about those

**SA045**

 1   lands that are state lands or municipal lands?

 2          MR. MICKUS:  I hate to pass the buck, but actually,

 3   Mr. Semerad is going to address that issue when he returns to

 4   the podium, Your Honor.

 5          THE COURT:  Fair enough.

 6          MR. MICKUS:  Because the state laws are actually

 7   being used to become the barrier, Plaintiff's trespass-based

 8   actions here asserted present an actual conflict.  And

 9   under --

10          THE COURT:  Doesn't that conflict, in order to exist,

11   presume that there is some right of access over private lands

12   to public lands?

13          MR. MICKUS:  It doesn't necessarily presume a right

14   of access.  It looks at the nature of the purpose set forth in

15   the federal laws, namely, in the UIA and in those regulations,

16   and they direct that access shall be given.

17          And I think you're hinting at a point that I'd like

18   to raise that counsel raised earlier, the notion of this -- I

19   like to call it a mathematical or Euclidean geometry-based

20   conception of the airspace rights.  That is a concept we heard

21   about from Plaintiff that makes it -- if followed, it would

22   make it physically impossible to access the lands without

23   violating those airspace rights.

24          But I would point the Court to how the UIA has

25   actually been interpreted to show that, in fact, that concept,

**SA046**

 1    that geometric, mathematically based concept, is never the way

 2    that the Court has interpreted the UIA's provision for access.

 3              I point specifically to *Mackay* in which the Court --

 4              THE COURT:  Is *Mackay* good law?

 5              MR. MICKUS:  *Mackay* is good law.

 6              THE COURT:  Why?

 7              MR. MICKUS:  *Mackay* is good law because despite *Leo*

 8    *Sheep* -- *Leo Sheep* addressed the notion of a permanent

 9    easement.  It did not address the UIA.  In fact, as counsel

10    already noted, *Leo Sheep* specifically said the UIA was not of

11    significance in this matter.

12              Again, it's -- this case also doesn't involve a

13    sovereign, and, maybe most importantly, it doesn't involve a

14    physical taking of the actual surface land.

15              In *Mackay,* it specifically looked at this notion

16    of -- and before we leave *Leo Sheep*, actually, that presents a

17    good example of this more practical approach to access than

18    this mathematical, abstract approach.

19              In *Leo Sheep*, it talks specifically about the open-

20    range concept and, in its discussion of the UIA, notes that

21    these kinds of -- I want to get this quote right.  It observed

22    that *the open range*, like still exists at Elk Mountain, *the*

23    *type of incursion on private property necessary to reach*

24    *public land was not such an interference that litigation would*

25    *serve any motive other than spite.*

                                                        **SA047**

Megan E. Strawn, RPR, CRR                              (307) 232-2626

1          So it rejects the notion that these sorts of

2    transient, non-damaging, certainly non-permanent, momentary

3    transits through the airspace constitute something that is

4    legitimately actionable.

5          *Mackay* certainly, I mean, specifically rejected the

6    mathematical approach.  *Camfield* also rejected that concept,

7    noting that -- *Stoddard* did, as well -- noting that fences

8    that are constructed outside the public land, on private land

9    themselves, where that fence had the practical effect of

10   blocking transit of real people and real livestock onto the

11   public land, those fences had to be removed because they

12   represented violations of the UIA.

13         To quote from *Camfield*:  *The inconvenience, or even*

14   *damage, to the individual proprietor does not authorize an act*

15   *which is in its nature a purpresture of government lands*, a

16   taking of government lands.

17         Likewise, in *Bergen*, even the presence of some open

18   gates in the fence along the boundary with the public land

19   would not prevent the finding of a UIA violation, because the

20   evidence showed that, even as a practical matter, the antelope

21   that were at issue in *Bergen* would not recognize those small

22   openings.

23         So again and again and again, *Leo Sheep*, *Camfield*,

24   *Stoddard*, *Bergen*, *Mackay*, they all consistently take a more

25   practical, more real-world-based conception of the access

**SA048**

22-CV-67                              Mr. Mickus                              36

1    point and how to treat that corner.

2            They reject this idea that there are these Euclidean

3    geometry-based planes in the abstract air that, somehow, by

4    breaching through that plane, even on a momentary basis, that

5    represents a trespass.  Rather, they say that constructing

6    that sort of analysis is inconsistent with the UIA.

