No. 23-8043

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

Iron Bar Holdings, LLC,

*Plaintiffs – Appellants*,

v.

Bradly Cape, et al.,
*Defendants – Appellees*,

_____

On Appeal from the United States District Court, District of Wyoming
D.C. No. 2:22-cv-00069-SWS
Hon. Scott. W. Skavdahl

_____

BRIEF OF *AMICUS CURIAE* GREAT OLD BROADS FOR WILDERNESS,
GREENLATINOS, SIERRA CLUB, AND WESTERN WATERSHEDS PROJECT IN
SUPPORT OF DEFENDANT-APPELLEES AND IN SUPPORT OF AFFIRMANCE

_____

Thomas Delehanty
Earthjustice
633 17th Street,
Suite 1600
Denver, CO 80202
Phone: (303) 996-9628
Fax: (303) 623-8083
tdelehanty@earthjustice.org

*Counsel for Great Old Broads for Wilderness,*
*GreenLatinos, Sierra Club, and Western Watersheds Project*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................1

BACKGROUND .............................................................................................2

I.    The Public Land Amici .......................................................................2

II.   The "Range Wars" Persist Today .......................................................5

    A.   Fear of confrontation with landowners who consider corner crossing illegal impairs access in the checkerboard ......................6

    B.   Private landowners use threats and intimidation to deter the public from using public land ........................................................7

    C.   Private landowners post false and misleading signage to block access ...............................................................................................9

    D.   Private landowners sometimes resort to violence to keep the public off of public land ................................................................ 10

    E.   Private landowners in the checkerboard leverage their property rights to wrongfully control management of public land ............ 11

    F.   Background summary ................................................................ 13

ARGUMENT ............................................................................................... 13

I.    Iron Bar's Trespass Action Unlawfully Seeks to Enclose Public Land ................................................................................................... 14

II.   The District Court Properly Concluded that the Public Is Entitled to a Reasonable Way of Passage Through the Checkerboard ................... 19

    A.   *Leo Sheep* did not overrule *Mackay, Camfield,* or the UIA ......... 20

    B.   *Mackay's* rule of the reason accounts for changes in custom ...... 21

    C.   Iron Bar's right to exclude is not unlimited ................................. 23

D.    Iron Bar wrongly dismisses the distinct nature of airspace........ 24

CONCLUSION..................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Buford v. Houtz,*
    133 U.S. 320 (1890) ........................................................................ 21

*Camfield v. United States*,
    167 U.S. 518 (1897) ...................................... 15–16, 23–24, 26–27

*Pueblo of Sandia ex rel. Chaves v. Smith*,
    497 F.2d 1043 (10th Cir. 1974) ............................................. 24–26

*Iron Bar Holdings, LLC v. Cape*,
    No. 22-cv-00067-SWS, 2023 WL 3686793 (D. Wyo. May 26,
    2023) ................................................................... 17, 19, 23–26

*Leo Sheep Co. v. United States*,
    440 U.S. 668 (1979) ........................................................................ 20

*Mackay v. Uinta Development Co.*,
    219 F. 116 (8th Cir. 1914) ......................................... 1, 18, 21–23

*U.S. ex rel. Bergen v. Lawrence*,
    848 F.2d 1502 (10th Cir. 1988) ................... 1, 14–16, 20–21, 23–24

### Statutes

43 U.S.C. § 1061 ................................................................... 1, 18

43 U.S.C. § 1063 ................................................................... 1, 18

43 U.S.C. § 1701 ................................................................... 15, 16

Wyo. Stat. § 6-3-303 ................................................................ 25

Wyo. Stat. § 10-4-303 .............................................................. 25

Wyo. Stat. § 23-3-305 .............................................................. 25

### Other Authorities

Fed. R. App. P. 29 ..................................................................... 5

H.R. Exec. Doc. No. 1, 48th Cong., 1st Sess. (1883)............................................5

H.R. Rep. No. 1325, 48th Cong., 1st Sess. (1884) ...............................................6

## INTRODUCTION

Iron Bar's lawsuit aims to exclude the public from public land near Elk Mountain so that its multi-millionaire owner can have it for himself. This maneuver is part of a broader pattern across the West of private landowners attempting to control public land access via threats, force, and other unlawful methods.

But Iron Bar's case fails under a legal rule of reason first applied by federal courts over a hundred years ago, codified in federal statute as the Unlawful Inclosures Act ("UIA"), endorsed by this Court, and applied by the district court. These authorities establish that, as members of the public, Mr. Cape and his fellow hunters had a right of reasonable passage to access public land in Wyoming's checkerboard and did not trespass by stepping momentarily over corners shared with private land. *See U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1507–11 (10th Cir. 1988); *Mackay v. Uinta Development Co.*, 219 F. 116, 119–20 (8th Cir. 1914); 43 U.S.C. §§ 1061, 1063. Tellingly, Iron Bar fails to cite *a single case* finding civil trespass liability for corner crossing in the checkerboard, asking this Court to be the first.

