Case No. 23-8043

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

IRON BAR HOLDINGS, LLC,
*Plaintiff-Appellant,*

v.

BRADLY CAPE, et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
For the District of Wyoming, No. 22-CV-00067
Hon. Scott W. Skavdahl, United States District Judge

BACKCOUNTRY HUNTERS & ANGLERS *AMICUS CURIAE*
BRIEF IN SUPPORT OF DEFENDANTS-APPELLEES
BRADLY CAPE ET AL.

Eric B. Hanson - # 254570
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188
Email: ehanson@keker.com
Attorney for Amicus Curiae,
Backcountry Hunters & Anglers

2526090

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, Backcountry Hunters & Anglers ("BHA") states it is a nonprofit organization, and no corporation owns more than 10% of its stock.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), BHA certifies that counsel for BHA has authored the brief in whole. No party or a party's counsel contributed money intended to fund preparing or submitting its brief. Further, no person—other than the amicus curiae and its members—has contributed money intended to fund preparing or submitting its brief.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ..........................................................iii

BHA'S INTEREST IN THIS CASE ...................................................1

INTRODUCTION ........................................................................4

ARGUMENT.................................................................................7

    I.     Uncertainty Over Corner Crossing Is Preventing Access
          to Millions of Acres of Public Land. ............................................7

    II.    More Than 100 Years Ago, Congress Struck a Balance
          Between Public Access and Private Property Rights by
          Barring Nuisances that Prevent Access to Public Land.............. 10

    III.   Access to Public Lands, Including Via Corner Crossing,
          Is Critically Important to BHA's Members, As Well As
          the Modern American System of Wildlife Management............. 15

    IV.   Policy Arguments by Iron Bar and Its Amici Miss the
          Mark.......................................................................................21

CONCLUSION ........................................................................28

CERTIFICATE OF DIGITAL SUBMISSION  AND PRIVACY
          REDACTIONS .................................................................30

CERTIFICATE OF SERVICE.........................................................31

## TABLE OF AUTHORITIES

**Federal Cases**

*U.S. ex rel. Bergen v. Lawrence*,
 620 F. Supp. 1414 (D. Wyo. 1985), aff'd, 848 F.2d 1502 (10th Cir.
 1988) ....................................................................................................13, 14

*U.S. ex rel. Bergen v. Lawrence*,
 848 F.2d 1502 (10th Cir. 1988), cert. denied, 488 U.S. .............................14, 24

*Bircher v. United States*,
 169 F. 589 (9th Cir. 1909)...................................................................13

*Camfield v. United States*,
 167 U.S. 518 (1897)........................................................................13, 25

*Fla. v. Jardines*,
 569 U.S. 1 (2013)...................................................................................4

*Leo Sheep Co. v. United States*,
 440 U.S. 668 (1979)....................................................................11, 25, 26

*Mackay v. Uinta Dev. Co.*,
 219 F. 116 (8th Cir. 1914)...................................................................11

*McKee v. Gratz*,
 260 U.S. 127 (1922).............................................................................10

**State Cases**

*Little Med. Creek Ranch, Inc. v. d'Elia Tr. of d'Elia Family Tr.*,
 527 P.3d 856 (Wyo. 2023) ..................................................................11

**Federal Statutes**

16 U.S.C. § 529 *et. Seq.* ......................................................................7

43 U.S.C. §§ 1061-1066.......................................................................12

43 U.S.C. § 1063..................................................................................13

43 U.S.C. § 1701(a)(8)..........................................................................14

2526090

43 U.S.C. § 1701 *et. Seq.* ("Federal Land Policy and Management Act of 1976," or "FLPMA") ........................................................................8

49 U.S.C. § 40103(a) ...............................................................................5

**State Statutes**

Mont. Code Ann. § 15-30-2380 ............................................................26

Mont. Code Ann. § 87-1-294 ...............................................................26

**Rules**

Fed. R. App. P. 29(a)(2) ..........................................................................1

**Regulations**

Closure and Restriction Orders, 43 C.F.R. § 8364.1.............................23

**Other Sources**

Amended Final Apportionment of Dingell-Johnson Sport Fish Restoration Funds for Fiscal Year 2023, USFWS ...........................19

*Ask Game & Fish* ..................................................................................23

*Assessing the Quality and Availability of Hunting and Shooting Access in the United States*, National Shooting Sports Foundation (2021) .............................................................................................18

Christine Paige, *A Wyoming Landowner's Handbook to Fences and Wildlife* ..........................................................................................24

*Conservation Funding*, Association of Fish & Wildlife Agencies.........18

Final Apportionment of Pittman-Robertson Wildlife Restoration Funds for Fiscal Year 2023, USFWS .............................................19

https://www.blm.gov/about/what-we-manage/national ...........................8

Hal Herring, *The Johnson County War: How Wyoming Settlers Battled an Illegal Death Squad*, Field & Stream (Apr. 12, 2013) ....................12

2526090

John W. Sheridan, *The Legal Landscape of America's Landlocked Property*, UCLA Journal of Environmental Law and Policy, 37:2 (2019) at 232-234 ..............................................................8

Maksim Sergeyev, et al., *Reducing the refuge effect: using private-land hunting to mitigate issues with hunter access*, The Journal of Wildlife Management, Vol. 86, Issue 1 (Jan. 2022) .........................................24

