No. 23-8043

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

IRON BAR HOLDINGS, LLC,
*Plaintiff-Appellant*,

v.

BRADLY CAPE, et al.,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Wyoming, No. 22-CV-67
Hon. Scott W. Skavdahl, United States District Judge

## APPELLANT'S REPLY BRIEF

Megan Overmann Goetz
PENCE AND MACMILLAN LLC
501 E. Garfield
P.O. Box 1285
Laramie, WY 82073
(307) 745-3626

Robert Reeves Anderson
Brian M. Williams
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
(303) 863-1000

Sean A. Mirski
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 942-5000

**Oral Argument Requested**

February 9, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................5

I.    Corner Crossing Is a Civil Trespass Under Wyoming Law ...........................5

II.   Federal Law Does Not Authorize Corner Crossing .......................................7

      A.   The UIA Does Not Preempt State Trespass Claims ...............................8

           1.   Congress Did Not Intend to Preempt State Trespass
                Claims in the UIA .........................................................9

           2.   Courts and the Federal Government Have Rejected
                Defendants' Interpretation of the UIA .......................................15

      B.   Other Federal Laws Also Do Not Preempt State Trespass Claims .......20

III.  Legalizing Corner Crossing Is a Policy Choice Involving Difficult
      Tradeoffs ..............................................................................................23

CONCLUSION ..................................................................................28

CERTIFICATE OF COMPLIANCE ....................................................29

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY
      REDACTIONS .................................................................................30

CERTIFICATE OF SERVICE ..............................................................31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Bergen v. Lawrence*,
   848 F.2d 1502 (10th Cir. 1988) ........................................................9, 16, 18, 19

*Buford v. Houtz*,
   133 U.S. 320 (1890)................................................................................10

*Camfield v. United States*,
   167 U.S. 518 (1897)......................................................................12, 15, 18

*Cedar Point Nursery v. Hassid*,
   141 S. Ct. 2063 (2021).....................................................................15, 16

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   80 F.4th 943 (9th Cir. 2023) ...............................................................26

*Day v. SkyWest Airlines*,
   45 F.4th 1181 (10th Cir. 2022) .............................................................7

*Deane v. United States*,
   329 F. App'x 809 (10th Cir. 2009) ......................................................8

*Fish v. Kobach*,
   840 F.3d 710 (10th Cir. 2016) ...........................................................15

*Henson v. Santander Consumer USA Inc.*,
   582 U.S. 79 (2017).......................................................................... 12-13

*Leo Sheep Co. v. United States*,
   440 U.S. 668 (1979)...............................................1, 2, 16, 18, 25, 27

*Light v. United States*,
   220 U.S. 523 (1911)..............................................................................21

*Luna Perez v. Sturgis Pub. Schs.*,
   143 S. Ct. 859 (2023).........................................................................13

*Mackay v. Uinta Development Co.*,
   219 F. 116 (8th Cir. 1914) ....................................................1, 10, 13

*Mulford v. Walnut Hill Farm Grp., LLC*,
   712 S.E.2d 468 (Va. 2011) ........................................................... 17-18

*Taylor v. Welbey*,
   36 Wis. 42 (1874) ...........................................................................10

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
   140 S. Ct. 1837 (2020)....................................................................16

*Wyeth v. Levine*,
   555 U.S. 555 (2009)..................................................................... 7-8

*Yellowstone River, LLC v. Meriwether Land Fund I, LLC*,
   264 P.3d 1065 (Mont. 2011)...........................................................17

**Statutes**

43 U.S.C.
   § 315......................................................................................22
   § 315e....................................................................................22
   § 315n....................................................................................22
   § 1061.................................................................................9, 11
   § 1062...............................................................................11, 19
   § 1063.....................................................................9, 11, 12, 19
   § 1065...............................................................................11, 14
   § 1701....................................................................................22

Wyo. Stat. Ann. § 24-9-101 ...................................................17

**Rules & Regulations**

*Department Hearings and Appeals Procedures; Cooperative
   Relations; Grazing Administration—Exclusive of Alaska*,
   60 Fed. Reg. 9894 (Feb. 22, 1995) ...................................................22

**Legislative Materials**

15 Cong. Rec. 4769 (1884)....................................................12

H.R. Rep. No. 48-1325 (1884)...........................................11, 12

**Other Authorities**

2 *The Universal Dictionary of the English Language*
(Robert Hunter & Charles Morris eds., 1897) ...................................................10

3 Tiffany Real Prop. § 935 (3d ed. 2023) ................................................20

4 *The Century Dictionary and Cyclopedia*
(William Dwight Whitney ed., 1895) ...............................................10

BLM, *Hunting, Fishing and Recreational Shooting* (2023),
bit.ly/3OFP1em...........................................................................27

Christine Paige, *A Wyoming Landowner's Handbook to Fences and Wildlife* (2015) ............................................................26

Jon W. Bruce et al., *The Law of Easements & Licenses in Land* § 6:2 (2023) ....................................................................20, 21

Kevin R. Crooks et al.,*Quantification of Habitat Fragmentation Reveals Extinction Risk in Terrestrial Mammals*,
114 PNAS 7835 (2017)...................................................................26

Noah Webster, *An American Dictionary of the English Language* (1882).............10