7            Your Honor, I would also like to make the point --

8    this came up in the context of the order on the motion to

9    dismiss, and counsel touched on it here briefly, that his

10   clients testified that the purpose was not to prevent access

11   from the public land.  The purpose of the signs, of the

12   confrontations, of the lock, of the criminal action, and of

13   this present lawsuit, the purpose is only to protect their

14   side of the intersection.

15           I would note that in *Bergen*, the Court specifically

16   focused that the inquiry is not on the purpose or the intent

17   of the violator; the focus is on the effect of the

18   obstruction.

19           THE COURT:  There's no *mens rea* component.  I

20   understand.

21           MR. MICKUS:  Exactly.  Thank you, Your Honor.

22           I would also like to very briefly address the point

23   that counsel raised that a UIA violation is dependent upon

24   action by a U.S. Attorney.  There are a number of different

25   points I'd like to raise in that regard.

                                                              **SA049**

1        First off, *Mackay* stands for the opposite.  *Mackay*

2   involved two private parties, Mr. Mackay and the Uinta Land

3   Development Company.  There, the plaintiff brought a civil

4   trespass action; and based on the UIA, the district court

5   dismissed -- or rather, the circuit court affirmed that the

6   trespass claims should be dismissed.  The government was not a

7   party there.

8        Likewise, in the *Western Wyoming Land v. Bagley* case,

9   we saw the same holding.  Western Wyoming relies on the *Mackay*

10  case.  It doesn't specifically speak to the UIA, but it's

11  clearly addressing that based on its citations to *Mackay*.

12       I would also note that counsel's argument about the

13  U.S. Attorney provision within the UIA doesn't take into

14  account those 1995 Department of Interior Regulations at 43

15  CFR 4140.1(b)(7) that are referenced in our brief.  There's no

16  such requirement within those regulations.

17       And as we have cited in our brief, and as countless

18  cases, including *Geier v. America Honda*, stand for, federal

19  regulations can preempt state laws just as effectively -- and

20  particularly, state law tort claims -- just as effectively as

21  statutory law.

22       And then I would also note that counsel, in

23  connection with this point, raised the argument that those

24  other seven corners that were not blocked by the signs with

25  the chain and the lock, that those were not obstructed.  And

**SA050**

22-CV-67                              Mr. Mickus                              38

 1    I'll return to a point that I raised earlier, Your Honor.

 2            THE COURT:  Was there any obstruction at all in

 3    *Mackay?*

 4            MR. MICKUS:  I don't believe so, Your Honor.  I'm

 5    thinking.  I don't believe so.  Certainly, there was in *Bergen*

 6    and in *Camfield*.

 7            THE COURT:  I didn't understand in *Mackay* that there

 8    were any fences, but it was, rather, I think, a request and a

 9    question of whether or not there was a reasonable -- I think

10    the test -- whether a reasonable way of passage over the

11    unenclosed lands.

12            MR. MICKUS:  I think that's exactly right.  And I

13    think, very similar to this case, the obstruction was

14    actually -- for purposes of the UIA, the obstruction was

15    actually the civil trespass claims and the request for damages

16    that were being asserted there, again, using the state law to

17    become the intangible obstruction that UIA would cover.

18            With respect to those other seven corners where there

19    is no physical obstruction -- and I've touched on this

20    already -- all of the other intangible obstructions, all of

21    the consistent acts that were cited at length in our statement

22    of undisputed facts, the confrontations, the interactions with

23    the law enforcement agency, and, perhaps, most importantly,

24    the bringing of this lawsuit seeking injunctive relief, all of

25    that applies equally and in force to every one of those other

SA051

22-CV-67                                Mr. Mickus                              39

1   actions of corner-crossing.

2           THE COURT:  Let me ask you about Waypoint 6 since

3   everybody wanted to talk about Waypoint 6.

4           MR. MICKUS:  Yes, Your Honor.

5           THE COURT:  So your position is, is my client signed

6   an affidavit.  Wasn't there.  Didn't happen.  I had a thumb,

7   finger, or whatever, and I dropped the waypoint on this piece

8   of area, which is identified as private as Mr. Eshelman's or

9   Iron Bar Holdings'.

10          MR. MICKUS:  Yes.

11          THE COURT:  But every other waypoint that I've

12  identified is accurate.

13          Now, we have that.  There is -- and I didn't see --

14  and forgive me, there's quite a few attachments, but I didn't

15  see a date/time.  Normally, when I drop a pin in Apple Maps,

16  there's a date and time or something that might be indicated.