A holding for Iron Bar would proclaim that private property rights to a few inches of airspace trump even the most reasonable way of passage to millions of acres of public land owned by all. Because that result defies law and reason, the Court should affirm.

1

# BACKGROUND

## I.     The Public Land Amici

The Public Land Amici are conservation and environmental justice groups whose members use and enjoy public land for a wide array of activities.  They care deeply about protecting public land from privatization and work to protect public resources for their members and future generations.  As discussed below, their members have encountered misleading signage; threatening, intimidating, and even violent landowners; and other barriers to access that, as a practical matter, prevent them from engaging in activities on public land like hiking, fishing, birdwatching, conducting science, surveying land for conservation values, and more.

**Great Old Broads for Wilderness** is a women-led national grassroots organization that engages and inspires activism to preserve and protect wilderness and wild public lands.  Broads believe these lands are for everyone; they are the heritage of all and a gift to future generations.  With more than 40 volunteer-led chapters across the U.S., Broads empowers, trains, and mobilizes advocates to rally for wilderness designation and public land protections to ensure clean air and water, and a healthy habitat for all of Earth's creatures.  The organization conducts placed-based education to help people develop a strong understanding of the issues, history, policies, politics, flora and fauna, and health of the land they seek to protect.  Broads

2

believes actions taken by private landowners to discourage or prevent access to public lands is unlawful and discriminatory.

**GreenLatinos** is a national non-profit organization that convenes a broad coalition of Latino leaders committed to addressing environmental, natural resources, and conservation issues that significantly affect the health and welfare of the Latino community in the United States. GreenLatinos envisions a healthy and equitable society where communities of color are liberated from disproportionate environmental burdens, free to breathe fresh air, drink pure water, access clean transportation and enjoy our majestic public lands, ocean, and waters. Equitable access to public lands for all is a significant priority of GreenLatinos and its membership. Communities of color, low-income communities, and migrant community members are disproportionately deterred by the risk of trespass accusations, even false ones. GreenLatinos believes the district court's ruling helped clear one barrier (of many) that these communities disproportionately face: fear that recreation in an area could be considered illegal and therefore unsafe, causing recreators not to access public land they're entitled to use.

**Sierra Club** is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. Sierra Club has approximately 3.8 million members and supporters nationwide, and its Wyoming chapter has 2,702 members and supporters in the state. Sierra

Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. Among other goals, Sierra Club and its Wyoming chapter seek to help people from all backgrounds explore nature and our outdoor heritage. Many of Sierra Club's members recreate on Wyoming's public land and are directly harmed by access challenges in the checkerboard.

**Western Watershed Project** is a nonprofit conservation group that works to protect and restore watersheds and wildlife throughout the West. It has approximately 14,000 members and supporters, who like to hike, hunt, fish, birdwatch, rockhound, camp, view wildlife, and appreciate nature on federal public lands. Among other forms of research and advocacy, Western Watersheds Project conducts inventories of public land to help with proposals for wilderness designation and management. It has advocated for solutions to public access problems and federal land management difficulties related to the checkerboard in Wyoming and elsewhere, including seeking government action clarifying the public's right of reasonable access on these lands. At present, public access remains impaired on vast acreages of public land

interspersed with private parcels in the checkerboard, despite Western Watersheds Project's best efforts.

Counsel for the Public Land Amici conferred with counsel for all parties, who stated they consent to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## II.    The "Range Wars" Persist Today.

Iron Bar's attempt to exclude Mr. Cape and his fellow hunters from public land in Wyoming's checkerboard is part of a larger and longstanding problem: wealthy, private landowners preventing public access to millions of acres of public land.

Private individuals wrongly excluding others from public land has a long history in the West. Leading up to the UIA's passage in 1885, federal officials became increasingly concerned over an escalation of the "range wars," in which "cattlemen and powerful others" blocked settlers and homesteaders from public land. Answering Br. of Appellees Cape et al. ("Cape Br.") 23, 34–40, 54. In addition to fencing, these companies used "violence to intimidate settlers or expel them from the inclosed lands" and made "fraudulent or fictitious entries" to falsely claim land for themselves. H.R. Exec. Doc. No. 1 at 30, 48th Cong., 1st Sess. (1883).[1] Congress's purpose

_____

[1] Available here.

in passing the UIA was to eliminate these unjust and unlawful activities. *E.g.*, H.R. Rep. No. 1325, 48th Cong., 1st Sess. (1884).[2]

The "range wars" of old take a new form today. As described below, people from many walks of life, and especially those with relatively less social and political power, are commonly excluded from enjoying lawful activities on public land, such as hunting, hiking, conducting science, and more. Landowners gain this undue control over public land with false or misleading signage, threats, and even outright violence.