Michael Allen, *The Hunters, the Landowner and the Ladder That Triggered a Wyoming Showdown*, Wall Street Journal (Nov. 10, 2022) .........................................................................................5

*New 5-Year Report Shows 101.6 Million Americans Participated in Hunting, Fishing & Wildlife Activities*, Department of Interior (Sept. 6, 2017) (last edited September 29, 2021). ......................................19, 20

*North American Model of Wildlife Conservation*, Association of Fish & Wildlife Agencies .............................................................................18

*North American Model of Wildlife Conservation,* U.S. Fish & Wildlife Service .............................................................................................6

Restatement (Second) of Torts § 159 cmt. f .............................................4

Restatement (Second) of Torts, § 159(2) ..................................................5

*The Corner-Locked Report* .....................................................................8

*WY Chapter Donates $3,000 to Access Yes* ...........................................2

2526090

## BHA'S INTEREST IN THIS CASE[1]

Backcountry Hunters & Anglers ("BHA") is the voice for our wild public lands, waters, and wildlife. BHA is a 501(c)(3) non-profit that seeks to ensure North America's outdoor heritage of hunting and fishing in a natural setting through education and work on behalf of fish, wildlife, and wild places. With more than 350,000 members and supporters, and chapters in 48 states, Washington, D.C., two Canadian provinces, and one Canadian territory, BHA draws support from sportsmen and women from across North America who share a commitment to the conservation and stewardship of public lands and waters, including public access for all, while upholding the principles of fair chase and ethical hunting and fishing traditions.

BHA is deeply invested in the conservation and stewardship of fish and wildlife habitat, including hands-on habitat improvement projects on public lands, often in collaboration with a diverse array of partners. BHA has formal Memorandums of Understanding with the Bureau of Land Management ("BLM"), U.S. Forest Service ("USFS"), and other state and federal agencies to improve fish and wildlife habitat on public lands within states that comprise the Tenth Circuit

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for Appellant and Appellees have consented to the filing of this brief.

2526090

and throughout the West.

BHA has a long and proud history of supporting public land access that has resulted in numerous public access wins, including, for example, raising $47,000 and providing volunteer labor to help secure public access to BLM's Raymond Mountain Wilderness Study Area. In addition, BHA staff and volunteers worked tirelessly to secure permanent funding for the Land and Water Conservation Fund, which has resulted in numerous public land acquisitions. They have also lobbied against bills from state and federal legislatures that would divest the public from access to their public lands. Notably, one of BHA's best-known slogans is "Keep Public Lands in Public Hands."

BHA also strongly supports private property rights and advocates for collaboration between private property owners and states to support public access on private land. For example, the Wyoming Chapter of BHA supports the State's "Access Yes Programs." *See, e.g.*, *WY Chapter Donates $3,000 to Access Yes*, available at https://www.backcountryhunters.org/wy_chapter_donates_3_000_to_access_yes. These programs facilitate public access hunting on private land. In 2021, "Access Yes" opened more than 2.6 million acres of land to hunting, as well as 4,006 lake acres and 86 stream miles for fishing on otherwise inaccessible private, state, and landlocked public lands. *See Game and Fish program provided 2.6 million acres of hunting access in 2021*, https://wgfd.wyo.gov/News/Game-

2

and-Fish-program-provided-2-6-million-acr-(1). According to the Wyoming Game & Fish Department, BHA's donation equaled creating access to almost 8,400 acres of previously inaccessible lands. *Id.*

Nonetheless, millions of acres of public lands remain largely inaccessible due to ambiguity surrounding access to checkerboarded public/private lands. BHA strongly believes that no individual interest should have the right to restrict the public from stepping across the corner of one parcel of federal public land to another, commonly known as "corner crossing."[2]

BHA offers the Court the perspective of the many millions of responsible "public landowners" across the country who deeply respect private property but also are devoted to the recreation and solace provided by our shared public lands. Many of these individuals have been discouraged from exercising their rights to recreate on public land, and in some cases are harassed or worse, by landowners seeking to claim for themselves land that belongs to all Americans. Clarifying that landowners cannot prevent the public from moving from public land to public land via corner crossing would be a win for BHA's members and millions of other Americans who recreate on public lands.

---

[2] The Wyoming Chapter helped raise funds to support the legal defense of appellees (hereinafter "the hunters") in both the criminal and civil cases brought against them.

## INTRODUCTION

From the perspective of everyday Americans, the assertion that a person trespasses by momentarily passing through the airspace over private property is both radical and absurd. No reasonable person would fault someone for placing one foot in front of the other and taking a step over a corner of open land when that person neither touches nor damages the physical property of another.

Do we regularly sue children who stick an arm over the sidewalk, hovering their hand over private property?[3] Or go after Girl Scouts or trick-or-treaters crossing onto private property while walking up a path to a person's front door?[4]

Plainly not.