Theodore Roosevelt Conservation Partnership, *Off Limits, But Within Reach: Unlocking the West's Inaccessible Public Lands* (2018),
https://bit.ly/3QcKU9m ...................................................14

William C. Anderson, *A Dictionary of Law* (1889)............................................ 9-10

## INTRODUCTION

Defendants have conceded nearly all of their case. They do not dispute that corner crossing violates Wyoming law. They admit the public has no reserved right of access to public parcels in the checkerboard under *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979). They do not deny that policymakers—including the BLM, the Wyoming Attorney General, and law enforcement agencies and prosecutors of multiple states—have agreed for decades that corner crossing is unlawful. Remarkably, Defendants do not even defend the decision below: They do not discuss *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914)—the centerpiece of the district court's analysis—until the last five pages of their brief, where they concede that *Mackay* is neither "binding precedent" nor "factually indistinguishable," instead damning it with faint praise as "not useless." Ans. Br. 51. Defendants try to excuse their trespass primarily by invoking the 1885 Unlawful Inclosures Act, even though the Act does not apply by its terms and courts (including the court below) have consistently rejected Defendants' reading of the Act.

On this the parties agree, however: The bundle of sticks held by private landowners does not include a right to exclude the public from the public domain. Ans. Br. 2. But landowners *do* have the right to prevent the public from trespassing on *their* property, and that is the only right that Iron Bar has ever asserted. Defendants thus are not complaining about the existence or scope of Iron Bar's

1

asserted right so much as the *effect* of asserting that right, because it hinders them from recreating when and where they want. But that effect flows from two decisions that have nothing to do with Iron Bar: First, when Congress platted and ceded checkerboard land in the West, it did not "reserve[] an easement to pass over [private] sections in order to reach [public] sections that [are] held by the Government." *Leo Sheep*, 440 U.S. at 678. Second, in the 45 years since *Leo Sheep* was decided, the government has not used its eminent domain power to create access to the public parcels scattered across Elk Mountain. Defendants' disagreement with those policy choices does not warrant eroding private property rights.

Defendants seek to obscure this central legal issue through rhetoric and reframing. They invoke the misleading concept of "common corners" and falsely accuse Iron Bar of laying claim to public land. Despite their efforts to obfuscate and downplay the sweeping nature of their position, the upshot is revolutionary: Defendants assert that every member of the public has an unfettered right to trespass across private property in order to recreate on any otherwise inaccessible public land that lies beyond it. Defendants and their *amici* invoke nearly a dozen different sources of federal law to justify this supposed right, but their argument ultimately rests on the fallacy that if the government gives the public an implied license to *use* public land, then the public must automatically have the right to conveniently *access* that land, even over private property. But use and access are different concepts:

2

Inviting a friend to swim in your backyard pool does not give him the right to trek across your neighbor's lawn. Congress has never given the public a license to intrude on private property, for the obvious reason that it could not do so without first exercising its condemnation powers.

At bottom, Defendants and their *amici* do not offer a legal argument so much as a story—the sequel to the range wars. Defendants cast themselves as heirs of the small-time herders and homesteaders of yore, law-abiders who merely want to use public land for law-abiding purposes. Standing in their way are private landowners, the modern-day descendants of the cattle kings who once ruled the Plains through fence and force. Defendants invite this Court to play the role of town sheriff, corralling Iron Bar and other landowners and restoring order to the West.

Reality is more nuanced, and the role of protagonist is a matter of perspective. To start, Iron Bar emphatically shares Defendants' concerns about access to public lands. Long before this suit, Iron Bar's owner approached both the state and federal governments with offers to swap checkerboarded parcels in ways that would have dramatically enhanced the public's access to public land while *halving* the area within the outer boundary of Iron Bar's holdings. Br. 18-19. Far from seeking "to secure an empire," Ans. Br. 5, Iron Bar is trying to work within the law to manage the headaches that come from owning land in the checkerboard.

3

Nor is Defendants' cause as straightforward as they portray. One can understand the policy temptation: Why not open up access to public land, if all it means is a crossed corner or two? But in practice, legalizing corner crossing would have deleterious second-order consequences for landowners and the environment that even Defendants do not deny. Such trade-offs are properly left to the political branches, who have been working for decades on tailored solutions to the difficult access issues Congress created. That is why, despite Congress originally granting over 150 million acres of checkerboarded land, the BLM today manages at most 5.8 million acres of corner-locked public land. Br. 16. There is every reason to believe that, over the coming years, public and private actors will resolve the remaining access challenges in ways that respect private property rights while balancing competing public interests in access, resource use, and conservation on a case-by-case basis.

This Court should let that process continue to its successful conclusion. This suit is not a morality play; courts do not dispense frontier justice or decide what policy outcomes would be most "reasonable." BHA *Amicus* Br. 4. This Court's role is to apply the law as it exists. That law is clear: Corner crossing is unlawful, and it would revolutionize property law to hold otherwise.

## ARGUMENT

### I.   Corner Crossing Is a Civil Trespass Under Wyoming Law

Defendants do not contest that corner crossing constitutes a textbook trespass under Wyoming law. They take no issue with Iron Bar's recitation of the elements of common-law trespass under Wyoming law—(1) the plaintiff must have been in possession of the property when the entry occurred, and (2) the defendant must have intentionally entered upon that property. Br. 28. Nor do they dispute that their intentional crossing over the corners of land possessed by Iron Bar satisfies both of those elements, even if the intrusion was temporary, caused no physical damage, and did not involve stepping on Iron Bar's land.