17  I didn't see a date and time that was indicated in terms of

18  Waypoint 6.

19          MR. MICKUS:  I believe you're right, Your Honor.  And

20  my recollection is that Mr. Smith -- Mr. Smith no longer has

21  those waypoints stored on his -- on his device.  The data that

22  is cited about Waypoint 6 actually came from a download from

23  onX, the app company that stores that information.

24          So I don't know that there is any information

25  associated with his entry at this point.

**SA052**

1          THE COURT:  So -- and I guess I ask that because,

2    obviously, if that entry was made at 3:00 p.m. on December

3    25th and he was having Christmas lunch with his family in

4    Missouri, he couldn't have been there.

5          MR. MICKUS:  Certainly.

6          THE COURT:  But at this point in time, it's there.

7    He says he wasn't there, but the data says he was in the

8    sense -- or that waypoint was.  And if I have to infer in the

9    light most favorable to the nonmoving party, do I not have a

10   genuine issue of material fact as to whether or not that

11   waypoint indicates and establishes that he may have been there

12   or may have not, depending upon the testimony?

13         MR. MICKUS:  You do not have a genuine issue of

14   material fact with that, and here's why, Your Honor:  It would

15   be a different story if Waypoint 6 was part of a tracking

16   function.  It is not.  Waypoint 6 is part of a tap function,

17   and it does not depend on the location of the user.  You've

18   got evidence both from the Defendants in their affidavits and

19   testimony and, also, even from the onX corporate

20   representative saying that one doesn't necessarily associate

21   being in a location with the creation of a waypoint.

22         So the fact that there is a waypoint, it could happen

23   accidentally.  It could happen from a distance.  He may have

24   been glassing an area and saw something way out there for any

25   number of reasons.

                                                    **SA053**

 1          When we were deposing the onX corporate

 2   representative, there was a discussion, actually, of one of

 3   their representatives putting waypoints for local bars that

 4   she wanted to go to.  So for all kinds of reasons, there is

 5   no -- there is no evidence that associates Mr. Smith's

 6   location with Waypoint 6 at any point in time.  It's only that

 7   it was tapped at that location.

 8          With that, Your Honor, I will turn it back over to

 9   Mr. Semerad to address your remaining points.

10          THE COURT:  Thank you.

11          MR. SEMERAD:  So let's talk about the State lands,

12   Town of Hanna, and those issues.  I would like to address

13   those first.  I'm actually holding in my hands here, because I

14   like this map better, Exhibit 8 to Plaintiff's Motion for

15   Summary Judgment.  I like it better than ours.

16          This -- this map has color codes; and it shows you

17   blue is the BLM, green is State, and yellow is the Town of

18   Hanna.  It's the yellow -- Town of Hanna is the only yellow on

19   the whole map.

20          And our position is there's three responses to this

21   "UIA doesn't work for the State lands."  The first response

22   is, well, the UIA does, because Section 26 has, in the

23   northern quarter of the southern half, a strip of BLM land.

24   And if Plaintiff's position were true and the UIA had no

25   application whatsoever, well, then this BLM strip would be,

**SA054**

1    truly and entirely and legally, always inaccessible.  There

2    would be no way whatsoever other than helicopter -- very, very

3    targeted helicopter or very, very targeted plane to arrive at

4    that very quarter strip of the 640-acre section.  The only way

5    to get there is from some section of BLM -- some other section

6    of BLM and crossing through either State or Town lands.

7            Likewise, when we have this entire section of State

8    land, which is Section 36 to the southeast of Section 26, when

9    you arrive here, the only way you can get to the public

10   section of Section 2 is, once more -- which this is a BLM

11   section -- is to cross through the State-owned section of

12   Section 36.

13           So the enclosure argument and the extension -- the

14   natural extension of it on that first application of the UIA

15   says it's got to work just the same if you're ever going to

16   get to those BLM lands.

17           So if Plaintiff's position holds water that, well,

18   the UIA can only ever have operation in purely and entirely

19   BLM sections, there's some access issues that would be

20   addressed by the UIA.

21           That would be my first response, Your Honor.  I've

22   got two more.

23           My second response is the Wyoming Constitution.  If

24   we need to turn to state law exclusively, well, the -- the

25   state law comes from state constitutions.  It is the

**SA055**

1   fundamental source of state law in every single state,

2   especially in Wyoming.

3          The Wyoming Constitution, at Article 21, Section 26,

4   Clause 1, says that *no one shall have right or title to*

5   *unappropriated public lands within the territory of Wyoming.*

6   And I would focus on that first discussion, "right," because,

7   obviously, this isn't a claim of title.