## A. Fear of confrontation with landowners who consider corner crossing illegal impairs access in the checkerboard.

Lifelong Wyoming resident and long-time Sierra Club member Connie Wilbert grew up in western Wyoming and now lives in Laramie. She is an avid outdoorswoman, enjoying hiking, camping, fishing, hunting, wildlife watching, Nordic skiing, and other recreational pursuits on public land across the state. On numerous occasions, she has studied ownership maps looking for ways to legally access interesting areas of public land and frequently has been disappointed by mixed ownership patterns—like the checkerboard layout—that prevent the public from accessing their public land. To avoid confrontations with landowners who may consider corner crossing illegal, she has avoided areas where abutting corners offered the only potential route,

---

[2] Available here.

even though this effectively prevents her from enjoying large swaths of public land that she would very much like to explore.

George Jones is a Sierra Club member who has lived in Wyoming for 65 years. He recently retired from a 33-year career as a plant ecologist with a natural-history survey and database in Wyoming, during which he conducted many field projects on public lands intermixed with private lands. Because he assiduously avoided trespassing on private lands, his concern that some landowners consider corner crossing illegal caused him to forego entering tracts of public land, even when doing so would have allowed him to conduct more thorough projects. Beyond his professional activity, Mr. Jones is an avid user of public lands, and this concern similarly limits his personal use of public lands.

These accounts illustrate basic access difficulties members of the public face in the checkerboard. Fear of encountering landowners who consider corner crossing illegal frequently dissuades the public from engaging in recreation, science, and other activities on public land—with private landowners reaping the benefits.

## B.    Private landowners use threats and intimidation to deter the public from using public land.

A member of GreenLatinos, Kyla Navarro, staffs a non-profit organization in New Mexico called Friends of the Organ Mountains-Desert

Peaks.  That group was founded to protect and restore public land for the

benefit of local communities, including advocating for the Organ Mountains-

Desert Peaks National Monument.  Ms. Navarro often works with young

people in her area on outdoor and public land issues, including leading

excursions into the monument.  She wants to ensure that community youth

in New Mexico's borderlands regions feel safe and comfortable exploring

public land, thereby passing on values of protecting and conserving shared

resources for generations to come.  However, the Organ Mountains-Desert

Peaks National Monument sits adjacent to private lands, and Ms. Navarro

has experienced hostile landowners who have confronted her and others over

false allegations of trespass.

   One incident occurred in the presence of students.  Ms. Navarro and

the group of students she was leading wanted to access a parcel of public land

known as an important site for Indigenous peoples due to artifacts that have

been found there.  However, a private landowner had blocked the public road

serving that access point.  So, to reach their destination while avoiding

private land, Ms. Navarro and her group parked at a different public access

point, walked along a government-owned levee that was open to hiking and

other activities, and then crossed the Rio Grande River to reach the land that

had been blocked.  However, as they reached the opposite bank, on public

land, a landowner confronted them, accusing them of trespassing.  Even after

Ms. Navarro and her group communicated what they had done and explained their intention to remain on public land, the landowner continued to threaten the group, saying she would call the authorities.

Ms. Navarro's experience demonstrates that merely recreating *close* to private property boundaries can lead to hostile actions from private landowners and be extremely uncomfortable for the public. That result deters people from using those portions of public land. Threats to involve the police have a disproportionate effect on communities that include recent immigrants—like many to which GreenLatinos members belong—who often have a heightened distrust or fear of legal authorities, even when they've done nothing wrong.

### C. Private landowners post false and misleading signage to block access.

Sara Husby, executive director of Great Old Broads for Wilderness, enjoys hiking and camping on public land in her home state of Colorado and elsewhere in the West. On many occasions, she has encountered signs posted on or near public land falsely suggesting that the land was private or closed to access. For example, Ms. Husby encountered such a sign on a National Forest gate while conducting monitoring work. Even though she diligently used maps to ascertain land ownership, Ms. Husby did not feel safe accessing the public land behind the sign because she had heard some of her colleagues

were previously confronted and threatened with violence by armed ranchers who held public-land grazing allotments.