---

[3] Appellant Iron Bar Holdings LLC ("Iron Bar") cites to an example in the Restatement (Second) of Torts stating that "A extends his arm over the boundary fence between A's land and B's land. A is a trespasser." Restatement § 159 cmt. f. The case underlying the comment is replete with language mocking the lawsuit, which involved quarrelling neighbors. It explains, "these petty suits are prosecuted and defended, not so much with hope of pecuniary advantage as with desire to achieve a triumph over an enemy. . . ." *Hannabalson v. Sessions*, 116 Iowa 457, 90 N.W. 93, 94 (1902). The "case is one with which the courts ought not to be burdened, and we can justify giving it the serious attention we have only in the hope that an exhibition of its petty and ridiculous features may tend to check such litigation." *Id.* At 95.

[4] *See Fla. v. Jardines*, 569 U.S. 1, 8 (2013) ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.").

2526090

Yet Iron Bar's case is devoted to attacking an even more transitory and less invasive incursion than those exercised by Girl Scouts, trick-or-treaters, census takers, and the like.

The hunters used a ladder to step over a short chain strung between two t-posts to avoid touching private land, and in other instances simply stepped over a survey monument denoting a corner. Other than the t-posts and chain placed by Iron Bar to wall off the airspace over the first corner, the prairie the hunters stepped across is essentially unchanged from how it appeared centuries ago. The land is not cultivated, developed, or improved.

The hunters moved on public land, crossing over the exact corners defining property boundaries and avoiding ever stepping on private land. Despite that care, Iron Bar has doggedly pursued trespass claims against the hunters. Iron Bar's goals are plain. It wants to prevent access to, and effectively claim exclusive control over, thousands of acres of public land that abut its inholdings.[5] Writ large across

---

[5] An incident described in the Wall Street Journal is illustrative. The law is settled that overflight of private property by aircraft is not a trespass unless the flight creates a nuisance or somehow damages private property. *See, e.g.*, 49 U.S.C. § 40103(a); Restatement (Second) of Torts, § 159(2). That did not stop Iron Bar's ranch manager from accosting pilots who flew onto public land intermixed with its land while this suit was underway in the district court. *See* Michael Allen, *The Hunters, the Landowner and the Ladder That Triggered a Wyoming Showdown*, Wall Street Journal (Nov. 10, 2022), https://www.wsj.com/articles/hunting-land-access-dispute-wyoming-11668094125.
The article describes Thomas Bienz, an orthopedic surgeon from Laramie, Wy.,

the West, such a policy effectively grants large landowners dominion over millions of acres of public land that these landowners never acquired title to or paid for.

A foundational component of America's hunting model is that "government allocates access to wildlife without regard for wealth, prestige, or land ownership." *See North American Model of Wildlife Conservation,* U.S. Fish & Wildlife Service, https://www.fws.gov/initiative/hunting/wildlife-conservation. Preventing corner crossing turns that principle on its head, elevating a pay-to-play hunting culture that increasingly pushes those with modest means away from hunting and public lands.

American law rightly and proudly protects private property, but Iron Bar's draconian interpretation of property law in this case is wrong.

---

and a friend who

> landed on a dirt road on federal land hemmed in by Mr. Eshelman's property. . . . Soon they were joined by two officials of the Elk Mountain Ranch and a state game warden. The ranch's property manager, Steve Grende, challenged the pilots about the flyover. Dr. Bienz, armed with a sheaf of legal papers to go with his holstered Glock semiautomatic, explained that Federal Aviation Administration regulations stipulated only that he stay at least 500 feet above the ground and that he was well within his rights to land on the BLM property. The manager backed off.

The ranch manager's behavior suggests it is not the legality of trespass that concerns Iron Bar, but access to the checkerboarded public land itself.

**ARGUMENT**

## I.    UNCERTAINTY OVER CORNER CROSSING IS PREVENTING ACCESS TO MILLIONS OF ACRES OF PUBLIC LAND.

The United States own millions of acres of land that it opens to the public. From the tundra of Alaska to the swamps of Florida, public land is a great equalizer, giving the poorest American the exact same rights and opportunities as the richest to wander vast tracts of land, camp beneath the stars, hunt wild game, fish lakes and rivers, experience the solace of the outdoors, and explore Native and American history.

Federal public lands take a variety of forms and are primarily managed by four agencies: the National Park Service ("NPS"), USFS, BLM, and the U.S. Fish and Wildlife Service ("USFWS"). These lands range from heavily protected national parks, like Yellowstone (managed by NPS), to impressive national forests like the Roosevelt National Forest (managed by USFS), to vast swaths of land owned by the federal government from the days of homesteading and westward migration (often managed by BLM).

Each of these lands are managed for different goals. Generally, national parks have the highest protection and most restrictions, while national forests and BLM land are both managed for multiple uses, including recreational uses such as hiking, camping, hunting, and fishing, among others. *See, e.g.*, 16 U.S.C. § 529 *et. Seq.* ("Multiple-Use Sustained-Yield Act of 1960") (directing USFS to manage for

7

2526090

multiple uses); 43 U.S.C. § 1701 *et. Seq.* ("Federal Land Policy and Management Act of 1976," or "FLPMA") (directing BLM to manage for multiple uses).

Notably, BLM manages the largest amount of land of any federal agency – 245 million acres, or one out of every ten acres of land in the entire country. *See* https://www.blm.gov/about/what-we-manage/national. BLM land is especially prevalent in the West.[6] Large swaths of BLM land in Wyoming and other Western states exist in checkerboard pattern where adjoining public land touches only at a corner due to how Congress allocated land during westward expansion. *See, e.g.*, John W. Sheridan, *The Legal Landscape of America's Landlocked Property*, UCLA Journal of Environmental Law and Policy, 37:2 (2019) at 232-234.