Instead, Defendants devote just two paragraphs to tangential issues of state law. *See* Ans. Br. 31, 53. First, Defendants assert that landowners cannot claim a right to the "exclusive use of public land." *Id.* at 31. True, but irrelevant. Iron Bar has never asserted an exclusive right to use public lands; it has maintained only its right to exclude others from *its* land.

Defendants next argue that Iron Bar cannot bring a trespass claim because Iron Bar lacks an exclusive property right in the checkerboard's "common corners." *Id.* But there is no such thing as a "common corner" in property law. Landowners own the area right up to the corner of their property and not an inch more. Here, Iron Bar and the federal government may be neighbors, but Iron Bar owns only the land

5

within its parcels, and the federal government owns only the land within its parcels. Each owner's parcels may colloquially be described as *meeting* at a "common" corner, but that fact does not somehow intermingle their respective property rights or mean that any of the land in their respective corners is owned in common.

Consider the four corners monument where Utah, Colorado, Arizona, and New Mexico meet. Even though the four states meet at a corner, there is no doubt where Colorado's boundary ends and Arizona's begins, and there is no property interest shared by the four states at that corner.



So too here. Iron Bar has an exclusive right to the land within its parcels—the only property from which Iron Bar has sought to exclude Defendants. Far from arguing that "its ownership of half the land at common corners entitles it to exclusive use of the whole corner," *id.* at 17, Iron Bar agrees the public may walk right up to the corners of public sections neighboring Iron Bar's land. But what the public cannot then do is intrude upon Iron Bar's property, including the corners of its land.

Finally, Defendants assert in a single conclusory sentence that Wyoming's criminal "trespass to hunt" law "protects access to public lands through common corners." *Id.* at 53. But Defendants simply ignore Iron Bar's and its *amici*'s

6

explanation why the statute in question has no bearing on Defendants' civil trespass liability, including because it deals exclusively with hunting while trespassing (not hunting after trespassing). *See* Br. 40-41, 52-53; Stock Growers' Br. 6-7. Defendants do not dispute that corner crossing is instead criminalized under a separate trespass law. App. V5:1000-04 (opinion of Wyoming Attorney General).

## II.    Federal Law Does Not Authorize Corner Crossing

Despite insisting that federal law excuses their trespasses, Defendants all but abandon the district court's reasoning. Defendants instead argue that Wyoming's trespass law is preempted by a medley of federal laws, including the Unlawful Inclosures Act (UIA), the Taylor Grazing Act, the Federal Land Policy and Management Act, and a potpourri of "tradition, custom, … and modern regulations." Ans. Br. 19. Defendants made these same preemption arguments below without success, App. V3:343-58; indeed, the word "preemption" never appears in the district court's opinion.

For good reason: Defendants bear a heavy burden of "showing with specificity that Congress intended to preempt state law." *Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022). Courts have long recognized a "presumption against preemption" that reaches its zenith in any "field which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S. 555, 565 & n.3 (2009) (citation omitted); *accord id.* at 565 ("[W]e start with the assumption that the historic police powers of

7

the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (cleaned up)). Accordingly, this Court has been "particularly averse to find preemption" in cases dealing with "[l]and use policy." *Deane v. United States*, 329 F. App'x 809, 814 (10th Cir. 2009) (citations omitted).

Here, Defendants fall far short of showing that Congress "clearly and manifestly" intended to preempt state trespass claims in the UIA or any other federal law.

## A.     The UIA Does Not Preempt State Trespass Claims

Defendants lead with the extraordinary argument that in 1885, Congress stripped over 150 million acres of private land of the most valuable property right there is—the right to exclude. Even more extraordinarily, this sea change in the nation's property law—what could be the most widespread taking in American history—apparently occurred without any notice or fanfare. No legislator acknowledged what Congress had purportedly done; not one landowner raised their voice in protest or asked for just compensation; and not a single court, then or since, ever commented on what allegedly transpired. Such an account does not simply strain credulity; it breaks it completely.

Defendants cannot meet their burden of showing the UIA preempted state trespass law and thereby granted the public a permanent right to cross private property to reach public land. Defendants' interpretation is foreclosed by all tools of

statutory interpretation and has been uniformly rejected by courts and other authorities for over a century.

### 1. Congress Did Not Intend to Preempt State Trespass Claims in the UIA

It is well-settled that the UIA grants Defendants no *affirmative* right to access public land. *United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1506 (10th Cir. 1988). Defendants thus argue that the UIA *preempts* any state trespass law that imposes a legal barrier to entry. But Congress did not "clearly and manifestly" intend to preempt state trespass law as a "nuisance" under the UIA.

<u>Text</u>. Start with the UIA's text. Defendants quote Sections 1061 and 1063 of the UIA but do not explain how either applies. Neither does, because a trespass action is neither an "inclosure" nor an "unlawful means" of impeding access.

Section 1061 declares unlawful "[a]ll inclosures of any public lands … made, erected, or constructed by any person." 43 U.S.C. § 1061. Iron Bar has not "made, erected, or constructed" any "inclosure[]" of public lands; it has instead sued Defendants for trespassing on *its* lands. Iron Bar thus has not violated Section 1061.