8          In this case, if Plaintiff's position -- we set aside

9   the UIA, and we talk about the corners involving intersections

10  of private and State land.  We have this question of does that

11  mean, then, that Plaintiff has exclusive right to those

12  unappropriated public lands within the territory of Wyoming?

13  The Constitution says it cannot, forever.  We forever disclaim

14  such a right.

15         So I think that there's a tension there that cannot

16  be resolved in favor of the Plaintiff without running afoul of

17  that Wyoming constitutional provision.

18         That would be my second response.

19         My third response is Wyoming Statute 10-4-302 as well

20  as Wyoming Statute 10-4-303, which are about airspace and

21  ownership.

22         I don't think that it is an artificial reading of the

23  phrase "several owners of the surface" to say that the several

24  owners of a given surface have rights to the airspace above

25  it.  And we are talking about section corners that are, of

**SA056**

1   course, composed of equal sections of land owned by different

2   people.

3              If Plaintiff's position is right, then that statute

4   doesn't mean what it says.  It means that there is some kind

5   of trump card or some kind of superior right in the private

6   landowner.

7              That's not what the statute says.  That can't be

8   right.

9              And then when we turn to 10-4-303, which is about

10  low-level airspace flights, it says, effectively, a low-level

11  flight is not a trespass unless it causes some kind of damage.

12  Well, if that's true for a plane, why would it be any

13  different for a person?

14             And I don't think that -- I think that that

15  conclusion that some plane or helicopter is appropriate but a

16  person stepping over the corner, engaging in an activity that

17  is lawful, that has been part of our historical tradition as a

18  species since the inception of humanity, hunting, and is using

19  public resources, public lands, that can't be so far different

20  than low-level airspace travel, like an airplane, that it is a

21  violation, whereas the airplane is not.

22             So those are my three responses to that issue about

23  these -- the State/private or Town/private corners.  I think

24  that there are UIA issues, and there are state law and

25  constitutional issues, as well.

**SA057**

1          A few other points, Your Honor, that I think need to

2     be addressed.  And I really do want to talk about this

3     airspace trespass question.  While we take the position that

4     it just simply cannot be the case that the UIA is repealed by

5     implication, as the Tenth Circuit refused to do in *Bergen* --

6     and that was a post-*Leo Sheep* decision, and that involved a

7     private party and another private party, though it was a UIA

8     prosecution initiated by the U.S. Attorney's Office -- if we

9     set the UIA issue aside for a moment, we do know that *Bergen*

10    says that private landowners do not have, nor have they ever

11    had, a right to exclude others from the public domain.  That's

12    not part of their bundle of sticks.  It's never been part of

13    their bundle of sticks.

14         But what's more is this concept of a low-level

15    airspace trespass is kind of a new thing.  It is a modern

16    thing.  Because at the founding of our country to present, and

17    probably before that, outside of England, travel through the

18    commons, unenclosed lands, pasture lands, or fields was never

19    considered a trespass.  This literalistic application of the

20    mere passage over open fields was never, ever considered a

21    trespass.

22         But then when we take that principle and then we

23    apply it to airspace, after World War II when we start having

24    *Causby* and *Henman* and the rejection of the ad coelum doctrine,

25    we now have to ask, Well, what do we do with the lower strata?

**SA058**

1   What do we do with travel through the lower strata?

2          And we have answers, Your Honor.  The Tenth Circuit

3   has told us specifically that a low-level travel through the

4   air that causes no damage is no trespass and is lawful.  This

5   is, of course, the *Pueblo of Sandia* decision that we cited in

6   our brief at pages -- or in our opposition motion, ECF 68.

7          THE COURT:  Mr. Semerad, let me ask you this, though:

8   If I declare that your clients had the right for their

9   low-level travel, and that is then allowed in every corner of

10  the checkerboard, would you pay as much land -- pay as much

11  for that private land that Mr. Eshelman -- Iron Bar holds,

12  knowing that, or would you pay more if you knew that you could

13  preclude people from that travel?

14         MR. SEMERAD:  I would certainly think that there's a

15  premium if you have exclusive access to double your land.  I

16  think that's true.  I think you're right, Your Honor, that,

17  yes, there's certainly going to be some premium.  Whether that

18  premium is legally justified or artificial, there's a premium

19  that's going to be lost, yes.

20         And -- and so I think, though -- I think the *Pueblo*

21  case is apt in addition to several of the others, which I'll

22  touch on briefly.