Experiences like this are all too common, causing Ms. Husby and other members of the public to forego accessing land owned by all. In Ms. Husby's view, misleading signage and similar tactics disproportionately threaten woman and other marginalized groups, who may be more averse to potential conflicts with landowners in remote places.

### D.   Private landowners sometimes resort to violence to keep the public off of public land.

Sierra Club member Shane Miller grew up in the Wyoming towns of Casper and Laramie. Mr. Miller has hunted, hiked, and rock-climbed in Wyoming all his life. He has often encountered areas where access is difficult or largely impossible because of private land.

Mr. Miller has also been assaulted by a landowner on public land near Alcova, Wyoming. Mr. Miller and a friend had parked their vehicle along a public road and went rock-climbing on public land. When they returned to their vehicle and began driving along the public road, an owner of nearby land began following them. When they stopped and spoke to him, the landowner accused Mr. Miller and his friend of trespassing. After Mr. Miller showed the landowner a map and explained that he had been recreating on public land, the landowner became violent, striking and kicking Mr. Miller.

When Mr. Miller and his friend fled in their vehicle, the landowner followed, eventually ramming their vehicle with his.  The landowner later pled guilty to aggravated assault.  After the incident, BLM provided signs that clearly marked public boundaries and access in the area to avoid a similar situation arising again.

Over the years, Mr. Miller has met local landowners on public land and had positive experiences.  But the assault he endured illustrates that a subset of landowners in the West are willing to use violence in an effort to control public land for themselves.

### E.    Private landowners in the checkerboard leverage their property rights to wrongfully control management of public land.

Western Watersheds Project's executive director Erik Molvar first encountered the checkerboard federal land ownership pattern in 1999 while researching his book, "Wild Wyoming."  Mr. Molvar asked the BLM whom he should contact to get permission to cross private squares, and he was told that the public was free to access the western Red Desert region of the checkerboard, as long as he left gates the way he found them.  He was later hired by a nonprofit conservation organization to conduct wilderness inventories in the Red Desert.  As part of that work, Mr. Molvar extensively documented wilderness-quality land in The Haystacks, adjacent to the Adobe Town Wilderness Study Area, with the hope that those lands could be

conserved for their spectacular, one-of-a-kind geological and ecological character.

Some years later, Mr. Molvar received a letter from an owner of private squares in the checkerboard. The letter accused Mr. Molvar of trespassing when conducting his wilderness surveys and warned him of legal action if he crossed private property to access public land sections again. The same landowner also subsequently threatened to end public access for everyone. The threat of legal action has prevented Mr. Molvar from doing field monitoring on a significant amount of public land in the Red Desert regarding land health, ecological conditions, and wilderness values—which, from Mr. Molvar's perspective, was the purpose of the letter. The fear of legal action has also prevented him from engaging in activities he previously enjoyed on public land in the region, like hunting, rockhounding, wildlife viewing, photography, camping, enjoyment of historic sites, and wild horse viewing.

Mr. Molvar's experience reflects that private landowners in parts of the checkerboard have functionally wrested control of public parcels, with access given or withdrawn on a whim. Mr. Molvar feels that his wilderness conservation activities specifically led to him being denied access, impeding his efforts to protect the Red Desert for future generations.

## F.    Background summary

As these examples demonstrate, private landowners have effectively blocked the public's ability to access public land in the checkerboard while chipping away access rights elsewhere too.  Indeed, the amicus briefs submitted in support of Iron Bar make clear that the livestock industry and landowner associations' goal in preventing corner crossing is to control access to public land.  *See* Br. of *Amicus Curiae* Wyo. Stock Growers Assoc. & Wyo. Wool Growers Assoc. ("Growers Br.") 3–4 (expressing concern over inability to "control activity by members of the public" and "police how the public" accesses public land); Br. of *Amicus Curiae* United Property Owners of Montana 22–23 (arguing corner crossing should be outlawed so that landowners will be paid for access to public land).

But, as discussed below, the public has a legal right to access this land. The Court should reject Iron Bar's attempt to further erode access rights in the checkerboard so that it can control that land for itself.

## ARGUMENT

The Public Land Amici emphasize two points in support of affirmance. First, controlling precedent grants the public a right of reasonable access to public land in the checkerboard via corner crossing.  Second, Iron Bar fails to justify its request that this Court eliminate access rights to millions of acres

of public land based on temporary and harmless airspace incursions at

shared corners.

## I.     Iron Bar's Trespass Action Unlawfully Seeks to Enclose Public Land.

This Court's holding in *Bergen* controls the outcome of this case and

requires affirmance of the district court's judgment against Iron Bar.  The

UIA "preserves access to federal lands for 'lawful purposes'" and prohibits

barriers—including ones on private property—that "effect[] an enclosure of

the public lands."  *Bergen*, 848 F.2d at 1507–10.  Because Iron Bar aims

through this lawsuit to preclude access to and effect an enclosure of federal

land in the checkerboard, the Court should rule in the hunters' favor.