These corners, by definition without length, width, shape, or size, form the center of the conflict in this case. More importantly, these corners represent the only practical way to access millions of acres of public land. Almost 6 million acres of federal public land in the West are consigned to the checkerboard pattern. *See The Corner-Locked Report*, https://www.onxmaps.com/onx-access-initiatives/corner-crossing-report. Forty-nine percent of that land is just one corner away from being accessible, and the remaining 51 percent would require crossing

---

[6] BLM manages 18.4 million acres of surface land in Wyoming, 8.3 million acres in Colorado, 22.8 million acres in Utah, and 13.5 million acres in New Mexico, Oklahoma, Texas, and Kansas combined. *See* https://www.blm.gov/about/what-we-manage.

anywhere between two and 15 corners. *Id.*

As shown in the map below, the hunters crossed from BLM land to BLM land at waypoint 8, which provided subsequent access to additional BLM land via corners (each square is 640 acres, or one square mile).



A zoomed-out view of the area in question in this case provides a small sense of the greater issue affecting access via corners to public land around the country:[7]

---

[7] Elk Mountain, the area at issue in this case, is in the southeastern portion of the map. Public BLM land shows in yellow, state land in light blue, private land is unshaded, and certain parts of national forest land in dark green in the far southeast.

2526090



## II.    MORE THAN 100 YEARS AGO, CONGRESS STRUCK A BALANCE BETWEEN PUBLIC ACCESS AND PRIVATE PROPERTY RIGHTS BY BARRING NUISANCES THAT PREVENT ACCESS TO PUBLIC LAND.

Courts have long recognized that the customs of the United States –

resulting in large part from the vast, open landscapes early settlers encountered –

softened the severe attitudes towards trespass that prevailed in England.

> The strict rule of the English common law as to entry upon a close must be taken to be mitigated by common understanding with regard to the large expanses of unenclosed and uncultivated land in many parts at least of this country. Over these it is customary to wander, shoot and fish at will until the owner sees fit to prohibit it. A license may be implied from the habits of the country.

*McKee v. Gratz*, 260 U.S. 127, 136 (1922) (citation omitted).

10

Further, frontier customs such as the "fence-out" doctrine, which permits cattle to enter upon and graze others' land without trespass liability, are still alive and well in the 21st century. *See, e.g.*, *Little Med. Creek Ranch, Inc. v. d'Elia Tr. of d'Elia Family Tr.*, 527 P.3d 856, 868 (Wyo. 2023) (discussing the fence-out doctrine in the context of adverse possession).

Iron Bar's trespass claims skip over the American experience and echo the harsh feudal property laws developed in the old world. As this Court's Eighth Circuit predecessor recognized, the strict property laws derived from English common law had receded in the American West more than 100 years ago.

> In other words, [plaintiff] seeks to introduce into the vast regions of the public domain, which have been open to the use of the herds of stockraisers for nearly a century without objection, the principle of law derived from England and applicable to highly cultivated regions of country, that every man must restrain his stock within his own grounds, and if he does not do so, and they get upon the unclosed grounds of his neighbor, it is a trespass for which their owner is responsible.

*Mackay v. Uinta Dev. Co.*, 219 F. 116, 120 (8th Cir. 1914)

Iron Bar's claims also harken back to a darker time in the West when landowners used fences and force to control access to public lands to the detriment of regular Americans trying to make their way on the frontier. *See, e.g.*, *Leo Sheep Co. v. United States*, 440 U.S. 668, 683-84 (1979) ("cattlemen found that ownership over a relatively small area might yield effective control of thousands of acres of grassland."). Known as the range wars, these conflicts pitted large,

11

wealthy, and often foreign landowners hoping to get rich on cattle, against farmers, settlers, and sheepherders. *See, e.g.*, Hal Herring, *The Johnson County War: How Wyoming Settlers Battled an Illegal Death Squad*, Field & Stream (Apr. 12, 2013), https://www.fieldandstream.com/articles/guns/2013/02/johnson-county-war/.

These attempts to wall off Western public land from ordinary Americans met with resistance in Congress, resulting in legislation against nuisances that prevented access across public lands. *See* 43 U.S.C. §§ 1061-1066 ("Unlawful Inclosures Act" or "UIA"). As the Committee on Public Lands in the 48th Congress explained almost 140 years ago,

> [t]he necessity of additional legislation to protect the public domain because of illegal fencing is becoming every day more apparent. Without the least authority, and in open and bold defiance of the rights of the Government, large, and oftentimes foreign, corporations deliberately enclose by fences areas of hundreds of thousands of acres, closing the avenues of travel and preventing the occupancy by those seeking homes.

S. Rep. No. 48-979, at 1 (1885).

Through the UIA, Congress recognized that preventing access to public land is a nuisance that the federal government can lawfully and constitutionally abate:

> Considering the obvious purposes of this structure, and the necessities of preventing the inclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of congress to order its abatement. . . . The inconvenience, or even damage, to the individual proprietor does not authorize an act which is in its nature a purpresture of government lands. . . . A different rule would place the public domain of the United States completely at the mercy of state legislation.