Defendants resist that plain reading by claiming that trespass lawsuits constitute "inclosures." But in 1885, the word "inclosure" was a term of art that meant sealing off land with a *physical* barrier. Contemporary legal dictionaries defined "inclosure" to mean "[a] tract of land surrounded by an actual fence, and such fence." William C. Anderson, *A Dictionary of Law* 532 (1889); *see, e.g.*, *id.* at

9

401 (defining "enclosure" as "[i]mport[ing] land enclosed with something more than the imaginary boundary line,—some visible or tangible obstruction, as, a fence, hedge, ditch, or an equivalent object"). Contemporary usage dictionaries likewise explained that an "inclosure" of real property was "the separation of land from common ground into distinct possessions by a fence." Noah Webster, *An American Dictionary of the English Language* 674 (1882); *accord, e.g.*, 4 *The Century Dictionary and Cyclopedia* 3038 (William Dwight Whitney ed., 1895) ("The separation and appropriation of land by means of a fence"); 2 *The Universal Dictionary of the English Language* 2635 (Robert Hunter & Charles Morris eds., 1897) ("The act of inclosing; specif., the act of separating or cutting off land from common land by a fence").

Courts understood the term "inclosure" the same way. In 1874, the Wisconsin Supreme Court defined "the term '*inclosure*,' as used in [a] statute," to mean "a tract of land surrounded by an actual fence, and such fence." *Taylor v. Welbey*, 36 Wis. 42, 44-45 (1874). Other opinions—including cases invoked by Defendants—used the phrase "uninclosed lands" to mean lands not separated from neighboring property by a physical barrier. *E.g.*, *Buford v. Houtz*, 133 U.S. 320, 327-28 (1890). Even *Mackay*, which involved the assertion of a trespass claim, still described the private land at issue as "uninclosed" because it was "open and unfenced." 219 F. at 117, 120.

10

If any ambiguity remained, it would be resolved in the context of the rest of the UIA, which reinforces that "inclosure" means tangible obstructions. Section 1061 refers to "inclosures" being "made, erected, or constructed" and prohibits their "maintenance, erection, construction, or control." 43 U.S.C. § 1061. Section 1062 provides for "the destruction" of an unlawful inclosure unless it is first "removed" by its owner. *Id.* § 1062. Section 1065 authorizes the President to deploy "civil or military force" to "remove and destroy" any unlawful inclosure. *Id.* § 1065. And in the original version of Section 1061, the public was authorized "to tear down, cut, or demolish any [prohibited] inclosure." H.R. Rep. No. 48-1325, at 7 (1884). While it is amusing to imagine a President trying to "destroy" a trespass cause of action using "military force," it is not a plausible reading of the statute.[1]

Section 1063 of the UIA is even further afield. It provides that "[n]o person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct … any person from peaceably entering upon … any tract of public land … , or shall prevent or obstruct free passage or transit over or

---

[1] Section 1061 also prohibits "the assertion of a right to the exclusive use and occupancy of any part of the public lands." 43 U.S.C. § 1061. Defendants do not lean on that language, and it would not help them: Iron Bar has never asserted any exclusive right to use or occupy public land, much less both. Congress included that provision to combat another contemporary problem, "fraudulent or fictious entries … under the pre-emption, homestead, and desert land laws" that prevented settlers from asserting their own use and occupancy claims. H.R. Rep. No. 48-1325, at 5 (citation omitted).

through the public lands." 43 U.S.C. § 1063. Defendants selectively quote that language for rhetorical effect, but they never dispute that trespass claims—the most routine defense of private property—are not an "unlawful means" of doing anything. Br. 39. Indeed, by forbidding only "unlawful" means of preventing access, Congress acknowledged that access might be hindered through *lawful* means. Br. 37.[2]

Legislative History and Purpose. Congress did not intend in the UIA to preempt state trespass claims or otherwise legislate an unprecedented right to intrude on private property. Congress was concerned about the use of fraud, force, and especially fences to keep the public off public land; one representative explained that "these wire fences" were "the great evil this bill is addressed to." 15 Cong. Rec. 4769 (1884). The eight-page House Report used the word "fence" and its derivatives 45 times while quoting multiple reports of fraud and violence against settlers, *see* H.R. Rep. No. 48-1325; Congress never once mentioned private trespass actions.

Defendants respond with a 40,000-foot conception of the UIA's purpose: ensuring the public "free passage to the public domain." Ans. Br. 27. But that was not the UIA's purpose, and regardless, it would be "quite mistaken to assume … that whatever might appear to further the statute's primary objective must be the law."

---

[2] Defendants insist Congress prohibited obstruction "by whatever means," Ans. Br. 28 (quoting *Camfield*, 167 U.S. at 525), but that phrase never appears in the statute and was used in *Camfield* only to emphasize that the UIA applied to fencing on private land.

12

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (cleaned up); *Luna Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859, 865 (2023) ("[N]o law pursues its purposes at all costs."). Congress could have prohibited—but didn't—any hinderance to accessing public lands. Congress could have provided—but didn't—a generalized right of access to public lands. Instead, Congress identified and outlawed only ongoing practices of concern. It is not the judiciary's job to update the UIA's text to redress modern access problems not foreseen or addressed by the enacting Congress.