23         *Pueblo* was an airspace -- it was a runway, and planes

24  were flying right off the runway right over the adjacent,

25  unoccupied, unused private land.  These were planes roaring

**SA059**

Appellate Case: 23-8043   Document: 010110979266   Date Filed: 01/05/2024   Page: 60

22-CV-67                        Mr. Semerad                        47

1    through the sky.  And the Tenth Circuit said, on summary

2    judgment, You know what -- or at least affirmed on summary

3    judgment after the trial court granted summary judgment in

4    favor of the airport -- this is just not a trespass.  It's

5    just not.  It concluded that if a plaintiff is going to argue

6    for an airspace trespass in that lower strata, it needs to

7    demonstrate that it sustained actual damage from the

8    defendant's airspace travels.

9              THE COURT:  And that's what I guess I was trying to

10   get at.  If I find that that trespass through the airspace

11   were to be allowed, would there not be damage to the owner?

12             MR. SEMERAD:  I think that -- damage not in the legal

13   sense.  So in the legal sense, damages is when I've harmed

14   something that you actually are entitled to or I've harmed

15   your person or something like that.

16             I would use -- this is damage in the colloquial

17   sense.  This is just mere they've lost something they thought

18   they had.  They lost this premium.  But as this Court

19   acknowledged in its previous order on the expert motion in

20   limine we filed, if, in fact, these low-level airspace travels

21   are legal in some form or fashion or, at least as we frame it,

22   Plaintiff can't stop people from doing it, they're not

23   actually losing something that they really had. They're losing

24   the artifice of a premium that should never have been there in

25   the first place.

                                                    **SA060**

22-CV-67                           Mr. Semerad                          48

1       And I would argue that that premium that they are

2    placing on exclusive access to these public lands is -- it's

3    saying the quiet part out loud.  They are saying that, Well,

4    of course our lands have extra value because we are the only

5    ones that get to use the public lands.  We are the only ones

6    that get to police and marshal and control who crosses and who

7    enters.  That whole scheme is a 43 U.S.C. 1063 violation.

8    Period.

9       The U.S. Supreme Court in *McKelvey* said it is free

10    transit that the statute permits.  Even a temporary

11    obstruction or a temporary choice, "You people can't come over

12    here," that temporary choice is a violation, because it is

13    free transit that we're trying to preserve.

14       And I think that the notion of homesteading

15    completely undermines this premium that Plaintiff places on

16    its land.  From the outset, the whole -- and even in

17    Plaintiff's argument today, the whole purpose, I guess, of

18    these lands was dispensation at some point; and at this point,

19    it's reservation and conservation.

20       But in either instance, the case was never that,

21    well, the adjacent landowner gets to call the shots.  That was

22    never the point, the purpose, the effect, the language.  There

23    is no law that says that.

24       And I think that is the problem with this case is

25    that there has been a kind of détente since -- I don't know if

SA061

1    it was *Leo Sheep* or if it was the advent of planes, but there

2    has been a lack of conversation about what we're supposed to

3    do with these millions of acres of public lands that the

4    public could just step over a corner and access, but private

5    landowners do not want to allow that.  They do not want to

6    allow it because they want to maintain a perceived monopoly,

7    and that is where the value comes.

8         If they're losing value because of an artificial

9    monopoly, well, sure, that's a loss, but it is not recoverable

10   under the law, as *Mackay* says.  You cannot found a prosecution

11   upon your own violations of law.

12        And I think every court in this country, including

13   every court in Wyoming, recognizes that equitable principle,

14   that you cannot recover from your own violations of law.  And

15   that's exactly the issue in this case.

16        Your Honor, I want to say one last thing, and I just

17   want to touch on it because I can't -- I can't stop myself

18   from saying it.  Plaintiff cites the *Koenig* case from the

19   Wisconsin appellate court.  Not only is that decision a per

20   curium decision that is not citable -- it's not persuasive

21   authority or binding authority even in Wisconsin -- but in

22   that case, the landowner -- this is at paragraph 2, page 12 of

23   2020 Wisconsin Appellate Reporter LEXIS 358 -- the landowner

24   in question had access to the public land.  He could have

25   walked around the other person's property.  He just chose to

**SA062**

 1    do the more convenient thing and step over the corner.

 2             It's apples and oranges.

 3             Your Honor, for all the reasons we've articulated in

 4    the briefs and that Mr. Mickus identified, we'd ask this Court

 5    to deny Plaintiff's Motion for Summary Judgment and to grant

 6    ours in full and dismiss this case.  Thank you.

 7             THE COURT:  Thank you.

 8             One moment.

 9        (Discussion off the record.)