In *Bergen*, a landowner constructed a 28-mile fence around more than

20,000 acres of land in Wyoming's checkerboard.  *Id.* at 1504.  The fence was

built "entirely on private lands, except where it crosse[d] the common corners

of state and federal sections," but it "enclosed 15 sections, or approximately

9,600 acres of unreserved public domain."  *Id.*  The fence prevented

pronghorn antelope from reaching winter forage on public land inside the

fence, prompting the United States government to sue the landowner under

the UIA.  *Id.*

This Court held that the fence violated the UIA because it had an "enclosing effect" on a "lawful use[]" of public land—wildlife foraging.[3]  *Id.* at 1510 (internal quotation mark omitted).  Relying on the UIA's text and *Camfield v. United States*, 167 U.S. 518 (1897), the Court determined that "enclosures are unlawful when they deny access to public lands for 'lawful purposes,'"[4] including activities authorized by the Federal Land Management and Policy Act ("FLPMA").  *Bergen*, 848 F.2d at 1508–09 (discussing 43 U.S.C. § 1701(a)(8)).  Because the fence "prevent[ed] the lawful purpose of antelope access," the Court held it was a "nuisance proscribed by federal law" and ordered its abatement.  *Id.* at 1507, 1511.  In reaching that conclusion, the Court emphasized that "it is not the fence itself, but its effect which constitutes the UIA violation."  *Id.* at 1511 (brackets omitted).

The Court's conclusion is dispositive here.  Iron Bar's trespass action aims to block access for hunting and other "lawful uses" of public land near Elk Mountain and thereby create an "enclosing effect."

Regarding lawful uses, no party has alleged that big-game hunting is not an authorized activity on federal land.  Indeed, FLPMA requires that

---

[3] The Court noted that the fence may have also unlawfully precluded "public access."  *Id.* at 1511 & n.13.

[4] The Court used "lawful purposes" and "lawful uses" interchangeably.  *See id.* at 1509–11.

public land "provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). It also provides that public land be managed in a manner that, among other things, "will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." *Id.* Thus, the hunters' lawful big-game hunting—and the Public Land Amici members' activities described above, like hiking, rock-climbing, scientific research, and more—fall squarely within the ambit of FLPMA and are "lawful uses" protected by the UIA. *See Bergen*, 848 F.2d at 1509.

Regarding enclosing effect, the post-and-chain blockade Iron Bar erected at one corner illustrates the intended effect of this lawsuit. The Supreme Court explained that a person violates the UIA "when, under the guise of inclosing his own land, he builds a fence which is useless for that purpose, and can only have been intended to inclose the lands of the government." *Camfield*, 167 U.S. at 528; *Bergen*, 848 F.2d at 1508.

There may be no better example of such a structure than this:


[*image follows on next page*]


16



App. V3:418.  The land visible behind the blockade in this photo is public, and the barrier is useless for anything except preventing access to that public parcel.  It's a textbook violation of the UIA, as the district court correctly held.  *Iron Bar Holdings, LLC v. Cape*, No. 22-cv-00067-SWS, 2023 WL 3686793, at *12 (D. Wyo. May 26, 2023).

17

The same is true of Iron Bar's trespass action, which aims to impose judicially what the blockade was designed to accomplish physically.  Iron Bar has said as much, asserting that the exclusive control of public land it desires is worth 30 percent of Elk Mountain Ranch's value—an enormous enrichment of private interests at public cost.  *See* Opening Br. of Appellant Iron Bar Holdings, LLC ("IB Br.") 56–57 (claiming inability to prevent corner crossing would cost landowners "billions of dollars" in lost private-property value).  The UIA prohibits both physical enclosures like "fencing" *and* nonphysical barriers like "force, threats, intimidation," and other means of exclusion.  43 U.S.C. § 1063; *see also id.* § 1061 (outlawing the "*assertion of a right* to the exclusive use and occupancy of any part of the public lands" (emphasis added)).  So, if the "erection of fences . . . would have been a nuisance" prohibited under the UIA, Iron Bar cannot "accomplish" the same effect through "actions in trespass" or other "intangible means."  *Mackay*, 219 F. at 120 (holding the UIA barred a trespass action that would functionally enclose public land).