12

*Camfield v. United States*, 167 U.S. 518, 525-526 (1897).

The UIA provided broad and sweeping protection to public land access. In addition to prohibiting fencing that would serve to enclose public land, the law says that "[n]o person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct, or shall combine and confederate with others to prevent or obstruct . . . free passage or transit over or through the public lands." 43 U.S.C. § 1063. As the 9th Circuit explained, "[t]he obvious intention of the statute was to make unlawful any exclusive use and occupancy of any of the public lands without claim or color of title, or asserted right under the land laws, whether by inclosing the same or otherwise." *Bircher v. United States*, 169 F. 589, 591 (9th Cir. 1909).

The customs and laws from frontier times have adapted to the modern era. In *U.S. ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414 (D. Wyo. 1985), aff'd, 848 F.2d 1502 (10th Cir. 1988), a landowner who owned property checkerboarded with public land fenced his private property, blocking the ability of pronghorns to travel over public land to their winter range. The court found the impediment impermissible under the UIA. *Id.*

In upholding the district court's conclusion, this Court succinctly explained the UIA's modern relevance: "The UIA proscribes unlawful enclosures; enclosures are unlawful when they deny access to public lands for 'lawful purposes'. . . .

13

Obviously, lawful uses of the public lands will change over time." *U.S. ex rel.*

*Bergen v. Lawrence*, 848 F.2d 1502, 1509 (10th Cir. 1988), cert. denied, 488 U.S.

980 (1988).

The district court in *Bergen* noted that modern laws continued to redefine

the lawful purposes that the UIA protects, including recreation and hunting.

> In the years since the 1885 passage of the UIA, the then-pressing concerns of settlement and range wars have faded. But, new present-day concerns have arisen. In the Federal Land Policy and Management Act (FLPMA) . . . Congress set out new goals for the public lands.

*Bergen*, 620 F. Supp. at 1417. The court found it "proper to consider FLPMA

statute in light of UIA, especially since Congress as recently as 1984 considered

and amended the UIA." *Id.*

One of the legislative policy goals of FLPMA is that "public lands be

managed in a manner . . . that will provide food and habitat for fish and wildlife

and domestic animals; and that will provide for outdoor recreation and human

occupancy and use." 43 U.S.C. § 1701(a)(8). Considering these goals, "[s]urely,

the free passage of hunters and their quarry is a lawful purpose for which the

public may seek access to public lands. In light of these precedents, the Court is

hardpressed to understand how the UIA could apply to cattle, but not to antelope."

*Bergen*, 620 F. Supp. at 1417.

*Bergen* shows that Congress' decision more than 100 years ago to ensure

access to the public lands of the West continues to prevent private property owners

from walling off public land to deer, elk, pronghorns, and the hunters who pursue those game animals.

While the frontier may be closed, as Iron Bar and its amici repeatedly emphasize, much of the checkerboarded land in the West still looks like the open prairie from centuries ago. Access issues are little changed from that time, either. Here, Iron Bar took possession of its property subject to the UIA, which was designed to prevent private landowners from interfering with access to and from public lands. It must live with the fact that its lands are part of the checkerboard pattern subject to the UIA.

## III.    ACCESS TO PUBLIC LANDS, INCLUDING VIA CORNER CROSSING, IS CRITICALLY IMPORTANT TO BHA'S MEMBERS, AS WELL AS THE MODERN AMERICAN SYSTEM OF WILDLIFE MANAGEMENT.

Access to public land, including corner-locked public land, is not just some inchoate good. Most Americans cannot afford to own even a small tract of land, let alone the many thousands of acres owned by Iron Bar and those similarly situated. But all Americans are owners, in a sense, of the millions of acres of public land across the country. Public land is a democratizing force allowing regular Americans to freely experience the unique gifts of America's wild places. These lands provide sustenance from wild game and forage, physical health from exercise, and mental wellbeing from time spent outdoors. Public lands are the birthright of all Americans, and the opportunities they provide are unique among

15

nations.

That said, many BHA members who live in or travel to hunt in the West have been dissuaded from accessing public land because of the uncertainty over crossing corners.

Jeff Schreier, a member who lives and hunts elk in Colorado, told BHA that "I have never corner crossed but know that that inability has limited my access to land on every public land hunt I have participated in in Colorado. There are specific parcels of BLM land I have not accessed but would have hunted" had the legality of corner crossing been clear.

Another member, Blake McGee, traveled in 2020 with his father from Oklahoma to Wyoming, but ran into difficulty when trying to access BLM land across a corner:

> In 2020, my dad and I drew antelope tags near Wright, Wyoming in a "limited public access" unit.
>
> We are from Oklahoma and have never been out west hunting so we were excited for the opportunity. We diligently studied OnX maps and located areas that it appeared we should be able to access.
>
> After driving the 18 hours to get there, we consulted our map and headed toward a checker-boarded area that appeared would give us access to several square miles of BLM land. As we approached the first corner, we were greeted by a gate and a rancher who said it was his land and there was no access to the BLM land beyond the gate. We went on about our way and tried to make a plan for a successful hunt in a different manner.
>
> We quickly learned that the "limited public access" to these lands was

16

not due to a lack of public lands but because of a deeply held belief by the ranchers that they controlled the access to those lands. Our hunt was successful but I was shocked at the control that these individuals held over the public lands that all Americans should be able to enjoy.