Practical Implications. Common sense also cuts against Defendants' sweeping interpretation, which goes miles (literally) beyond corner crossing. If a trespass action constitutes an unlawful "inclosure," the UIA equally immunizes a trespasser who corner crosses as one who marches straight down the middle of private property. *Cf. Mackay*, 219 F. 116. Nor would the extent of the trespass matter: On Defendants' interpretation, landowners can *never* stop trespassers trying to get to public property, even if that public property is a single section of land located hundreds of miles deep in private property. Nothing in the UIA, after all, limits it to corners, the checkerboard, or trespasses that do not involve setting foot (or hoof or wheel) on

land. If trespass law were truly an unlawful enclosure and nuisance, then under the UIA it must all be "remove[d] and destroy[ed]." 43 U.S.C. § 1065.[3]

This concern is real. Estimates suggest that over 7.5 million acres of public land remain inaccessible because they are completely surrounded by private land. *See* App. V4:624, 626. Consider one example from near the Wyoming-Montana border:



Theodore Roosevelt Conservation Partnership, *Off Limits, But Within Reach: Unlocking the West's Inaccessible Public Lands* 3 (2018), https://bit.ly/3QcKU9m.

---

[3] Defendants' *amici* recognize the need for a "limiting principle" and argue for "reasonableness," even claiming that Congress codified "a legal rule of reason" in the UIA. Broads Br. 1, 22. Congress did nothing of the sort, and *amici* do not point to anything in the UIA to support that assertion.

Defendants would read the UIA to permit any member (and any number) of the public to traverse as many miles of private land as needed to access the highlighted parcels. That cannot be right, and Defendants' position crumbles at scale.

Constitutionality. If any doubt remains, the doctrine of constitutional avoidance resolves it in Iron Bar's favor. Congress has the power under the Property Clause to abate nuisances on private property that affect government land, *Camfield v. United States*, 167 U.S. 518, 525-26 (1897), and such abatement is not a taking because landowners have no "right to engage in [a] nuisance in the first place," *Cedar Point Nursery v. Hassid,* 141 S. Ct. 2063, 2079 (2021). But Defendants do not cite—and counsel for Iron Bar has not found—a single case in which a trespass action was held to be a nuisance. If Congress had actually meant to preempt private property owners' rights to bring a trespass action, then Congress would have exceeded its power under the Property Clause to abate nuisances as well as violated the Takings Clause (to say nothing of infringing the states' police powers). At minimum, this Court must interpret any ambiguity in the UIA to avoid the constitutional doubts raised by Defendants' interpretation. *Fish v. Kobach*, 840 F.3d 710, 742 (10th Cir. 2016).

## 2. Courts and the Federal Government Have Rejected Defendants' Interpretation of the UIA

Defendants' expansive interpretation of the UIA has been soundly rejected at every turn.

15

First, this Court, the Supreme Court, and the federal government all agree that the UIA "creates no easements or servitudes." *Bergen*, 848 F.2d at 1506; *see Leo Sheep*, 440 U.S. at 683-85; Brief for the United States, *Leo Sheep*, 1978 WL 223187, at *23 n.13 ("[T]he Act created no new rights or interests.").[4] An easement—specifically, a right-of-way granting "the limited 'right to pass … through the estate of another,'" *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1844 (2020)—is exactly what Defendants are demanding in this appeal.

Defendants try to duck this caselaw by arguing that they are not *really* asking for the right to intrude on private property; rather, they claim only that Iron Bar does not have the right to prevent such intrusions through trespass claims. Potato potahto. Courts have long held that a property owner's right to *exclude* is the mirror image of the public's right to *intrude*; taking away the former *is* granting the latter. Indeed, whenever the government abrogates a private property owner's "right to exclude," "the property interest taken [is] a servitude or an easement." *Cedar Point*, 141 S. Ct. at 2073. *Cedar Point* itself concerned a regulation granting "labor organizations a 'right to take access' to an agricultural employer's property," *id.* at 2069 (citation omitted), but the Court still described the resulting easement as "an abrogation of the right to exclude," *id.* at 2074. Here, it doesn't matter whether Defendants frame

---

[4] Defendants misread *Leo Sheep*'s oral argument transcript. Ans. Br. 21-22. In that exact exchange, petitioner's counsel confirmed that the case centered on a purported "easement across the corners."

their argument as granting the public a right to intrude or as abrogating landowners' right to exclude; both sides of that coin are foreclosed by precedent.

Defendants also argue that Iron Bar never had a "right to exclude others from the public domain" in the first place, and that the UIA simply reflects that fact rather than creates an easement. Ans. Br. 25 (citing *Bergen*, 848 F.2d at 1508). But, again, Iron Bar is not suing to exclude Defendants from the public domain; it is suing to exclude them from its own property.[5] Defendants conflate the two by assuming that landowners have no right to exclude others from their property if doing so would hinder access to adjacent land. That is simply wrong. Property owners have no right to trespass across their neighbors' land to reach their own estates even when those estates are landlocked; instead, landlocked owners must meet the stringent requirements of an easement by necessity or avail themselves of "private" eminent domain statutes. *See, e.g.*, Wyo. Stat. Ann. § 24-9-101. If they do not do so, that is not the fault of the neighbors, who retain full rights to exclude through trespass actions. *See, e.g.*, *Yellowstone River, LLC v. Meriwether Land Fund I, LLC*, 264 P.3d 1065, 1076-87 & n.16 (Mont. 2011) (holding landowner had no right of access to its landlocked checkerboard parcel); *Mulford v. Walnut Hill Farm Grp., LLC*, 712

---

[5] Defendants repeatedly mischaracterize Iron Bar's actions and motives. *E.g.*, Ans. Br. 12. Iron Bar has never sought to remove anyone who accessed public land lawfully. App. V2:249; BHA Br. 6 n.5 (conceding ranch manager "backed off" after potential trespasser explained he had flown onto public land lawfully).