10             THE COURT:  Let me -- I'll give each of you the

11    opportunity to enlighten me, if that's possible, not because

12    of your ability but my lack of ability.

13             But turning to CM/ECF 67-3, page 2 of 2 -- this is

14    also noted as Plaintiff's Exhibit 15A -- there is a highlight

15    on that page 2 of Document 67-3 that indicates "Waypoint

16    9301214 M-type, Waypoint notes:  Null.  Deleted at" and then

17    there's a time.  "Client created at" -- I guess what I was

18    trying to see is, is that the Waypoint 6 that we're talking

19    about?  And is that -- do we know as to the date of creation?

20    It says, "Created, updated, deleted."

21             So, Mr. Weisz, I'll give you the first discussion on

22    that.

23             MR. MICKUS:  I'm sorry, Your Honor.  Can you please

24    just focus us back on what page it is?

25             THE COURT:  It is on page 2 of 2 in Document 67-3.

**SA063**

1          MR. MICKUS:  Thank you.

2          THE COURT:  Okay.  And, Mr. Weisz, are you -- are we

3    on the same page, do you think?

4          MR. WEISZ:  We are, Your Honor.  With your

5    permission, may I remain seated?

6          THE COURT:  You may.

7          MR. WEISZ:  Thank you.

8          Yeah.  In fact, you had asked that question of

9    counsel.  That is Waypoint 6, as described in the affidavit

10   from my legal assistant.

11         The waypoint was created on September 30th of 2020 at

12   12:14.  It was deleted by Mr. Smith on October 19th of 2020.

13         And so this information that we have here shows that

14   Mr. Smith created the waypoint when he was in the field,

15   hunting, in 2020.  He deleted it October 19th.  However, the

16   onX data for individual users, which is what this is from,

17   shows that, even though he deleted it, for whatever reason, he

18   did -- it was retained in the onX system.

19         And so thank you for bringing this up, Your Honor,

20   because I was going to raise this question.  There is a date

21   and time showing when the waypoint was created while they were

22   hunting and then deleted a couple -- three weeks later.

23         Thank you.

24         THE COURT:  All right.

25         Mr. Semerad or Mr. Mickus?

**SA064**

 1          MR. MICKUS:  Thank you, Your Honor.

 2          I appreciate you raising that point again.  I

 3     obviously was not aware of that detail within the metadata

 4     that came from onX.

 5          I think counsel is right about what he has described

 6     it as.  But for the same reasons I discussed while I was at

 7     the podium, I don't think it establishes anything other than

 8     it got created while it was -- in Wyoming.

 9          THE COURT:  All right.  Very well.

10          MR. MICKUS:  Not necessarily at any location.

11          THE COURT:  I understand that it -- yeah.  And what I

12     was looking for is just the time of creation that might

13     eliminate the possibility of the same time frame we're looking

14     at.

15          All right.  Thank you very much.

16          Well, I commend you on the briefing in this matter.

17     You've given me plenty of things to chew on, but I think it

18     really comes down to a little corner of the pie.  And that's

19     really going to be the nuts and bolts of the issue and what is

20     and is not allowed or recognized as part of those sticks.

21          And I will take the matter under advisement and get

22     you a decision as soon as reasonably possible given the

23     circumstances and the caseload.

24          But obviously, I know we have further settings coming

25     up, and I will try to get you a decision so that we can know

**SA065**

1    where we're going on those other settings.  Thank you for your

2    excellent arguments.  We'll stand in recess.

3          (Proceedings concluded at 2:21 p.m., May 10, 2023.)

4                    *      *      *      *      *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SA066**

1                        C E R T I F I C A T E

2

3              I, MEGAN E. STRAWN, Federal Official Court Reporter

4     for the United States District Court for the District of

5     Wyoming, a Registered Professional Reporter and Certified

6     Realtime Reporter, do hereby certify that I reported by

7     machine shorthand the proceedings contained herein on the

8     aforementioned subject on the date herein set forth, and that

9     the foregoing 53 pages constitute a full, true, and correct

10    transcript.

11              Dated this 5th day of July 2023.

12

13

14

15              _____/s/ Megan E. Strawn_____

16                        MEGAN E. STRAWN
                   Registered Professional Reporter
17                  Certified Realtime Reporter

18

19

20

21

22

23

24

25

**SA067**

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2024, I electronically filed the foregoing supplemental appendix with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users.

Dated: January 5, 2024                    */s/ Ryan A. Semerad*
                                          Ryan Alexander Semerad