As plainly as the blockade is illegal, so too is Iron Bar's trespass lawsuit—both of which aim to enclose and block lawful uses on public land.  Because "a private litigant cannot recover from another for [trespass] founded upon his own violation of the [UIA]," *id.*, the Court should affirm the district court's judgment against Iron Bar.

18

## II.    The District Court Properly Concluded that the Public Is Entitled to a Reasonable Way of Passage Through the Checkerboard.

The district court reached a similar conclusion: the public is entitled to a "reasonable way of passage" to public land in the checkerboard, and a person is not liable for trespass where she crosses "from public land to public land without touching the surface of private land and without damaging private property." *Iron Bar*, 2023 WL 3686793, at *12 (citing *Mackay*, 219 F. at 120).  Like this Court in *Bergen*, the district court found that the public enjoys a "right to the benefit of the public domain, which necessarily requires some limitation on the adjoining private landowner's right of exclusion within the checkerboard." *Id.* at *7 (internal citation and quotation mark omitted). It reached that conclusion based on fundamental "principles of nuisance and property law" along with "history, federal caselaw, federal statutory law [i.e., the UIA], and recent Wyoming legislation." *Id.* at *6–7 (quoting *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 538 (2005)).

Though Iron Bar criticizes the district court's conclusion, it fails to cite a single case holding that corner crossing constitutes civil trespass under Wyoming state law.  Iron Bar instead asks this Court to be the first to make that finding—an especially remarkable request given that the hunters here were already acquitted of criminal trespass.  App. V3:601–08.  Iron Bar offers several arguments in support of that request, and all fail.

19

### A. *Leo Sheep* did not overrule *Mackay*, *Camfield*, or the UIA.

Iron Bar argues that the district court erroneously relied on *Mackay* because the Supreme Court overruled it in *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979).  IB Br. 47.  According to Iron Bar, *Leo Sheep* dispels any right of reasonable passage through the checkerboard under *Mackay*, *Camfield*, or the UIA because the Supreme Court determined that the UIA did not implicitly reserve an "easement" across common corners in the checkerboard.  IB Br. 32–38; *see also id.* at 39 (claiming the post-and-chain barrier was "not an 'enclosure'" because the public had no "lawful right to enter [the public land behind it] in the first place").  Iron Bar thus contends that it may legally block access across shared corners.

But this Court already rejected that argument in *Bergen*.  There, the Court found that the fence-erecting defendant's "central argument"—that wildlife impacted by the fence had "no easement across his lands"—was "not relevant to [its] decision."  *Bergen*, 848 F.2d at 1506.  It explained that the right asserted in *Leo Sheep*—an affirmative easement authorizing construction of a permanent road across the surface of private land—was "simply not at issue."  *Id.* at 1505.  Thus, while the Supreme Court determined in *Leo Sheep* that *Camfield* and the UIA are "not applicable to a road question," they "clearly ha[ve] much to say on the subject of [a] fence."  *Id.* at 1506.  And this lawsuit concerns fences: the physical one blocking

20

public land, pictured above, and the equivalent barriers Iron Bar seeks to erect by "by intangible means" through this lawsuit. *Mackay*, 219 F. at 120. All are unlawful.

**B.    *Mackay's* rule of reason accounts for changes in custom.**

Iron Bar also contends that *Mackay* is no longer valid because it was decided "at the apex of the open-range era." IB Br. 46. Then, leaving lands unenclosed was considered "an implied license to cattle and other stock at large to traverse and graze them." *Buford v. Houtz*, 133 U.S. 320, 330 (1890). Iron Bar contends that *Mackay* is limited by "the scope and vitality" of that now-archaic open-range custom and therefore has "no relevance to the legality of corner crossing today." IB Br. 46–47.

The Court in *Bergen* rejected a similar argument: that "the UIA became superfluous" when the Taylor Grazing Act of 1934 and other federal legislation "put an end to the open public range." *Bergen*, 848 F.2d at 1506. Contrary to Iron Bar's theory, the Court held that the Taylor Grazing Act, in fact, "reinforces the UIA's mandate that access to public lands be preserved" based on the Congress's proviso that the Taylor Grazing Act "shall" not "restrict the ingress and egress over the public lands for all proper and lawful purposes." *Id.* at 1510 (quoting 43 U.S.C. § 315e, internal ellipses omitted). Congress made clear that its overhaul of grazing laws did not abrogate the public's right to enter and enjoy public land.

21

Moreover, Iron Bar's argument ignores *Mackay's* key word: reasonable—which bakes in changes to custom over time.  In the open-range era, trailing a large flock of sheep across unfenced private land was reasonable.  *Mackay*, 219 F. at 118–19.  Now, perhaps not.  But any shift in *what's considered reasonable* does not make a *standard of reasonableness* bad law.  Thus, Iron Bar's true gripe is with the scope of *Mackay's* application, not its core holding.