Member Erik Castello, a forest stewardship specialist, has also faced the inability to access public land in Colorado and Wyoming:

I have been affected by the corner crossing issue in both Colorado and Wyoming. I believe that my access to public lands has been limited by the vagaries around the laws that relate to whether it's legal for me to cross from one piece of public land to another piece of public land by not touching or negatively affecting adjacent private land. This has limited my opportunities to access public lands to continue my hunting, fishing and outdoor recreation heritage and lifestyle.

Similarly, member Josh Harrison from Wyoming would like to access public land using corners, but worries about confrontations with landowners:

I live in Wyoming. Consequently, my access to public lands has been limited by the unclear legality of corner crossing. I have not corner crossed because I do not want to deal with any legal fallout or, what is more likely, irate landowners that feel I am trespassing on their land. There is a ton of land near me that I would love to recreate on that is only accessible via corner crossing. It is worth noting that as outdoors pursuits are becoming ever more popular a very effective way to ease congestion is to open up millions of acres to access via corner crossing. I am certain that the overwhelming majority of Americans would agree that corner crossing should be legal; it just seems like common sense that the public should be able to access their own land.

Preventing access to public land via corners has a profoundly negative effect on hunters. That lack of access also has a spillover effect that should concern all Americans. Public land serves as the stage where the principles of the North

17

American Model of Wildlife Conservation, the most successful wildlife management tool in the world, play out. *See North American Model of Wildlife Conservation*, Association of Fish & Wildlife Agencies,

https://www.fishwildlife.org/landing/north-american-model-wildlife-conservation.

Lack of hunting access is one of the main reasons for the decline in hunter participation. *See Assessing the Quality and Availability of Hunting and Shooting Access in the United States*, National Shooting Sports Foundation (2021) at i,

https://www.nssf.org/wp-content/uploads/2022/02/NSSF-Access-Report-Access-Inventory-Report-2021-Item-30321.pdf ("Research has consistently shown that difficulty gaining access to lands for hunting and sport shooting has become a constraint to recruiting, retaining, and reactivating hunters and shooters.").

That is problematic because hunters and anglers are the vanguard of conservation in America. License and tag fees from state hunting and angling programs go directly to state wildlife agencies to support conservation projects, wildlife research, habitat restoration, and public education. Excise taxes levied by Congress on firearms, ammunition, archery equipment, and fishing equipment are distributed to states and are used for wildlife conservation, habitat restoration, and developing public access projects. *See The American System of Conservation Funding*, Association of Fish & Wildlife Agencies, https://www.fishwildlife.org/afwa-informs/resources/american-system-conservation-funding. Notably, in 2022,

18

hunters funded $1.2 billion through these taxes (and more than $1.6 billion when including anglers) to support state and local outdoor recreational opportunities, and wildlife and habitat conservation efforts.[8]

Access to public land is critical to sustaining the North American Model of Conservation. Losing hunters means losing conservation dollars. A report by USFWS that concluded in 2017 found a decrease in hunter participation, leading then U.S. Secretary of the Interior, Ryan Zinke, to comment, "[t]his report absolutely underscores the need to increase public access to public lands across the United States. . . . Hunters and anglers are at the backbone of American conservation, so the more sportsmen and women we have, the better off our wildlife will be."). *See New 5-Year Report Shows 101.6 Million Americans Participated in Hunting, Fishing & Wildlife Activities*, Department of Interior (Sept. 6, 2017) (last edited September 29, 2021),

https://www.doi.gov/pressreleases/new-5-year-report-shows-1016-million-americans-participated-hunting-fishing-wildlife.

---

[8] Final Apportionment of Pittman-Robertson Wildlife Restoration Funds for Fiscal Year 2023, USFWS, https://www.fws.gov/sites/default/files/documents/WR%20Final%20apportionment%20table%20-%20FY%2023%20Review.pdf; Amended Final Apportionment of Dingell-Johnson Sport Fish Restoration Funds for Fiscal Year 2023, USFWS, https://www.fws.gov/sites/default/files/documents/SFR%20Final%20apportionment%20table%20-%20FY%2023%20Review.pdf.

2526090

Clarifying that landowners cannot prevent people from crossing corners from public land to public land opens millions of acres to hunters and anglers who sustain our wildlife populations and natural resources. It also creates certainty that allows both recreational users and landowners to know what is squarely within the law, and what is not, to the benefit of all.

For example, based on the district court's ruling, Guy Litt, a BHA member from Wyoming, engaged in a hunt that involved accessing public land over a shared public-private corner. Litt carefully planned his hunt, accessed the corner on public land, identified the monument denoting the corner separating public and private land, and crossed directly over it, even though it was on a steep slope.



20

During his pursuit, Litt identified a mature mule deer and harvested it. Litt notes that "nobody would reasonably climb the ridge via this route if it wasn't for that small access point by stepping over a survey marker." Litt took multiple trips to pack out the meat because of the steep hill and the necessity of crossing only at the corner.