S.E.2d 468, 470 (Va. 2011) (holding landowner was trespassing and "did not have a legal right to access [the landlocked] property that he owned").

Courts have also rejected Defendants' sweeping claim that "if a landowner's chosen device has the effect of enclosing the public domain or obstructing free passage thereto, the UIA prohibits it." Ans. Br. 29. *Camfield* said exactly the opposite: A landowner "doubtless" has "the right to" "separately fence[]" his "odd-numbered sections" *even if* "the result"—that is, "the effect"—would be to "practically exclude the government from the even-numbered sections." 167 U.S. at 527-28. Citing this language, *Leo Sheep* confirmed it "was not a violation of the Unlawful Inclosures Act" to "individually fence[]" "odd-numbered lots" *even if* "access to even-numbered lots is obstructed." 440 U.S. at 685.

This Court's decision in *Bergen* also supports Iron Bar. In *Bergen*, this Court applied the plain text of the UIA and correctly held that a 28-mile fence surrounding public land was an unlawful "inclosure." 848 F.2d at 1508-09. In so doing, however, the Court emphasized that the UIA "creates no easements or servitudes" like the right-of-way Defendants now demand. *Id.* at 1506.

Defendants say *Bergen* holds that the UIA prohibits anything which has the "effect" of excluding "others from the public domain." Ans. Br. 31-32. Not so; this Court merely observed that "[i]t is not the fence itself, but its effect which constitutes the UIA violation." 848 F.2d at 1511 (citation omitted). That makes sense: A fence

18

that does not enclose land is not an "inclosure," because an "inclosure" requires *both* a physical barrier *and* an enclosing effect.[6] *Bergen* never suggested that an enclosing effect would be enough on its own to violate the UIA.

Finally, Defendants fail to mention that the federal government has already determined that trespass actions do not violate the UIA *in this very case*. Government officials must investigate notices of UIA violations and, if appropriate, bring suit. 43 U.S.C. § 1062. Shortly after this case began, a Wyoming resident accused Iron Bar of violating the UIA because the use of trespass law "constitutes an unlawful, virtual 'legal fence' to exclude the public from public lands." App. V4:709. The U.S. Attorney's Office investigated and ultimately declined to bring suit against Iron Bar after concluding the situation did not "constitute an unlawful 'inclosure' of public land." App. V4:712. Defendants are thus arguing in the teeth of a decision by the very government entity charged with enforcing the UIA.

---

[6] That is why a foot-long chain between two "no trespassing" signs staked at the suggestion of the Wyoming Game & Fish Department is not an "inclosure" of anything. A foot-long chain also does not "prevent or obstruct … any person from peaceably entering upon … any tract of public land," 43 U.S.C. § 1063, since anyone could just step around it. Of course, what prevents members of the public from doing *that* is exactly what would prevent them from crossing the corner even if the chain had never existed: state trespass law. As the district court correctly held, the chain could implicate the UIA *only* if Defendants had a right to cross at that corner in the first place. *See* Add. 28.

### B.     Other Federal Laws Also Do Not Preempt State Trespass Claims

Besides the UIA, Defendants and their *amici* argue that Iron Bar's right to exclude has been preempted by three other sources of federal law: modern-day customs, the extinguished custom of the open range, and a variety of statutes and regulations. Defendants are wrong about each.

*First*, Defendants argue for a customary right to intrude on private property to access public land. Courts, however, will not find a legally enforceable custom unless the practice in question has "continued from time immemorial, without interruption, and as of right; it must be certain as to the place, and as to the persons; and it must be certain and reasonable as to the subject matter or rights created." 3 Tiffany Real Prop. § 935 (3d ed. 2023) (citation omitted). Several courts have concluded that this standard is so demanding that it is nearly "impossible" to meet in the United States. Jon W. Bruce et al., *The Law of Easements & Licenses in Land* § 6:2 (2023).