Iron Bar's attempt to press this concern in a different way further illustrates the fallacy.  It asserts that *Mackay* "proves too much" because the defendant there trailed and grazed his sheep on private land rather than passing momentarily through shared airspace.  IB Br. 50.  Bewailing a purported lack of limiting principle, Iron Bar speculates that members of the public will take the district court's ruling as license to engage in all manner of "more intrusive trespasses," including driving ATVs and cars on private property at will—none of which happened here.  *Id.* at 50–51.

But again, *Mackay* held that the public is entitled to "a *reasonable* way of passage" through the checkerboard, not an unfettered one.  *Mackay*, 219 F. at 120 (emphasis added).  Reasonableness—which reflects custom—is the limiting principle Iron Bar demands.  And as the district court held, passing through the checkerboard by momentarily stepping through shared airspace at common corners—without touching private land or damaging private

22

property—is an eminently reasonable way to access public land.  *Iron Bar*, 2023 WL 3686793, at *12.

### C. Iron Bar's right to exclude is not unlimited.

Further eschewing a standard of reasonableness, Iron Bar insists that it "doubtless" has the right to fence (and otherwise exclude) on its own land with no regard for the public's right to access adjoining parcels.  IB Br. 38 (citing *Camfield*, 167 U.S. at 527–28).  As this Court held in *Bergen* after considering *Camfield*, a private landowner indeed "retains the right to exclude" others from "his own land," but only "*if* he can accomplish that exclusion without at the same time effecting an enclosure of the public lands."  *Bergen*, 848 F.2d at 1507 (emphasis added); *see also id.* at 1505 ("The Supreme Court considered Camfield's argument that he could do whatever he wished on his own land, and soundly rejected it.").  Thus, Iron Bar cannot, as it claims, "seal off access to public lands" through some inviolable right of exclusion.  IB Br. 38.

To the extent the UIA "lessens in a moderate degree what are frequently regarded as absolute rights of private property," *Mackay*, 219 F. at 119, the Supreme Court has long held that result constitutional. Acknowledging the supremacy of the UIA over state nuisance law (including trespass), the Court determined that the UIA falls "within the constitutional power of congress" even though it prohibits, among other things, fences

23

"erected a few inches inside the [private property] line." *Camfield*, 167 U.S. at 525.

Thus, the UIA—as interpreted by the Supreme Court and others—makes clear that Iron Bar's rights on its own property do not empower it to block access to adjoining public land. In reality, "[a]ll that [Iron Bar] has lost is the right to exclude others . . . from the public domain—a right [it] never had." *Bergen*, 848 F.2d at 1508.

**D.    Iron Bar wrongly dismisses the distinct nature of airspace.**

Iron Bar also criticizes the district court opinion by attempting to diminish the distinction between a property's surface and its airspace. But Iron Bar is simply wrong that "property law has never distinguished between" surface rights and airspace rights. IB Br. 29. Under both federal and Wyoming state law, private rights to airspace are narrower than surface rights.

Start with federal law. As the district court rightly found, a private-property owner bringing a trespass action against aircraft flight "must allege and prove that low level flights are within the immediate reaches of, and interfere with the actual use of, his land." *Pueblo of Sandia ex rel. Chaves v. Smith*, 497 F.2d 1043, 1045 (10th Cir. 1974); *see Iron Bar*, 2023 WL 3686793, at *10 (finding *Pueblo of Sandia* "offers persuasive guidance" regarding airspace and corner crossing). As this Court explained, the Supreme Court

24

"severely limited" earlier "common law" conceptions of private airspace rights by declaring that portions of airspace are "a public highway." *Pueblo of Sandia*, 497 F.2d at 1045 (citing *United States v. Causby*, 328 U.S. 256, 266 (1946)). As a result, "traversing the airspace above a plaintiff's land is not, of itself, a trespass" under federal law. *Id.* Instead, "[i]t is lawful unless done under circumstances which cause injury." *Id.*

Wyoming state law sets a similar standard. Flying aircrafts over private land or water "is lawful" in Wyoming unless, among other things, it "interfere[s] with the existing use" of or is "imminently dangerous to persons or property lawfully on" the land or water. Wyo. Stat. § 10-4-303(a). This statute reflects the Wyoming legislature's decision to treat airspace differently than private surface, just as federal common law does.[5]

Indeed, Iron Bar concedes that the public *can* cross Iron Bar's airspace to access adjacent public parcels using an aircraft. Its ranch manager Steven Grende stated that the public could gain access to public parcels near Elk