Litt's story, much like that of the hunters in this case, shows that responsible public land recreators can and will safely and successfully cross corners on foot to access public land without disturbing private property.

## IV.    POLICY ARGUMENTS BY IRON BAR AND ITS AMICI MISS THE MARK.

The public stands to benefit significantly if landowners are prevented from excluding people from accessing public land across corners. Nonetheless, Iron Bar and its amici make several policy arguments against corner crossing. These arguments ignore the facts on the ground and do not call into question the district court's conclusion.

*First*, Iron Bar argues that corner crossing will inevitably lead to trespass. Appellant's Br. at 54. But, as it concedes, and as shown by Litt's hunt, in many places in the West, BLM has already placed permanent monuments that mark corners. *Id.* Conscientious public land users will use technology like onX Maps to carefully stay on public land while approaching and identifying those markers. Iron Bar speculates that people seeking access to public land over corners "guarantees

21

trespasses," but there is no reason to believe that public land recreationists, who are generally armed with technology and binoculars and are well-versed in avoiding trespass, would accidentally wander onto private land while looking for a monument.

Further, while there is no doubt that there are some corners in the West lacking easily identifiable monuments, simple solutions exist to the hypothetical problems Iron Bar identifies. For one, BHA and its members stand ready and willing to collaborate with landowners and BLM to identify and permanently mark priority corners where public and private land intersect. These volunteer efforts would, at no cost to landowners, ensure that recreationalists could easily identify corners and then cross on foot without touching private land. BHA volunteers could even help fundraise for, and install ladders over, corners where private landowners feel the need to install fences that wall off private property from the public domain. That would allow members of the public to still access public land without disturbing landowners' fences.

*Second*, Iron Bar argues that corner crossing would impose significant costs on property owners because landowners would need to fence and patrol internal boundaries. Appellant's Br. at 55. The mere possibility that someone might corner cross from and to public land does not inexorably lead to a need for expensive fencing and patrols on private land, as shown for example by Litt's public land

22

hunt. And, as discussed below, fencing interior boundaries to block access to public land would run afoul of the UIA.

Iron Bar also fearmongers that hunters with "high-powered rifles" will "roam freely within the perimeter without notifying anyone of their presence. . . . The potential for accidents (and worse) is obvious." Appellant's Br. at 56. Putting aside the assertion that Iron Bar has a "perimeter" that subsumes the public land within its boundaries, it is not at all obvious to any hunter that crossing corners abutting public and private land creates a potential for accidents or worse. In general, hunting accidents are exceedingly rare. Rifle hunters are trained to identify what they are shooting at, and what is beyond, and in Wyoming, hunters are required to wear blaze orange during rifle season for high visibility and to reduce hunting accidents. *See Ask Game & Fish*, https://wgfd.wyo.gov/Ask-Game-and-Fish/Katie,-who-should-wear-fluorescent-orange-or-pink. Further, all evidence here suggests that both the public and private land that Iron Bar seeks to control are wide open. A hunting accident in this context is difficult to imagine. Iron Bar's argument about rifles appears to be either naïve or a scare tactic. In any event, should tracts of public land become overcrowded, unsafe, or deleterious to the environment, BLM has mechanisms for limiting or restricting access. *See* Closure and Restriction Orders, 43 C.F.R. § 8364.1.

*Third*, Iron Bar argues that corner crossing would damage the environment

23

because some landowners might fence the interior of their properties, blocking

migration routes. Appellant's Br. at 57. The argument is specious. A conscientious

landowner seeking to fence its property has many options to build wildlife-friendly

fences that can define property boundaries while allowing for wildlife migration.

*See, e.g.*, Christine Paige, *A Wyoming Landowner's Handbook to Fences and

Wildlife*, Wyoming Community Foundation (2015) (available at

https://extension.colostate.edu/wp-content/uploads/2022/01/A-Wyoming-

Landowners-Handbook-to-Fences-and-Wildlife_2nd-Edition_-lo-res.pdf). Plus,

these fences should not prohibit access to public land. *See Bergen*, 848 F.2d at

1511-1512 (holding that the UIA applies to fences that exclude antelope migration

and stating that the landowner "cannot maintain a fence which encloses public

lands and prevents the lawful purpose of antelope access to their winter feeding

range." (citation omitted)).

Further, contrary to Iron Bar's assertion, increased hunting access to public

lands interspersed with private land benefits wildlife by dispersing them across the

landscape. For example, one study of elk behavior in Utah found that hunting on

private land was effective in shifting elk back onto public land. *See* Maksim

Sergeyev, et al., *Reducing the refuge effect: using private-land hunting to mitigate

issues with hunter access*, The Journal of Wildlife Management, Vol. 86, Issue 1

(Jan. 2022). Given that the public land at issue here is treated as if it were private,

24

similar effects are likely to be seen.

*Fourth*, Iron Bar argues that in response to a decision that corner crossing is legal, landowners may choose to fence their individual parcels, which would block access across the corners. Appellant's Br. at 57. This argument ignores the UIA and misunderstands the Supreme Court's holdings in *Camfield* and *Leo Sheep*. Fencing private land for the sole purpose of preventing access to public land would violate the UIA:

> [W]hen, under the guise of inclosing his own land, he builds a fence which is useless for that purpose, and can only have been intended to inclose the lands of the government, he is plainly within the statute, and is guilty of an unwarrantable appropriation of that which belongs to the public at large.