Corner crossing meets none of the required elements. Far from "continuing uninterrupted as of right from time immemorial," it has been outlawed by states for decades, Br. 22, 39-42, and the BLM has made clear that "[i]t is illegal to cross public land at corners," App. V2:237; Stock Growers' Br. 17-22 (Congress has also assumed corner crossing is unlawful). Far from being specific to a "place" or set of "persons," corner crossing would be lawful under Defendants' view across the entire

checkerboard and by any member of the public. And far from being "certain and reasonable" as to its subject matter, there would be many serious questions about its scope. Br. 50-51. Even Defendants' *amici* concede they do not corner cross because it is legally "uncertain[]," BHA Br. 16; such "uncertainty" defeats any suggestion of a lawful custom.[7]

*Second*, Defendants invoke the custom of the open range that once prevailed across the West. Ans. Br. 38-40. But that custom was limited to grazing, not corner crossing; herds, not hunters. UPOM Br. 12-17. Defendants try to reframe the custom at a higher level of generality, *see, e.g.*, Ans. Br. 39 (extending custom to all "recognized lawful uses of public land"), but customs must be certain as to the place, the persons, and the rights created. Furthermore, the custom of the open range created only a limited implied license; it never "authorize[d] wanton and wilful trespass." *Light v. United States*, 220 U.S. 523, 537 (1911); *see* UPOM Br. 11-12. Regardless, Defendants admit the custom has been dead for almost a century. Ans. Br. 24 ("[T]he Taylor Grazing Act put an end to the open public range.").

---

[7] For similar reasons, there is no broader customary "right of reasonable passage to access public land." Broads Br. 1. *Amici* concede their proposed custom would necessarily "shift" and "change[] ... over time." *Id.* at 22. Such elasticity is no virtue, as *amici* claim, but antithetical to the concept of custom and the reliance interests the doctrine protects. Bruce et al., *supra*, § 6:2.

Since the custom never granted the public "any vested right," Defendants cannot rely on it today. *Light*, 220 U.S. at 535.[8]

 *Third*, Iron Bar's trespass claim is not preempted by the Taylor Grazing Act, the Federal Land Policy and Management Act, or their related regulations. *See* Ans. Br. 52. Both statutes disclaim any preemptive effect. *See* 43 U.S.C. §§ 1701 note (g)(6), 315, 315n.[9] So do the BLM regulations cited by Defendants. *See Department Hearings and Appeals Procedures; Cooperative Relations; Grazing Administration—Exclusive of Alaska*, 60 Fed. Reg. 9894, 9947 (Feb. 22, 1995). That explains why the BLM—which administers the two statutes and issued the relevant regulations—has maintained for decades that corner crossing is unlawful and that members of the public "are not guaranteed access" even when "trying to reach public lands." App. V2:237; *see* Br. 39-42.

---

[8] Defendants also claim, *à la* Woody Guthrie, that there once existed a separate "right to travel through the unimproved lands of the continent," Ans. Br. 33, but it is doubtful this practice was ever sufficiently specific and uninterrupted to become an enforceable custom. Either way, even "right to roam" proponents concede its demise long ago, and trespass law applies to posted land today.

[9] Defendants invoke 43 U.S.C. § 315e, but that provision is a limiting clause, not a grant of rights: "*Nothing contained in this subchapter shall restrict* … ingress or egress over the public lands in [grazing] districts" (emphasis added). Section 315e also does not apply by its terms: It clarifies that even after Congress withdrew the public's right to graze on federal lands, the public could still cross "over" those lands to access private property (not vice versa).

Defendants cannot point to any source of federal law in which Congress "clearly and manifestly" intended to preempt state trespass claims, and they are accordingly liable for their repeated and intentional intrusions on Iron Bar's property.

### III. Legalizing Corner Crossing Is a Policy Choice Involving Difficult Tradeoffs

Corner crossing is a policy preference in search of a legal rationale, as demonstrated by the many, often conflicting arguments of its advocates. But even as policy, corner crossing is controversial: Defendants notably do not dispute that it imposes heavy costs on landowners, the public, and the environment. Such costs may (or may not) outweigh corner crossing's benefits in any given circumstance, but that choice is for policymakers, not courts, to make in ways that respect private property rights. *Cf.* UPOM Br. 2 (states have consistently rejected proposals to legalize corner crossing).

*First*, corner crossing inevitably leads to other trespasses and damage. Recreationists who rely on GPS devices alone cannot reliably corner cross without trespassing because those devices are 5-10 feet off on average and often wrong by 50 feet or more. Br. 54. *Amicus* Backcountry Hunters & Anglers (BHA) responds that recreationists can use GPS to find monuments marking "many" corners. BHA Br. 21. But "many" is not "all," and BHA concedes that other corners have no monument, are impossible to find, or are located in perilous places that "nobody

23

would reasonably" be near otherwise. *Id.*; *see* Br. 54-55.[10] So even if some corners can be easily crossed, most cannot, and recreationists will usually be unable to tell the difference until they have already trespassed. Only if recreationists limit corner crossing to situations where they can see a soda-can-sized brass cap from a greater distance than the maximum error range on their GPS devices—at least 150 feet— can trespassing be realistically avoided. But that limitation would make corner crossing essentially impossible in anything but a barren field.

*Second*, corner crossing also imposes costs on landowners—including trespasses, poaching, littering, fires, predators, and the risk of accidents—that accompany greater public presence near private property. Br. 55-57; *see* UPOM Br. 22; Stock Growers' Br. 3-6. BHA insists that not every recreationist will cause problems. BHA Br. 23. That's true, but not everyone is the BHA's model hunter (or Girl Scout or trick-or-treater). Some significant percentage of corner crossers will undoubtedly inflict harms on landowners and require costly mitigation measures like additional fencing and patrols. *See* App. V4:631-32.