---

[5] The district court also looked to legislation passed in 2023 that "requires physically touching or driving of the surface" of private property to be liable for trespass under Wyoming's Game and Fish statutes. *Iron Bar*, 2023 WL 3686793, at *11 (discussing Wyo. Stat. § 23-3-305(b)). The amici livestock groups claim responsibility for this legislation and assert it was not intended to be "about this litigation." Growers' Br. 7. Yet they acknowledge that the purpose of the legislation was to "harmonize" Wyoming's Game and Fish statutes (Wyo. Stat. § 23-3-305(b)) and criminal statutes (Wyo. Stat. § 6-3-303), *id.*, suggesting Wyoming lawmakers *did* understand the latter to require physically touching private property.

Mountain Ranch via helicopter.  App. V3:462.  Surely stepping (or using a step ladder) through shared airspace does not "interfere with the actual use of" Iron Bar's land *more* than flying a helicopter does.  *Pueblo of Sandia*, 497 F.2d at 1045.  Yet Iron Bar insists on treating this less-invasive, momentary mode of airspace incursion more harshly than federal and state law treat aircraft flight—which is not equally accessible to all people and communities.  Appropriately, the district court declined to follow Iron Bar's illogic and instead used aircraft law principles to guide its rejection of Iron Bar's claim of trespass to airspace.  *Iron Bar*, 2023 WL 3686793, at *10–11.

Iron Bar's view of airspace rights as rigid and inviolable is further belied by its own decision to erect the post-and-chain barrier over the common corner of Sections 13, 14, 23, and 24.  *See* Cape Br. 12–13.  Due to the dimensionless nature of the point where corners meet, the chain strung between the posts was situated partly in federal airspace.  And Iron Bar intended it to prevent the public from accessing public land.  Thus, the one airspace incursion that *did* interfere with actual use of property was Iron Bar's blockade—which was permanent, not momentary.  If any party is guilty of trespass, it's Iron Bar.  *See Camfield*, 167 U.S. at 525 (reasoning that a fence "erected upon public lands" is "a trespass").

In sum, Iron Bar's arguments are contrary to governing law and provide no basis for this Court to be the first to find civil trespass liability for

corner crossing in the checkerboard.  The UIA codified, *Mackay* and *Bergen* endorsed, and the district court applied a rule of reason, and the hunters' momentary, harmless, airspace incursion was manifestly reasonable.  Iron Bar lobbies for a different, wholly unreasonable outcome in which a claimed right to exclude others from a few inches of airspace allows private landowners to claim millions of acres of public land for themselves.  The Court should reject Iron Bar's unjust and unreasonable position.

## CONCLUSION

As the Supreme Court observed, the federal government "would be recreant to its duties as trustee for the people of the United States to permit any individual or private corporation to monopolize [public land] for private gain." *Camfield*, 167 U.S. at 524.  A decision in Iron Bar's favor would do just that, functionally erecting invisible copies of its illegal post-and-chain blockade at the corners of million acres of public land—harming far more people than just the four embattled defendants here, and emboldening landowners to wrongly claim public land for themselves.  The Court should deny that result and affirm the decision below.


Submitted January 12, 2024.

*/s/ Thomas Delehanty*
Thomas Delehanty
Earthjustice

27

633 17th Street,
Suite 1600
Denver, CO 80202
Phone: (303) 996-9628
Fax: (303) 623-8083
tdelehanty@earthjustice.org

*Counsel for Great Old Broads for
Wilderness, GreenLatinos, Sierra
Club, and Western Watersheds
Project*

## Certificate of Compliance

This document complies with the type-volume limitation of Fed. R. App. P. 32(g) and word limit of Fed. R. App. P. 29(a)(5) because it contains [5,870] words.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2016 in 13-point Century Schoolbook font.

*/s/ Thomas Delehanty*
Thomas Delehanty

## Rule 29(a)(4)(E) Statement

No party's counsel authored this brief in whole or in part.  No party or a party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

*/s/ Thomas Delehanty*
Thomas Delehanty

**Certificate of Service**

I hereby certify that on January 12, 2024, I electronically transmitted the attached amicus brief to the Clerk's Office using the CM/ECF System for filing, thereby generating service upon all parties of record.

*/s/ Thomas Delehanty*
Thomas Delehanty

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that: (1) all required privacy redactions have been made pursuant to Fed. R. App. P. 25(a)(5) and 10th Cir. R. 25.5; (2) all hard copies filed with the Court are exact copies of this ECF submission; and (3) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Windows PowerShell, and according to the program is free of viruses.

January 12, 2024

*/s/ Thomas Delehanty*
Thomas Delehanty