*Camfield*, 167 U.S. at 528. Notably, the Supreme Court found the issue "scarcely a practical question" because "a separate inclosure of each section would only become desirable when the country had been settled, and roads had been built which would give access to each section." *Id.* The Court in *Leo Sheep* echoed *Camfield*, noting,

> Congress obviously believed that when development came, it would occur in a parallel fashion on adjoining public and private lands and that the process of subdivision, organization of a polity, and the ordinary pressures of commercial and social intercourse would work itself into a pattern of access roads. . . . It is some testament to common sense that the present case is virtually unprecedented, and that in the 117 years since the grants were made, litigation over access questions generally has been rare."

*Leo Sheep*, 440 U.S. at 686-687.

25

2526090

Development did not come to these lands. They have not been settled, for the most part. Subdivisions have not been established, and access roads have not always been built. Further, as the *Leo Sheep* Court noted, in the late 19th Century "the type of incursions on private property necessary to reach public land was not such an interference that litigation would serve any motive other than spite." *Leo Sheep*, 440 U.S. at 685-686 (citation omitted). Stepping a foot over a shared corner without touching or harming private property is exactly the type of "incursion" the *Leo Sheep* Court understood to be customarily allowed.

Finally, amicus United Property Owners of Montana ("UPOM") argues that corner crossing "has an economic component" and "[n]egotiating an agreement to allow for public access across private property in exchange for compensation, may make the difference between a successful family business and one that fails." UPOM Br. at 23. UPOM does not cite any instance of a property owner negotiating for access over a corner, nor does it say what the economic value of such access might be.[9] Notably, Iron Bar does not now claim any actual damages

---

[9] UPOM does mention a Montana statute, Mont. Code Ann. § 87-1-294, that provides a tax credit to landowners that provide "direct access across landowner's land," as well as at a corner where a "landowner . . . shall grant access through the landowner's land to establish a corridor between the two parcels of public land." Mont. Code Ann. § 87-1-294(5)(a)(i)-(ii). The tax credit is $750 for each qualified access provided (whether across private land or via a corner), with a maximum of $3,000. Mont. Code Ann. § 15-30-2380. It seems unlikely that such a credit would determine whether a family business survives or not.

26

for the hunters' conduct. BHA is also not aware of any landowner who charges a trespass fee for moving over a corner between public land and public land, though many landowners and outfitters charge fees in the thousands of dollars for hunting access on private (and adjoining public) land. UPOM's argument is again confirmation that large landowners treat public land like their private property, which is exactly the injustice the UIA sought to remedy.

Finally, BHA agrees with Iron Bar and its amici that political solutions to access are critical to ensuring public access to land, and it has supported and continues to support these types of solutions, including the use of state and federal funds to purchase private inholdings and/or public easements from willing sellers to facilitate access to public lands. But these access options are not a reason to ignore the important – even if limited – law enacted by Congress to abate nuisances that prevent access to public land across corners.

The district court's decision is a narrow one. It sanctioned corner crossing only to the extent that the person does not touch or damage adjoining private land. Despite Iron Bar's claims, that will not inexorably lead to free-for-all trespass, habitat fragmentation, dangerous gunmen running across the prairie, or any other parade of horrors. Plenty of daylight exists between the district court's ruling based

---

2526090

on custom and the UIA, and the many political solutions that can support access.

Under the district court's ruling, roads will not be built over corners. Trucks and ATVs cannot tromp across private land. Access will still need to be handled carefully by the public. State legislators can still enhance access by improving public/private access solutions, and private landowners can still agree to land swaps and purchases that will provide additional opportunities for recreating on public land. Corner crossing is simply one small tool in the access playbook, but one that has outsized meaning to those who value recreating on public land.

## CONCLUSION

The hunters simply stepped from public land to public land over a corner that shared a boundary with private property. Iron Bar's claims of trespass are a nuisance that the UIA is designed to abate. The corner crossing by the hunters was legal, and the Court should uphold the district court's ruling.

BHA is ready to assist the Court further in any way the Court may request.


Dated:  January 12, 2024                    Keker, Van Nest & Peters, LLP


                                             */s/ Eric B. Hanson*
                                             Eric B. Hanson
                                             Attorney for Amicus Curiae,
                                             Backcountry Hunters & Anglers

28

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6477 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Version 2311 of Microsoft Word in 14 point Times New Roman.

Dated:  January 12, 2024         */s/ Eric B. Hanson*
                                        Eric B. Hanson

2526090

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

I certify that all required privacy redactions have been made in this brief

pursuant to 10th Cir. R. 25.5. I further certify that the hard copies of this brief to be

submitted to the Court will be exact copies of the version submitted electronically

and that the electronic submission of this brief was scanned for viruses with the

most recent version of a commercial virus scanning program and is free of viruses.


Dated:  January 12, 2024        */s/ Eric B. Hanson*
                                          Eric B. Hanson

2526090

# CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2024, I electronically filed the above brief with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users.

Dated:  January 12, 2024          */s/ Eric B. Hanson*
                                            Eric B. Hanson

2526090