Defendants and their *amici* also do not deny the economic impact of legalizing corner crossing. Br. 56-57. Defendants dismiss the concern, however, by blaming

---

[10] Iron Bar appreciates BHA's offer to rally volunteers to mark these corners, BHA Br. 22, but the proposal just underscores how the legalization of corner crossing would be only the first step in a long and complicated policy program best left to other branches of government.

thousands of landowners for overpaying for their land on the mistaken assumption that corner crossing was unlawful. Supp. App. 60. But that assumption was indisputably reasonable—every relevant authority, from the federal agency tasked with managing federal land to the state authorities charged with enforcing state trespass laws, has repeatedly stated for decades that corner crossing is unlawful. Defendants thus ask this Court to upset legitimate reliance interests valued in the billions of dollars in an area of law where courts have "traditionally recognized the special need for certainty and predictability." *Leo Sheep*, 440 U.S. at 687.

*Third*, legalizing corner crossing may not even materially increase access to public land because landowners might respond by fencing their parcels in ways that hinder access across corners. BHA responds that landowners cannot fence their land "for the sole purpose of preventing access to public land." BHA Br. 25. But landowners would be fencing for a different and admittedly lawful purpose: to defend their land against new threats from poaching, predators, and the like.

*Fourth*, corner crossing can threaten animal habitats and migration corridors by increasing human traffic and inviting greater use of lawful fencing by landowners. Br. 57. If that point were overstated, one would expect a rebuttal from the self-described "conservation and environmental justice groups." Broads Br. 2. Their conspicuous silence is understandable since some of them have spent years litigating the adverse environmental consequences of increased hunting on public

25

lands. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 946-47 (9th Cir. 2023) (suit by *amicus* Sierra Club).

BHA nevertheless steps forward to argue that landowners could "build wildlife-friendly fences." BHA Br. 24. But BHA's own source begins from the premise that "[t]he best situation for wildlife is open habitat with no fences at all." Christine Paige, *A Wyoming Landowner's Handbook to Fences and Wildlife* 8 (2015). Furthermore, that fences *can* be built to accommodate wildlife is unfortunately no guarantee that they *will*. Most aren't: One study estimates that for every two-and-a-half miles of fence in Colorado and Utah, one antelope, deer, or elk is killed annually. *Id.* at 7.[11]



*Finally*, BHA claims that legalizing corner crossing would reverse a decline in hunting participation. BHA Br. 15-20. But opening an additional 2% of federal

---

[11] BHA also claims that increased hunting benefits wildlife by "dispersing them across the landscape," BHA Br. 24, but it cites an article focused on the benefits of such dispersion *for hunters*. *See id.* Fragmenting previously contiguous habitats wreaks havoc on animal populations, *see, e.g.*, Kevin R. Crooks et al., *Quantification of Habitat Fragmentation Reveals Extinction Risk in Terrestrial Mammals*, 114 PNAS 7835 (2017), which is why the Fish & Wildlife Service does not generally try to save endangered species by declaring open season on them.

land to hunting is unlikely to trigger a wave of new enthusiasts previously uninterested in the 240 million acres of land already available. BLM, *Hunting, Fishing and Recreational Shooting* (2023), bit.ly/3OFP1em.

*     *     *

Iron Bar agrees that increasing access to public land is a legitimate goal. But there is no one-size-fits-all path to securing that objective. Sometimes, access can meaningfully be created only through paved roads. *Cf. Leo Sheep*, 440 U.S. 668. Other times, dirt trails may work best. In still other cases, policymakers may decide they do not want any access at all. State and federal governments have the tools to make these case-by-case decisions in a way that balances all relevant interests within a publicly accountable framework that respects private property rights. Br. 58-61. Legalizing corner crossing, by contrast, would stymie these ongoing efforts and upend fundamental tenets of property law in ways that create problems for public and private landowners alike. *See* UPOM Br. 20-22.

Existing initiatives are working, and a few groups' demand for immediate access to public land across private property does not merit trampling the rights of landowners nationwide—especially when doing so would contravene property law, common sense, and the uniform understanding of every relevant authority that corner crossing is unlawful.

# CONCLUSION

Iron Bar respectfully asks the Court to reverse the decision below.

Respectfully submitted,

*/s/ R. Reeves Anderson*

Megan Overmann Goetz
PENCE AND MACMILLAN LLC
501 E. Garfield
P.O. Box 1285
Laramie, WY 82073
(307) 745-3626
movermann@penceandmac.com

Robert Reeves Anderson
Brian M. Williams
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
(303) 863-1000
reeves.anderson@arnoldporter.com
brian.williams@arnoldporter.com

Sean A. Mirski
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 942-5000
sean.mirski@arnoldporter.com

February 9, 2024

## CERTIFICATE OF COMPLIANCE

1.       The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii) because the brief contains 6,442 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.       The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.


Dated: February 9, 2024                    */s/ R. Reeves Anderson*
                                             Robert Reeves Anderson

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

I certify that all required privacy redactions have been made in this brief pursuant to 10th Cir. R. 25.5. I further certify that the hard copies of this brief to be submitted to the Court will be exact copies of the version submitted electronically and that the electronic submission of this brief was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Dated: February 9, 2024          */s/ R. Reeves Anderson*
                                  Robert Reeves Anderson

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2024, I electronically filed the foregoing brief with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users.


Dated: February 9, 2024                    */s/ R. Reeves Anderson*
                                             Robert Reeves Anderson